UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **JEHAN ZIBOUKH, MARGRET PHILIE, VERA FIGLOCK, NICOLE MAY, TYANA DAUGHTERY, SOLALIZ HERNANDEZ, DEBRA KRYSTYN, I.E., A MINOR, CYNTHIA RODRIGUEZ, J.P. A MINOR, MIGUEL ACOSTA, VINSON MANGOS, NOAH KUPPER, J.P. A MINOR, CHRISTIAN VEGA, A.H. A MINOR, AND OLAYA BOURAKKADI AMRANI, on behalf of themselves and all others similarly situated,**<br><br>Plaintiffs,<br><br>v.<br><br>**WHALECO INC. D/B/A TEMU, AND PDD HOLDINGS INC. F/K/A PINDUODUO INC.,**<br><br>Defendants. | **Case No. 23-cv-15653**<br><br>CLASS ACTION<br><br><u>JURY TRIAL DEMANDED</u> |

AMENDED CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

Page


I. INTRODUCTION .......... 1

II. PARTIES .......... 6

A. Plaintiffs .......... 6

1. California Plaintiffs .......... 6

2. Illinois Plaintiffs .......... 7

3. Massachusetts Plaintiffs .......... 7

4. New York Plaintiffs .......... 8

5. Virginia Plaintiffs .......... 8

B. Defendants .......... 9

1. PDD Holdings Inc. f/k/a Pinduoduo Inc. .......... 9

2. Whaleco Inc. d/b/a Temu .......... 10

C. Alter Ego and Single Enterprise Allegations .......... 10

III. JURISDICTION AND VENUE .......... 11

IV. BACKGROUND .......... 13

A. Defendant PDD Holdings Inc. Is A Large, Tech-Based Business That Originated In China, Developing An Online Retail App Named Pinduoduo .......... 13

B. PDD Holdings Inc. Recently Developed A Second Online Retail App, Temu, That Is Based On The Pinduoduo App and Which It Aggressively Marketed In The United States .......... 14

C. Experts Have Concluded That Defendants' Temu And Pinduoduo Apps Violate Users' Data Privacy Rights In Multiple Ways .......... 16

1. Temu Violates Users' Data Privacy .......... 17

2. Temu Is Designed To Hide Its Malicious Features. .......... 26

3. Temu Subjects User Data To Misappropriation By Chinese Authorities. .......... 30

D. Defendants Are Violating Plaintiffs' Right to Privacy Of Their Data ..................... 33

E. Defendants Utilize Deceptive, Manipulative, And Unscrupulous Practices To Maximize Their Access To User Data ................................................ 36

F. Defendants Have Collected Personal Information From Minors, Including Minors under The Age of Thirteen ....................................................... 44

G. Additional Allegations Concerning the Named Plaintiffs ....................................... 49

V. CLASS ALLEGATIONS ........................................................................................ 52

VI. APPLICABLE LAW ............................................................................................ 59

VII. COUNTS ........................................................................................................... 60

FIRST COUNT: Violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 ........................................................................................................... 60

SECOND COUNT: Violation of the Electronic Communications Privacy Act of 1986 (ECPA), 18 U.S.C. §§ 2510 *et seq.* ........................................................ 61

THIRD COUNT: Violation of the Right to Privacy Under Mass. Gen. Laws Ch. 214, § 1B ................................................................................................ 65

FOURTH COUNT: Violation of the Massachusetts Wiretap Act, Mass. Gen. Laws, Ch. 272, § 99 ................................................................................... 69

FIFTH COUNT: Trespass to Chattels ....................................................................... 71

SIXTH COUNT: Restitution / Unjust Enrichment ...................................................... 73

SEVENTH COUNT: Violation of Illinois's Biometric Information Privacy Act, 740 ILCS 14/1, *et seq.* .................................................................................... 76

EIGHTH COUNT: Intrusion Upon Seclusion ............................................................ 82

NINTH COUNT: Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. Ann. 505/2 *et seq.* ........................................................ 83

TENTH COUNT: Violation of the California Comprehensive Data Access and Fraud Act, Cal. Pen. C. § 502 ....................................................................... 86

ELEVENTH COUNT: Violation of the Right of Privacy Under the California Constitution ................................................................................................. 87

TWELFTH COUNT: Intrusion Upon Seclusion ......................................................... 90

THIRTEENTH COUNT: Violation of the California Unfair Competition Law, Bus. & Prof. C. §§ 17200 *et seq.* ................................................................. 93

FOURTEENTH COUNT: Violation of the California False Advertising Law, Bus. & Prof. C. §§ 17500 *et seq.* .......... 97

FIFTEENTH COUNT: Violation of the California Invasion of Privacy Act, Cal. Penal Code §§ 630, *et seq.* .......... 99

SIXTEENTH COUNT: Statutory Larceny, Cal. Penal Code §§ 484, 496 .......... 103

SEVENTEENTH COUNT: Conversion .......... 104

EIGHTEENTH COUNT: Violation of the Virginia Computer Crimes Act, Va. Code § 18.2-152.1, *et seq.* .......... 105

NINETEENTH COUNT: Violation of Section 349 of New York General Business Law .......... 108

TWENTIETH COUNT: Violation of New York Right to Privacy Statute, N.Y. Civ. Rights Law § 51 .......... 112

REQUEST FOR RELIEF .......... 113

DEMAND FOR JURY TRIAL .......... 114

Plaintiffs, individually and on behalf of all others similarly situated (the "Class"), bring this class action complaint based upon personal knowledge of the facts pertaining to them and on information and belief based upon investigation of counsel as to all other matters, by and through undersigned counsel, against PDD Holdings Inc. f/k/a Pinduoduo Inc. and Whaleco Inc. d/b/a Temu ("Temu") (collectively, "Defendants").

## I. INTRODUCTION

1. In 2022, Defendants launched an online shopping platform, Temu, in the United States. The Temu mobile app and website (the "Temu platform" or "Temu app"), allows users to purchase low-cost goods manufactured in China.

2. Temu is ultimately owned by the Nasdaq-listed Chinese company PDD Holdings Inc., which runs the Chinese e-commerce giant Pinduoduo, an online shopping platform that is the precursor for the Temu platform (the "Pinduoduo platform" or "Pinduoduo app").

3. The Temu app has become extremely popular. The app was introduced in the United States last year and has been extensively promoted, including in a widely viewed Super Bowl commercial, using the tagline: "Shop like a billionaire." Temu was the most downloaded app in the US for the last few months of 2022 and remained there throughout 2023, achieving more than 100 million users in the United States by May 2023.[1] The Temu app is one of the most popular apps for mobile devices in the United States and the world.

4. However, this growth has a dark side which is the subject of this case. Experts who have reviewed the app have concluded that the "TEMU app is purposefully and intentionally loaded with tools to execute virulent and dangerous malware and spyware activities on user devices

[1] https://www.businessofapps.com/data/temu-statistics/#:~:text=Like%20Wish%20and%20other%20discount,almost%20every%20day%20in%202023.

which have downloaded and installed the TEMU app."[2] In addition, they have concluded that "Temu misled people about how it uses their data."[3]

5. According to these experts, Temu collects user data beyond what is necessary for an online shopping app, including biometric information and data from users of the app. Temu has "a complete arsenal of tools to exfiltrate virtually all the private data on a user's device and perform nearly any malign action upon command trigger from a remote server."[4] Accordingly, it gains access to "literally everything on your phone."[5] This is particularly concerning, given that biometric information such as facial characteristics, voiceprints, and fingerprints are immutable characteristics that can be misused by unscrupulous actors.[6]

6. In addition, experts have concluded that the app collects a greater amount of information from users than is disclosed. Accordingly, users are not able to effectively consent to the collection of their data by the app, given that Defendants have misled users regarding the scope of the data collected from them and the ways in which their data is used.[7] Experts have found that Temu is particularly "dangerous" because it "'bypasses' phone security systems to read a user's private messages, make changes to the phone's settings and track notifications."[8]

---

[2] https://grizzlyreports.com/we-believe-pdd-is-a-dying-fraudulent-company-and-its-shopping-app-temu-is-cleverly-hidden-spyware-that-poses-an-urgent-security-threat-to-u-s-national-interests/.

[3] https://www.politico.eu/article/booming-chinese-shopping-app-temu-faces-western-scrutiny-over-data-security-2/.

[4] https://grizzlyreports.com/we-believe-pdd-is-a-dying-fraudulent-company-and-its-shopping-app-temu-is-cleverly-hidden-spyware-that-poses-an-urgent-security-threat-to-u-s-national-interests/.

[5] https://www.komando.com/kims-column/temu-security-concerns/883861/.

[6] https://www.compassitc.com/blog/temu-app-poses-potential-data-risk-for-consumers#:~:text=The%20U.S%20has%20accused%20Temu,vulnerabilities%20in%20Android%20operating%20systems.

[7] https://www.politico.eu/article/booming-chinese-shopping-app-temu-faces-western-scrutiny-over-data-security-2/.

[8] https://www.ibtimes.com/after-tiktok-montana-bans-wechat-temu-telegram-government-devices-3694060.

7. As a result of such privacy violations, it has been reported that Apple recently concluded that the Temu app "violated the company's mandatory privacy rules."[9] Indeed, experts have found "smoking gun evidence" that the "widely downloaded shopping app TEMU is the most dangerous malware/spyware package currently in widespread circulation."[10]

8. Moreover, experts have found that Defendants have gone to great lengths to conceal their privacy violations from Temu's users so that Defendants may continue to steal their data. "It is evident that great efforts were taken to intentionally hide the malicious intent and intrusiveness of the software."[11]

9. These privacy violations are particularly concerning because Temu is a Chinese-owned company. As a result, the data collected by the Temu app is ultimately available to individuals and entities in China. Under Chinese law, in turn, such user data possessed by, controlled by, or accessible to individuals and entities in China may be demanded by the government at any time. The accessibility of user data to Chinese entities and ultimately the Chinese Communist Party and the Chinese government is not adequately disclosed to users of the Temu app.

10. Such concerns regarding data privacy associated with Temu and other Chinese-owned apps have led government entities to ban or restrict their use. As with other Chinese-owned apps, such as the TikTok app, Temu conveys "data to its Chinese parent company, [and] is legally

[9] https://www.politico.eu/article/booming-chinese-shopping-app-temu-faces-western-scrutiny-over-data-security-2/.

[10] https://grizzlyreports.com/we-believe-pdd-is-a-dying-fraudulent-company-and-its-shopping-app-temu-is-cleverly-hidden-spyware-that-poses-an-urgent-security-threat-to-u-s-national-interests/.

[11] *Id.*

unable to refuse to share data to the Chinese Government."[12] Accordingly, the State of Montana recently banned the Temu app from government devices due to its significant concerns regarding the privacy of user data.[13] Likewise, Defendants are currently the subject of a congressional investigation based on "concerns about Temu and the amount of data collected."[14]

11. These recent revelations regarding Temu's data privacy violations are merely the latest in a string of privacy violations committed by the Defendants. As noted, the Temu app was a successor to the Pinduoduo online shopping app, which is owned by Temu's parent company, Defendant PDD Holdings Inc. As with Temu, the Pinduoduo app has also been noted for its significant privacy violations. For example, the Pinduoduo app was recently suspended from the Google Play Store "due to the presence of malware on the Pinduoduo app that exploited vulnerabilities in Android operating systems." According to reports, "Company insiders said the exploits were utilized to spy on users and competitors, allegedly to boost sales."[15] It has been reported that the same software engineers who developed the Pinduoduo app also worked on the Temu app.[16]

12. Defendants have sought to maximize their access to user data and their profits by implementing fundamentally unfair and deceptive trade practices. Defendants employ a variety of manipulative and deceptive business practices in an effort to get users to urge friends and

---

[12] *See* https://inc.com/jason-aten/the-department-of-defense-is-warning-people-not-to-use-tiktok-over-national-security-concerns.html.

[13] https://www.ibtimes.com/after-tiktok-montana-bans-wechat-temu-telegram-government-devices-3694060.

[14] https://d1dth6e84htgma.cloudfront.net/CCP_Marketplace_Letter_to_Whaleco_Inc_Temu_7f921e1a67.pdf.

[15] https://www.compassitc.com/blog/temu-app-poses-potential-data-risk-for-consumers#:~:text=The%20U.S%20has%20accused%20Temu,vulnerabilities%20in%20Android%20operating%20systems.

[16] https://nypost.com/2023/08/05/why-the-chinese-shopping-app-is-a-scam/.

acquaintances to sign up for the Temu app, thereby subjecting new users' data to unlawful collection by Defendants. "TEMU is able to hack your phone from the moment you install the app, overriding the data privacy settings you think you have in place, as well as your intentions, helping itself to your contact list, your precise location, in some cases, control of your camera, screenshots of the apps running on your screen, and, depending on the permissions you may have given when you installed the app, your SMS text messages and other documents you may have on your phone."[17]

13. This is a proposed nationwide class action alleging violations of the Computer Fraud and Abuse Act, 18 U.S.C. § 103; Electronic Communications Privacy Act of 1986 (ECPA), 18 U.S.C. §§ 2510 *et seq.*; the right to privacy under Mass. Gen. Laws Ch. 214, § 1B; the Massachusetts Wiretap Act, Mass. Gen. Laws, Ch. 272, § 99; trespass to chattels; and restitution/unjust enrichment. There are three nationwide classes—one on behalf of Temu users, one on behalf of minor Temu users, and one on behalf of non-users who communicated electronically with Temu users. In addition, the complaint contains subclasses for adults and minors asserting additional state-law claims under Illinois, California, Massachusetts, New York and Virginia law, including claims under Illinois's Biometric Information Privacy Act, 740 ILCS 14/1, *et seq*.

[17] https://grizzlyreports.com/we-believe-pdd-is-a-dying-fraudulent-company-and-its-shopping-app-temu-is-cleverly-hidden-spyware-that-poses-an-urgent-security-threat-to-u-s-national-interests/.

## II. PARTIES

### A. Plaintiffs

#### 1. California Plaintiffs

14. **Nicole May** is a resident of Santa Clarita, California. She downloaded the Temu app and purchased products on the platform, thereby subjecting her personal and private data to misappropriation by Defendants. She asserts claims for the California Subclass of Temu users and the nationwide Class of Temu users as defined below.

15. **Tyana Daugherty** is a resident of Los Angeles, California. She downloaded the Temu app, thereby subjecting her personal and private data to misappropriation by Defendants. She asserts claims for the California Subclass of Temu users and the nationwide Class of Temu users as defined below.

16. **Solaliz Hernandez** is a resident of Sylmar, California. She downloaded the Temu app, thereby subjecting her personal and private data to misappropriation by Defendants. She asserts claims for the California Subclass of Temu users and the nationwide Class of Temu users as defined below.

17. **I.E., a minor,** is a resident of Los Angeles, California, and brings this suit by and through his mother and legal guardian, Jamilah Crane, who is also a resident of Los Angeles, California. I.E. accessed the Temu app while he was under the age of 13, thereby subjecting his personal and private data to misappropriation by Defendants. He asserts claims for the California Subclass of minor users and the nationwide Class of minor users.

18. **Plaintiff Cynthia Rodriguez** is a resident of North Hollywood, California. She had electronic communications with a Temu user, and had her data stored on a device used by a Temu

user, but she is not a Temu user herself. She asserts claims for the California Subclass of Temu Non-Users and the nationwide Class of Temu Non-Users as defined below.

**2. Illinois Plaintiffs**

19. **Debra Krystyn** is a resident of Chicago, Illinois. She downloaded the Temu app and purchased products on the platform, thereby subjecting her personal and private data to misappropriation by Defendants. She asserts claims for the Illinois Subclass of Temu users and the nationwide Class of Temu users as defined below.

20. **J.P., a minor,** is a resident of Pekin, Illinois, and brings this suit by and through his father and legal guardian, Bryan Massey, who is also a resident of Pekin, Illinois. J.P. accessed the Temu app while he was under the age of 13, thereby subjecting his personal and private data to misappropriation by Defendants. He asserts claims for the Illinois Subclass of minor users and the nationwide Class of minor users as defined below.

21. **Miguel Acosta** is a resident of Chicago, Illinois. He had electronic communications with a Temu user, and had his data stored on a device used by a Temu user, but he is not a Temu user himself. He asserts claims for the Illinois Subclass of Temu Non-Users and the nationwide Class of Temu Non-Users as defined below.

**3. Massachusetts Plaintiffs**

22. **Margret Philie** is a resident of Middleborough, Massachusetts. She downloaded the Temu app and purchased products on the platform, thereby subjecting her personal and private data to misappropriation by Defendants. She asserts claims for the Massachusetts Subclass of Temu users and the nationwide Class of Temu users as defined below.

23. **Vera Figlock** is a resident of Taunton, Massachusetts. She downloaded the Temu app and purchased products on the platform, thereby subjecting her personal and private data to

misappropriation by Defendants. She asserts claims for the Massachusetts Subclass of Temu users and the nationwide Class of Temu users as defined below.

24. **Vinson Mangos** is a resident of Fitchburg, Massachusetts. He had electronic communications with a Temu user, and had his data stored on a device used by a Temu user, but he is not a Temu user himself. He asserts claims for the Massachusetts Subclass of Temu Non-Users and the nationwide Class of Temu Non-Users as defined below.

**4. New York Plaintiffs**

25. **Noah Kupper** is a resident of New York, New York. He downloaded the Temu app and purchased products on the platform, thereby subjecting his personal and private data to misappropriation by Defendants. He asserts claims for the New York Subclass of Temu Users and the nationwide Class of Temu users as defined below.

26. **J.P., a minor,** is a resident of Yonkers, New York, and brings this suit by and through his mother and legal guardian, Gissell Fernandez, who is also a resident of Yonkers, New York. J.P. accessed the Temu app while he was under the age of 13, thereby subjecting his personal and private data to misappropriation by Defendants. He asserts claims for the New York Subclass of minor users and the nationwide Class of minor users as defined below.

27. **Christian Vega** is a resident of Kew Gardens, New York. He had electronic communications with a Temu user, and had his data stored on a device used by a Temu user, but he is not a Temu user himself. He asserts claims for the New York Subclass of Temu Non-Users and the nationwide Class of Temu Non-Users as defined below.

**5. Virginia Plaintiffs**

28. **Jehan Ziboukh** is a resident of Richmond, Virginia, who initially downloaded and used the Temu app when she was a minor, thereby subjecting her personal and private data to

misappropriation by Defendants. She asserts claims for the Virginia Subclass of Temu users and the nationwide Class of Temu users as defined below.

29. **A.H., a minor,** is a resident of Evington, Virginia, and brings this suit by and through her legal guardian, Tracey Johnson, who is also a resident of Evington, Virginia. A.H. downloaded the Temu app while she was under the age of 13, thereby subjecting her personal and private data to misappropriation by Defendants. She asserts claims for the Virginia Subclass of minor users and the nationwide Class of minor users as defined below.

30. **Olaya Bourakkadi Amrani** is a resident of Woodridge, Virginia. She had electronic communications with a Temu user, and had her data stored on a device used by a Temu user, but she is not a Temu user herself. She asserts claims for the Virginia Subclass of Temu Non-Users and the nationwide Class of Temu Non-Users as defined below.

## B. Defendants

### 1. PDD Holdings Inc. f/k/a Pinduoduo Inc.

31. **Defendant PDD Holdings Inc.,** is a company that was founded in China in 2015 under the name Pinduoduo. It owns and operates a portfolio of businesses and is listed on the Nasdaq exchange in the United States. Among other things, PDD Holdings Inc., operates the Pinduoduo e-commerce platform that offers products in various categories, including agricultural produce, apparel, shoes, bags, mother and childcare products, food and beverage, electronic appliances, furniture and household goods, cosmetics and other personal care, sports and fitness items and auto accessories. It also owns the company that operates the Temu online marketplace. PDD Holdings Inc., was formerly known as Pinduoduo Inc., with headquarters in Shanghai, China. PDD Holdings Inc. claims that in February 2023, it moved its "principal executive offices"

from Shanghai, China to Dublin, Ireland.[18] However, it continues to have significant operations in China, with multiple subsidiaries located within China. PDD Holdings Inc., is registered in the Cayman Islands.

### 2. Whaleco Inc. d/b/a Temu

32. **Defendant Whaleco Inc.,** ("Temu") is, and at all relevant times was, a corporation incorporated in Delaware and headquartered in Boston, Massachusetts. Temu is an online marketplace operated by the Chinese e-commerce company PDD Holdings Inc. It offers heavily discounted goods that are mostly shipped to consumers directly from China.

## C. Alter Ego and Single Enterprise Allegations

33. Defendants do not function as separate and independent corporate entities. To the contrary, Defendant Temu is directly controlled by Defendant PDD Holdings Inc.

34. At all relevant times, Defendant PDD Holdings Inc., has directed the operations of Defendant Temu with respect to the Temu app, and Defendant Temu has reported to Defendant PDD Holdings Inc.

35. Moreover, employees from Defendant PDD Holdings Inc., performed work on the Temu app, including software engineers who previously developed the Pinduoduo app for PDD Holdings Inc.

36. Defendant PDD Holdings Inc., made key strategy decisions for Defendant Temu, which was charged with executing such decisions.

37. At all relevant times, and in connection with the matters alleged herein, each Defendant acted as an agent, servant, partner, joint venturer, and/or alter ego of the other

---

[18] https://www.cnbc.com/2023/05/04/chinas-pdd-holdings-parent-of-temu-moves-headquarters-to-ireland.html.

Defendant, and acted in the course and proper scope of such agency, partnership, and relationship and/or in furtherance of such joint venture. Each Defendant acted with the knowledge and consent of the other Defendant and/or directed, authorized, affirmed, consented to, ratified, encouraged, approved, adopted and/or participated in the acts or transactions of the other Defendant.

38. At all relevant times, and in connection with the matters alleged herein, Defendants constituted a single enterprise with a unity of interest. Nonetheless, as detailed further below, each Defendant is also directly liable based on its own actions independent of any alter ego or single enterprise theory of liability.

## III. JURISDICTION AND VENUE

39. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) & 1367 because: (i) this is a class action in which the matter in controversy exceeds the sum of $5,000,000, exclusive of interest and costs; (ii) there are 100 or more class members; and (iii) some members of the class are citizens of states different from some Defendants, and also because a Defendant is a citizen or subject of a foreign state.

40. This Court has personal jurisdiction over Defendants because: (i) they transact business in the United States, including in this District; (ii) they have substantial aggregate contacts with the United States, including in this District; and (iii) they engaged and are engaging in conduct that has and had a direct, substantial, reasonably foreseeable, and intended effect of causing injury to persons throughout the United States, including in this District, and they purposely availed themselves of the laws of the United States.

41. This Court further has personal jurisdiction with respect to the claims of the Illinois Subclass (defined below) because Defendants used and disseminated data derived directly

from Illinois-based Temu users and exposed residents of Illinois to ongoing privacy risks within Illinois based on the collection, capture, obtainment, disclosure, redisclosure and dissemination of their biometric identifiers and information. Furthermore, many of the images or other data Defendants used for their unlawful collection, capture and obtainment of biometric identifiers and information were created in Illinois, uploaded from Illinois, and/or managed via Illinois-based user accounts, computers, and mobile devices. Because of the scope and magnitude of Defendants' conduct, Defendants knew that their collection, capture, obtainment, disclosure, redisclosure and dissemination of impacted individuals' biometric identifiers and information would injure Illinois residents and citizens. Defendants knew or had reason to know that collecting, capturing, obtaining, disclosing, redisclosing and disseminating Illinois citizens' and residents' biometric identifiers and information without providing the requisite notice or obtaining the requisite releases would deprive Illinois citizens and residents of their statutorily-protected privacy rights, neutralize Illinois citizens' and residents' ability to control access to their biometric identifiers and information via their Illinois-managed devices and exposed minors and other in Illinois to potential surveillance and other privacy harms as they went about their lives within the state.

42. Furthermore, through the Temu app, Defendants actively collect information harvested from the Illinois-based devices of Illinois residents, including location information based on users' SIM cards and/or IP addresses.

43. Defendants use this harvested information to provide users with location-based services directed toward Illinois.

44. Defendants' deliberate gathering of Illinois users' personally identifiable information is intentionally targeted toward Illinois residents, including Plaintiffs and the Class, and constitutes purposeful activity directed at devices and individuals in Illinois.

45. In addition, Defendants transacted business in the State with Illinois residents and shipped merchandise into the state in exchange for payments made by Illinois residents.

46. Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the acts or omissions giving rise to the claims alleged herein occurred in Illinois. Alternatively, venue is proper under 28 U.S.C. § 1391(b)(3) because this Court has personal jurisdiction over Defendants.

## IV. BACKGROUND

### A. Defendant PDD Holdings Inc. Is A Large, Tech-Based Business That Originated In China, Developing An Online Retail App Named Pinduoduo

47. Defendant PDD Holdings Inc. is a large tech conglomerate that was founded in 2015 by Chinese businessman and software engineer Colin Huang. It is one of China's largest companies with an estimated valuation of more than $100 billion.[19] In the last year alone, the conglomerate achieved a gross operating profit of more than $4 billion.[20] Its total revenue for the year was nearly $19 billion.[21]

48. PDD Holdings Inc. operates a series of subsidiaries in China and has long maintained its corporate headquarters in Shanghai, China. However, in an effort to obscure its connections to China, PDD Holdings Inc., recently disclosed that it was moving its "principal

[19] https://www.wsj.com/market-data/quotes/PDD.

[20] https://investor.pddholdings.com/news-releases/news-release-details/pdd-holdings-announces-fourth-quarter-2022-and-fiscal-year-2022.

[21] *Id.*

executive offices" to Dublin, Ireland. Nonetheless, the vast majority of PDD Holdings Inc.'s business operations, including several subsidiaries, continue to be located in China.

49. Among other business activities, PDD Holdings Inc., operates Pinduoduo, an e-commerce platform created in China that offers products in various categories, including agricultural produce, apparel, shoes, bags, mother and childcare products, food and beverage, electronic appliances, furniture and household goods, cosmetics and other personal care, sports and fitness items and auto accessories.

50. Pinduoduo was developed in China by PDD Holdings Inc. to compete with Chinese online retailers Alibaba and JD.com by selling low-priced goods. The Pinduoduo app serves as a marketplace that recruits China-based suppliers to offer products and provides a range of low-cost products to consumers who visit its site.

**B. PDD Holdings Inc. Recently Developed A Second Online Retail App, Temu, That Is Based On The Pinduoduo App and Which It Aggressively Marketed In The United States**

51. Defendant PDD Holdings Inc., subsequently developed a second online retail app, the Temu app, that was based on the Pinduoduo app. Indeed, many of the same software engineers who developed Pinduoduo also worked on what became known as the Temu app.[22] Nonetheless, as with PDD Holdings, Defendants have sought to obscure Temu's relationship to China (and to the precursor Pinduoduo app) by asserting publicly that "the Temu platform operates primarily in the United States."[23]

[22] https://nypost.com/2023/08/05/why-the-chinese-shopping-app-is-a-scam/.
[23] PDD Holdings Inc. Annual Report (2022).

52. Defendants made the Temu app available to consumers in the United States in September 2022. Since that time, Defendants have heavily promoted the Temu app, including through television advertisements, large online ad campaigns, and sponsorships. Temu's marketing budget for 2023 alone is reportedly more than $7 billion; in contrast, Walmart's 2022 marketing budget was only $3.9 billion.[24]

53. Like the Pinduoduo app, the Temu app provides a marketplace for Chinese suppliers to offer their products. However, the Temu app also handles delivery, promotion and after-sales services for merchants on its platform. Temu's network now includes more than 80,000 suppliers.[25]

54. Defendants market the Temu app as offering "affordable, quality products," claiming Temu sells "the best products globally,"[26] and they have positioned it to compete with online retail companies such as Amazon. Defendants market the app using the tagline "Shop Like a Billionaire" to communicate to consumers that the app provides significant value to consumers by providing them access to deeply discounted goods that are comparable in quality to higher-priced goods offered by other retailers.

[24] https://grizzlyreports.com/we-believe-pdd-is-a-dying-fraudulent-company-and-its-shopping-app-temu-is-cleverly-hidden-spyware-that-poses-an-urgent-security-threat-to-u-s-national-interests/.

[25] https://selectcommitteeontheccp.house.gov/sites/evo-subsites/selectcommitteeontheccp.house.gov/files/evo-media-document/fast-fashion-and-the-uyghur-genocide-interim-findings.pdf.

[26] https://www.temu.com/about-temu.html?_x_vst_scene=adg&_x_ads_sub_channel=search&_x_ads_channel=google&_x_ads_account=1213016319&_x_ads_set=19694142866&_x_ads_id=141345685810&_x_ads_creative_id=648389974220&_x_ns_source=g&_x_ns_gclid=EAIaIQobChMIp-qu7uHrgQMVzOHjBx3NbwNPEAAYASAAEgJG7vD_BwE&_x_ns_placement=&_x_ns_match_type=e&_x_ns_ad_position=&_x_ns_product_id=&_x_ns_target=&_x_ns_devicemodel=&_x_ns_wbraid=CjkKCQjwyY6pBhDkARIoAIxVarMMiImKANb_YPCex1QlQIP18Qo6VyWLbo5bKiA0ncz9-bGx8hoCReg&_x_ns_gbraid=0AAAAAo4mICFRpdcyS3-Cw22-MR1T_CF7V&_x_ns_keyword=temu&_x_ns_targetid=kwd-5681707004&refer_page_name=home&refer_page_id=10005_1696950675462_i3umf3qzlf&refer_page_sn=10005&_x_sessn_id=hbzdvage0f.

55. Defendants have used a variety of mechanisms to aggressively market the app in the United States. Among other things, in February 2023, Temu ran an advertisement promoting the app during the Super Bowl. In addition to the initial and subsequent views of the advertisement on television, the ad has received more than 341 million views online on the YouTube app alone.[27]

56. As a result of Defendants' heavy promotion of the Temu app, it has experienced exponential growth. It has become one of the most popular apps available in the United States, and already has more than 100 million active users.[28] As a result, the market capitalization of Defendant PDD Holdings has swelled to approximately $135 billion.[29]

57. Temu users purchase billions of dollars of goods on the Temu app, through millions of individual transactions. As a result, Temu is responsible for tens of millions of shipments that are sent to the United States each year through Temu's network of more than 80,000 China-based sellers participating in its online marketplace.[30]

**C. Experts Have Concluded That Defendants' Temu And Pinduoduo Apps Violate Users' Data Privacy Rights In Multiple Ways**

58. Temu has been identified as one of the Chinese-affiliated apps that pose a significant threat to user data privacy. Experts in the field as well as government authorities have repeatedly noted the security risks associated with China-affiliated apps such as Tiktok and Temu,

---

[27] https://www.latimes.com/business/story/2023-06-15/temu-sells-products-linked-to-forced-labor-in-china.

[28] https://www.businessofapps.com/data/temu-statistics/#:~:text=Like%20Wish%20and%20other%20discount,almost%20every%20day%20in%202023.

[29] https://grizzlyreports.com/we-believe-pdd-is-a-dying-fraudulent-company-and-its-shopping-app-temu-is-cleverly-hidden-spyware-that-poses-an-urgent-security-threat-to-u-s-national-interests/.

[30] https://selectcommitteeontheccp.house.gov/sites/evo-subsites/selectcommitteeontheccp.house.gov/files/evo-media-document/fast-fashion-and-the-uyghur-genocide-interim-findings.pdf.

which violate users' data privacy rights in multiple ways. Such observations have led to restrictions of such Chinese apps and outright bans due to data privacy concerns.

**1. Temu Violates Users' Data Privacy.**

59. Analysts have concluded that Temu specifically is using the inducement of low-cost Chinese-made goods to lure users into unknowingly providing unwarranted and broad-ranging access to their private data in ways that are deceptive.

60. Such concerns began to emerge after Temu's precursor, the Pinduoduo app, was pulled from Google's Play Store due to the presence of malware on the app that exploited vulnerabilities in Android operating systems. According to one report put out by an IT security firm, "Company insiders said the exploits were utilized to spy on users and competitors, allegedly to boost sales. Pinduoduo requested as many as 83 permissions, including access to biometrics, Bluetooth, and Wi-Fi network information. Temu is not as aggressive in its data requests as Pinduoduo, although the fact that Temu requests 24 permissions, including access to Bluetooth and Wi-Fi network information, is a cause for concern. These permissions might seem innocuous at first glance, but cybersecurity experts argue there is no need for an e-commerce app to store biometric data, and any request to do so should be treated with suspicion. Unlike passwords, biometric data like fingerprints cannot be changed, which makes them a lucrative target for cybercriminals."[31]

61. Analysts, including experts at Google, concluded that the Pinduoduo app was covertly collecting private and personal data from users without their knowledge and consent,

[31] https://www.compassitc.com/blog/temu-app-poses-potential-data-risk-for-consumers#:~:text=The%20U.S%20has%20accused%20Temu,vulnerabilities%20in%20Android%20operating%20systems.

including highly sensitive biometric data contained on users' devices. These functions were not accidental—they were intentionally built into the design of the app: "Pinduoduo's malware was not a fringe or circumstantial effort. PDD recruited and hired a team of 100 programmers to find and exploit OEM customizations of Android (installed on mainstream brands of low-priced smartphones), intending to exploit vulnerabilities audited less often than the mainline Android codebase (estimates of over 50 such vulnerabilities were targeted)."[32]

62. Moreover, even after Defendants made changes to the Pinduoduo app in response to the suspension, it continued to violate users' privacy rights. For example, multiple security vendors continue to rate Pinduoduo as "malicious", as reported by the malware statistics service VirusTotal.com.

63. Analysts further concluded that Pinduoduo's data privacy policies and practices were deceptive and that many of the features of the Pinduoduo app that were problematic were shared with the Temu app. Indeed, it has been reported that Apple recently expressed similar concerns regarding the Temu app, concluding that the app did not comply with Apple's data privacy standards and that Temu was misleading users regarding how their data is being used. As an investigation published by *Politico* noted: "Apple said Temu previously violated the company's mandatory privacy rules. It said it had found that Temu misled people about how it uses their data. Temu's so-called privacy nutrition labels — descriptions about the types of data an app can access, how it does so and what it uses them for — did not accurately reflect its privacy policy, said Apple. Temu also isn't letting users choose not to be tracked on the internet."[33]

[32] https://grizzlyreports.com/we-believe-pdd-is-a-dying-fraudulent-company-and-its-shopping-app-temu-is-cleverly-hidden-spyware-that-poses-an-urgent-security-threat-to-u-s-national-interests/.

[33] https://www.politico.eu/article/booming-chinese-shopping-app-temu-faces-western-scrutiny-over-data-security-2/.

64. Such concerns have also been expressed recently by government authorities who have examined the app. For example, the State of Montana recently banned the Temu app on government devices, along with other Chinese apps that have engaged in data privacy violations, such as TikTok.[34] As the State's Chief Information Officer noted when the action was announced, it was implemented to ban apps that pose a "risk of foreign adversaries obtaining Montanans' personal, private, sensitive information and data" from government-issued devices.[35]

65. U.S. authorities have also raised concerns regarding Temu's data practices. For example, in April 2023, the U.S.-China Economic and Security Review Commission, a government entity established by Congress to investigate, assess, and report annually on the national security implications of the economic relationship between the United States and the People's Republic of China, issued a report noting the significant data risks associated specifically with the Temu app.[36]

66. Similarly, on December 20, 2023, members of Congress from the Committee on Energy and Commerce sent Defendants a letter demanding a variety of information relating to their data collection practices, noting "Security officials have cited concerns about Temu and the amount of data collected." The letter indicated that Congress was "concerned that China may be able to exploit lax data security practices or backdoors to access user information, much like the concerns we have raised regarding TikTok," observing that, "[f]rom 2014 to 2017, the Chinese

---

[34] https://www.ibtimes.com/after-tiktok-montana-bans-wechat-temu-telegram-government-devices-3694060.

[35] *Id.*

[36] https://www.uscc.gov/research/shein-temu-and-chinese-e-commerce-data-risks-sourcing-violations-and-trade-loopholes.

Communist Party (CCP) passed several laws requiring all Chinese tech companies to allow CCP officials access to user data."[37]

67. Technical analyses have concluded that the Temu app is "even more 'malicious' than the suspended pinduoduo-6-49-0 app."[38] As analysts have observed, the scope of the data collected by Temu is sweeping and goes well beyond the scope of the data that is needed to run an online shopping app. As one commentator noted, in addition to Bluetooth and Wi-Fi access, "Temu gains full access to all your contacts, calendars, and photo albums, plus all your social media accounts, chats, and texts. In other words, literally everything on your phone.... No shopping app needs this much control, especially one tied to Communist China."[39] As another commentator observed in commenting on the Montana ban: "'Temu is dangerous,' said tech writer Albert Khoury,' warning that the app 'bypasses' phone security systems to read a user's private messages, make changes to the phone's settings and track notifications."[40]

68. One technical investigation of the app published by an analyst firm on September 6, 2023, concluded that the "TEMU app is purposefully and intentionally loaded with tools to execute virulent and dangerous malware and spyware activities on user devices which have downloaded and installed the TEMU app."[41] The analysis went so far as to claim that Defendant PDD Holdings was a "fraudulent company" and that "its shopping app TEMU is cleverly hidden

[37]https://d1dth6e84htgma.cloudfront.net/CCP_Marketplace_Letter_to_Whaleco_Inc_Temu_7f921e1a67.pdf.

[38] https://grizzlyreports.com/we-believe-pdd-is-a-dying-fraudulent-company-and-its-shopping-app-temu-is-cleverly-hidden-spyware-that-poses-an-urgent-security-threat-to-u-s-national-interests/.

[39] https://www.komando.com/kims-column/temu-security-concerns/883861/.

[40] https://www.ibtimes.com/after-tiktok-montana-bans-wechat-temu-telegram-government-devices-3694060.

[41] https://grizzlyreports.com/we-believe-pdd-is-a-dying-fraudulent-company-and-its-shopping-app-temu-is-cleverly-hidden-spyware-that-poses-an-urgent-security-threat-to-u-s-national-interests/.

spyware that poses an urgent security threat to U.S. national interests."[42] Indeed, the analysis purported to provide "smoking gun evidence" that the "widely downloaded shopping app TEMU is the most dangerous malware/spyware package currently in widespread circulation."[43]

69. Among the primary findings of the report were the following:

a. "The app has hidden functions that allow for extensive data exfiltration unbeknown to users, potentially giving bad actors full access to almost all data on customers' mobile devices."

b. "It is evident that great efforts were taken to intentionally hide the malicious intent and intrusiveness of the software."

c. "We engaged numerous independent data security experts to decompile and analyze TEMU app's code, integrated with experts of our own staff, and analysts who have written independently in the public domain."

d. "Contributing to the danger of mass data exfiltration is the fast uptake rate of the TEMU app: over 100 million app downloads in the last 9 months, all in U.S. and Europe. TEMU is not offered in China."

e. "The TEMU app development team includes 100 engineers who built the Pinduoduo app, which earned a suspension from the Google Play Store."

f. "Pinduoduo app got reinstated by removing the 'bad parts,' some of which were identically utilized as components of the TEMU app, strongly indicating malicious intent."

---

[42] *Id.*

[43] *Id.*

g. "We strongly suspect that TEMU is already, or intends to, illegally sell stolen data from Western country customers to sustain a business model that is otherwise doomed for failure."[44]

70. Specifically, the analysis concluded that the Temu app contains malware, spyware, and other means to "plunder" user data: "TEMU has laid an extensive software foundation to recklessly plunder its customers' data. Our staff analysis, verified by numerous expert confirmations, both proprietary experts we hired, plus those independently published in the public domain, find malware, spyware, and several levels of exceptionally threatening software behavior."[45]

71. The analysis further found that the Temu app has the capability to hack users' phones and override data privacy settings that users have purposely set to prevent their data from being accessed: "So in exchange for that super low, too-good-to-be-true price on some gadget, we warn you that TEMU is able to hack your phone from the moment you install the app, overriding the data privacy settings you think you have in place, as well as your intentions, helping itself to your contact list, your precise location, in some cases, control of your camera, screenshots of the apps running on your screen, and, depending on the permissions you may have given when you installed the app, your SMS text messages and other documents you may have on your phone."[46]

72. Technical analysis of the Temu app found "all the signs of red-flag concern," noting that "[t]he calls to outside device data and functions that violate users' privacy are far more aggressive than any well-known consumer shopping app." As depicted in the chart below, the

---

[44] *Id.*

[45] *Id.*

[46] *Id.*

analysis found "a stack of software functions that are completely inappropriate to and dangerous in this type of software"[47]:

| | Security issue | TEMU | SHEIN | Alibaba.com | Amazon | TikTok | eBay |
|---|---|---|---|---|---|---|---|
| 1 | Local compiling with "package compile" executed with **getRuntime.exec()** | Yes | No | No | No | No | No |
| 2 | Requesting information if app runs with root rights ("superuser") | Yes | Yes | Yes | Yes | No | Yes |
| 3 | Request process list with "**getRunningAppProcesses()**" | Yes | Yes | Yes | Yes | Yes | Yes |
| 4 | Requesting system logs from "/system/bin/logcat" | Yes | No | No | No | No | No |
| 5 | Accessing debugger status with "**Debug.isDebuggerConnected()**" | Yes | Yes | Yes | Yes | No | Yes |
| 6 | Reading and writing system files in "sys/devices/" | Yes | Yes | Yes | Yes | Yes | No |
| 7 | Accessing external storage with "ExternalStorage" | Yes | Yes | Yes | Yes | Yes | Yes |
| 8 | Making screenshots ("**getRootView()**", "**peekDecorView()**" in "**getWindow()**") | Yes | Yes | Yes | Yes | Yes | No |
| 9 | Requesting the MAC address | Yes | Yes | Yes | Yes | No | Yes |
| 10 | Putting MAC address into a JSON to send the information to server | Yes | No | No | No | No | No |
| 11 | Code obfuscation with most JAVA code: unnamed files, folders, functions | Yes | No | No | No | Yes | No |
| 12 | android.permission.**CAMERA** | Yes | Yes | Yes | Yes | Yes | Yes |
| 13 | android.permission.**WRITE_EXTERNAL_STORAGE** | Yes | Yes | Yes | Yes | Yes | Yes |
| 14 | android.permission.**RECORD_AUDIO** | Yes | No | Yes | Yes | Yes | No |
| 15 | android.permission.**INSTALL_PACKAGES** | Yes | No | No | No | No | No |
| 16 | android.permission.**INTERNET** | Yes | No | Yes | Yes | No | No |
| 17 | android.permission.**WAKE_LOCK** | Yes | No | Yes | No | No | No |
| 18 | Putting location information into JSON to send the information to server | Yes | No | No | Yes | No | No |

73. For example, the "TEMU app is referencing systems data outside the bounds of TEMU's own app. TEMU seemingly reads the user's system logs. This gives TEMU the ability to track user actions with other apps running on the user's device."[48]

74. The app also collects identifying information unique to a user's device. Specifically, "TEMU asks for the MAC address, and other device information, and inserts it into a JSON object to be sent to the server. This is especially aggressive. Why does a shopping app need a database of technical details of their customers' devices?"[49]

75. The Temu app also has the capability to take screenshots of user phones and store those to a file, which can be another way to "spy on customers' activities" with respect to other programs and data. Again, there is no legitimate reason for a function like this, given that Temu is a shopping app.[50]

---

[47] *Id.*
[48] *Id.*
[49] *Id.*
[50] *Id.*

76. Temu also has the ability to read and transmit files on the user's system "with little or no encryption." Again, there is no legitimate reason that a shopping app would seek to intentionally lower encryption standards for its users.[51]

77. Temu can access users' cameras and microphones whenever the app is running. While users can upload photos using the Temu app, there is no reason that a shopping app would require the unrestricted ability to control users' cameras and microphones at all times. Moreover, such a function provides another means by which the Temu app can surreptitiously collect user biometric data and information such as video, facial image, and voiceprint data.[52]

78. Temu is particularly malicious because much of the data collection occurs as soon as the app is downloaded. As reported in a recent technical report: "'TEMU sends a lot of detailed user and system data elements as soon as the app is loaded.' The user's system gets queried in detail, so all that information is available to send to TEMU servers. (As noted above, this includes the device's unique MAC address.) No user permission is required to gather any of this category of information." Temu contains "a complete arsenal of tools to exfiltrate virtually all the private data on a user's device and perform nearly any malign action upon command trigger from a remote server."[53]

79. As one analyst observed, the immediate broad-based collection of such data violates user privacy: "'I intercepted http traffic sent by the app, the first anomaly I noticed was the amount of data being sent as soon as you launch the app. This system information should not be disclosed,

[51] *Id.*
[52] *Id.*
[53] *Id.*

this is a clear violation of the user's privacy. And I really don't see what a 'shopping' app would do with the user's operating processes.... Let alone his phone's serial number."[54]

80. In addition to these concerns, other investigators examining Temu reported that older versions of the Temu app had a patching capability through a home-built framework known as "Manwe," which is an unpacking and patching tool that was also found in the malicious versions of Pinduoduo. Manwe could enable PDD holdings to patch the app on the device, rather than through the Apple App Store or Google Play Store. This is against app store policies, as it could enable the developer to push unauthorized code via updates to user devices.

81. Authorities in other countries have also raised alarms after examining the Temu app. For example, in the United Kingdom, "law enforcement authorities have issued a stark warning about this online marketplace. They have uncovered evidence of the app harvesting customer data and expressed concerns that this data may find its way into Chinese hands."[55]

82. In addition to the unauthorized collection of their data, users may suffer additional injuries; the data collected from Temu users by these unauthorized means can be misused by Defendants themselves in ways that are not authorized, and as analysts have observed, may be sold or given to unauthorized third parties without the consent of Temu users. Indeed, as analysts have noted, regardless of whether users authorized the initial collection of such data by Defendants, Temu users may be subjected to additional injuries, including the provision or sale of their data to unauthorized third parties or the use of their data in ways that users did not authorize by Defendants themselves.

---

[54] *Id.*

[55] https://www.cybersecurity-insiders.com/china-temu-app-caused-data-privacy-concerns-in-united-kingdom/.

83. Individuals who are not Temu users and have never signed up for the platform may also be adversely impacted. Unbeknownst to them, non-users who engage in electronic communications with Temu users, such as through email or text messages, may have their private communications subject to harvesting by Defendants who have broad access to Temu users' devices. In addition, individuals who never signed up for Temu but who have stored information on a Temu user's device may also have their data subject to unauthorized harvesting by Defendants.

**2. Temu Is Designed To Hide Its Malicious Features.**

84. Further, experts who have examined the Temu app in detail have concluded that it is purposefully designed to hide these malicious features and that Defendants have taken actions to prevent users from discovering the app's numerous data privacy violations. A recent technical analysis found "clues in the software that reflect the app engineers' strong intention to purposefully cloak and obscure what the app actually performs when it is executing."[56]

85. The Temu app contains technology (encrypt, decrypt or shift integer signals) that obscures the source code and system calls so that intrusive and dangerous calls are harder to detect when an app store or others perform security scans. In addition, the Temu app contains a runtime.exec() function that allows Temu to get compiled code onto the user's system at runtime that has not been seen by any security detection scans. These features alone demonstrate that the Temu app is purposefully designed to be "very virulent malware/spyware."[57]

[56] https://grizzlyreports.com/we-believe-pdd-is-a-dying-fraudulent-company-and-its-shopping-app-temu-is-cleverly-hidden-spyware-that-poses-an-urgent-security-threat-to-u-s-national-interests/.

[57] *Id.*

86. In addition, technical analysis of the app has uncovered that many of the "red-flag" issues uncovered with the app "occur in parts of the code that are proprietary, obscured, and/or from a code library rarely used, poorly programmed by a niche company." This is inconsistent with common practice and appears to be designed to obscure the dangerous features of the app so that they will not be disclosed to the public and will avoid scrutiny by the app stores that provide the app to the public.[58]

87. Thus, for example, a technical analysis found a "package compile" function that was "not visible to security scans before or during installation of the app, or even with elaborate penetration testing." As a result, "TEMU's app could have passed all the tests for approval into Google's Play Store, despite having an open door built in for an unbounded use of exploitative methods." "Put another way, if all the rest of the objectionable code was removed, while this one backdoor went undetected due to its concealment, the app could become just as malignant, by changing its behavior, controlled by foreign servers, in almost all possible ways and reactive to all future developments of the app, the regulations and all other possible influences."[59]

88. In addition, the Temu app seeks to obscure the permissions that are given to the app to access information on users' phones. "[M]any of these permissions in TEMU's source code are not listed in their Android Manifest file, which is the standardized overview source for an app." In addition, the Temu app deceptively requests permissions in ways that do not clearly inform users that they are providing certain permissions to the app. Accordingly, because the Temu app "masks its intentions" by using such deceptive means, "You wouldn't suspect that the

[58] *Id.*
[59] *Id.*

TEMU app contains a full stack of malware/spyware tools to do just about anything it wants with your phone and get nearly anything stored on it sent to its own servers in the background."[60]

89. The Temu app also contains functions to alert the app if a debugger is engaged. Such a feature is likely incorporated into the app "to obstruct or obscure analysis of the app, and most likely to change app behavior if an analyst is inspecting it dynamically." As one expert noted, this is a "HUGE red flag" because "Detecting a debugger means … you don't want anyone else to know what code you're running."[61]

90. The files, folders, classes, and functions of the Temu app are also designed, named, and cross-reference each other in a highly complex way that is designed to hamper investigation of the malicious aspects of the app. Indeed, analysts have concluded that "it is practically impossible for a human to read the decompiled code, and we believe TEMU uses additional tools in the compiling process to create this obfuscation. The most outstanding indicator of TEMU's code obfuscation is the top-level view of the JAVA source code after decompiling." These practices are in contrast to other apps that are much more transparent.[62]

91. In addition, Defendants have sought to cover their tracks by removing from the public domain prior versions of files associated with the app and have deleted features of the app when necessary to avoid detection of their wrongdoing. Among other things, analysts have concluded that "TEMU is hiding something" because of the following deceptive practices: 1) features of the Temu app that were similar to those of the Pinduoduo app were mysteriously

[60] *Id.*
[61] *Id.*
[62] *Id.*

deleted in May 2023 after Google suspended Pinduoduo for malicious spyware and 2) prior versions of certain files associated with the app have been removed from Google's Play Store.[63]

92. As one technical report noted with respect to the latter issue, "Many websites archive APK's published in Google's Play Store. However, TEMU's app seems to have disappeared from many of these archives, in particular almost all with Google Page Rank 6 or higher that appear on the top of Google searches. The TEMU APKs are removed from all websites with U.S. jurisdiction, indicating that legal measures by TEMU could be behind the exclusion from the web archives. Inaccessibility of the APK files makes malware research more cumbersome."[64]

93. As reflected in the chart below, this lack of visibility with respect to Temu is in contrast to other apps.[65]

| APK Posting Website | Juris-diction | Page Rank | Monthly traffic | TEMU | Shein | Amazon | Ebay | Ali-baba | TikTok |
|---|---|---|---|---|---|---|---|---|---|
| APKMirror.com | US | 7 | 17.0M | no | yes | yes | yes | yes | yes |
| uptodown.com | ES | 8 | 66.9M | no | yes | yes | yes | yes | yes |
| apkpure.com | US | 8 | 64.2M | no* | yes | yes | yes | yes | yes |
| apkcombo.com | US | 5 | 24.8M | no | yes | yes | yes | yes | yes |
| aptoide.com | PT | 8 | 11.9 | yes | yes | yes | yes | yes | yes |
| apk-dl.com | US | 6 | 1.2M | no | no | yes | yes | yes | yes |
| apkmonk.com | US | 6 | 3.3M | no | yes | yes | yes | yes | yes |
| apkbe.com | ?? | 4 | 1.5M | yes** | yes | yes | yes | yes | yes |
| softpedia.com | RO | 8 | 0.3M | no | no | yes | yes | yes | yes |
| appsapk.com | IL | 6 | 0.2M | no | yes | yes | yes | no | yes |
| download.cnet.com | US | 8 | 6.3M | no | yes | yes | yes | yes | yes |
| softonic.com | ES | 8 | 43.0M | yes | yes | yes | yes | yes | yes |
| malavida.com | ES | 8 | 13.4M | yes | yes | yes | yes | yes | yes |
| apkmody.io | SG | 5 | 26.2M | yes | yes | yes | yes | yes | yes |
| allofapps.com | HK | 2 | 2.1M | yes | yes | yes | yes | yes | yes |

[63] *Id.*
[64] *Id.*
[65] *Id.*

Despite these revelations, Defendants issued a recent statement to the press, declaring: "At Temu, we prioritize the protection of privacy and are transparent about our data practices."

**3. Temu Subjects User Data To Misappropriation By Chinese Authorities.**

94. The data privacy violations documented with the Temu app are particularly concerning not only because they subject user data to unauthorized collection and potential sale to third parties, but also because Temu's parent is a China-based company that is subject to Chinese law that requires companies to provide user data to the government upon request. As a technical analysis of the Temu app has noted, "Your personal data – much more than you ever assumed – is resold indiscriminately for marketing purposes, and in all probability available to Chinese Security authorities for data mining purposes. Chinese Government security agents or their AI computers might be looking at what products you or your family buy on TEMU as a source of leverage, influence, manipulation, 'cross-border remote justice', surveillance, or more."[66]

95. As experts and government authorities have repeatedly observed, under applicable law, user data owned by Chinese companies is available on command to officials of the Chinese communist government. The Chinese government's ongoing efforts to acquire such private user data from American citizens—both legally and illegally—are well documented.

96. In October 2019, for example, United States Senators Charles Schumer and Tom Cotton sent a bipartisan letter to the Acting Director of National Intelligence describing risks associated with Chinese ownership of the TikTok app. The Senators noted that there was a significant security risk even though TikTok maintained that it "does not operate in China and stores U.S. user data in the U.S.," given that it was still "required to adhere to the laws of China."

[66] *Id.*

As the Senators explained, "Security experts have voiced concerns that China's vague patchwork of intelligence, national security, and cybersecurity laws compel Chinese companies to support and cooperate with intelligence work controlled by the Chinese Communist Party."[67]

97. A November 15, 2020, CBS News 60 Minutes broadcast addressed the dangers inherent in Chinese ownership of companies collecting American users' private and personally identifiable information. During the broadcast, among other things, a former member of the U.S. intelligence community observed that what makes the possession of U.S. user data by China-affiliated companies "particularly concerning" is that "[t]he Chinese have fused their government and their industry together so that they cooperate to achieve the ends of the state." As Senator Hawley observed during the broadcast, for example, the Chinese-owned parent company of TikTok had an express legal obligation to share such private user data with the Chinese government: "under Chinese law, TikTok, ByteDance, the parent, is required to share data with the Chinese Communist Party"; "all it takes is one knock on the door of their parent company, based in China, from a Communist Party official for that data to be transferred to the Chinese government's hands, whenever they need it."[68]

98. In testimony given to Congress in November 2022, FBI Director Christopher Wray reiterated these concerns, noting that Chinese law requires Chinese companies to "do whatever the government wants them to in terms of sharing information or serving as a tool of the Chinese government." "And so that's plenty of reason by itself to be extremely concerned."[69]

---

[67] https://www.law360.com/articles/1213180/sens-want-tiktok-investigated-for-national-security-threats; https://www.cotton.senate.gov/?p=press_release&id=1239.

[68] https://www.nbcnews.com/politics/congress/hawley-takes-aim-tiktok-china-congressional-hearing-n1076586.

[69] https://www.npr.org/2022/11/17/1137155540/fbi-tiktok-national-security-concerns-china.

99. Based on such concerns, Senator Marco Rubio and Representative Mike Gallagher recently introduced legislation to completely ban TikTok "and other social media companies that are effectively controlled by the CCP [Communist Chinese Party] from operating in the United States."[70]

100. There have been calls for specific action against Temu by commentators who argue that "TEMU is demonstrably more dangerous than TikTok. The app should be removed from the Google and Apple app stores."[71]

101. For example, Senator Tom Cotton recently noted: "Just like TikTok, Temu or any Chinese tech company must allow the Communist Party unfettered access to its data. This should be a non-starter for doing business in the United States."[72]

102. China-based companies are required by law to secretly provide consumer data to the government upon demand:

> The message contained in each of China's state security laws passed since the beginning of 2014 is clear: everyone is responsible for the party-state's security. According to the CCP's definition of state security, the Party's political leadership is central. … And the party expects Chinese people and citizens to assist in collecting intelligence. The Intelligence Law states "any organization and citizen shall, in accordance with the law, support, provide assistance, and cooperate in national intelligence work, and guard the secrecy of any national intelligence work that they are aware of…" Not only is everyone required to participate in intelligence work when asked, but that participation must be kept secret.[73]

---

[70] https://www.npr.org/2022/11/17/1137155540/fbi-tiktok-national-security-concerns-china; *see also* https://www.washingtonpost.com/opinions/2022/11/10/marco-rubio-ban-tiktok-america-china-mike-gallagher/.

[71] https://grizzlyreports.com/we-believe-pdd-is-a-dying-fraudulent-company-and-its-shopping-app-temu-is-cleverly-hidden-spyware-that-poses-an-urgent-security-threat-to-u-s-national-interests/.

[72] https://twitter.com/SenTomCotton/status/1757055483217604697.

[73] https://capx.co/britain-must-avoid-being-sucked-into-huaweis-moral-vacuum/. *See also* https://www.lawfareblog.com/beijings-new-national-intelligence-law-defense-offense.

103. Chinese law requires Chinese citizens, individuals and organizations or entities in China, to cooperate with "national intelligence work." It grants Chinese government and Communist Party officials broad, invasive authority to, among other things, access private networks, communications systems, and facilities to conduct inspections and reviews. These laws are broad and open-ended. Laws including, but not limited to, the National Security Law, Cybersecurity Law, and National Intelligence Law are part of "an interrelated package of national security, cyberspace, and law enforcement legislation" that "are aimed at strengthening the legal basis for China's security activities and requiring Chinese and foreign citizens, enterprises, and organizations to cooperate with them."[74]

104. The concerns with transferring personal data from U.S. users to Chinese-based companies are so great that Congress has drafted legislation that would prohibit the transfer of personal data from users in the United States to entities or individuals that are under the control or influence of China such as China-affiliated businesses like TikTok and Temu.[75]

**D. Defendants Are Violating Plaintiffs' Right to Privacy Of Their Data**

105. As a result of their multiple violations of users' data privacy, Defendants possess identifying information, biometric identifiers and information, and other data sufficient to create a file of private and personally identifiable data and content for Plaintiffs, the Classes and Subclasses. Such files can be supplemented over time with additional private and personally identifiable user data and content, and all of this private and personally identifiable data and

[74] M. Scot Tanner, Beijing's New National Intelligence Law: From Defense to Offense, LAWFARE (July 20, 2017), https://bit.ly/3fXfB4A.

[75] https://www.congress.gov/bill/118th-congress/house-bill/1153/text.

information has been, is, and will be used in the past, the present, and the future for economic and financial gain.

106. Meanwhile, Plaintiffs, the Classes and the Subclasses have incurred, and continue to incur, harm as a result of the invasion of privacy stemming from Defendants' possession of their private and personally identifiable data and content – including their user identifiers, biometric identifiers and information, and other data.

107. Plaintiffs, the Classes and the Subclasses also have suffered and continue to suffer harm in the form of diminution of the value of their private and personally identifiable data and content as a result of Defendants' surreptitious and unlawful activities.

108. Plaintiffs, the Classes, and the Subclasses have a reasonable expectation of privacy in the private and personally identifiable data and content on their mobile devices.

109. The United States Supreme Court has recognized that, in contemporary society, cell phones are so ubiquitous and inextricably intertwined with the user's personal privacy that the devices have become "almost a 'feature of human anatomy.'" *Carpenter v. United States*, 138 S. Ct. 2206, 2218 (2018) (quoting *Riley v. California*, 573 U.S. 373, 385 (2014)). The United States Constitution thus provides a privacy right that protects individuals against unreasonable governmental searches of their physical movements through historical cell phone records in the possession of their service providers. *Id.* at 2218.

110. As discussed above, Defendants have designed the Temu app to surreptitiously collect a wide range of data from Temu users. In addition, Defendants continue to take actions and have purposefully designed the Temu app to obscure and hide their unlawful collection of users' data.

111. Defendants' actions also adversely impact non-users of Temu who have had electronic communications with Temu users or whose data is stored on the device of a Temu user because their data is subject to harvesting by Defendants without their knowledge.

112. Many of the categories of data and information collected by Defendants are particularly sensitive. For example, in addition to highly sensitive biometric information discussed below, Defendants also collect physical and digital location tracking data that is highly invasive of Temu users' privacy rights. "Location data is among the most sensitive personal information that a user can share with a company . . . Today, modern smartphones can reveal location data beyond a mere street address. The technology is sophisticated enough to identify on which floor of a building the device is located."[76] Over time, location data reveals private living patterns of Temu users, including where they work, where they reside, where they go to school, and when they are at each of these locations. Location data, either standing alone, or combined with other information, exposes deeply private and personal information about Temu users' health, religion, politics and intimate relationships.

113. Moreover, as analysts have noted, there is no legitimate reason that a shopping app would be collecting such location data. The fact that location data is collected by Temu constitutes additional evidence that Defendants are selling users' data to generate additional, covert profits: "Things like location data to me definitely raises a flag for me because I am not envisioning a lot of legitimate uses for it. And I know that selling location data is a big side business."[77]

[76] https://www.law360.com/consumerprotection/articles/1221312/sens-prod-zuckerberg-why-keep-tracking-user-locations-.

[77] https://grizzlyreports.com/we-believe-pdd-is-a-dying-fraudulent-company-and-its-shopping-app-temu-is-cleverly-hidden-spyware-that-poses-an-urgent-security-threat-to-u-s-national-interests/.

114. More generally, the various functions and aspects of the Temu app described above make clear that it is an extremely malicious app designed to covertly harvest user data in violation of their privacy rights. As one technical analysis concluded:

> TEMU has laid an extensive software foundation to recklessly plunder its customers' data. Our staff analysis, verified by numerous expert confirmations, both proprietary experts we hired, plus those independently published in the public domain, find malware, spyware, and several levels of exceptionally threatening software behavior. So in exchange for that super low, too-good-to-be true price on some gadget, we warn you that TEMU is able to hack your phone from the moment you install the app, overriding the data privacy settings you think you have in place, as well as your intentions, helping itself to your contact list, your precise location, in some cases, control of your camera, screenshots of the apps running on your screen, and, depending on the permissions you may have given when you installed the app, your SMS text messages, and other documents you may have on your phone. Further, the TEMU app is engineered to hide its intentions and cloak detection of its invasive capabilities.[78]

**E. Defendants Utilize Deceptive, Manipulative, And Unscrupulous Practices To Maximize Their Access To User Data**

115. Defendants actively utilize manipulative and deceptive practices in order to maximize the number of users who sign up to use the app, thereby maximizing the amount of data that Defendants can misappropriate. According to one commentator, "TEMU is a notoriously bad actor in its industry. We see rampant user manipulation, chain-letter-like affinity scams to drive signups, and overall, the most aggressive and questionable techniques to manipulate large numbers of people to install the app."[79]

---

[78] *Id.*

[79] https://grizzlyreports.com/we-believe-pdd-is-a-dying-fraudulent-company-and-its-shopping-app-temu-is-cleverly-hidden-spyware-that-poses-an-urgent-security-threat-to-u-s-national-interests/.

116. Defendants seek to induce users to sign up for the Temu app with the promise of low-cost, high-quality goods manufactured in China. Defendants underscore this aspect of the platform through a variety of mechanisms such as pop-ups with wheels to spin for discounts, tokens to collect, and countdown clocks.







117. These tactics have been wildly successful: "PDD's TEMU online marketplace is being reported as among the fastest uptaken apps in history."[80]

118. However, Defendants' representations regarding the products sold on the Temu platform are false and serve only to further conceal its scheme to maximize the number of users who sign up to the platform and unwittingly subject their private data to theft by Defendants. For example, while Temu represents that it sells "affordable, quality products," and indeed "the best products globally,"[81] there have been many complaints regarding the quality of goods sold on the site as well as the service provided by Temu. The Better Business Bureau alone has received

[80] *Id.*

[81] https://www.temu.com/about-temu.html?_x_vst_scene=adg&_x_ads_sub_channel=search&_x_ads_channel=google&_x_ads_account=1213016319&_x_ads_set=19694142866&_x_ads_id=141345685810&_x_ads_creative_id=648389974220&_x_ns_source=g&_x_ns_gclid=EAIaIQobChMIp-qu7uHrgQMVzOHjBx3Nbw NPEAAYASAAEgJG7vD_BwE&_x_ns_placement=&_x_ns_match_type=e&_x_ns_ad_position=&_x_ns_product_id=&_x_ns_target=&_x_ns_devicemodel=&_x_ns_wbraid=CjkKCQjwyY6pBhDkARIoAIxVarMMiImKANb_YPCex1QlQIP18Qo6VyWLbo5bKiA0ncz9-bGx8hoCReg&_x_ns_gbraid=0AAAAAo4mICFRpdcyS3-Cw22MR1T_CF7V&_x_ns_keyword=temu&_x_ns_targetid=kwd-5681707004&refer_page_name=home&refer_page_id=10005_1696950675462_i3umf3qzlf&refer_page_sn=10005&_x_sessn_id=hbzdvage0f.

hundreds of complaints in the past year, earning Temu a rating of 2.1 out of 5 stars.[82] Users experience undelivered packages and poor customer service. Moreover, even when goods are delivered, they are often of low quality, contrary to Temu's marketing and representations.

119. For example, one analysis observed that "TEMU products as shipped often do not resemble the photos."[83] Users frequently receive low-quality, cheaply-made merchandise when the photo on the app indicates that they would receive high-quality goods. Moreover, photos and product descriptions are sometimes simply copied directly from other sellers on sites like Amazon, bearing no relationship to the actual goods being sold.[84] In addition, while Defendants claim that they use "world-class manufacturers" and have a "zero tolerance policy against counterfeits,"[85] Temu frequently sells counterfeit, knock-off products in violation of the law. For example, it recently was reported that Temu was selling knockoff Air Jordans on the site and continued to do so even after the issue came to light.[86]

[82] https://www.uscc.gov/sites/default/files/2023-04/Issue_Brief-Shein_Temu_and_Chinese_E-Commerce.pdf.

[83] https://grizzlyreports.com/we-believe-pdd-is-a-dying-fraudulent-company-and-its-shopping-app-temu-is-cleverly-hidden-spyware-that-poses-an-urgent-security-threat-to-u-s-national-interests/.

[84] https://www.businessinsider.com/temu-sellers-are-counterfeiting-amazon-listings-and-storefronts-2023-7.

[85] https://www.temu.com/confidence.html?_x_vst_scene=adg&_x_ads_sub_channel=search&_x_ads_channel=google&_x_ads_account=1213016319&_x_ads_set=19694142866&_x_ads_id=141345685810&_x_ads_creative_id=648389974220&_x_ns_source=g&_x_ns_gclid=EAIaIQobChMIpu7uHrgQMVzOHjBx3NbwNPEAAYASAAEgJG7vD_BwE&_x_ns_placement=&_x_ns_match_type=e&_x_ns_ad_position=&_x_ns_product_id=&_x_ns_target=&_x_ns_devicemodel=&_x_ns_wbraid=CjkKCQjwyY6pBhDkARIoAIxVarMMiImKANb_YPCex1QlQIP18Qo6VyWLbo5bKiA0ncz9-bGx8hoCReg&_x_ns_gbraid=0AAAAAo4mICFR pdcyS3-Cw22-MR1T_CF7V&_x_ns_keyword=temu&_x_ns_targetid=kwd-5681707004&refer_page_name=home&refer_page_id=10005_1696950675462_i3umf3qzlf&refer_page_sn=10005&_x_sessn_id=hbzdvage0f.

[86] https://www.businessinsider.com/shein-and-temu-listed-fake-air-jordans-for-under-50-2023-6.

120. In addition, while Defendants claim that they seek to "[d]o good for the world," are "honest, ethical and trustworthy," and are "socially responsible,"[87] a recent report found that much of the merchandise sold on Temu is produced using forced labor provided by China's Uyghur minority held against their will in camps in the Chinese province of Xinjiang.[88] As the *Los Angeles Times* noted in a recent exposé, such practices are not only deceptive, but they violate federal law: "Products made in China's western province of Xinjiang are being sold to U.S. consumers through the online shopping platform Temu, in breach of a ban that forbids goods from the region due to links to forced labor, according to research by a global supply chain verification firm." As one expert noted in the article, "It's a systematic violation of U.S. trade policies."[89]

121. As the article explains, "Citing what the U.S. State Department has called 'horrific abuses' against the Uyghur people of Xinjiang, who are predominantly Muslim, federal officials banned the importation of cotton from the region in 2021 and expanded the law and its enforcement to all Xinjiang products last year under the Uyghur Forced Labor Prevention Act. Statements from former detainees and reports from an array of researchers and advocacy groups

---

[87] https://www.temu.com/about-temu.html?_x_vst_scene=adg&_x_ads_sub_channel=search&_x_ads_channel=google&_x_ads_account=1213016319&_x_ads_set=19694142866&_x_ads_id=141345685810&_x_ads_creative_id=648389974220&_x_ns_source=g&_x_ns_gclid=EAIaIQobChMIp-qu7uHrgQMVzOHjBx3NbwNPEAAYASAAEgJG7vD_BwE&_x_ns_placement=&_x_ns_match_type=e&_x_ns_ad_position=&_x_ns_product_id=&_x_ns_target=&_x_ns_devicemodel=&_x_ns_wbraid=CjkKCQjwyY6pBhDkARIoAIxVarMMiImKANb_YPCex1QlQIP18Qo6VyWLbo5bKiA0ncz9-bGx8hoCReg&_x_ns_gbraid=0AAAAAo4mICFRpdcyS3-Cw22-MR1T_CF7V&_x_ns_keyword=temu&_x_ns_targetid=kwd-5681707004&refer_page_name=home&refer_page_id=10005_1696950675462_i3umf3qzlf&refer_page_sn=10005&_x_sessn_id=hbzdvage0f.

[88] https://www.latimes.com/business/story/2023-06-15/temu-sells-products-linked-to-forced-labor-in-china.

[89] *Id.*

have alleged that the Chinese government put more than 1 million people in detention camps in the region and that laborers in fields and factories were forced or coerced."[90]

122. The U.S. government has also expressed concerns that Temu is selling Chinese goods to consumers in the United States that are manufactured using forced labor. For example, the Congressional U.S.-China Economic and Security Review Commission issued a report noting that Temu posed "risks and challenges to U.S. regulations, laws and principles of market access" resulting from such direct-to-consumer sales.[91] Likewise, Representative Mike Gallagher, chair of the House Select Committee on the Chinese Communist Party, and the panel's top Democrat, Raja Krishnamoorthi, who represents Illinois' 8th Congressional district, sent letters to Temu asking for information concerning whether the company is importing products derived from forced labor in China.

123. The House Select Committee on the Chinese Communist Party recently issued an Interim Report regarding its findings to date, entitled "Fast Fashion and the Uyghur Genocide." The report concludes that "Temu does not have any system to ensure compliance with the Uyghur Forced Labor Prevention Act (UFLPA). This all but guarantees that shipments from Temu containing products made with forced labor are entering the United States on a regular basis, in violation of the UFLPA."[92] The report concluded that Temu is actively seeking to avoid the protections in place to prevent the sale of goods manufactured with forced labor: "Temu's business model … is to avoid bearing responsibility for compliance with the UFLPA and other prohibitions

---

[90] *Id.*

[91] https://www.uscc.gov/research/shein-temu-and-chinese-e-commerce-data-risks-sourcing-violations-and-trade-loopholes.

[92] https://selectcommitteeontheccp.house.gov/sites/evo-subsites/selectcommitteeontheccp.house.gov/files/evo-media-document/fast-fashion-and-the-uyghur-genocide-interim-findings.pdf.

on forced labor while relying on tens of thousands of Chinese suppliers to ship goods direct to U.S. consumers."[93] Moreover, the report observed that "Temu admitted that it does not expressly prohibit third party sellers from selling products based on their origin in the Xinjiang Autonomous Region."[94]

124. The committee's report was issued after it held hearings at which it received expert testimony regarding the "genocide of the Uyghur people and other minorities." As recounted in the report, "The Committee received first-hand witness testimony and expert reports about the CCP's atrocities, which include imprisonment, torture, rape, forced sterilization, and the widespread exploitation of the Uyghur people in forced labor."[95]

125. The committee noted that the hearings provided evidence that Temu ships "millions of packages" to the United States "duty free" and "without providing CBP [Customs & Border Patrol] with sufficient data regarding the contents of the packages."[96] The committee concluded: "In light of the sheer volume of shipments sent to the United States through its website, Temu's failure to take any meaningful steps with respect to preventing the importation of goods with forced labor is striking."[97]

126. These unscrupulous practices have allowed Defendants to maximize their access to user data through the false promise of low-cost, high-quality goods. Moreover, they further demonstrate that Defendants' real business is not providing a platform for the sale of quality

[93] *Id.*
[94] *Id.*
[95] *Id.*
[96] *Id.*
[97] *Id.*

merchandise, but rather obtaining access to user data under false pretenses, which they then misappropriate and seek to monetize.

127. Defendants utilize additional deceptive marketing techniques to induce users to sign up for the platform and grant Defendants access to user data. For example, Defendants run what has been described as an "affinity scam" or "chain letter" like tactic where users are repeatedly urged to sign up their friends and acquaintances in order to expand the number of users whose data Defendants may then access through the app.

128. Among other things, Temu offers credit and free items to users who get their friends and acquaintances to sign up for the app. "Those who do register are subjected to a bombardment of emails and app notifications."[98] "[O]nce you give TEMU your personal information, you will be repeatedly spammed, hounded, nagged, and bribed to get your friends and family to give TEMU their personal information. When users fall down this rabbit hole (getting that Nintendo Switch absolutely free), TEMU sends a torrent of popup sequences milking users for 'just one more contact'."[99] In addition, Temu users are bombarded by notifications and spam from third parties other than Defendants. These emails and notifications occur even after users delete the app from their devices and even when users seek to block such notifications.

129. Moreover, Temu has utilized online "influencers" to harvest new users on an even larger scale. "There are now literally thousands of so-called 'influencers' hawking TEMU referrals on Reddit, YouTube, TikTok, and also Minecraft, Roblox, Discord… the pitch is: 'You don't have to buy anything, just sign up!'" "If you have a social media presence, TEMU will figure that out

---

[98] https://web.archive.org/web/20230705172831/https://www.telegraph.co.uk/business/2023/07/01/temu-china-bargain-basement-amazon-rival-retail-online-shop/.

[99] https://grizzlyreports.com/we-believe-pdd-is-a-dying-fraudulent-company-and-its-shopping-app-temu-is-cleverly-hidden-spyware-that-poses-an-urgent-security-threat-to-u-s-national-interests/.

and will start to spam you – every day – to induce you to create videos promoting TEMU, for which they promise to pay."[100]

130. Defendants attract and maintain users through other fraudulent means. For example, "TEMU … compensates users to write reviews," which are then "obviously skewed positive." Moreover, reviews are categorized in a deceptive manner with reviews characterized as "five star" positive reviews when in reality they contain extremely negative comments about the platform. For example, one report cited a so-called "five star" review stating that "What this company is doing is illegal" and constitutes "fraud", that the company relies on "lies and deceptions", and that "[c]ountless reviews are clearly negative, yet it shows that the person gave the item 5 stars which is impossible."[101]

131. Finally, as illustrated by its gamified nature, Temu is designed to be highly addictive. As one report notes, "[t]he app successfully keeps people hooked. The average user spends around 28 minutes a day on the app, according to Sensor Tower, nearly double the 16 minutes spent on Amazon."[102] The more time users spend on the app, the more data is available for covert collection by Defendants in violation of users' right to privacy in their personal data.

132. As one analysis observes, the addictive tactics extend not only to users' continued use of the platform, but also inducing individuals to sign up for the app: "Your behavior will be categorized and siloed. If these kinds of inducements exert an addictive pull on your brain, AI pattern recognition will guarantee you will see a lot more of them. If you are on the TEMU

[100] *Id.*
[101] *Id.*
[102] https://web.archive.org/web/20230705172831/https://www.telegraph.co.uk/business/2023/07/01/temu-china-bargain-basement-amazon-rival-retail-online-shop/.

website, all the most persistent inducements are pointed towards getting you to install the TEMU app."[103]

**F. Defendants Have Collected Personal Information From Minors, Including Minors under The Age of Thirteen**

133. These practices are particularly abusive, given that many of the users of Temu are minors, including minors under the age of thirteen. Defendants were aware that minors, including minors under the age of thirteen, were using the Temu platform. Nonetheless, Defendants failed to take adequate measures to protect minor users from these abusive tactics or to ensure that minor users, including minor users under the age of thirteen, had parental consent before they used the Temu platform. Nor did Defendants implement adequate age verification procedures or procedures to confirm that minor users were acting with the consent of their parents in using the Temu platform or adequate opt-out rights or rights to delete collected information.

134. Anyone can use Temu without verifying his or her age, and indeed many children use the Temu platform, including children under thirteen years old. Temu sells a wide variety of products that are marketed to children such as children's toys and clothing. Defendants have increased their revenue and profits by marketing these products to minors and by collecting minors' personal data when minors accessed the Temu platform.

135. Many of the advertisements for products on Temu are directed toward children, sometimes in inappropriate ways. For example, the United Kingdom's Advertising Standards Authorities recently found that certain Temu ads inappropriately sexualized children.[104] Likewise,

[103] https://grizzlyreports.com/we-believe-pdd-is-a-dying-fraudulent-company-and-its-shopping-app-temu-is-cleverly-hidden-spyware-that-poses-an-urgent-security-threat-to-u-s-national-interests/.

[104] https://news.sky.com/story/adverts-for-online-shopping-platform-temu-banned-for-sexualising-a-child-and-objectifying-women-12997811.

a consumer group in the United Kingdom found that Temu was selling age-restricted weapons such as survival knives and axes that were illegal for children to possess without any age verification.[105] Others have observed that Temu is filled with smoking and drug paraphernalia that is sold to any customer, without age verification.

136. Finally, Temu recently ran an advertisement multiple times during the 2024 Super Bowl that featured a young-looking animated cartoon protagonist in an animated cartoon world who uses magic to bestow low-priced Temu products on everyone she encounters. Attorneys General from several states as well as members of Congress urged CBS not to run the ad given ongoing investigations by Congress into Temu, and the company's documented relationship with the Chinese Communist Party. As one congresswoman who objected to the advertisement observed, it "looked like it belonged on a children's show."[106]




[105] https://www.theguardian.com/money/2023/nov/17/weapons-banned-in-uk-apparently-found-on-shopping-app-temu-which.

[106] https://www.cnbc.com/video/2024/02/12/temus-ad-controversy-heres-what-you-need-to-know.html.

137. Temu's data collection procedures with respect to minors have also been a specific concern of government authorities. Thus, for example, in their ongoing investigation of Temu, members of Congress recently sent a letter to Defendants specifically requesting information regarding Temu's data collection practices with respect to minors.[107]

138. Defendants' actions violated, among other things, the requirements contained in the Children's Online Privacy Protection Act ("COPPA"), 15 U.S.C. § 6501 *et seq.*, and associated rules. COPPA protects children under thirteen years old from having their personal information collected by operators of websites or online services directed to children, or operators with actual knowledge that they are collecting personal information online from children under thirteen, unless their parent has first given verifiable consent.

139. Congress passed COPPA in 1998 in response to concerns that children's personal information was being collected by operators of websites and online services. COPPA is intended to "maintain the security of personally identifiable information of children collected online" and to "protect children's privacy by limiting the collection of personal information from children without parental consent."[108] The standards in COPPA have given rise to, and correlate with, accepted norms throughout society for defining the expectations of privacy for minor children.

140. COPPA applies to any operator of a commercial website or online service used by children under thirteen years of age that collects, uses, and/or discloses personal information from children. COPPA "prohibits unfair … acts or practices in connection with the collection, use,

[107]https://d1dth6e84htgma.cloudfront.net/CCP_Marketplace_Letter_to_Whaleco_Inc_Temu_7f921e1a67.pdf.

[108] 144 CONG. REC. S12787.

and/or disclosure of personal information from and about children on the Internet." 16 C.F.R. § 312.1.

141. COPPA provides, in pertinent part, that: "It is unlawful for an operator of a website or online service directed to children, or any operator that has actual knowledge that it is collecting personal information from a child, to collect personal information from a child in a manner that violates the regulations prescribed [by the Federal Trade Commission]." 15 U.S.C. § 6502(a).

142. COPPA thus prohibits, *inter alia*, the collection of persistent identifiers absent adequate notice and verifiable parental consent. 16 C.F.R. §§ 312.4, 312.5(c)(7), 312.2.

143. The 2013 enhancement to COPPA widened the definition of children's "personal information" to include "persistent identifiers" such as cookies that track a child's activity online, geolocation information, photos, videos, and audio recordings.

144. COPPA violations "shall be treated as a violation of a rule defining an unfair … act or practice prescribed under section 18(a)(1)(B) of the Federal Trade Commission Act (the "FTC Act"), 15 U.S.C. § 57a(a)(1)(B)." In other words, a violation of COPPA constitutes an unfair trade practice under Section 5 of the FTC Act. 15 U.S.C. § 45(a).

145. While COPPA itself does not provide individuals a private cause of action for violations of the statute, state legislatures across the country have enacted consumer protection statutes proscribing the same unfair and unlawful business conduct proscribed by the FTC Act and rules promulgated thereunder. These "Little FTC Acts" were often enacted for the specific purpose of supplementing the FTC's mission of protecting consumers from unfair and/or unlawful acts or practices by providing state citizens with a private right of action to seek redress for harm arising

out of acts which are also prohibited by the FTC Act, which lacks a private right of action. The above-described conduct engaged in by Defendants not only violates COPPA, but also independently violates the state statutes prohibiting unfair and/or unlawful business practices which are modeled, patterned after, and/or which take interpretive guidance from, the FTC Act, including those cited herein.

146. Additionally, the conduct of each of the Defendants constitutes unwarranted invasions of privacy in violation of the substantial protections afforded under California, Illinois, Massachusetts, New York, and Virginia law.

147. During the Class Period, minor Plaintiffs accessed the Temu platform owned by Defendants. While Plaintiffs accessed the Platform, Defendants unfairly and unlawfully collected Plaintiffs' personal information, including persistent identifiers such as IP address and IMEI number. Defendants were aware, at all times through the Class period that minor children accessed the platform, including children under the age of thirteen. However, Defendants did not obtain verifiable parental consent to collect personal information of children under thirteen who used the Temu app or comply with other COPPA requirements. In doing so, Defendants violated state consumer protection laws as well as the privacy rights of children under thirteen using Temu and their reasonable expectation of privacy.

148. Plaintiffs, and the minor Class and Subclasses have been deprived of, and thereby lost, the economic value of their personal information. A child's personal information has equivalent (or potentially greater) value than that of an adult. Children are more susceptible to being influenced by advertisements as they often cannot tell the difference between content and advertisements. And Defendants may be able to utilize children's personal information to show

them behavior-targeted advertising for the duration of their lives. Plaintiffs and the minor Class and Subclasses can no longer realize the full economic value of their personal information because their personal information has already been collected, analyzed, acted upon, and monetized by Defendants. Defendants have thus also been incentivized to develop, and as noted above, have developed ways to addict children to the Temu platform in order to maximize their profits.

149. By failing to (i) obtain verifiable parental consent, (ii) adequately disclose to parents the nature and purpose of their data collection practices (and use of that data), and (iii) take other steps to preclude the capture of children's personal information, and by manipulating and exploiting the habits of minors for their economic gain, Defendants have breached the privacy rights and reasonable expectations of privacy of the minor Plaintiffs and the millions of minors in the minor Class and Subclasses who have used the Temu platform, in contravention of privacy norms.

**G. Additional Allegations Concerning the Named Plaintiffs**

150. During the time that the Temu app was installed on the named plaintiffs' mobile devices, Defendants surreptitiously performed, among others, the following actions without notice to or the knowledge and consent of the named plaintiffs or, in the case of the minor plaintiffs, their legal guardians: (i) Defendants took plaintiffs' user/device identifiers and private data from their mobile devices; (ii) Defendants took plaintiffs' biometric identifiers and information from plaintiffs' mobile devices; (iii) Defendants took plaintiffs' private and personally identifiable data and content from plaintiffs' mobile devices; and (iv) Defendants made some or all such stolen data and content accessible to individuals in China – including individuals under the control of the Chinese government.

151. Defendants performed these acts for the purpose of secretly collecting the named plaintiffs' private and personally identifiable data and content – including their user/device identifiers, biometric identifiers and information, and other private information – and using such data and content to track, profile and target plaintiffs with advertisements. Further, Defendants have used plaintiffs' private and personally identifiable data and content for their economic gain. Defendants and others now have access to private and personally identifiable data and content regarding plaintiffs that can be used for further commercial advantage and other harmful purposes. Defendants have profited, and will continue to profit, from these activities.

152. Meanwhile, the named plaintiffs have incurred harm as a result of Defendants' invasion of their privacy rights through Defendants' covert taking of plaintiffs' private and personally identifiable data and content – including their user/device identifiers, biometric identifiers and information, and private information and data. Plaintiffs also have suffered harm because Defendants' actions have diminished the value of their private and personally identifiable data and content. Moreover, plaintiffs have suffered injury to their mobile devices. The battery, memory, CPU, and bandwidth of such devices have been compromised, and as a result, the functioning of those devices has been impaired and slowed, due to Defendants' clandestine and unlawful activities. Finally, Plaintiffs have incurred additional data usage and electricity costs that they and/or their guardians would not have incurred but for Defendants' covert and unlawful actions.

153. Neither the named plaintiffs nor, in the case of the minor plaintiffs, their guardians, ever received notice that Defendants would collect, capture, receive, otherwise obtain, store, and/or use their biometric identifiers and other private information. Defendants never

informed plaintiffs or their guardians of the specific purpose and length of time for which their biometric identifiers or other biometric information would be collected, captured, received, otherwise obtained, stored, and/or used. Neither Plaintiffs nor, in the case of minors, their guardians, ever signed a written release authorizing Defendants to collect, capture, receive, otherwise obtain, store, and/or use their biometric identifiers or other biometric information.

154. Based on counsel's investigation and analysis, Temu deliberately designed its Terms of Service and Privacy Policy to decrease the likelihood that a user will notice and comprehend its terms and conditions or could provide meaningful, express consent to its conditions, in order to encourage users to sign up and not be deterred by accurate and truthful disclosures.

155. The named plaintiffs did not know nor expect that Defendants would collect, store, and use their private and personally identifiable information, including their biometric identifiers and biometric information when they used the Temu app.

156. The named plaintiffs did not receive notice from Defendants (written or otherwise) that Defendants would collect, store, and/or use their private and personally identifiable information, including their biometric identifiers or biometric information. Plaintiffs did not receive notice from Defendants of the specific purpose and length of time that Defendants would collect, store, and/or use their biometric identifiers or biometric information. Plaintiffs did not give effective authorization (written or otherwise) for Defendants to collect, store, and/or use their private and personally identifiable information, including their biometric identifiers or biometric information.

## V. CLASS ALLEGATIONS

157. Plaintiffs seek certification of the classes set forth herein pursuant to Federal Rule of Civil Procedure 23 ("Rule 23"). Specifically, Plaintiffs seek class certification of all claims for relief herein on behalf of classes and subclasses defined as follows:

> **Nationwide Class of Temu Users:** All persons who reside in the United States who used the Temu platform.
>
> **Nationwide Class of Minor Users:** All persons who reside in the United States who used the Temu platform while under the age of thirteen.
>
> **Nationwide Class of Temu Non-Users:** All persons who reside in the United States who had electronic communications with Temu users or had their data stored on devices used by Temu users, but are not Temu users themselves.
>
> **California Subclass of Temu Users:** All persons who reside in California and used the Temu platform.
>
> **California Subclass of Minor Users:** All persons who reside in California and used the Temu platform while under the age of thirteen.
>
> **California Subclass of Temu Non-Users:** All persons who reside in California who had electronic communications with Temu users or who had their data stored on devices used by Temu users, but are not Temu users themselves.
>
> **Illinois Subclass of Temu Users:** All persons who reside in Illinois and used the Temu platform.
>
> **Illinois Subclass of Minor Users:** All persons who reside in Illinois and used the Temu platform while under the age of thirteen.
>
> **Illinois Subclass of Temu Non-users:** All persons who reside in Illinois who had electronic communications with Temu users or who had their data stored on devices used by Temu users, but are not Temu users themselves.
>
> **Massachusetts Subclass of Temu Users:** All persons who reside in Massachusetts and used the Temu platform.
>
> **Massachusetts Subclass of Minor Users:** All persons who reside in Massachusetts and used the Temu platform while under the age of thirteen.

**Massachusetts Subclass of Temu Non-users:** All persons who reside in Massachusetts who had electronic communications with Temu users or who had their data stored on devices used by Temu users, but are not Temu users themselves.

**New York Subclass of Temu Users:** All persons who reside in New York and used the Temu platform.

**New York Subclass of Minor Users:** All persons who reside in New York and used the Temu platform while under the age of thirteen.

**New York Subclass of Temu Non-Users:** All persons who reside in New York who had electronic communications with Temu users or who had their data stored on devices used by Temu users, but are not Temu users themselves.

**Virginia Subclass of Temu Users:** All persons who reside in Virginia and used the Temu platform.

**Virginia Subclass of Minor Users:** All persons who reside in Virginia and used the Temu platform while under the age of thirteen.

**Virginia Subclass of Temu Non-Users:** All persons who reside in Virginia who had electronic communications with Temu users or who had their data stored on devices used by Temu users, but are not Temu users themselves.

158. Plaintiffs are the proposed class representatives for the Nationwide Classes. California Plaintiffs are the proposed class representatives for the California Subclasses. The Illinois Plaintiff is the proposed class representative for the Illinois Subclasses. The Massachusetts Plaintiffs are the proposed representatives for the Massachusetts Subclasses. The New York Plaintiffs are the proposed class representatives for the New York Subclasses. The Virginia Plaintiffs are the proposed representatives for the Virginia Subclasses.

159. Plaintiffs reserve the right to modify or refine the definitions of the Classes and the Subclasses.

160. Excluded from the Classes and the Subclasses are: (i) any judge or magistrate judge presiding over this action and members of their staff, as well as members of their families; (ii)

Defendants, Defendants' predecessors, parents, successors, heirs, assigns, subsidiaries, and any entity in which any Defendant or its parents have a controlling interest, as well as Defendants' current or former employees, agents, officers, and directors; (iii) persons who properly execute and file a timely request for exclusion from the class; (iv) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (v) counsel for Defendants; and (vi) the legal representatives, successors, and assigns of any such excluded persons.

161. **Ascertainability.** The proposed Classes and Subclasses are readily ascertainable because they are defined using objective criteria so as to allow Class and Subclass members to determine if they are part of the Classes and/or one of the Subclasses. Further, the Classes and Subclasses can be readily identified through records maintained by Defendants.

162. **Numerosity (Rule 23(a)(1)).** The Classes and Subclasses are so numerous that joinder of individual members herein is impracticable. The exact number of Class and Subclass members, as herein identified and described, is not known, but download figures indicate that the Temu app has been downloaded at least 100 million times.

163. **Commonality (Rule 23(a)(2)).** Common questions of fact and law exist for each cause of action and predominate over questions affecting only individual Class and Subclass members, including the following:

a) Whether Defendants engaged in the activities and practices referenced above;

b) Whether Defendants' activities and practices referenced above constitute a violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030;

c) Whether Defendants' activities and practices referenced above constitute a violation of the Electronic Communications Privacy Act of 1986, 18 U.S.C. §§ 2510 *et seq*.;

d) Whether Defendants' activities and practices referenced above constitute a violation of the right of privacy under Mass. Gen. Laws Ch. 214, § 1B;

e) Whether Defendants' activities and practices referenced above constitute a violation of the Massachusetts Wiretap Act, Mass. Gen. Laws, Ch. 272, § 99;

f) Whether Defendants' activities and practices referenced above constitute trespass to chattels;

g) Whether Defendants' activities and practices referenced above constitute unjust enrichment concerning which restitution and/or disgorgement is warranted;

h) Whether Defendants' activities and practices referenced above constitute a violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/1, *et seq*.;

i) Whether Defendants' activities and practices referenced above constitute a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. Ann. 505/2 *et seq*.;

j) Whether Defendants' activities and practices referenced above constitute a violation of the California Comprehensive Data Access and Fraud Act, Cal. Pen. C. § 502;

k) Whether Defendants' activities and practices referenced above constitute a violation of the right of privacy under the California Constitution;

l) Whether Defendants' activities and practices referenced above constitute intrusion upon seclusion;

m) Whether Defendants' activities and practices referenced above constitute a violation of the California Unfair Competition Law, Bus. & Prof. C. §§ 17200 *et seq*.;

n) Whether Defendants' activities and practices referenced above constitute a violation of the California False Advertising Law, Bus. & Prof. C. §§ 17500 *et seq*.;

o) Whether Defendants' activities and practices constitute a violation of the California Invasion of Privacy Act, Cal. Penal Code §§ 630, *et seq*.;

p) Whether Defendants' activities and practices referenced above constitute statutory larceny under Cal. Penal Code §§ 484, 496;

q) Whether Defendants' activities and practices referenced above constitute conversion;

r) Whether Defendants' activities and practices referenced above constitute a violation of the Virginia Computer Crimes Act, Va. Code § 18.2-152.1, *et seq*.

s) Whether Defendants' activities and practices referenced above constitute a violation of Section 349 of the New York General Business Law;

t) Whether Defendants' activities and practices referenced above constitute a violation of the New York right to privacy statute, N.Y. Civ. Rights Law § 51;

u) Whether Plaintiffs and members of the Classes and Subclasses sustained damages as a result of Defendants' activities and practices referenced above, and, if so, in what amount;

v) Whether Defendants profited from their activities and practices referenced above, and, if so, in what amount;

w) What is the appropriate injunctive relief to ensure that Defendants no longer unlawfully: (i) take private and personally identifiable Temu user data and content – including user/device identifiers, biometric identifiers and information, and other private and personally identifiable data; (ii) utilize private and personally identifiable Temu user data; (iii) utilize private and personally identifiable Temu user data and content to create consumer demand for and use of Defendants' other products; (iv) give access to such private and personally identifiable Temu user data and content to individuals in China and to third parties either in China or whose data is accessible from within China; (v) cause the diminution in value of Temu users' private and personally identifiable data; (vi) cause injury and harm to Temu users' mobile devices; (vii) cause Temu users to incur higher data usage and electricity charges; (viii) retain the unlawfully acquired private

and personally identifiable data of Temu users; and (ix) profile and target, based on the above activities, Temu users with advertisements; and

x) What is the appropriate injunctive relief to ensure that Defendants take reasonable measures to ensure that they and relevant third parties destroy unlawfully acquired private and personally identifiable Temu user data in their possession, custody or control.

164. **Typicality (Rule 23(a)(3)).** Plaintiffs' claims are typical of the claims of members of the Classes and Subclasses because, among other things, Plaintiffs and members of the Classes and Subclasses sustained similar injuries as a result of Defendants' uniform wrongful conduct, and their legal claims all arise from the same events and wrongful conduct by Defendants.

165. **Adequacy (Rule 23(a)(4)).** Plaintiffs will fairly and adequately protect the interests of the Classes and Subclasses. Plaintiffs' interests do not conflict with the interests of the Classes and Subclass members, and Plaintiffs have retained counsel experienced in complex class action and data privacy litigation to prosecute this case on behalf of the Classes and Subclasses.

166. **Predominance & Superiority (Rule 23(b)(3)).** In addition to satisfying the prerequisites of Rule 23(a), Plaintiffs satisfy the requirements for maintaining a class action under Rule 23(b)(3). Common questions of law and fact predominate over any questions affecting only individual Classes and Subclass members, and a class action is superior to individual litigation and all other available methods for the fair and efficient adjudication of this controversy. The amount of damages available to Plaintiffs is insufficient to make litigation addressing Defendants' conduct economically feasible in the absence of the class action procedure. Individualized litigation also presents a potential for inconsistent or contradictory judgments, and increases the delay and

expense presented by the complex legal and factual issues of the case to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

167. **Final Declaratory or Injunctive Relief (Rule 23(b)(2)).** Plaintiffs also satisfy the requirements for maintaining a class action under Rule 23(b)(2). Defendants have acted or refused to act on grounds that apply generally to the Classes and Subclasses, making final declaratory and/or injunctive relief appropriate with respect to the Classes and Subclasses as a whole.

## VI. APPLICABLE LAW

168. In addition to any state-specific claims they may have (such as the Illinois BIPA claims brought by the Illinois Subclasses), every member of the classes may invoke Massachusetts' substantive laws to bring claims against Defendants, regardless of where in the United States the Class Member resides. Massachusetts' substantive laws may be constitutionally applied to the claims of Plaintiffs and the Classes under the Due Process Clause, 14th Amend. §1, and the Full Faith and Credit Clause, Art. IV §1 of the U.S. Constitution. Massachusetts has significant contacts, or significant aggregation of contacts, to the claims asserted by Plaintiffs and all Class Members, thereby creating state interests that ensure that the application of Massachusetts state law is not arbitrary or unfair.

169. Defendants' U.S. headquarters and principal place of business is located in Massachusetts. Defendants also own property and conduct substantial business in Massachusetts, and therefore Massachusetts has an interest in regulating Defendants' conduct under its laws. Defendants' decision to reside in Massachusetts and avail itself of Massachusetts' laws, and to

engage in the challenged conduct from and emanating out of Massachusetts, renders the application of Massachusetts law to the claims herein constitutionally permissible.

170. Massachusetts is also the state from which Defendants' alleged misconduct emanated. This conduct similarly injured and affected Plaintiffs and all other Class Members.

171. The application of Massachusetts laws to the claims of the Classes is also appropriate under Massachusetts' choice of law rules because Massachusetts has significant contacts to the claims of Plaintiffs and the proposed Classes, and Massachusetts has a greater interest in applying its laws here than any other interested state.

172. In the alternative, every Member of the classes may invoke New York's substantive laws to bring claims against Defendants.

## VII. COUNTS

### FIRST COUNT:

**VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT, 18 U.S.C. § 1030**
**(On Behalf of the Plaintiffs and the User, Minor User, and Non-User Classes)**

173. Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

174. The Plaintiffs' and the Class's computers and mobile devices are, and at all relevant times have been, used for interstate communication and commerce, and are therefore "protected computers" under 18 U.S.C. § 1030(e)(2)(B).

175. Defendants have exceeded, and continue to exceed, authorized access to the Plaintiffs' and the Class's protected computers and obtained information thereby, in violation of 18 U.S.C. § 1030(a)(2), (a)(2)(C). Defendants intentionally accessed Plaintiffs' devices without the necessary authorization in order to obtain data that Plaintiffs did not authorize them to take.

176. Defendants' conduct caused "loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value" under 18 U.S.C. § 1030(c)(4)(A)(i)(I), inter alia, because of the secret transmission of the Plaintiffs' and the Class's private and personally identifiable data and information – including user/device identifiers, biometric identifiers and information, and other private and personally identifiable data and information. Defendants' unauthorized access and collection of data (i) frequently and systematically drained Plaintiffs' and the Class Members' devices and batteries, and (ii) caused a diminution in value of Plaintiffs' and Class Members' personal information, both of which occurred to millions of Class Members. In addition, Defendants' unauthorized access to their devices requires evaluation by professionals and potential replacement of their devices.

177. Defendants' conduct also constitutes "a threat to public health or safety" under 18 U.S.C. § 1030(c)(4)(A)(i)(IV), due to the private and personally identifiable data and content of the Plaintiffs and the Class being made available to foreign actors, including the Chinese Communist Party and foreign intelligence services, in locations without adequate legal privacy protections. That this threat is real and imminent is evidenced by the materials cited above.

178. Accordingly, the Plaintiffs and the Class are entitled to "maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief." 18 U.S.C. § 1030(g).

## SECOND COUNT:

### VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT OF 1986 (ECPA), 18 U.S.C. §§ 2510 *ET SEQ.* (On Behalf of the Plaintiffs and the User, Minor User and Non-User Classes)

179. Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

180. The Electronic Communications Privacy Act of 1986, 18 U.S.C. §§ 2510, *et seq*., prohibits the interception of any wire, oral, or electronic communications without the consent of at least one authority party to the communication. The statute confers a civil cause of action on "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter." 18 U.S.C. § 2520(a).

181. "Intercept" is defined as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

182. "Contents" is defined as "includ[ing] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

183. "Person" is defined as "any employee, or agent of the United States or any State or political subdivision thereof, and any individual, partnership, association, joint stock company, trust, or corporation." 18 U.S.C. § 2510(6).

184. "Electronic communication" is defined as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce" 18 U.S.C. § 2510(12).

185. Defendants are each a "person" for purposes of the ECPA because they are corporations.

186. As described above, the code used by the Temu app secretly accesses texts, emails and other content on users' computers and thus constitutes a "device or apparatus" that is used to intercept a wire, oral, or electronic communication through electronic means.

187. Plaintiffs' and Class Members' sensitive personal information, data, and interactions with other individuals and websites that Defendants surreptitiously intercepted through the Temu app are "electronic communication[s]" under 18 U.S.C. § 2510(12).

188. Plaintiffs and Class Members reasonably believed that Defendants were not intercepting, recording, or disclosing their electronic communications. Plaintiffs have an expectation of privacy in such communications, and exercised a reasonable expectation of privacy concerning the transmission of those messages.

189. Plaintiffs' and Class Members' electronic communications were intercepted during transmission, without their consent and for the unlawful and/or wrongful purpose of monetizing private information and data, including by using their private information and data to develop marketing and advertising strategies and utilizing user data for other commercial advantage.

190. Defendants were not parties to those communications, which occurred between Plaintiffs and Class Members and third parties or other websites they sought to access or accessed. Defendants used Plaintiffs' and Class Members' electronic communications as part of their business model.

191. Defendants' actions were at all relevant times knowing, willful, and intentional, particularly because Defendants are sophisticated parties who know the type of data they intercept through their own products. Moreover, experts who have examined the Temu app have concluded that the features of the app that allow these covert interceptions are intentional, non-trivial, engineering tasks—the kind that does not happen by mistake or randomly.

192. Neither Plaintiffs nor Class Members consented to Defendants' interception, disclosure, and/or use of their electronic communications. The third parties and/or websites that

Plaintiffs and Class Members visited did not know of or consent to Defendants' interception of the communications. Nor could they—Defendants never sought to obtain, nor did they obtain, Plaintiffs', Class Members', or third parties' consent to intercept Temu users' electronic communications with third parties.

193. These actions violate § 2511(1)(a) of the ECPA because Defendants intentionally endeavored to intercept, and did intercept, messages transmitted by Plaintiffs and the Class using the Temu platform.

194. Defendants' acts further violate § 2511(1)(d) of the ECPA because, based on information and belief, information intercepted from Plaintiffs' and Class Members' communications was intentionally used for corporate gain and profit. In the process, Defendants were unjustly enriched by their unauthorized interception of Plaintiffs' and Class Members' electronic communications.

195. Defendants' acts further violate § 2511(1)(c) of the ECPA because, based on information and belief, Defendants information intercepted from Plaintiffs' and Class Members' communications was accessible by third parties, including the Chinese Communist Party and foreign governmental entities whose interests are opposed to those of United States citizens.

196. Pursuant to 18 U.S.C. § 2520, Plaintiffs and Class Members have been damaged by the interception, disclosure, and/or use of their communications in violation of the ECPA and are each entitled to: (1) appropriate equitable or declaratory relief; (2) damages, in an amount to be determined at trial, assessed as the greater of (a) the sum of the actual damages suffered by Plaintiffs and the Class and any profits made by Defendants as a result of the violation, or (b)

statutory damages of whichever is the greater of $100 per day per violation or $10,000; and (3) reasonable attorneys' fees and other litigation costs reasonably incurred.

## THIRD COUNT:

### VIOLATION OF THE RIGHT TO PRIVACY UNDER MASS. GEN. LAWS CH. 214, § 1B (On Behalf of the Plaintiffs and the User, Minor User and Non-User Classes Or, in the Alternative, on Behalf of the Massachusetts User, Non-User, and Minor User Subclasses)

197. Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

198. Mass. Gen. Laws Ch. 214, § 1B provides that "A person shall have a right against unreasonable, substantial or serious interference with his privacy." The statute provides a private cause of action for damages by those whose privacy rights were violated.

199. Plaintiffs and the Class hold, and at all relevant times held, a legally protected privacy interest in their private and personally identifiable data and content – including user/device Identifiers, biometric identifiers and information, and other private information – on their mobile devices and computers.

200. There is a reasonable expectation of privacy concerning Plaintiffs' and the Class's data and content under the circumstances present.

201. As the materials cited above demonstrate, Defendants have engaged in unreasonable, substantial, and serious interference with Plaintiffs and Class Members' privacy rights.

202. The reasonableness of Plaintiffs' and the Class's expectation of privacy is supported by the undisclosed, hidden, and non-intuitive nature of Defendants' taking of private and personally identifiable data and content – including user/device identifiers, biometric identifiers

and information, and other private data and information – from Plaintiffs' and the Class's mobile devices and other social media accounts.

203. Defendants intentionally intruded upon the Plaintiffs' and the Class's solitude, seclusion, and private affairs – and continue to do so – by intentionally designing the Temu app, including all associated code, to surreptitiously obtain, improperly gain knowledge of, review, and retain the Plaintiffs' and the Class's private and personally identifiable data and content – including user/device identifiers, biometric identifiers and information, and other private data and information never intended for public consumption.

204. These intrusions are highly offensive to a reasonable person, as evidenced by substantial research, literature, and governmental enforcement and investigative efforts to protect consumer privacy against surreptitious technological intrusions.

205. Defendants' conduct constitutes and, at all relevant times, constituted a serious invasion of privacy, as Defendants either did not disclose at all, or failed to make an effective disclosure, that they would take and make use of – and allow individuals and companies based in China to take and make use of – Plaintiffs' and the Class's private and personally identifiable data. Defendants intentionally invaded Plaintiffs' and the Class's privacy interests by intentionally designing the Temu app, including all associated code, to surreptitiously obtain, improperly gain knowledge of, review, and retain their private and personally identifiable data and content. These intrusions are highly offensive to a reasonable person, as evidenced by substantial research, literature, and governmental enforcement and investigative efforts to protect consumer privacy against surreptitious technological intrusions.

206. Defendants further violated Plaintiffs' and the Class's privacy rights by making Plaintiffs' and the Class's private and personally identifiable data and content available to third parties, including foreign governmental entities whose interests are opposed to those of United States citizens. The intentionality of Defendants' conduct, and the steps they have taken to disguise and deny it, also demonstrate the highly offensive nature of their conduct. Further, Defendants' conduct targeted Plaintiffs' and the Class's mobile devices, which the United States Supreme Court has characterized as almost a feature of human anatomy, and which contain Plaintiffs' and the Class's private and personally identifiable data and information.

207. Plaintiffs and the Class were harmed by, and continue to suffer harm as a result of, the intrusion as detailed throughout this Complaint.

208. Defendants' conduct was a substantial factor in causing the harm suffered by Plaintiffs and the Class.

209. Plaintiffs and the Class seek compensatory and punitive damages as a result of Defendants' actions. Punitive damages are warranted because Defendants' malicious, oppressive, and willful actions were calculated to injure the Plaintiffs and the Class and were made in conscious disregard of their rights. Punitive damages are also warranted to deter Defendants from engaging in future misconduct.

210. Plaintiffs and the Class seek injunctive relief to rectify Defendants' actions, including but not limited to requiring Defendants to stop taking more private and personally identifiable data and information of Plaintiffs and the Class from their mobile devices and computers than is reasonably necessary to operate the Temu app; to make clear disclosures; to obtain Plaintiffs' and the Class's consent to the taking of their private and personally identifiable

data and information; to stop allowing individuals in China access to Plaintiffs' private and personally identifiable data and information; to stop transferring such information to servers that are accessible from within China; and to recall and destroy Plaintiffs' and the Class's private and personally identifiable data and information already taken in contravention of Plaintiffs' and the Class's right to privacy.

211. Plaintiffs and the Class seek restitution and disgorgement for Defendants' violation of their privacy rights. A person acting in conscious disregard of the rights of another is required to disgorge all profit because disgorgement both benefits the injured parties and deters the perpetrator from committing the same unlawful actions again. Disgorgement is available for conduct that constitutes "conscious interference with a claimant's legally protected interests," including tortious conduct or conduct that violates another duty or prohibition. Restatement (3rd) of Restitution and Unjust Enrichment, §§ 40, 44.

212. "One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person." Restatement (2nd) of Torts § 652B.

213. The Plaintiffs and the Class have, and at all relevant times had, a reasonable expectation of privacy in their mobile devices and computers. And their private affairs include their past, present and future activity on their mobile devices and computers.

## FOURTH COUNT:

### VIOLATION OF THE MASSACHUSETTS WIRETAP ACT, MASS. GEN. LAWS, CH. 272, § 99 (On Behalf of the Plaintiffs and the User, Minor User and Non-User Classes Or, in the Alternative, on Behalf of the Massachusetts User, Minor User and Non-User Subclasses)

214. Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

215. Mass. Gen. Laws, Ch. 272, § 99 provides that "Any aggrieved person whose oral or wire communications were intercepted, disclosed or used except as permitted or authorized by this section or whose personal or property interests or privacy were violated by means of an interception except as permitted or authorized by this section shall have a civil cause of action against any person who so intercepts, discloses or uses such communications or who so violates his personal, property or privacy interest …." *Id.* § 99.Q.

216. The term "wire communication" means "any communication made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception." *Id.* 99.B.1.

217. The term "interception" means "to secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire or oral communication through the use of any intercepting device by any person other than a person given prior authority by all parties to such communication…." *Id.* 99.B.4.

218. Defendants are each a "person" for purposes of the Wiretap Act because they are corporations.

219. As described above, the code used by the Temu app secretly accesses, texts, emails and other content on users' computers and thus constitutes an "intercepting device" that is used to intercept a wire, oral, or electronic communication through electronic means.

220. Plaintiffs' and Class Members' sensitive personal information, data, and interactions with other individuals and websites, including texts, emails, and other communications, that Defendants secretly intercepted through the Temu app are "wire communications".

221. Plaintiffs and Class Members reasonably believed that Defendants were not intercepting, recording, or disclosing their electronic communications. Defendants' interception of Plaintiffs' and the Class's communications was done in secret.

222. Plaintiffs' and Class Members' electronic communications were intercepted during transmission, without their consent and for the unlawful and/or wrongful purpose of monetizing private information and data, including by using their private information and data to develop marketing and advertising strategies and utilizing user data for other commercial advantage.

223. Defendants were not parties to those communications, which occurred between Plaintiffs and Class Members and third parties or other websites they sought to access or accessed. Defendants used Plaintiffs' and Class Members' electronic communications as part of their business model.

224. Defendants' actions were at all relevant times knowing, willful, and intentional, particularly because Defendants are sophisticated parties who know the type of data they intercept through their own products. Moreover, experts who have examined the Temu app have concluded that the features of the app that allow these covert interceptions are intentional, non-trivial, engineering tasks—the kind that does not happen by mistake or randomly. These experts also concluded that Defendants sought to conceal the features of the Temu app that accomplished the interception of Plaintiffs' and the Class's communications.

225. Neither Plaintiffs nor Class Members consented to Defendants' interception, disclosure, and/or use of their electronic communications. The third parties and/or websites that Plaintiffs and Class Members visited did not know of or consent to Defendants' interception of the communications. Nor could they—Defendants never sought to obtain, nor did it obtain, Plaintiffs', Class Members', or third parties' consent to intercept Temu users' electronic communications with third parties.

226. Pursuant to Mass. Gen. Laws, Ch. 272, § 99.Q, Plaintiffs and Class Members have been damaged by the interception, disclosure, and/or use of their communications in violation of the Wiretap Act and are each entitled to: (1) appropriate equitable or declaratory relief; (2) damages, in an amount to be determined at trial, assessed as the greater of (a) the sum of the actual damages suffered by Plaintiffs and the Class and any profits made by Defendants as a result of the violation, or (b) statutory damages of whichever is the greater of $100 per day per violation or $1,000; (3) punitive damages; and (4) reasonable attorneys' fees and other litigation disbursements reasonably incurred.

## FIFTH COUNT:

### TRESPASS TO CHATTELS

**(On Behalf of the Plaintiffs and the User, Minor User and Non-User Classes Or, In the Alternative, On Behalf of the California, Illinois, Massachusetts, New York and Virginia User, Non-User and Minor User Subclasses)**

227. Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

228. The common law prohibits the intentional interference with a chattel, including an electronic device, in possession of another that results in the deprivation of the use or enjoyment of the chattel or impairment of the condition, quality, or usefulness of the chattel.

229. As described above, Defendants engaged in deception and concealment to gain access to Plaintiffs' and Class Members' electronic devices.

230. By engaging in the acts described above without authorization or in excess of consent given by Plaintiffs and other Class Members, Defendants dispossessed Plaintiffs and Class Members from use, access and/or enjoyment of their electronic devices. These acts impaired the use, value, and quality of Plaintiffs' and Class Members' electronic devices. The battery, memory, CPU and bandwidth of such devices have been compromised, and as a result the functioning of such devices has been impaired and slowed, due to Defendants' clandestine and unlawful activities. Plaintiffs, the Class, and the Subclasses have also incurred additional data usage and electricity costs that they would not have incurred but for Defendants' covert and unlawful actions.

231. In addition, Plaintiffs, the Class and the Subclasses have suffered and continue to suffer harm in the form of diminution of the value of their private and personally identifiable data and content as a result of Defendants' surreptitious and unlawful activities. There is a market for such personally identifiable data and content, which has commercial value.

232. Defendants' acts constitute an intentional interference with the use and enjoyment of the Plaintiffs' and Class Members' electronic devices. Defendants' conduct constitutes trespass to chattels.

233. Plaintiffs and the Class seek compensatory, exemplary and other damages proximately caused by Defendants' trespass to chattels.

## SIXTH COUNT:

**RESTITUTION / UNJUST ENRICHMENT**
**(On Behalf of the Plaintiffs and the User, Minor User and Non-User Classes Or, In the Alternative, on Behalf of the California, Illinois, Massachusetts, New York and Virginia User, Non-User and Minor User Subclasses)**

234. Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

235. Plaintiffs and the Class have conferred substantial benefits on Defendants by downloading and using the Temu app. These include the Defendants' collection and use of the Plaintiffs' and the Class's private and personally identifiable data and content – including user/device identifiers, biometric identifiers and information, and other private data and information never intended for public consumption. Such benefits also include the revenues and profits resulting from Defendants' collection and use of such data and content for Defendants' targeted advertising, use of the data, and increased consumer demand for and use of Defendants' products.

236. Defendants possess user/device identifiers, biometric identifiers and information, and other highly personal data sufficient to create a dossier of private and personally identifiable data and content for each Class Member. Such living files can be supplemented over time with additional private and personally identifiable user data and content, and all of this private and personally identifiable data and information has been, is, and will be used in the past, the present, and the future for Defendants' economic and financial gain.

237. Defendants' unlawful possession and control over this data and information make tracking and profiling Class Members, and targeting them with advertising, much more efficient, effective, and lucrative. Such private and personally identifiable data and content are used to

analyze Class Members' income, consumption habits, and preferences. Such information provides guidance as to what methods of advertising will be most effective on particular Class Members, what products – including Defendants' own products – will be most attractive to particular Class Members, and how much to spend on particular ads. Defendants unjustly have earned and continue to earn substantial profits and revenues from such targeted advertising and from generating increased demand for and use of Defendants' other products.

238. Analysts have observed that, based on the features and design of the Temu app, Defendants may be utilizing the app to purposefully harvest user data for subsequent resale to third parties without Plaintiffs' consent, thereby deriving further economic advantage.

239. Meanwhile, Plaintiffs, the Class and the Subclasses have incurred, and continue to incur, harm as a result of the invasion of privacy stemming from Defendants' covert theft of their private and personally identifiable data and content – including their user/device identifiers, biometric identifiers and information, and other highly personal information. These injuries are further exacerbated by the fact that Plaintiffs' user data is available to the Chinese communist government which, by law, now has access to Plaintiffs' data without Plaintiffs' consent.

240. Plaintiffs, the Class and the Subclasses also have suffered and continue to suffer harm in the form of diminution of the value of their private and personally identifiable data and content as a result of Defendants' surreptitious and unlawful activities.

241. Moreover, Plaintiffs, the Class and the Subclasses have suffered and continue to suffer injuries to their mobile devices. The battery, memory, CPU and bandwidth of such devices have been compromised, and as a result the functioning of such devices has been impaired and slowed, due to Defendants' clandestine and unlawful activities.

242. Plaintiffs, the Class, and the Subclasses have incurred additional data usage and electricity costs that they would not have incurred but for Defendants' covert and unlawful actions.

243. Defendants have knowingly and willingly accepted and enjoyed these benefits.

244. Defendants either knew or should have known that the benefits rendered by the Plaintiffs and the Class were given with the expectation that Defendants would not take and use the Plaintiffs' and the Class's private and personally identifiable data and content that Defendants have taken and used without permission. For Defendants to retain the aforementioned benefits under these circumstances is inequitable.

245. Through deliberate violation of the Plaintiffs' and the Class's privacy interests, and statutory and constitutional rights, Defendants each reaped benefits that resulted in each Defendant wrongfully receiving profits. Likewise, Defendants received significant benefits as a result of their intentionally deceptive and unfair business practices.

246. Equity demands disgorgement of Defendants' ill-gotten gains. Defendants will be unjustly enriched unless they are ordered to disgorge those profits for the benefit of the Plaintiffs and the Class.

247. As a direct and proximate result of Defendants' wrongful conduct and unjust enrichment, the Plaintiffs and the Class are entitled to restitution from Defendants and institution of a constructive trust disgorging all profits, benefits, and other compensation obtained by Defendants through this inequitable conduct.

**SEVENTH COUNT:**

**VIOLATION OF ILLINOIS'S BIOMETRIC INFORMATION PRIVACY ACT, 740 ILCS 14/1, *ET SEQ.***
**(On Behalf of the Illinois Plaintiffs and the Illinois User, Minor User and Non-User Subclasses)**

248. Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

249. Defendants are violating specific statutory protections governing biometric data contained in the Illinois Biometric Information Privacy Act ("BIPA"), 740 ILCS 14/1, *et seq*. In 2008, Illinois enacted BIPA to address the "very serious need [for] protections for the citizens of Illinois when it [comes to their] biometric information." Illinois House Transcript, 2008 Reg. Ses. No. 276. The Illinois Legislature recognized the importance of protecting the privacy of individuals' biometric data, finding that "[b]iometrics are unlike other unique identifiers that are used to access finances or other sensitive information." 740 ILCS 14/5(c). "For example, social security numbers, when compromised, can be changed. Biometrics, however, are biologically unique to the individual; therefore, once compromised, the individual has no recourse [and] is at heightened risk for identity theft …." *Id.* 239. As the Illinois Supreme Court has recognized, through BIPA, "our General Assembly has codified that individuals possess a right to privacy in and control over their biometric identifiers and biometric information." *Rosenbach v. Six Flags Entm't Corp.*, 129 N.E.3d 1197, 1206 (Ill. 2019).

250. BIPA thus focuses on "biometric identifiers" and "biometric information." Biometric identifiers consist of "a retina or iris scan, fingerprint, voiceprint, or scan of hand or face geometry." 740 ILCS 14/10. A "scan" under BIPA means to examine by observation or checking, or systematically in order to obtain data especially for display or storage. *In re Facebook Biometric Information Privacy Litigation*, 2018 WL 2197546, *3 (N.D. Cal. May 14, 2018).

"Geometry" under BIPA is the relative arrangement of parts or elements. *Id.* Neither the term "scan" nor the term "geometry" requires "actual or express measurements of spatial quantities like distance, depth, or angles." *Id.* Biometric information constitutes "any information, regardless of how it is captured, converted, stored, or shared, based on an individual's biometric identifier used to identify an individual." 740 ILCS 14/10.

251. BIPA makes it unlawful for any private entity to, among other things, "collect, capture, purchase, receive through trade, or otherwise obtain a person's or a customer's biometric identifiers or biometric information, unless it first: (1) informs the subject . . . in writing that a biometric identifier or biometric information is being collected or stored; (2) informs the subject . . . in writing of the specific purpose and length of term for which a biometric identifier or biometric information is being collected, stored, and used; and (3) receives a written release executed by the subject of the biometric identifier or biometric information or the subject's legally authorized representative." 740 ILCS 14/15(b). At all relevant times, the Illinois Plaintiffs were residents of Illinois and each is a "person" and/or a "customer" within the meaning of BIPA. 740 ILCS 14/15(b).

252. Each Defendant is, and at all relevant times was, a "corporation, limited liability company, association, or other group, however organized," and thus is, and at all relevant times was, a "private entity" under the BIPA. 740 ILCS 14/10.

253. The Illinois Plaintiffs and the Illinois Subclass had their "biometric identifiers," including their "biometric information" collected, captured, received, or otherwise obtained by Defendants as a result of the Illinois Plaintiffs' and the Illinois Subclass's use of the Temu app. 740 ILCS 14/10.

254. Defendants violated multiple provisions of the Illinois BIPA statute. A private entity in possession of biometric identifiers or biometric information must develop a written policy, made available to the public, establishing a retention schedule and guidelines for permanently destroying biometric identifiers and biometric information when the initial purpose for collecting or obtaining such identifiers or information has been satisfied or within 3 years of the individual's last interaction with the private entity, whichever occurs first. 740 ILCS 14/15(a). Defendants failed to comply with this provision.

255. At all relevant times, Defendants systematically and surreptitiously collected, captured, received or otherwise obtained the Illinois Plaintiffs' and the Illinois Subclass's "biometric identifiers" and "biometric information" without first obtaining signed written releases, as required by 740 ILCS 14/15(b)(3), from any of them or their "legally authorized representatives" in violation of Section 15(b). In fact, Defendants failed to properly inform the Illinois Plaintiffs and the Illinois Subclass, or any of their parents, legal guardians, or other "legally authorized representatives," in writing (or in any other way) that the Illinois Plaintiffs' and the Illinois Subclass's "biometric identifiers" and "biometric information" were being "collected or stored" by Defendants. Nor did Defendants inform the Illinois Plaintiffs and the Illinois Subclass, or any of their parents, legal guardians, or other "legally authorized representatives," in writing of the specific purpose and length of term for which the Illinois Plaintiffs' and the Illinois Subclass's "biometric identifiers" and "biometric information" were being "collected, stored and used" as required by 740 ILCS 14/15(b)(1)-(2). Nor did Defendants obtain from the Illinois Plaintiffs or the Illinois Subclass the specific written release required by 740 ILCS 14/15(b)(3). The Illinois

Plaintiffs did not provide consent to the collection or use of biometric identifiers or biometric information.

256. Defendants did not properly inform the Illinois Plaintiffs and the Illinois Subclass in writing of this collection, the specific purpose and length of term for which these biometric identifiers were collected, stored or used, and without obtaining the specific written release as required by BIPA.

257. Defendants' unauthorized collection of users' biometric data is particularly harmful here given the access that the Chinese government has to such data. The Chinese government has aggressively sought to collect such data and information in order to further the country's advances in artificial intelligence.

258. As the South China Morning Post reported: "China's goal of becoming a global leader in artificial intelligence (AI) is nowhere more manifested than in how facial recognition technology has become a part of daily life in the world's second-largest economy. Facial recognition systems, which are biometric computer applications that automatically identify an individual from a database of digital images, are now being used extensively in areas such as public security, financial services, transport and retail across the country."[109] In fact, the Chinese government employs a variety of biometrics for population surveillance and control: "In addition to voice recognition, there are facial and pupil recognition, gathering of DNA samples—building the world's largest DNA database—and fingerprint scans."[110]

[109] https://www.scmp.com/tech/start-ups/article/2133234/meet-five-chinese-start-ups-pushingfacial-recognition-technology.

[110] https://vlifestyle.org/codec-news/?l=business/content-2254742-china-gathers-people-s-voicesnew-identification-technology-drawing-concerns.

259. BIPA also makes it unlawful for a private entity "in possession of a biometric identifier or biometric information" to "sell, lease, trade, or otherwise profit from a person's or a customer's biometric identifier or biometric information." 740 ILCS 14/15(c).

260. Defendants are, and at all relevant times were, "in possession of" the Illinois Plaintiffs' and the Illinois Subclass's "biometric identifiers," including but not limited to their "biometric information." Defendants profited from such "biometric identifiers" and "biometric information" by using them for targeted advertising and the generation of increased demand for and use of Defendants' other products, thereby violating Section 15(c). 740 ILCS 14/15(c).

261. BIPA prohibits private entities "in possession of a biometric identifier or biometric information" from "disclos[ing], redisclos[ing], or otherwise disseminat[ing] a person's or a customer's biometric identifier or biometric information unless" any one of four enumerated conditions are met. 740 ILCS 14/15(d)(1)-(4). None of such conditions are met here.

262. Defendants possess, disclose, redisclose and disseminate, and at all relevant times possessed, disclosed, redisclosed and disseminated, the Illinois Plaintiffs' and the Illinois Subclass's "biometric identifiers," including but not limited to their "biometric information" without the consent of any of them or their "legally authorized representatives." 740 ILCS 14/15(d)(1). Moreover, the disclosures and redisclosures did not "complete[] a financial transaction requested or authorized by" the Illinois Plaintiffs, the Illinois Subclass or any of their legally authorized representatives. 740 ILCS 14/15(d)(2). Nor are, or at any relevant times were, the disclosures and redisclosures "required by State or federal law or municipal ordinance." 740 ILCS 14/15(d)(3). Finally, at no point in time were the disclosures ever "required pursuant to a valid warrant or subpoena issued by a court of competent jurisdiction." 740 ILCS 14/15(d)(4). BIPA mandates that

a private entity "in possession of biometric identifiers or biometric information" "develop a written policy, made available to the public, establishing a retention schedule and guidelines for permanently destroying biometric identifiers and biometric information when the initial purpose for collecting or obtaining such identifiers or information has been satisfied or within 3 years of the individual's last interaction with the private entity, whichever occurs first." 740 ILCS 14/15(a). But Defendants do not publicly provide any written policy establishing any retention schedule or guidelines for permanently destroying the Illinois Plaintiffs' and the Illinois Subclass's "biometric identifiers" and "biometric information." 740 ILCS 14/15(a).

263. BIPA also commands private entities "in possession of a biometric identifier or biometric information" to: (1) store, transmit, and protect from disclosure all biometric identifiers and biometric information using the reasonable standard of care within the private entity's industry; and (2) store, transmit, and protect from disclosure all biometric identifiers and biometric information in a manner that is the same as or more protective than the manner in which the private entity stores, transmits and protects other confidential and sensitive information. 740 ILCS 14/15(e). Based on the facts alleged herein, including Defendants' lack of an adequate public written policy, their failure to inform Temu users that Defendants obtain such users' "biometric identifiers" and "biometric information," their failure to obtain written consent to collect or otherwise obtain Temu users' "biometric identifiers" and "biometric information," and their unauthorized dissemination of Temu users' "biometric identifiers" and "biometric information," Defendants have violated this provision too. In addition, Defendants violated Section 15(e) by failing to comply with industry standards for the handling of biometric data and

information. Defendants' data processing and storage practices have made that data available to third parties, including third parties based in China.

264. Defendants recklessly or intentionally violated each of BIPA's requirements and infringed the Illinois Plaintiffs' and the Illinois Subclass's rights to keep their immutable and uniquely identifying biometric identifiers and biometric information private. As individuals subjected to each of Defendants' BIPA violations above, the Illinois Plaintiffs and the Illinois Subclass are and have been aggrieved. 740 ILCS 14/20.

265. On behalf of themselves and the Illinois Subclass, the Illinois Plaintiffs seek: (1) injunctive and equitable relief as is necessary to protect the interests of the Illinois Plaintiffs and the Illinois Subclass by requiring Defendants to comply with BIPA's requirements; (2) $1,000.00 or actual damages, whichever is greater, for each negligent violation of BIPA by Defendants; (3) $5,000.00 or actual damages, whichever is greater, for each intentional or reckless violation of BIPA by Defendants; and (4) reasonable attorneys' fees and costs, including expert witness fees and other litigation expenses. 740 ILCS 14/20(1)-(4).

## EIGHTH COUNT:

### INTRUSION UPON SECLUSION
**(On Behalf of the Illinois Plaintiffs and the Illinois User, Minor User and Non-User Subclasses)**

266. Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

267. Illinois Plaintiffs' and members of the Illinois Subclasses' private affairs, concerns, and seclusion includes their interest in their private and personally identifiable information.

268. Defendants each and in concert, through aid or assistance, or pursuant to a common purpose with the knowledge of the others, intentionally intruded upon the private

affairs, concerns, and seclusion of members of the Subclasses by improperly accessing their private and personally identifiable information and using it for improper purposes that would be highly offensive to a reasonable person, constituting an egregious breach of social norms.

269. Defendants' intrusions upon the private affairs, concerns, and seclusion of the Subclasses were substantial, and would be highly offensive to a reasonable person, constituting an egregious breach of social norms.

**NINTH COUNT:**

**ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT, 815 ILL. COMP. STAT. ANN. 505/2 *ET SEQ.***
**(On Behalf of the Illinois Plaintiffs and the Illinois User, Minor User and Non-User Subclasses)**

270. Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

271. At all times mentioned herein, Defendants each engaged in "trade" or "commerce" in Illinois in that Defendants each engaged in the advertising, offering for sale, sale, and distribution of property or any other articles, commodities, or things of value in Illinois.

272. Defendants each engaged in consumer-oriented acts through the offering, promoting, and/or distributing of Temu and associated goods and services, which significantly impacted the public and members of the Illinois Subclasses.

273. 815 Ill. Comp. Stat. Ann. 505/2 provides "[u]nfair methods of competition and unfair … acts or practices … in the conduct of any trade or commerce are hereby declared unlawful … In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act."

274. Defendants each violated 815 Ill. Comp. Stat. Ann. 505/2 by engaging in the unfair acts or practices proscribed by 815 Ill. Comp. Stat. Ann. 505/2 outlined herein.

275. Defendants at all relevant times knowingly violated legal duties and public policy for their own commercial financial gain.

276. As outlined herein, Defendants intentionally collected private and personally identifiable information from members of the Subclasses, including from children under the age of thirteen.

277. As outlined herein, Defendants intentionally designed and marketed Temu to attract minors, including minors under the age of thirteen.

278. Defendants failed to provide sufficient notice of the information Defendants collected, how Defendants used such information, or the purposes for which the information was used.

279. Defendants failed to provide sufficient direct notice to parents of the information Defendants collected online from children under thirteen, how Defendants used such information, and their disclosure practices. Defendants failed to obtain verifiable parental consent before collection or use of personal information from children under thirteen. Defendants failed to establish and maintain reasonable procedures to protect the confidentiality, security, and integrity of personal information collected from children under thirteen.

280. Defendants willfully engaged in the unfair and unlawful acts described herein and knew or recklessly disregarded the fact that they violated 815 Ill. Comp. Stat. Ann. 505/2 *et seq.*

281. Illinois Plaintiffs and members of the Illinois Subclasses were harmed by Defendants' practices described herein, which were a substantial factor and caused injury in fact and actual damages to Illinois Plaintiffs and members of the Illinois Subclasses.

282. As a direct and proximate result of Defendants' unfair and unlawful acts and practices in violation of 815 Ill. Comp. Stat. Ann. 505/2 *et seq.*, Illinois Plaintiffs and members of the Illinois Subclasses have suffered and will continue to suffer an ascertainable loss of money or property, real or personal, and monetary and non-monetary damages, as described herein, including, inter alia, the loss of the value and/or diminishment in value of their private and personally identifiable information and the loss of the ability to control the use of such information.

283. As outlined herein, there is tangible value in Illinois Plaintiffs' and the Illinois Subclasses' private and personally identifiable information and members of the Illinois Subclasses have lost the opportunity to receive value in exchange for such information. There is a market for such information.

284. Illinois Plaintiffs' and members of the Illinois Subclasses' private and personally identifiable information is now in the possession of Defendants, who have used and will use it for their financial gain.

285. Illinois Plaintiffs' and members of the Illinois Subclasses seek relief for the injuries they have suffered as a result of Defendants' unfair and unlawful acts and practices, as provided by 815 Ill. Comp. Stat. Ann. 505/2 *et seq.* and applicable law, including all actual damages and attorneys' fees and costs, treble damages, statutory damages, and restitution, as well as an injunction requiring Defendants to each permanently delete, destroy or otherwise sequester the

private and personally identifiable information collected without parental consent, requiring Defendants to provide a complete audit and accounting of the uses of the information by them and any other third parties, and other appropriate injunctive and/or declaratory relief.

**TENTH COUNT:**

**VIOLATION OF THE CALIFORNIA COMPREHENSIVE DATA ACCESS AND FRAUD ACT, CAL. PEN. C. § 502**
**(On Behalf Of the California Plaintiffs and California User, Minor User, and Non-User Subclasses)**

286. Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

287. Defendants' acts violate Cal. Pen. C. § 502(c)(1) because they have knowingly accessed, and continue to knowingly access, data and computers to wrongfully control or obtain data. The Plaintiffs' and the Subclass's private and personally identifiable data and content accessed by Defendants – including user/device identifiers, biometric identifiers and information, and other private data – far exceeds any reasonable use of the Plaintiffs' and the Subclass's data and content to operate the Temu app. There is no justification for Defendants' surreptitious collection and transfer of the Plaintiffs' and the Subclass's private and personally identifiable data and content from their devices and computers and allowing access to that information to individuals and third-party companies in China that are subject to Chinese law requiring the sharing of such data and content with the Chinese government.

288. Defendants' acts violate Cal. Pen. C. § 502(c)(2) because they have knowingly accessed and without permission taken, copied, and made use of data from a computer – and they continue to do so. Defendants did not obtain permission to take, copy, and make use of the Plaintiffs' and the Subclass's private and personally identifiable data and content – including

user/device identifiers, biometric identifiers and information, and other private data and information – from their devices – and provide access to the Chinese Communist Party or individuals and companies that are subject to Chinese law requiring the sharing of such data and content with the Chinese government. Defendants intentionally accessed Plaintiffs' devices without the necessary authorization in order to obtain data that Plaintiffs did not authorize them to take.

289. Accordingly, the Plaintiffs and the Subclass are entitled to compensatory damages, including "any expenditure reasonably and necessarily incurred by the owner or lessee to verify that a computer system, computer network, computer program, or data was or was not altered, damaged, or deleted by the access," injunctive relief, and attorneys' fees. Cal. Pen. C. § 502(e)(1), (2).

**ELEVENTH COUNT:**

**VIOLATION OF THE RIGHT OF PRIVACY UNDER THE CALIFORNIA CONSTITUTION (On Behalf Of the California Plaintiffs and California User, Minor User, and Non-User Subclasses)**

290. Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

291. The California Constitution expressly provides for a right to privacy: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." Cal. Const., art I, § 1.

292. Plaintiffs and the California Subclass hold, and at all relevant times held, a legally protected privacy interest in their private and personally identifiable data and content – including

user/device identifiers, biometric identifiers and information, and other private data – on their devices and computers.

293. Plaintiffs and the Subclass have a reasonable expectation of privacy in their data and content under the circumstances present.

294. The reasonableness of Plaintiffs' and the Subclass's expectation of privacy is supported by the undisclosed, hidden, and non-intuitive nature of Defendants' accessing private and personally identifiable data and content – including user/device identifiers, biometric identifiers and information, and other private data and information – from Plaintiffs' and the Subclass's devices and computers.

295. Defendants' conduct constitutes and, at all relevant times, constituted a serious invasion of privacy, as Defendants either did not disclose at all, or failed to make an effective disclosure, that they would take and make use of – and allow individuals and companies based in China to take and make use of – Plaintiffs' and the Subclass's private and personally identifiable data and content. Defendants intentionally invaded Plaintiffs' and the Subclass's privacy interests by intentionally designing the Temu app, including all associated code, to surreptitiously obtain, improperly gain knowledge of, review, and retain their private and personally identifiable data and content. These intrusions are highly offensive to a reasonable person, as evidenced by substantial research, literature, and governmental enforcement and investigative efforts to protect consumer privacy against surreptitious technological intrusions. The offensiveness of Defendants' intrusion is heightened by Defendants' making Plaintiffs' and the Subclass's private and personally identifiable data and content available to third parties, including the Chinese Communist Party and foreign governmental entities whose interests are opposed to those of United States citizens. The

intentionality of Defendants' conduct, and the steps they have taken to disguise and deny it, also demonstrate the highly offensive nature of their conduct. Further, Defendants' conduct targeted Plaintiffs' and the Subclass's devices, which contain Plaintiffs' and the Subclass's private and personally identifiable data and content.

296. Further, Defendants' conduct targeted Plaintiffs' and Subclass Members' mobile devices, which the United States Supreme Court has characterized as akin to a feature of human autonomy, and which contain Plaintiffs' and Subclass Members' private and personally-identifiable data and information.

297. Plaintiffs and the Subclass were harmed by, and continue to suffer harm as a result of, the intrusion as detailed throughout this Complaint.

298. Defendants' conduct was a substantial factor in causing the harm suffered by Plaintiffs and the Subclass.

299. Plaintiffs and the Subclass seek compensatory and punitive damages as a result of Defendants' actions. Punitive damages are warranted because Defendants' malicious, oppressive, and willful actions were calculated to injure the Plaintiffs and the Subclass and were made in conscious disregard of their rights. Punitive damages are also warranted to deter Defendants from engaging in future misconduct.

300. Plaintiffs and the Subclass seek injunctive relief to rectify Defendants' actions, including but not limited to requiring Defendants (a) to stop taking more private and personally identifiable data and content of Plaintiffs and the Subclass from their devices and computers than is reasonably necessary to operate the Temu app; (b) to make clear disclosures of Plaintiffs' and the Subclass's private and personally identifiable data and content that is reasonably necessary to

operate the Temu app; (c) to obtain Plaintiffs' and the Subclass's consent to the taking of their private and personally identifiable data and content; (d) to stop providing access to the Plaintiffs' private and personally identifiable data and content to individuals in China or transferring such data to servers or companies whose data is accessible from within China; and (e) to recall and destroy Plaintiffs' and the Subclass's private and personally identifiable data and content already taken in contravention of Plaintiffs' and the Subclass's right to privacy under the California Constitution.

301. The Plaintiffs and the Subclass seek restitution and disgorgement for Defendants' violation of their privacy rights. A person acting in conscious disregard of the rights of another is required to disgorge all profit because disgorgement both benefits the injured parties and deters the perpetrator from committing the same unlawful actions again. Disgorgement is available for conduct that constitutes "conscious interference with a claimant's legally protected interests," including tortious conduct or conduct that violates another duty or prohibition. Restatement (3rd) of Restitution and Unjust Enrichment, §§ 40, 44.

## TWELFTH COUNT:

### INTRUSION UPON SECLUSION
**(On Behalf Of the California Plaintiffs and California User, Minor User, and Non-User Subclasses)**

302. Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

303. "One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person." Restatement (2nd) of Torts § 652B.

304. The Plaintiffs and the California Subclass have, and at all relevant times had, a reasonable expectation of privacy in their devices and computers, and their private affairs include their past, present and future activity on their devices and their other media accounts.

305. The reasonableness of the Plaintiffs' and the Subclass's expectations of privacy is supported by the undisclosed, hidden, and non-intuitive nature of Defendants' taking of private and personally identifiable data and content from the Plaintiffs' and the Subclass's devices and computers.

306. Defendants intentionally intruded upon the Plaintiffs' and the Subclass's solitude, seclusion, and private affairs – and continue to do so – by intentionally designing the Temu app, including all associated code, to surreptitiously obtain, improperly gain knowledge of, review, and retain the Plaintiffs' and the Subclass's private and personally identifiable data and content – including user/device identifiers, biometric identifiers and information, and other private data and information.

307. These intrusions are highly offensive to a reasonable person, as evidenced by substantial research, literature, and governmental enforcement and investigative efforts to protect consumer privacy against surreptitious technological intrusions. The offensiveness of Defendants' intrusion is heightened by Defendants' making the Plaintiffs' and the Subclass's private and personally identifiable data and content available to third parties, including the Chinese Communist Party and foreign governmental entities whose interests are opposed to those of United States citizens. The intentionality of Defendants' conduct, and the steps they have taken to disguise and deny it, also demonstrate the highly offensive nature of their conduct. Further, Defendants' conduct targeted the Plaintiffs' and the Subclass's devices, which the United States

Supreme Court has characterized as almost a feature of human anatomy, and which contain the Plaintiffs' and the Subclass's private and personally identifiable data and content.

308. The Plaintiffs and the Subclass were harmed by, and continue to suffer harm as a result of, the intrusion as detailed throughout this Complaint.

309. Defendants' conduct was a substantial factor in causing the harm suffered by the Plaintiffs and the Subclass.

310. The Plaintiffs and the Subclass seek nominal and punitive damages as a result of Defendants' actions. Punitive damages are warranted because Defendants' malicious, oppressive, and willful actions were calculated to injure the Plaintiffs and the Subclass, and were made in conscious disregard of their rights. Punitive damages are also warranted to deter Defendants from engaging in future misconduct.

311. The Plaintiffs and the Subclass seek injunctive relief to rectify Defendants' actions, including but not limited to requiring Defendants (a) to stop taking more private and personally identifiable data and content from the Plaintiffs' and the Subclass's devices and computers accounts than is reasonably necessary to operate the Temu app; (b) to make clear disclosures of the Plaintiffs' and the Subclass's private and personally identifiable data and content that is reasonably necessary to operate the Temu app; (c) to obtain the Plaintiffs' and the Subclass's consent to the taking of such private and personally identifiable data and content; (d) to stop providing access to the Plaintiffs' and the Subclass's private and personally identifiable data and content to individuals in China or transferring such data to servers or companies whose data is accessible from within China; and (e) to recall and destroy the Plaintiffs' and the Subclass's private and personally

identifiable data and content already taken in contravention of the Plaintiffs' and the Subclass's privacy rights.

312. Plaintiffs and the Subclass seek restitution and disgorgement for Defendants' intrusion upon seclusion. A person acting in conscious disregard of the rights of another is required to disgorge all profit because disgorgement both benefits the injured parties and deters the perpetrator from committing the same unlawful actions again. Disgorgement is available for conduct that constitutes "conscious interference with a claimant's legally protected interests," including tortious conduct or conduct that violates another duty or prohibition. Restatement (3rd) of Restitution and Unjust Enrichment, §§ 40, 44.

**THIRTEENTH COUNT:**

**VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW, BUS. & PROF. C. §§ 17200 *ET SEQ.***
**(On Behalf Of the California Plaintiffs and California User, Minor User, and Non-User Subclasses)**

313. Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

314. The Unfair Competition Law, California Business & Professions Code §§ 17200, *et seq*. (the "UCL"), prohibits any "unlawful," "unfair," or "fraudulent" business act or practice, which can include false or misleading advertising.

315. Defendants acted jointly to violate, and continue to violate, the "unlawful" prong of the UCL through violation of statutes, constitutional provisions, and common law, as alleged herein.

316. Defendants acted jointly to violate, and continue to violate, the "unfair" prong of the UCL because they accessed private and personally identifiable data and content – including user/device identifiers, biometric identifiers and information, electronic communications, and

other private data and information – from the Plaintiffs' and the Subclass's devices and computers under circumstances in which the Plaintiffs and the Subclass would have no reason to know that such data and content was being taken. This information is property under the laws of California and common law. Defendants' unlawful taking and use of this property was immoral, unethical, oppressive, unscrupulous and substantially injurious to Plaintiffs and the Subclass. Defendants' unauthorized collection and disclosure of private and personal information was made for their own gain and at the expense of Plaintiffs and the Subclass.

317. Plaintiffs and the Subclass had no reason to know because (i) there was no disclosure, or no effective disclosure, of Defendants' collection and transfer of the Plaintiffs' and the Subclass's biometric identifiers and information, and private data and information; (ii) there was no disclosure that Defendants had embedded source code within the Temu app that makes Plaintiffs' and the Subclass's private and personally identifiable data and content accessible to third-party companies and individuals based in China where such companies and individuals are subject to Chinese law requiring the sharing of such data and content with the Chinese government; and (iii) there was no effective disclosure of the wide range of private and personally identifiable data and content that Defendants took from the Plaintiffs' and the Subclass's devices. Defendants violated, and continue to violate, the "fraudulent" prong of the UCL because (i) Defendants made it appear that the Plaintiffs' private and personally identifiable data and content would not be collected and transferred unless the Plaintiffs and the Subclass chose to do so, but in fact Defendants collected and transferred such data and content without notice or consent; (ii) Defendants made it appear that the Plaintiffs' and the Subclass's private and personally identifiable data and content would not be provided to individuals or companies that

are subject to Chinese law requiring the sharing of such data and content with the Chinese government; and (iii) Defendants have intentionally refrained from disclosing the uses to which the Plaintiffs' and the Subclass's private and personally identifiable data and content has been put, while simultaneously providing misleading reassurances about Defendants' data collection and use practices. The Plaintiffs and the Subclass were misled by Defendants' concealment, and had no reason to believe that Defendants had taken the private and personally identifiable data and content that they had taken or used it in the manner they did.

318. In addition, Defendants fail to adequately disclose that users' data will be accessible to individuals in China, and ultimately accessible by the Chinese communist government. To the contrary, Defendants assured Plaintiffs and the Subclass of the privacy of their data, while under Chinese law the Chinese government has an absolute right to access users' data.

319. Defendants' conduct is particularly egregious because these violations extend to minor users whom Defendants acknowledge should not be using the platform. Indeed, through their promotion through various influencers and other means, Defendants have encouraged minor use, including use by children under the age of 13. Moreover, they have failed to incorporate appropriate age verification and other measures in the Temu app necessary to prevent underage use and have incorporated features in the design of the Temu app that actually facilitate underage use.

320. Defendants failed to provide sufficient direct notice to parents of the information Defendants collected online from children under thirteen, how Defendants used such information, and their disclosure practices. Defendants failed to obtain verifiable parental consent before collection or use of personal information from children under thirteen. Defendants failed

to establish and maintain reasonable procedures to protect the confidentiality, security, and integrity of personal information collected from children under thirteen.

321. Defendants were under a duty to disclose the omitted facts because they were under a confidential, contractual or fiduciary relationship with Plaintiffs and the Subclass.

322. In addition, Defendants have utilized a variety of deceptive, unfair and manipulative means to increase usage of the Temu app and, in turn, the collection of user data.

323. Plaintiffs and the Subclass have been harmed and have suffered economic injury as a result of Defendants' UCL violations. First, Plaintiffs and the Subclass have suffered harm in the form of diminution of the value of their private and personally identifiable data and content. Plaintiffs and the Subclass have a property interest in the personally identifiable information and other personal information taken by Defendants. There is a market for such data and Plaintiffs and the Subclass have been deprived of the money or property they would have received for the data improperly collected by Defendants. Second, they have suffered harm to their devices. The battery, memory, CPU and bandwidth of such devices have been compromised, and as a result the functioning of such devices has been impaired and slowed. Third, they have incurred additional data usage and electricity costs that they would not otherwise have incurred. Fourth, they have suffered harm as a result of the invasion of privacy stemming from Defendants' covert theft of their private and personally identifiable data and content – including user/device identifiers, biometric identifiers and information, and other private data and information.

324. Defendants, as a result of their conduct, have been able to reap unjust profits and revenues in violation of the UCL. This includes Defendants' profits and revenues from their targeted advertising, revenues from the sale of goods on the Temu site, and the increased

consumer demand for and use of Defendants' products. Plaintiffs and the Subclass seek restitution and disgorgement of these unjust profits and revenues.

325. Plaintiffs and the Subclass lack an adequate remedy at law and thus are entitled to seek equitable relief. Unless restrained and enjoined, Defendants will continue to misrepresent their private and personally identifiable data and content collection and use practices, and will not recall and destroy Plaintiffs' and the Subclass's wrongfully collected private and personally identifiable data and content. Due to the ongoing nature of the harm, damages will be insufficient to address it. Accordingly, injunctive relief is appropriate.

326. Further, Plaintiffs and the Subclass are entitled to restitution as the available damages and remedies are inadequate to return to Plaintiffs and the Subclass the value of the information taken by Defendants, including for use in developing their artificial intelligence systems. Plaintiffs and the Subclass are entitled to restitution for Defendants' unjust enrichment in a sum that is not identical to the legal damages suffered.

**FOURTEENTH COUNT:**

**VIOLATION OF THE CALIFORNIA FALSE ADVERTISING LAW, BUS. & PROF. C. §§ 17500 *ET SEQ.***
**(On Behalf Of the California Plaintiffs and California User, Minor User, and Non-User Subclasses)**

327. Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

328. California's False Advertising Law (the "FAL") – Cal. Bus. & Prof. Code §§ 17500, *et seq*. – prohibits "any statement" that is "untrue or misleading" and made "with the intent directly or indirectly to dispose of" property or services.

329. Defendants' advertising and other statements regarding Temu are, and at all relevant times were, highly misleading. Defendants do not disclose at all, or do not meaningfully

disclose, the private and personally identifiable data and content – including user/device identifiers, biometric identifiers and information, electronic communications, and private data and information – that they have collected and transferred from the Plaintiffs' and the Subclass's devices and computers. Nor do Defendants disclose that the Plaintiffs' and the Subclass's private and personally identifiable data and content have been made available to the Chinese Communist Party and foreign government entities.

330. Reasonable consumers, like the Plaintiffs and the Subclass, are – and at all relevant times were – likely to be misled by Defendants' misrepresentations. Reasonable consumers lack the means to verify Defendants' representations concerning their data and content collection and use practices, or to understand the fact or significance of Defendants' data and content collection and use practices.

331. Plaintiffs and the Subclass have been harmed and have suffered economic injury as a result of Defendants' misrepresentations. First, they have suffered harm in the form of diminution of the value of their private and personally identifiable data and content. Plaintiffs and the Subclass have a property interest in the personally identifiable information and other personal information taken by Defendants. There is a market for such data and Plaintiffs and the Subclass have been deprived of the money or property they would have received for the data improperly collected by Defendants. Second, they have suffered harm to their devices. The battery, memory, CPU and bandwidth of such devices have been compromised, and as a result the functioning of such devices has been impaired and slowed. Third, they have incurred additional data usage and electricity costs that they would not otherwise have incurred. Fourth, they have suffered harm as a result of the invasion of privacy stemming from Defendants' accessing their private and personally

identifiable data and content – including user/device identifiers, biometric identifiers and information, and other private data and information.

332. Defendants, as a result of their misrepresentations, have been able to reap unjust profits and revenues. This includes Defendants' profits and revenues from their targeted advertising, revenue from the sale of goods on the Temu site, and increased consumer demand for and use of Defendants' other products and services. Plaintiffs and the Subclass seek restitution and disgorgement of these unjust profits and revenues.

333. Unless restrained and enjoined, Defendants will continue to misrepresent their private and personally identifiable data and content collection and use practices and will not recall and destroy Plaintiffs' and the Subclass's wrongfully collected private and personally identifiable data and content. Accordingly, injunctive relief is appropriate.

**FIFTEENTH COUNT:**

**VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT, CAL. PENAL CODE §§ 630, *ET SEQ.***
**(On Behalf Of the California Plaintiffs and California User, Minor User, and Non-User Subclasses)**

334. Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

335. The California Legislature enacted the California Invasion of Privacy Act, Cal. Penal Code §§ 630, *et seq.* ("CIPA") finding that "advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." *Id.* § 630. Thus, the intent behind CIPA is "to protect the right of privacy of the people of this state." *Id.*

336. Cal. Pen. Code § 631(a) imposes liability upon: "Any person who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to lawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section . . . ."

337. Cal. Pen. Code § 632(a) imposes liability upon: "A person who, intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio."

338. Plaintiffs and the Subclass have an expectation of privacy in their private and personally identifiable data and information, and they exercised a reasonable expectation of privacy concerning the transmission of such information.

339. Under either section of the CIPA quoted above, a defendant must show it had the consent of all parties to a communication. However, without the consent of either the sender or recipient, Defendants intercepted and recorded messages and electronic communications transmitted using the Temu platform without Plaintiffs' and the Subclass's consent or knowledge.

340. Defendants knowingly and intentionally used and continue to use the Temu app platform and associated servers and other computer devices, to read, attempt to read, learn, attempt to learn, eavesdrop, record, and/or use electronic communications containing private data from Plaintiff and Subclass Members, while these electronic communications were and are in transit, originating in or sent to California, and without the authorization or consent of Plaintiff or Subclass Members. Acts by Defendants in violation of the CIPA occurred in the State of California because those acts resulted from business decisions, practices, and operating policies that Defendants developed, implemented, and utilized in the State of California and which are unlawful and constitute criminal conduct in the state of California. Defendants profited and continue to profit in the State of California as a result of these repeated and systemic violations of CIPA. Defendants' unlawful conduct, which occurred in the State of California, harmed and continues to harm Plaintiffs and the Subclass.

341. The communications intercepted by Defendants include "contents" of electronic communications exchanged between Plaintiffs and Subclass Members, on the one hand, and third parties through shared communications. Defendants recorded and stored such private message content, separate from the process of transmitting the message to the intended recipient. Defendants purposefully designed the Temu platform in a way that they knew Plaintiffs' and the Subclass's privacy rights would be violated, in that their messages would be unlawfully intercepted and recorded. The defective and unlawful design of the Temu platform directly facilitates Defendants' unlawful conduct.

342. The following constitute "machine[s], instrument[s], or contrivance[s], under Cal. Penal Code § 631(a): (a) Plaintiff's and Subclass Members' personal computing devices; (b) the

computer codes and programs Defendants used to effectuate the interception of communications; (c) Defendants' servers; (d) and the plan Defendants carried out to effectuate the interception of the communications that were exchanged with Plaintiffs and Subclass Members. In the alternative, Defendants' purposeful scheme that facilitated its interceptions falls under the broad statutory catch-all category of "any other manner".

343. The private data Defendants collected constitutes "confidential communications," as that term is used in Cal. Pen. Code § 632(a), because Plaintiffs and Subclass Members have an objectively reasonable expectation of privacy in their communications not being disseminated by Defendants.

344. Neither Plaintiffs nor the Subclass Members consented to Defendants' interception, disclosure, and/or use of their electronic communications. Nor, based on information and belief, did third parties receiving the communications.

345. The unauthorized interceptions described herein are not covered by any business exception because the interceptions were not required to facilitate the communications.

346. Plaintiffs and Subclass Members have suffered loss because of these violations, including, but not limited to, violation of their rights to privacy and loss of value in their private data. Plaintiffs and the Subclass have a property right in their private communications, videos and messages such that interception of those messages violated those rights and therefore caused them injuries and damages. Plaintiffs and the Subclass suffered further economic injury as a result of Defendants' unlawful and unauthorized interceptions and recordings of communications. The battery, memory, CPU and bandwidth of their cellular devices have been compromised and they incurred additional data and electricity costs that they otherwise would not have.

347. Pursuant to Cal. Pen. Code § 637.2, Plaintiffs and Subclass Members have been injured by the violations of Cal. Pen. Code §§ 631, 632, and each seeks damages for the greater of $5,000 or three times the amount of actual damages, as well as injunctive or other equitable relief.

348. Plaintiffs and Subclass Members have also suffered irreparable injury from these unauthorized acts of disclosure; their personal, private, and sensitive data have been collected, viewed, accessed, stored, and used by Defendants, and have not been destroyed. Due to the continuing threat of such injury, Plaintiffs and Subclass Members have no adequate remedy at law, Plaintiffs and Subclass Members are entitled to injunctive relief.

## SIXTEENTH COUNT:

### STATUTORY LARCENY, CAL. PENAL CODE §§ 484, 496
### (On Behalf Of the California Plaintiffs and California User, Minor User, and Non-User Subclasses)

349. Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

350. Cal. Pen. Code § 496 imposes liability upon: "Every person who buys or receives any property that has been stolen or that has been obtained in any manner constituting theft or extortion, knowing the property to be so stolen or obtained, or who conceals, sells, withholds, or aids in concealing, selling, or withholding any property from the owner, knowing the property to be so stolen or obtained[.]"

351. Cal. Pen. Code § 484, which defines "theft", states in pertinent part: "Every person who shall feloniously steal, take, carry, lead, or drive away the personal property of another, or who shall fraudulently appropriate property which has been entrusted to him or her, or who shall knowingly and designedly, by any false or fraudulent representation or pretense, defraud any other person of money, labor or real or personal property, or who causes or procures others to report

falsely of his or her wealth or mercantile character and by thus imposing upon any person, obtains credit and thereby fraudulently gets or obtains possession of money, or property or obtains the labor or service of another, is guilty of theft."

352. Under California law, Plaintiffs and Subclass Members have a property interest in their personal information and private data.

353. Defendants acted in a manner constituting theft by surreptitiously taking Plaintiffs' and Subclass Members' private data through the Temu platform under false pretenses, with the specific intent to deprive Plaintiff and Subclass Members of their property.

354. Plaintiff and Subclass Members did not consent to any of Defendants' actions in taking Plaintiff's and Subclass Members' private data.

355. Pursuant to Cal. Pen. Code § 496(c), Plaintiff and Subclass Members are entitled to treble damages, as well as attorneys' fees and costs, for injuries sustained as a result of Defendants' violations of Cal. Pen. Code § 496(a).

## SEVENTEENTH COUNT:

### CONVERSION
### (On Behalf Of the California Plaintiffs and California User, Minor User, and Non-User Subclasses)

356. Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

357. Property is the right of any person to possess, use, enjoy, or dispose of a thing, including intangible things such as data or communications. Plaintiffs' and Subclass Members' private data is their property under California law.

358. Defendants unlawfully intercepted, collected, used, and exercised dominion and control over Plaintiffs' and Subclass Members' private data without authorization.

359. Defendants wrongfully exercised control over Plaintiffs' and Subclass Members' private data, and have not returned such private data.

360. Plaintiff and Subclass Members have been damaged as a result of Defendants' unlawful conversion of their property.

**EIGHTEENTH COUNT:**

**VIOLATION OF THE VIRGINIA COMPUTER CRIMES ACT, VA. CODE § 18.2-152.1*, ET SEQ.***
**(On Behalf Of the Virginia Plaintiffs and Virginia User, Minor User, and Non-User Subclasses)**

361. Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

362. The Virginia Computer Crimes Act, Va. Code § 18.2-152.1, *et seq*., prohibits the actions taken by Defendants to steal private data and content from Plaintiffs and the Virginia Subclass. Defendants have committed multiple violations of the Virginia Computer Crimes Act.

363. For each of the actions described below, the Virginia Computer Crimes Act provides a private right of action as follows:

> A. Any person whose property or person is injured by reason of a violation of any provision of this article or by any act of computer trespass set forth in subdivisions Al through A8 of § 18.2-152.4 regardless of whether such act is committed with malicious intent may sue therefor and recover for any damages sustained and the costs of suit. Without limiting the generality of the term, "damages" shall include loss of profits.
>
> * * *
>
> E. The provisions of this article shall not be construed to limit any person's right to pursue any additional civil remedy otherwise allowed by law.

Va. Code § 152.12(A).

364. Virginia Code section 18.2-152.3 provides:

Computer fraud; penalty.

Any person who uses a computer or computer network, without authority and:

1. Obtains property or services by false pretenses;
2. Embezzles or commits larceny; or
3. Converts the property of another;

is guilty of the crime of computer fraud. Va. Code § 18.2-152.3.

365. Under the Virginia Computer Crimes Act, "property" is defined broadly to include "computer data, computer programs, computer software and all other personal property." Va. Code § 18.2-152.2.

366. By collecting Plaintiffs' and the Subclass's private data and information without their consent, Defendants have obtained property by false pretenses and converted that property, as described in the Virginia Computer Crimes Act.

367. Virginia Code § 18.2-152.4 provides:

> Computer trespass, penalty.
>
> A. It shall be unlawful for any person . . to:
>
> * * *
>
> 6. Use a computer or computer network to make or cause to be made an unauthorized copy, in any form, including, but not limited to, any printed or electronic form of computer data, computer programs or computer software residing in, communicated by, or produced by a computer or computer network.

Va. § 18.2-152.4.

368. By collecting Plaintiffs' and the Subclass's private data and information without their consent, Defendants used a computer or computer network to make an unauthorized copy of computer data residing in a computer or computer network, as described in the Virginia Computer Crimes Act.

369. Virginia Code § 18.2-152.5 provides:

Computer invasion of privacy; penalties.

> A. A person is guilty of the crime of computer invasion of privacy when he uses a computer or computer network and intentionally examines without authority any employment, salary, credit or any other financial or identifying information, as defined in clauses (iii) through (xiii) of subsection C of § 18.2-186.3, relating to any other person. "Examination" under this section requires the offender to review the information relating to any other person after the time at which the offender knows or should know that he is without authority to view the information displayed.

Va. Code § 18.2-152.5(A).

370. In turn, Virginia Code § 18.2-186.3 defines "identifying information" to include, inter alia, name, date of birth, and "biometric data," which includes the sorts of private data and information Defendants collected from Plaintiffs' and the Subclass.

371. By collecting the private data and information of Plaintiffs' and the Subclass without their consent, Defendants used a computer or computer network to intentionally examine "identifying information," including "biometric data," and reviewed such information "after the time at which the offender knows or should know that he is without authority to view the information displayed."

372. Virginia Code § 18.2-152.5:1 provides:

Using a computer to gather identifying information; penalties.

> A. It is unlawful for any person, other than a law-enforcement officer, as defined in § 9.1-101, and acting in the performance of his official duties, to use a computer to obtain, access, or record, through the use of material artifice, trickery or deception, any identifying information, as defined in clauses (iii) through (xiii) of subsection C of § 18.2-186.3.

Va. Code § 18.2-152.5(A).

373. Virginia Code § 18.2-186.3 defines "identifying information" to include, inter alia, name, date of birth, and "biometric data."

By collecting Plaintiffs' and the Subclass's private data and information without their consent, Defendants used a computer to obtain, access and record, through the use of material artifice, trickery or deception, identifying information, as defined in clauses (iii) through (xiii) of subsection C of § 18.2-186.3.

**NINETEENTH COUNT:**

**VIOLATION OF SECTION 349 OF NEW YORK GENERAL BUSINESS LAW**
**(On Behalf Of the New York User, Minor User, and Non-User Subclasses)**

374. Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

375. New York General Business Law Section 349 prohibits unlawful, unfair, deceptive, and fraudulent business practices.

376. Defendants violated, and continue to violate, the statute because they took private and personally identifiable data and information – including user/device identifiers, biometric identifiers and information, electronic communications, and other private data and information – from the Plaintiffs' and the Subclass's mobile devices and computers under circumstances in which the Plaintiffs and the Subclass would have no reason to know that such data and content was being taken.

377. Plaintiffs and the Subclass had no reason to know because (i) there was no disclosure of Defendants' collection and transfer of the Plaintiffs' and the Subclass's biometric identifiers and information, and other private data; (ii) there was no disclosure that Defendants had embedded source code within the Temu app that secretly harvested their data; (iii) there was no disclosure that Plaintiffs' and the Subclass's private and personally identifiable data was subject to Chinese law requiring the sharing of such data and content with the Chinese government; and

(iv) there was no effective disclosure of the wide range of private and personally identifiable data and content that Defendants took from the Plaintiffs' and the Subclass's mobile devices and computers.

378. Defendants further violated, and continue to violate, the statute because (i) Defendants made it appear that the Plaintiffs' private and personally identifiable data and information would not be collected and transferred unless the Plaintiffs and the Subclass chose to do so, but in fact Defendants collected and transferred such data and content without notice or consent; (ii) Defendants made it appear that the Plaintiffs' and the Subclass's private and personally identifiable data and information would not be made available to individuals or companies that are subject to Chinese law requiring the sharing of such data and content with the Chinese government; and (iii) Defendants have intentionally refrained from disclosing the use to which the Plaintiffs' and the Subclass's private and personally identifiable data and content has been put, while simultaneously providing misleading reassurances about Defendants' data collection and use practices. The Plaintiffs and the Subclass were misled by Defendants' concealment, and had no reason to believe that Defendants had taken the private and personally identifiable data and content that they had taken or used it in the manner they did.

379. Plaintiffs and the Subclass were further harmed by Defendants' deceptive and manipulative business practices, which sought to maximize Defendants' access to new users and their data (which they proceeded to take without consent) as well as Defendant's profits. As the materials cited above demonstrate, Defendants engaged in a variety of unfair and deceptive business practices in order to induce Plaintiffs and Subclass Members to get friends and acquaintances to sign up for the Temu app and give Defendants access to their data.

380. As outlined herein, Defendants intentionally collected private and personally identifiable information from members of the Subclasses, including from children under the age of thirteen.

381. As outlined herein, Defendants intentionally designed and marketed Temu to attract minors, including minors under the age of thirteen.

382. Defendants failed to provide sufficient notice of the information Defendants collected, how Defendants used such information, or the purposes for which the information was used.

383. Defendants failed to provide sufficient direct notice to parents of the information Defendants collected online from children under thirteen, how Defendants used such information, and their disclosure practices. Defendants failed to obtain verifiable parental consent before collection or use of personal information from children under thirteen. Defendants failed to establish and maintain reasonable procedures to protect the confidentiality, security, and integrity of personal information collected from children under thirteen.

384. As outlined herein, Defendants intentionally collected private and personally identifiable information from members of the Subclasses, including from children under the age of thirteen. As outlined herein, Defendants intentionally designed and marketed Temu to attract minors, including minors under the age of thirteen.

385. Defendants failed to provide sufficient notice of the information Defendants collected, how Defendants used such information, or the purposes for which the information was used.

386. Defendants failed to provide sufficient direct notice to parents of the information Defendants collected online from children under thirteen, how Defendants used such information, and their disclosure practices. Defendants failed to obtain verifiable parental consent before collection or use of personal information from children under thirteen. Defendants failed to establish and maintain reasonable procedures to protect the confidentiality, security, and integrity of personal information collected from children under thirteen.

387. Plaintiffs and the Subclass have been harmed and have suffered economic injury as a result of Defendants' violations. First, Plaintiffs and the Subclass have suffered harm in the form of diminution of the value of their private and personally identifiable data and information. Second, they have suffered harm to their mobile devices and computers. The battery, memory, CPU and bandwidth of such devices have been compromised, and as a result the functioning of such devices has been impaired and slowed. Third, they have incurred additional data usage and electricity costs that they would not otherwise have incurred. Fourth, they have suffered harm as a result of the invasion of privacy stemming from Defendants' covert theft of their private and personally identifiable data and content – including user/device identifiers, biometric identifiers and information, and other private data and information.

388. Defendants, as a result of their conduct, have been able to reap unjust profits and revenues in violation of the statute. This includes Defendants' profits and revenues from their targeted advertising, use of Plaintiffs' private data and information, profits Defendants derived from the sale of defective and unlawful goods, and the increased consumer demand for and use of Defendants' products as a result of Defendants' unlawful collection of Plaintiffs' private data and

information. Plaintiffs and the Subclass seek restitution and disgorgement of these unjust profits and revenues.

389. Unless restrained and enjoined, Defendants will continue to misrepresent their private and personally identifiable data and content collection and use practices, and will not recall and destroy Plaintiffs' and the Subclass's wrongfully collected private and personally identifiable data and content. Accordingly, injunctive relief is appropriate.

## TWENTIETH COUNT:

### VIOLATION OF NEW YORK RIGHT TO PRIVACY STATUTE, N.Y. CIV. RIGHTS LAW § 51 (On Behalf Of the New York User, Minor User, and Non-User Subclasses)

390. Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

391. N.Y. Civ. Rights Law § 51 prohibits the use of a person's name, portrait, picture, or voice for advertising purposes or for the purposes of trade without first obtaining that person's consent, or where appropriate the consent of that person's parent or legal guardian.

392. Defendants violated this section by allowing access to Plaintiffs' content and information—including names, like history, private messages, photographs, and video—to third parties, including the Chinese Communist Party and foreign government entities. In addition, based on information and belief, Defendants directly benefited from the use of Plaintiffs' content and information.

393. Prior to using the Plaintiffs' content and information, Defendants never obtained consent.

394. Defendant profited from the commercial use of Plaintiffs' information.

395. Plaintiffs did not receive any compensation in return for this use.

396. Under N.Y. Civ. Rights Law § 51, Plaintiffs seek actual damages suffered, plus any profits attributable to Defendants' unauthorized use of Plaintiffs' information not calculated in actual damages. Plaintiffs also reserve the right to equitable relief, punitive damages, costs, and reasonable attorney's fees as allowed under this statute.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request relief against Defendants as set forth below:

A. Entry of an order certifying the proposed class and subclass pursuant to Federal Rule of Civil Procedure 23, appointing Plaintiffs as representatives of the class and subclasses, appointing Plaintiffs' counsel as co-lead counsel for the class and subclasses, and directing that notice be given to members of the class and subclasses;

B. Entry of an order declaring that Defendants' actions, as set forth in this Complaint, violate the law;

C. Entry of judgment in favor of each class and subclass member for damages suffered as a result of the conduct alleged herein, including compensatory, statutory, and punitive damages, restitution, and disgorgement, in an amount to be determined at trial;

D. Award Plaintiffs pre- and post-judgment interest;

E. Award Plaintiffs their costs of suit, including reasonable attorneys' fees and expenses;

F. Entry of a permanent injunction, including public injunctive relief, enjoining Defendants from continuing conduct determined to be unlawful; and

G. Grant such other and further legal and equitable relief as the court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial for all claims so triable.

Dated this 16th day of February, 2024

Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

By */s/ Steve W. Berman*
Steve W. Berman
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com

Jeannie Evans
HAGENS BERMAN SOBOL SHAPIRO LLP
455 N. Cityfront Plaza Drive, Suite 2410
Chicago, IL 60611
Telephone: (708) 628-4962
Facsimile: (708) 628-4952
jeannie@hbsslaw.com

Douglas G. Smith
AURELIUS LAW GROUP LLC
77 West Wacker Drive, Suite 4500
Chicago, IL 60601
Telephone: (312) 451-6708
dsmith@aureliuslawgroup.com

*Attorneys for Plaintiffs, individually and on behalf of all others similarly situated*