**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JEHAN ZIBOUKH, MARGRET PHILIE, VERA FIGLOCK, NICOLE MAY, TYANA DAUGHTERY, SOLALIZ HERNANDEZ, DEBRA KRYSTYN, I.E., A MINOR, CYNTHIA RODRIGUEZ, J.P., A MINOR, MIGUEL ACOSTA, VINSON MANGOS, NOAH KUPPER, J.P., A MINOR CHRISTIAN VEGA, A.H., A MINOR, AND OLAYA BOURAKKADI AMRANI, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>WHALECO INC. d/b/a TEMU, and PDD HOLDINGS INC.,<br><br>Defendants. | Case No. 1:24-cv-03733-MKB-RML<br><br>District Judge Margo K. Brodie<br><br>Magistrate Judge Robert M. Levy |

# **DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS CLAIMS OF "NON-USER" PLAINTIFFS**

Date: November 4, 2024

Serrin Turner
Matthew Valenti
Hadrian Luo
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, New York 10020
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
Email: serrin.turner@lw.com
matthew.valenti@lw.com
hadrian.luo@lw.com

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................1

FACTUAL BACKGROUND ....................2

A. Temu and PDD Holdings ....................2

B. The Second Amended Complaint and the Short-Seller Report It Parrots ....................3

C. The Non-Users' Perfunctory Allegations ....................7

LEGAL STANDARDS ....................8

A. Rule 12(b)(1): Standing Requirements ....................8

B. Rule 12(b)(6): Plausibility Requirements ....................8

ARGUMENT ....................9

I. THE NON-USERS LACK STANDING BECAUSE THEY DO NOT PLAUSIBLY ALLEGE THAT TEMU ACTUALLY COLLECTED THEIR DATA ....................9

II. THE NON-USERS FAIL TO STATE A CLAIM ....................13

A. The Grizzly Report Does Not Supply a Plausible Basis for Their Claims ....................13

B. The Non-Users Fail to State Any Valid Cause of Action in Any Event ....................15

1. Computer-Hacking Claims (Counts 1 and 12) ....................16

2. Wiretapping Claims (Counts 2, 5, and 17) ....................17

3. Invasion of Privacy Claims (Counts 3, 8, 10, 13, 14, and 22) ....................17

4. Negligence Claim (Count 7) ....................19

5. Restitution/Unjust Enrichment Claim (Count 8) ....................20

6. BIPA Claim (Count 9) ....................20

7. Consumer Protection Claims (Counts 4, 11, 15, 16, and 21) ....................21

8. Statutory Larceny and Conversion Claims (Counts 18 and 19) ....................22

9. Virginia Computer Crimes Act Claim (Count 20) ....................23

III. CLAIMS AGAINST PDD HOLDINGS FAIL FOR LACK OF PERSONAL JURISDICTION ........................................................................24

CONCLUSION........................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Ainette v. Mkt. Basket Inc.*,
2021 WL 3371037 (S.D.N.Y. Aug. 2, 2021)....................25

*Al-Ahmed v. Twitter, Inc.*,
553 F. Supp. 3d 118 (S.D.N.Y. 2021)....................24

*Albanese v. Cuomo*,
1998 WL 760339 (E.D.N.Y. Sept. 18, 1998), *aff'd sub nom. Albanese v. U.S. Dep't of Hous. & Urb. Dev.*, 182 F.3d 898 (2d Cir. 1999)....................12

*Arkansas v. PDD Holdings Inc.*,
No. 12-cv-24-149 (June 25, 2024)....................6

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................8, 9

*Aspen Speciality Ins. Co. v. RCI Hosp. Hodlings, Inc.*,
2023 WL 4080550 (S.D.N.Y. June 20, 2023)....................26, 27

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)....................9, 20

*Bellomo v. Pennsylvania Life Co.*,
488 F. Supp. 744 (S.D.N.Y. 1980)....................28

*Campbell v. Goodyear Tire & Rubber Co.*,
1984 WL 730 (S.D.N.Y. Aug. 8, 1984)....................26

*Chimienti v. Wendy's Int'l, LLC*,
2023 WL 6385346 (E.D.N.Y. Sept. 30, 2023)....................21

*City of Long Beach v. Total Gas & Power N. Am., Inc.*,
465 F. Supp. 3d 416 (S.D.N.Y. 2020), *aff'd*, 2021 WL 5754295 (2d Cir. Dec. 3, 2021)....................27

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013)....................8, 11, 12

*Com. v. Vitello*,
367 Mass. 224 (1975)....................17

*Cooper v. Bonobos, Inc.*,
2022 WL 170622 (S.D.N.Y. 2022)........13

*Corning Inc. v. Shin Etsu Quartz Prod. Co.*,
242 F.3d 364 (2d Cir. 2000)........25

*Democratic Nat'l Comm. v. Russian Fedn*,
392 F. Supp. 3d 410 (S.D.N.Y. 2019)........17

*DiPizio v. Empire State Dev. Corp.*,
745 F. App'x 385 (2d Cir. 2018)........15

*Drucker Cornell v. Assicurazioni Generali S.p.A. Consol.*,
2000 WL 284222 (S.D.N.Y. Mar. 16, 2000)........25

*Gualandi v. Adams*,
385 F.3d 236 (2d Cir. 2004)........29

*Hall v. EarthLink Network, Inc.*,
396 F.3d 500 (2d Cir. 2005)........17

*Harris v. AmTrust Fin. Servs., Inc.*,
135 F. Supp. 3d 155 (S.D.N.Y. 2015), *aff'd*, 649 F. App'x 7 (2d Cir. 2016)........14

*Hassan v. United States*,
441 F. App'x 10 (2d Cir. 2011)........10

*Heeger v. Facebook, Inc.*,
509 F. Supp. 3d 1182 (N.D. Cal. 2020)........10, 11

*Huan v. Fauci*,
2024 WL 1181476 (E.D.N.Y. Feb. 12, 2024), *report and recommendation adopted*, 2024 WL 1174538 (E.D.N.Y. Mar. 19, 2024)........13

*Hunter v. Deutsche Lufthansa AG*,
863 F. Supp. 2d 190 (E.D.N.Y. 2012)........28, 29

*Ilustrata Servicos Design, LTDA v. PDD Holdings, Inc.*,
2024 WL 3177901 (N.D. Ill. June 26, 2024)........28

*In re DraftKings Inc. Sec. Litig.*,
650 F. Supp. 3d 120 (S.D.N.Y. 2023)........14

*In re Google Assistant Privacy Litig.*,
457 F. Supp. 3d 797 (N.D. Cal. 2020)........15

*In re iPhone Application Litig.*,
844 F. Supp. 2d 1040 (N.D. Cal. 2012)........22

*In re Longtop Fin. Techs. Ltd. Sec. Litig.*,
910 F. Supp. 2d 561 (S.D.N.Y. 2012)....................................................................13

*In re McKesson HBOC, Inc. Sec. Litig.*,
126 F. Supp. 2d 1248 (N.D. Cal. 2000) ..................................................................14

*In re Sci. Applications Int'l Corp. (SAIC) Backup Tape Data Theft Litig.*,
45 F. Supp. 3d 14 (D.D.C. 2014) ...........................................................................13

*In re Ski Train Fire in Kaprun, Austria on Nov. 11, 2000*,
230 F. Supp. 2d 403 (S.D.N.Y. 2002)....................................................................29

*In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*,
903 F. Supp. 2d 942 (S.D. Cal. 2012)....................................................................21

*In re U.S. for an Ord. Authorizing the Release of Hist. Cell-Site Info.*,
809 F. Supp. 2d 113 (E.D.N.Y. 2011) ...................................................................18

*In re Yahoo Mail Litig.*,
7 F. Supp. 3d 1016 (N.D. Cal. 2014) .....................................................................18

*J.L.B. Equities, Inc. v. Ocwen Fin. Corp.*,
131 F. Supp. 2d 544 (S.D.N.Y. 2001)....................................................................28

*Jacobs v. Hanwha Techwin Am., Inc.*,
2021 WL 3172967 (N.D. Ill. July 27, 2021).........................................................20

*Jaghory v. N.Y. State Dep't of Educ.*,
131 F.3d 326 (2d Cir. 1997).......................................................................................8

*Jazini v. Nissan Motor Co.*,
148 F.3d 181 (2d Cir. 1998).....................................................................................26

*Kloss v. Acuant, Inc.*,
462 F. Supp. 3d 873 (N.D. Ill. 2020) .....................................................................20

*Kramer v. Time Warner Inc.*,
937 F.2d 767 (2d Cir. 1991).......................................................................................2

*Kurowski v. Rush Sys. for Health*,
683 F. Supp. 3d 836 (N.D. Ill. July 24, 2023) .......................................................21

*Lau v. Gen Digital Inc.*,
2023 WL 10553772 (N.D. Cal. Sept. 13, 2023) ....................................................22

*Licea v. Am. Eagle Outfitters*,
659 F. Supp. 3d 1072 (C.D. Cal. 2023) ..................................................................17

*Long Miao v. Fanhua, Inc.*,
442 F. Supp. 3d 774 (S.D.N.Y. 2020)....................14

*Lopez v. Apple, Inc.*,
519 F. Supp. 3d 672 (N.D. Cal. 2021)....................12, 18

*Lord v. PDD Holdings, Inc.*,
2024 WL 3177891 (N.D. Ill. June 26, 2024)....................28

*Mandala v. NTT Data, Inc.*,
975 F.3d 202 (2d Cir. 2020)....................8

*McGowan v. Weinstein*,
505 F. Supp. 3d 1000 (C.D. Cal. 2020)....................22

*Mears v. Allstate Indem. Co.*,
336 F. Supp. 3d 141 (E.D.N.Y. 2018)....................9

*Milburn v. PDD Holdings, Inc.*,
2024 WL 3177639 (N.D. Ill. June 26, 2024)....................28

*Molchatsky v. United States*,
778 F. Supp. 2d 421 (S.D.N.Y. 2011), *aff'd,* 713 F.3d 159 (2d Cir. 2013)....................29

*Mount v. PulsePoint, Inc.*,
2016 WL 5080131 (S.D.N.Y. Aug. 17, 2016), *aff'd*, 684 F. App'x 32 (2d Cir. 2017)....................21

*Namuwonge v. Kronos, Inc.*,
418 F. Supp. 3d 279 (N.D. Ill. 2019)....................15

*NovelAire Techs., L.L.C. v. Munters AB*,
2013 WL 6182938 (S.D.N.Y. Nov. 21, 2013)....................27

*Nowak v. Xapo, Inc.*,
2020 WL 6822888 (N.D. Cal. Nov. 20, 2020)....................16

*O'Hara v. Diageo-Guinness, USA, Inc.*,
306 F. Supp. 3d 441 (D. Mass. 2018)....................22

*OpenRisk, LLC, v. Microstrategy Servs. Corp.*,
876 F.3d 518 (4th Cir. 2017)....................23

*Peters v. Mundelein Consol. High Sch. Dist. No. 120*,
2022 WL 393572 (N.D. Ill. Feb. 9, 2022)....................17

*Roadget Bus. Pte. Ltd. v. PDD Holdings Inc.*,
2023 WL 4865005 (N.D. Ill. July 31, 2023)....................28

*Roe v. St. John's Univ.*,
91 F.4th 643 (2d Cir. 2024) ....................19

*Saraceno v. S. C. Johnson & Son, Inc.*,
83 F.R.D. 65 (S.D.N.Y. 1979) ....................25

*Sava v. 21St Century Spirits, LLC*,
2024 WL 3161625 (N.D. Ill. June 25, 2024) ....................21

*Shaeffer v. Califia Farms, LLC*,
44 Cal. App. 5th 1125 (2020) ....................21

*Shaulis v. Nordstrom, Inc.*,
865 F.3d 1 (1st Cir. 2017)....................21

*Smith v. Maryland*,
442 U.S. 735 (1979)....................18

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016)....................8

*SPV Osus Ltd. v. UBS AG*,
882 F.3d 333 (2d Cir. 2018)....................24

*Thole v. U.S. Bank N.A.*,
590 U.S. 538 (2020)....................8

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021)....................8

*Trinidad v. PDD Holdings, Inc.*,
2024 WL 3177912 (N.D. Ill. June 26, 2024) ....................28

*Van Buren v. United States*,
593 U.S. 374 (2021)....................16

*Vigil v. Take-Two Interactive Software, Inc.*,
235 F. Supp. 3d 499 (S.D.N.Y. 2017), *standing holding aff'd in Santana v. Take-Two Interactive Software, Inc.*, 717 F. App'x 12 (2d Cir. 2017)....................11

*Wang v. PDD Holdings, Inc.*,
2024 WL 3177892 (N.D. Ill. June 26, 2024) ....................28

**STATUTES**

18 U.S.C. § 1030(a) ....................16

Cal. Pen. Code § 502(c) ....................16

Va. Code Ann. § 18.2-186.3 ........................................................................................................23

## OTHER AUTHORITIES

Android, *Application Sandbox*, https://source.android.com/docs/security/app-sandbox (last visited Oct. 30, 2024)............................................................................................6

Apple, *Platform Security*, *Security of runtime process in iOS and iPadOS*, https://support.apple.com/guide/security/security-of-runtime-process-sec15bfe098e/ (last visited Oct. 30, 2024)...................................................................................6

PDD Holdings, SEC Form 20-F Annual Report (2022), *available at* https://investor.pddholdings.com/static-files/83d4cabc-ff91-4fe2-919f-747d9bf74709 ........................................................................................................................3

Pursuant to Federal Rules of Civil Procedure 12(b)(1), (b)(2), and (b)(6), Defendants Whaleco Inc. d/b/a Temu ("Temu") and PDD Holdings Inc. ("PDD Holdings") respectfully move to dismiss all claims brought by the Plaintiffs described in the Second Amended Complaint ("SAC") as not being Temu users: Cynthia Rodriguez, Miguel Acosta, Vinson Mangos, Christian Vega, and Olaya Bourakkadi Amrani (the "Non-Users").[1]

## PRELIMINARY STATEMENT

The Non-Users were added to this lawsuit in an attempt to avoid arbitration—not because they have any coherent grievance with Temu. While they speculate that the personal data of Non-Users is "subject to" collection by Temu from devices used by others, they fail to allege any facts sufficient to show *their* data was *actually* collected by Temu. As a result, the Non-Users lack standing or any plausible factual basis to bring suit. Moreover, they do not even try to articulate how the SAC's causes of action apply to them. Separately, their claims against PDD Holdings fail for lack of personal jurisdiction. For all these reasons, the Non-Users' claims should be dismissed.

*First*, the Non-Users' claims rest on paradigmatic hypothetical injuries that cannot support Article III standing. It is now a full year since Plaintiffs filed this lawsuit, and the Non-Users still cannot identify a *single example* of any personal data Temu actually collected about them—or any purported injury suffered as a result. After being put on notice of this deficiency, Plaintiffs have not genuinely fixed it but rather resorted to word games: they have deleted the allegation that Temu "may have" collected Non-Users' data, stating instead that their data was "subject to" collection by Temu—which amounts to the same thing. What is still missing are any new alleged *facts*

---

[1] Although they claim never to have used the Temu app, Temu has identified accounts created by at least three of the five "Non-Users"—Miguel Acosta, Vinson Mangos, and Christian Vega—using the email addresses Plaintiffs' counsel provided for them. *See* Trinh Declaration in support of Defendants' Motion to Compel Arbitration (concurrently filed herewith) at ¶ 65. Any Non-Users who created Temu accounts necessarily assented to Temu's Terms of Use and are therefore subject to Defendants' concurrently filed motion to compel arbitration.

sufficient to show that Temu *actually* collected data about the Non-Users. The Non-Users' claims remain fundamentally based on conjecture—and therefore remain insufficient under Article III.

*Second*, the Non-Users' claims fail on the merits in any event. Their allegations merely parrot a short-seller's report—an implausible basis for a lawsuit to begin with—which itself asserts only that Temu *could* collect certain data *if users grant it permission* to do so. The Non-Users thus do not provide any plausible basis to conclude that any data about them has actually been collected by Temu (let alone improperly). The SAC does not even attempt to connect its claims specifically to the Non-Users—which is no surprise, as the paltry allegations made about the Non-Users provide no support for the claims they assert.

*Third*, PDD Holdings should be dismissed because it is not subject to personal jurisdiction in New York, as it is a Cayman Islands corporation that conducts no business in the U.S. Plaintiffs allege PDD Holdings is subject to jurisdiction here as an alter ego of Temu, simply because they are part of a corporate family. However, the law is clear that a corporate relationship is insufficient to impute jurisdiction to a parent company.

For these reasons, the Non-Users' claims should be dismissed as against both Defendants, and PDD Holdings should also be dismissed for lack of personal jurisdiction.

## FACTUAL BACKGROUND[2]

### A. Temu and PDD Holdings

Temu is an e-commerce company that provides an online shopping platform with products from around the world. SAC ¶¶ 1, 32, 83-84. Temu makes its services available through its website

[2] Unless otherwise indicated, all internal citations and quotations are omitted, and all emphasis is added. Citations to "SAC ¶ __" refer to the Second Amended Complaint; citations to "Zhang Decl." refer to the Declaration of Kairui Zhang, submitted herewith; and all referenced exhibits are attached to the Declaration of Serrin Turner, also submitted herewith. Because the exhibits are incorporated by reference in the SAC and relied upon as Plaintiffs' basis for this suit, the Court may consider them without converting this motion into a motion for summary judgment. *See Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991).

(https://temu.com) and mobile apps on Android and Apple iOS devices. *Id.* ¶ 51.

PDD Holdings is Temu's parent company. *Id.* ¶¶ 12, 32. It is incorporated in the Cayman Islands and has its principal executive office in Ireland. *Id.* ¶ 32. It is purely a holding company for its subsidiary businesses (including Temu) and does not itself conduct any substantive business. *See* Zhang Decl. ¶ 6. Like many holding companies, PDD Holdings reports the operations and financial results of its subsidiary companies on a consolidated basis, although it does not directly operate those businesses. *See id.* ¶ 11; SAC ¶¶ 47-75.[3]

**B. The Second Amended Complaint and the Short-Seller Report It Parrots**

The SAC alleges that the Temu app is "malware" that can access everything on its users' devices. It asserts 22 privacy-based causes of action on behalf of putative classes of individuals who used the Temu app, as well as individuals who never used Temu but allegedly had their data stored on a Temu user's device—*i.e.*, the Non-Users. *See* SAC ¶¶ 269-523.

The SAC's allegations about the Temu app are directly sourced from a "report" published on the internet by an acknowledged short-seller that calls itself "Grizzly Research" (the "Grizzly Report"). *See* SAC ¶¶ 101-128; Ex. A. The report, published on September 6, 2023, is unsubtly titled "We Believe PDD Is a Dying Fraudulent Company and Its Shopping App TEMU is Cleverly Hidden Spyware that Poses an Urgent Security Threat to U.S. National Interests." Ex. A. It is prefaced with a lengthy "disclaimer" advising that persons associated with Grizzly Research "have a short position in the securities of [Temu] and therefore will realize significant gains in the event that the prices of [Temu's] securities decline." *Id.* It further warns in bold capital letters that "**THIS**

[3] For example, the SAC quotes PDD Holdings' Annual Reports referring to Temu as "our [] platform" or "our service[]" or using the pronoun "we" to include Temu (*e.g.*, SAC ¶¶ 50, 56, 57, 58, 62), but omits that the same reports make clear that "PDD Holdings Inc., [is] a Cayman Islands holding company that does not conduct operations directly" and "only maintain[s] contractual arrangements [] which allows us to consolidate the financial results … into our consolidated financial statements in accordance with U.S. GAAP." *See, e.g.*, PDD Holdings, SEC Form 20-F Annual Report (2022), *available at* https://investor.pddholdings.com/static-files/83d4cabc-ff91-4fe2-919f-747d9bf74709.

**REPORT AND ALL STATEMENTS CONTAINED HEREIN ARE THE OPINIONS OF GRIZZLY RESEARCH LLC AND ARE NOT STATEMENTS OF FACT.**" *Id.*

The Grizzly Report makes various incendiary claims—which are cited throughout the SAC but to this day have never been corroborated by any other source—that the Temu app supposedly constitutes "malware" or "spyware" that could be used to "do just about anything it wants with your phone" and "recklessly plunder [Temu] customers' data." SAC ¶¶ 4, 8, 100, 101, 103, 138, 141, 146, 201 (quoting the Grizzly Report). However, nowhere does the report allege that the unnamed "analysts" behind the report actually observed the Temu app "plunder" data from user devices, *e.g.*, through monitoring traffic sent from the app. The only description the Grizzly Report includes of any data being sent from the app is the vague statement that "Temu sends a lot of detailed user and system data elements as soon as the app is loaded"; but the report does not identify what these "user and system data elements" are, except for "the device's unique MAC address"—*i.e.*, a mere device identifier. SAC ¶ 107; *see also* Ex. A at 22 (quoted in SAC ¶ 111); *see also id.* at 35 (asserting that an anomalous amount of "system information" is sent "as soon as you launch the app," but only specifying the "phone's serial number" (quoted in SAC ¶ 112)).

Instead, the Grizzly Report tries to cast suspicion on the Temu source code. It claims the code includes various "software functions" that are "completely inappropriate to and dangerous in this type of software"—even while acknowledging that many of these same functions are found in other major shopping apps, such as Amazon and eBay—and speculates that they *could* be used for improper purposes. *Id.* at 6 (quoted in SAC ¶ 105). The Grizzly Report's conclusions thus concern not what the Temu app *actually* does, but what the authors believe the app has *the ability* to do—with the basis for even these beliefs shrouded in technical jargon that the authors never explain. For example, the report surmises that the Temu app "is referencing systems data outside the bounds

of TEMU's own app" and "*seemingly* reads the user's system logs," which "gives TEMU *the ability* to track user actions with other apps running on the user's device." *Id*. at 16 (quoted in SAC ¶ 106). Likewise, the report speculates: "The app has hidden functions that *allow for* extensive data exfiltration unbeknown to users, *potentially* giving bad actors full access to almost all data on customers' mobile devices." *Id*. at 3 (quoted in SAC ¶ 102).

Moreover, even these assertions about what the Temu app supposedly *could* do are accompanied by caveats that these alleged capabilities exist only while the app is running and only if the device user has *specifically granted certain permissions* to the Temu app. So caveated, the Grizzly Report's claims amount to virtual tautologies, to the effect that, if a user grants the app permission to access certain data, then the app can access that data. For example, the report states that "once a user grants file storage permission to the TEMU app—even unwittingly—Temu will be able to remotely collect any and all files from the user's device and send them to their own servers. Ditto for any other privacy-intruding permission." *Id*. at 12. Similarly, with respect to its allegations about location data, the Grizzly Report states that Temu's ability to collect such data "depends … on the permissions you've granted to the TEMU app."[4] *Id.* at 14.

The SAC's key allegations rest entirely on the Grizzly Report—it is the only source cited for any specific allegations about what the Temu app can supposedly do.[5] While the SAC is padded with a handful of other references, they add no factual content to Plaintiffs' claims about how the

[4] These allegations are baseless—Temu does not ever ask users to share their "files" or exact location (or their "text messages," *see infra*). But even assuming they are true for purposes of this motion, these caveated allegations do not provide a sufficient basis for the Non-Users' claims. *See* Argument pts. I and II, *infra*.

[5] The SAC deliberately obscures how thinly sourced it is by not actually citing to the Grizzly Report by name, but instead variously attributing alleged facts to "experts," ¶ 88, or "analysts," ¶ 72, or "a technical analysis," ¶ 105—as if each alleged fact comes from a different source—when in fact the footnotes make clear that the Grizzly Report is being cited throughout. Enclosed as Appendix A is a table identifying the source for each of Plaintiffs' numerous references to supposed "experts" and "analyses"—all of which lead back to the Grizzly Report or conclusory assertions of talk-radio host Kim Komando (*see infra* at 6).

Temu app works. For example, the SAC repeatedly cites a post by talk-radio host Kim Komando for the proposition that "Temu gains full access to all your contacts, calendars, and photo albums, plus all your social media accounts, chats, and texts. In other words, literally everything on your phone." Ex. B at 5 (quoted in SAC ¶¶ 5, 133). The post itself makes this (false) accusation in a completely conclusory fashion, with no explanation of its factual basis—or how it could be true given the basic constraints that limit what an individual app can access on a mobile device. *See id*.[6] Similarly, the SAC cites an article in the *International Business Times* for the proposition that Temu "'bypasses' phone security systems to read a user's private messages, make changes to the phone's settings and track notifications." Ex. C at 3 (quoted in SAC ¶ 6). However, clicking the link in the article to the source of this quote brings one back, again, to the "Kim Komando" website, which again provides no factual basis for this otherwise vague assertion.[7] Worse still, the SAC cites to a complaint brought by the Arkansas Attorney General, which is not only premised on the Grizzly Report, but is itself a copycat suit based off *this* litigation. Ex. D (quoted at SAC ¶ 96).[8]

Plaintiffs have had ample opportunity—either before filing this lawsuit or in the year

---

[6] As publicly available (and judicially noticeable) guidance from both Apple and Android make clear, Apple and Android mobile devices use "sandboxing" to limit what an app can access on a mobile device and to prevent one app from accessing data from another app absent the user's grant of permission. *See* Apple, *Platform Security*, *Security of runtime process in iOS and iPadOS*, https://support.apple.com/guide/security/security-of-runtime-process-sec15bfe098e/ ("All third-party apps are 'sandboxed,' so they are restricted from accessing files stored by other apps or from making changes to the device.") (last visited Oct. 30, 2024); Android, *Application Sandbox*, https://source.android.com/docs/security/app-sandbox ("By default, apps can't interact with each other and have limited access to the OS. If app A tries to do something malicious, such as read application B's data or dial the phone without permission, it's prevented from doing so because it doesn't have the appropriate default user privileges.") (last visited Oct. 30, 2024).

[7] *See* Marvie Basilan, *After TikTok, Montana Bans WeChat, Temu and Telegram from Government Devices*, International Business Times (May 18, 2023) available at https://www.ibtimes.com/after-tiktok-montana-bans-wechat-temu-telegram-government-devices-3694060 (attributing the statement to a "tech writer," the link for which leads to https://www.komando.com/security-privacy/delete-temu/883294/).

[8] The SAC refers to the complaint in *Arkansas v. PDD Holdings Inc*., No. 12-cv-24-149 (June 25, 2024), as though it provides an independent factual bases for their allegations about the Temu app. However, that complaint merely parrots the same allegations made here. The complaint does not describe any independent investigation carried out by the Arkansas AG prior to bringing suit, and in fact Defendants did not receive any requests for information from the Arkansas AG before the complaint was filed.

since—to attempt to corroborate the Grizzly Report's allegations with their own analysis. Indeed, the Grizzly Report itself states that it is "based on public information in a manner that any person could have done [sic] if they had been interested in doing so." Ex. A at 1. Yet, Plaintiffs do not claim to have engaged any analysts to independently test the Temu app or examine its source code. Instead, Plaintiffs simply credit the report's allegations as true—notwithstanding its express disclaimers—and repackage those allegations as the basis for the SAC.

### C. The Non-Users' Perfunctory Allegations

Following the parties' August 2, 2024 pre-motion conference, and based on Your Honor's comments at the conference about the Non-Users' allegations appearing insufficient for standing, Plaintiffs opted to amend their complaint a second time. But their amended allegations still say almost nothing about the Non-Users, and certainly do not plausibly allege that their data was actually collected by Temu or that they have suffered harm as a result.

Besides their names and cities of residence, the SAC provides no information about the Non-Users except for a vague, boilerplate allegation that each "had electronic communications with a Temu user, and had [their] data stored on a device used by a Temu user." SAC ¶¶ 19, 22, 25, 28, 31. The Non-Users do not identify any specific communications they had with any Temu user or any specific data they somehow "had stored" on a Temu user's device—let alone provide a factual basis to conclude that their data was *actually* "collected" or what Temu supposedly did with it. Rather, they merely assert that they "shared sensitive data with Temu users through electronic communications that were *subject to* collection by the Temu app." SAC ¶ 251.

Plaintiffs nevertheless bring all but one of the SAC's 22 causes of action on behalf of the Non-Users. These include: violation of federal and state computer-hacking statutes (Counts 1 and 12); violation of federal and state wiretapping laws (Counts 2, 5, 17); invasion of privacy (Counts 3, 10, 13, 14, 22); negligence (Count 7); restitution/unjust enrichment (Count 8); violation of the

Illinois Biometric Information Privacy Act ("BIPA") (Count 9); unfair or deceptive business practices under various state statutes (Counts 4, 11, 15, 16, 21); statutory larceny and conversion (Counts 18 and 19); and violation of the Virginia Computer Crimes Act (Count 20).

## LEGAL STANDARDS

### A. Rule 12(b)(1): Standing Requirements

"To establish standing under Article III of the Constitution, a plaintiff must demonstrate (1) that he or she suffered an injury in fact that is concrete, particularized, and actual or imminent, (2) that the injury was caused by the defendant, and (3) that the injury would likely be redressed by the requested judicial relief." *Thole v. U.S. Bank N.A.*, 590 U.S. 538, 540 (2020). It is not sufficient to "merely speculate and make assumptions" that a defendant is behaving in harmful ways. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 411 (2013). "A 'concrete' injury must be 'de facto'; that is, it must actually exist." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016). "The keystone for determining injury in fact is the requirement that it be distinct and palpable—and, conversely, that it not be abstract or conjectural or hypothetical." *Jaghory v. N.Y. State Dep't of Educ.*, 131 F.3d 326, 330 (2d Cir. 1997). Likewise, "the mere risk of future harm, without more, cannot qualify as a concrete harm." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 414 (2021). A plaintiff may sue only for harms that have "materialized." *Id.* at 437.

### B. Rule 12(b)(6): Plausibility Requirements

A claim must be dismissed unless it pleads "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Courts need not accept "conclusory and unsupported assertion[s]," *Mandala v. NTT Data, Inc.*, 975 F.3d 202, 211 (2d Cir. 2020), or "'naked assertion[s]' devoid of 'further factual enhancement,'" *Iqbal*,

556 U.S. at 678. Rather, a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level," which requires "something more … than … a statement of facts that merely creates a suspicion [of] a legally cognizable right of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Iqbal*, 556 U.S. at 678 (holding that allegations must demonstrate "more than a sheer possibility that a defendant has acted unlawfully"); *Mears v. Allstate Indem. Co.*, 336 F. Supp. 3d 141, 150 (E.D.N.Y. 2018) (dismissing claims resting merely on "rank speculation, with no specific factual instances, details, or supporting information").

## ARGUMENT

### I. THE NON-USERS LACK STANDING BECAUSE THEY DO NOT PLAUSIBLY ALLEGE THAT TEMU ACTUALLY COLLECTED THEIR DATA

The Non-Users allege no concrete injury for the simple reason that they do not (and cannot) identify any data that Temu allegedly collected about them. The FAC acknowledged as much—alleging only that the Non-Users' data "may" be collected by Temu. After the Court doubted at the pre-motion conference that this was sufficient to plead Article III standing, Plaintiffs simply deleted that language from the SAC. *Compare* FAC ¶ 83, *with* SAC ¶ 132. That cosmetic change does not make the Non-Users' alleged harm any more concrete—and the SAC offers no new facts or allegations to bolster the their standing. Their alleged harm is inherently speculative and therefore insufficient under Article III, warranting dismissal under Rule 12(b)(1).

Plaintiffs allege that "Defendants' collection of data from Temu users' devices includes data from non-users who engage in electronic communications with Temu users," but fail to allege that Temu collected data specifically from the named Non-Users or what that data is. SAC ¶ 132. Instead, the SAC vaguely alleges that the Non-Users "shared sensitive data with Temu users through electronic communications that were *subject to* collection by the Temu app." SAC ¶ 251. However, alleging the Non-Users' data was "subject to" collection is the same as alleging their

data "may have" been collected. Absent specific factual allegations sufficient to show their data was *actually* collected by Temu, the Non-Users cannot establish standing. *See Hassan v. United States*, 441 F. App'x 10, 11 (2d Cir. 2011) (rejecting claims based on allegations of what "*might*" happen, which is too "conjectural or hypothetical to establish standing").

The SAC makes only generic allegations that Temu collects "electronic communications with Temu users, such as through email or text messages," citing various "experts," yet the only cited "expert" source that says anything specific is, of course, the Grizzly Report. SAC ¶¶ 132-133. Notably, the Grizzly Report itself says nothing about Temu's supposed ability to access a user's "email," and it alleges only that Temu can access a user's "text messages and other documents" "*depending on the permissions you may have given* when you installed the app." Ex. A at 35. The SAC does not allege anything different—it simply quotes this same statement from the Grizzly Report. *See* SAC ¶¶ 13, 104, 201. Thus, the SAC fails to plausibly allege that Temu *actually* collects email or text messages from *any* non-users, let alone the Non-Users named here.

In this respect, the SAC resembles the complaint in *Heeger v. Facebook, Inc.*, 509 F. Supp. 3d 1182 (N.D. Cal. 2020), where the plaintiffs sued based on similarly speculative allegations, sourced from internet postings, that Facebook collected users' location data without their consent. As the *Heeger* court explained:

> [The plaintiffs' complaint] reads like a book report that simply summarizes third-party news stories about Facebook's ostensible capacity to 'discern precise locations' from user data. … Few facts are alleged … without hedging on whether Facebook actually does what Heeger accuses, or simply has the ability to do it. … [Plaintiffs] did little more than parrot internet musings about things Facebook may or may not be doing, and which plaintiffs may or may not have experienced themselves.

*Id.* at 1187-88. Based on these shortcomings, the *Heeger* court dismissed the complaint for lack of standing, finding that the only thing that plaintiffs unequivocally alleged was that Facebook

collected their IP addresses, which was insufficient to establish any injury. Here, the Non-Users do not allege that *any* data associated with them was actually collected. Instead, they merely "parrot internet musings" about things Temu "may or may not be doing" and things they "may or may not have experienced themselves." *Id.* at 1188. That is insufficient. *See Vigil v. Take-Two Interactive Software, Inc.*, 235 F. Supp. 3d 499, 512 (S.D.N.Y. 2017) ("At best, the plaintiffs' allegations are that [Defendant's] storage and dissemination practices have subjected their [data] to an 'enhanced risk of harm' of somehow falling into the 'wrong hands,' which is too abstract and speculative to support standing."), *standing holding aff'd in Santana v. Take-Two Interactive Software, Inc.*, 717 F. App'x 12 (2d Cir. 2017).

The Supreme Court's decision in *Clapper*, *supra*, confirms the point. There, the plaintiffs sued based on a fear that they were subject to government surveillance, even though they had no specific evidence they were being surveilled. The Supreme Court held that the plaintiffs failed to establish standing because their alleged injury "relied on a highly attenuated chain of possibilities," 568 U.S. at 410, as they had no actual knowledge of the Government's surveillance practices and thus could "merely speculate" that their communications "*may* be subject to government surveillance." *Id.* at 411 (emphasis in original). The Non-Users' claims here likewise depend on multiple layers of unsubstantiated conjecture. Their case for standing depends on assuming that:

> (1) the Temu app actually has the capability to collect "text messages and other documents" from a user's device "depending on the permissions" the user has granted by the app (SAC ¶ 104)—an allegation that comes from a short-seller report Plaintiffs have made no effort to validate, *infra* at 13-15;
>
> (2) Temu actually *uses* this alleged capability *indiscriminately* to "harvest" all available text messages or other documents from the device of every Temu user who grants the app permission to access such data—a facially implausible scenario that the SAC itself does not definitively allege happened;
>
> (3) each Non-User communicated by text with or sent other data to a Temu User who granted permission to the Temu app to access such data from their device—*and that they have a reasonable expectation of privacy in that specific data*—which

the SAC nowhere even alleges (*cf.* SAC ¶ 7); and

(4) Temu actually *used* this data in some way that supposedly harmed them, *e.g.*, by disclosing the data to the Chinese government (SAC ¶ 384), or using it for targeted advertising (SAC ¶ 387)—which amounts to wild-eyed speculation without any support in well-pled facts.

This chain of unsupported inferences "merely present[s] abstract speculation about what might happen if certain remote and unlikely eventualities were to occur." *Albanese v. Cuomo*, 1998 WL 760339, at *3 (E.D.N.Y. Sept. 18, 1998), *aff'd sub nom. Albanese v. U.S. Dep't of Hous. & Urb. Dev.*, 182 F.3d 898 (2d Cir. 1999). As in *Clapper*, the Non-Users' theory of harm is "necessarily conjectural," and therefore insufficient for standing. 568 U.S. at 412; *see also Lopez v. Apple, Inc.*, 519 F. Supp. 3d 672, 681-82 (N.D. Cal. 2021) (rejecting standing where "Plaintiffs allege[d] no facts to suggest that *their own* private communications were intercepted").

The only attempt the Non-Users make to allege specific facts supposedly evidencing that Temu collected their data is risible: they allege that they have received spam texts and emails, been shown Temu ads, or had fraudulent charges on their debit or credit cards—things that obviously can happen to anyone. SAC ¶¶ 249-252. The Non-Users do not allege any specific facts about these events that would somehow suggest they were caused by Temu collecting their data from a Temu user's device. Indeed, they do not allege any specific facts about these events at all—such as which Non-Users experienced them, what the texts/emails, ads, or fraudulent charges were, or how the events somehow relate to data they sent to someone who uses Temu (which would beg the question, for example, of why would they be sending their credit card information to anyone in the first place). All the Non-Users can muster is a vague assertion that they "began to receive Temu ads after [a] friend or family member downloaded the Temu app" and some of the ads "*appear to be tailored* to the individual non-user's interests based on information collected by the Temu app." SAC ¶ 250. The Non-Users do not identify a single one of these ads or how they

concluded they were "tailored to the[ir] interests," nor could they, because the Non-Users cannot even identify any information Temu collected about them. Instead, Plaintiffs simply leap to the conclusion that these commonplace events *must* have happened because they know someone who uses Temu. *Id.* ¶¶ 249-252. The theory is not just speculative—it is absurd. *See In re Sci. Applications Int'l Corp. (SAIC) Backup Tape Data Theft Litig*., 45 F. Supp. 3d 14, 32 (D.D.C. 2014) (rejecting standing where alleged "identity theft [could not] plausibly be linked to the [breach]"); *see also Huan v. Fauci*, 2024 WL 1181476, at *3 (E.D.N.Y. Feb. 12, 2024) (dismissing complaint for lack of standing where "plaintiff provides no basis for th[e]conclusory assertion that defendants[]" caused her alleged harm), *report and recommendation adopted*, 2024 WL 1174538 (E.D.N.Y. Mar. 19, 2024).[9]

## II. THE NON-USERS FAIL TO STATE A CLAIM

Beyond failing for lack of standing, the Non-Users' claims are separately subject to dismissal because the core factual premise of all their causes of action—that Temu collected their data—is not plausibly pled, warranting dismissal under Rule 12(b)(6).

### A. The Grizzly Report Does Not Supply a Plausible Basis for Their Claims

As an initial matter, to the extent the SAC makes any specific allegations about how the Temu app works and what data it can collect, all those allegations come from the Grizzly Report—an uncorroborated report from an acknowledged short-seller with a financial incentive to spread derogatory information about Temu—or sources that parrot the Grizzly Report. *See* Appendix A. Even at the motion to dismiss stage, courts are appropriately skeptical of short-seller reports, given their inherent bias. *See, e.g.*, *In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 910 F. Supp. 2d 561, 577

---

[9] Even setting all this aside, claims of spam emails or phone calls are not a cognizable injury for standing purposes in the first place. *Cooper v. Bonobos, Inc.*, 2022 WL 170622, at *5 (S.D.N.Y. 2022) ("Courts have generally rejected the theory that unsolicited calls or emails constitute an injury in fact.").

(S.D.N.Y. 2012) (short-sellers "have an obvious motive to exaggerate the infirmities of the securities in which they speculate"); *In re DraftKings Inc. Sec. Litig.*, 650 F. Supp. 3d 120, 154 (S.D.N.Y. 2023) (explaining that short-sellers have "an economic interest in driving down the company's stock price" and that "courts 'critically analyze[]' 'factual attributions to short-seller reports'"). Accordingly, courts dismiss complaints that are based merely on a short-seller's allegations. *See Harris v. AmTrust Fin. Servs., Inc.*, 135 F. Supp. 3d 155, 159 (S.D.N.Y. 2015) (dismissing complaint that "[r]el[ied] almost entirely on a negative report published by a short seller" that was "long on sound, fury and speculation"), *aff'd*, 649 F. App'x 7 (2d Cir. 2016). Dismissal is particularly appropriate here the Grizzly Report's prominent disclaimer that it reflects only the short-seller's "opinions" and not "statements of fact."

Nowhere does the SAC describe any investigation Plaintiffs undertook to verify any of the Grizzly Report's claims, even though the report purports to rest on publicly available information. *See Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 801 (S.D.N.Y. 2020) (dismissing complaint for lack of such corroboration); *DraftKings*, 650 F. Supp. 3d at 155 (where plaintiff "extracted and pled as true statements from a report by a short seller attributing adverse facts to unidentified persons, these aspects of the complaint, if not corroborated, are fairly discounted or put aside altogether as ill-pled"). While the SAC sprinkles in a few references to other media articles that make allegations about Temu's supposed abilities to access data on users' devices, the allegations are utterly conclusory. *See* Exs. B, C. They are not transformed into a plausible basis for a legal claim merely because Plaintiffs found them somewhere else. *See In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1272 (N.D. Cal. 2000) ("Conclusory allegations of wrongdoing are no more sufficient if they come from a newspaper article than from plaintiff's counsel.").

Even if Plaintiffs' allegations based on the Grizzly Report were accepted as true, they do

not provide any plausible factual basis to infer that Temu has actually collected any data relating to the Non-Users. Again, those allegations at most assert that the Temu app has the *capability* to collect certain types of data *under certain conditions*. In particular, with respect to data such as "text messages and other documents," Plaintiffs allege only that Temu could obtain access to such data "depending on the permissions [a Temu user] may have given" the app. SAC ¶¶ 13, 104.

The Non-Users thus do not even allege in a conclusory fashion that Temu *actually has* "harvested" *their* data, let alone plead any facts that would support such an inference. Just as the SAC's allegations are too speculative to support standing for the Non-Users, they are also too speculative to provide the plausible factual basis for their claims demanded by *Twombly* and *Iqbal*. *DiPizio v. Empire State Dev. Corp.*, 745 F. App'x 385, 390 (2d Cir. 2018) (dismissing complaint for failure to allege "specific facts that plausibly support a claim" after "stripping away the complaint's conclusory statements, none of which [were] entitled to an assumption of truth") (summary order); *Namuwonge v. Kronos, Inc.*, 418 F. Supp. 3d 279, 285-286 (N.D. Ill. 2019) (dismissing privacy claims where plaintiff "did not allege [] specifics related to any disclosure [of her data] by [defendant] to a third party" or that the defendant "collected, captured, or otherwise obtained" her data); *In re Google Assistant Privacy Litig.*, 457 F. Supp. 3d 797, 816 (N.D. Cal. 2020) (dismissing privacy claims based on media article alleging improper interception of conversations by Google product because "these allegations do not suffice to show that Plaintiffs' *own* oral communications were intercepted, which they must do").

### B. The Non-Users Fail to State Any Valid Cause of Action in Any Event

Beyond lacking any plausible factual basis, the Non-Users' claims separately fail because the SAC does not state any valid cause of action as to them. Even though the SAC hardly alleges anything about the Non-Users, it sweeps them into 21 of the 22 asserted causes action by referencing them in the heading for each count, without making *any effort* to connect any

allegations about them to the elements of each cause of action. Nor is it otherwise apparent how the elements could be satisfied for their claims, as there is a fundamental mismatch between the causes of action asserted and the wafer-thin allegations made about the Non-Users. For this reason as well, the Non-Users' claims should be dismissed.

### 1. Computer-Hacking Claims (Counts 1 and 12)

Counts 1 and 12 allege violations of the federal and California computer-hacking statutes. As to each, the SAC alleges only that Defendants unlawfully accessed *users'* mobile devices. *See* SAC ¶ 271 (alleging that "Defendants intentionally *accessed users' devices* without the necessary authorization"); *id.* ¶¶ 414-415 (alleging that Defendants surreptitiously collected "Plaintiffs'" data "from *their* devices and computers"). On their face, these claims do not apply to the Non-Users—who are defined as individuals who *did not use* Temu, and who therefore cannot allege that Temu unlawfully accessed their devices.[10]

Further, because the Non-Users cannot claim their own device was hacked, they cannot claim damages that are cognizable under either statute because neither allows for recovery based on the value of the data allegedly hacked. *See Van Buren*, 593 U.S. at 392 (finding federal statute's definitions of "loss" and "damage" "ill fitted … to remediating 'misuse' of sensitive information"); *Nowak v. Xapo, Inc.*, 2020 WL 6822888, at *5 (N.D. Cal. Nov. 20, 2020) ("The [California hacking statute] is California's state-law analogue to the [federal hacking statute] … [The California] claim fails for the same reasons that the [federal] claim does").

---

[10] In any event, because the SAC alleges that whether the Temu app can access things like "text messages and other documents" depends on the permissions the device user grants the app (SAC ¶ 104), Plaintiffs cannot claim that any access Temu allegedly had to such data was "without authorization" or "without permission," as required under these statutes. 18 U.S.C. § 1030(a); Cal. Pen. C. § 502(c); *see Van Buren v. United States*, 593 U.S. 374, 389-390 (2021) (holding that the federal statute requires that defendant breached a barrier to access).

### 2. Wiretapping Claims (Counts 2, 5, and 17)

Counts 2, 5, and 17 allege violations of the federal, Massachusetts, and California wiretapping statutes, respectively. These statutes have no evident application here, and certainly not to the Non-Users, because, as the SAC itself acknowledges, each statute requires the interception of communications *in transit*—as opposed to the collection of data *in storage*. *See* SAC ¶ 286 (alleging under federal statute that "Plaintiffs' and Class Members' electronic communications were intercepted during transmission"); *id.* ¶ 330 (same for Massachusetts statute); *id.* ¶ 463 (same for California statute).[11] The SAC does not allege the Temu app is even capable of collecting users' communications in real time. Instead, Plaintiffs' theory—while still baseless—is that Temu can collect personal messages *stored* on a user's device. SAC ¶ 104 (alleging that "TEMU is able to *hack* your phone," in that "depending on the permissions you may have given when you installed the app, [it can collect] your SMS text messages and other documents you may *have on your phone*"). This theory cannot support a "wiretapping" claim. *See Hall v. EarthLink Network, Inc.*, 396 F.3d 500, 504, n.1 (2d Cir. 2005) (distinguishing cases that involved "the *continued receipt* of e-mail messages" from "the acquisition of *previously stored* electronic communication," which does not support a valid claim under the Wiretap Act).

### 3. Invasion of Privacy Claims (Counts 3, 8, 10, 13, 14, and 22)

Counts 3, 8, 10, 13, 14, and 22 allege invasion-of-privacy claims under various state statutes, constitutional provisions, and common law. As with the computer-hacking claims, the

---

[11] *See also Democratic Nat'l Comm. v. Russian Fedn*, 392 F. Supp. 3d 410, 446 (S.D.N.Y. 2019) ("The term 'intercept' is construed narrowly 'to require that the interception of an electronic communication be contemporaneous with the transmission of that communication.'"); *Peters v. Mundelein Consol. High Sch. Dist. No. 120*, 2022 WL 393572, *11 (N.D. Ill. Feb. 9, 2022) ("Every court of appeals to consider the issue has concluded that to constitute an 'interception' under the Wiretap Act, 'the acquisition of a communication must be contemporaneous with its transmission.'" (collecting cases)); *Licea v. Am. Eagle Outfitters*, 659 F. Supp. 3d 1072, 1084 (C.D. Cal. 2023) (explaining that California statute "requires that messages be intercepted while in transit"); *Com. v. Vitello*, 367 Mass. 224, 251 (1975) ("[I]n substance the requirements of the Massachusetts statute are the same as those of [the federal Wiretap Act], as the legislative history of [the federal act] shows that they should be.").

asserted basis for these claims is Defendants' supposed intrusion into *Plaintiffs'* devices and the reasonable expectation of privacy they have in *those devices*. *See, e.g.*, SAC ¶ 310 (alleging under Count 3 that "Plaintiffs" have "a reasonable expectation of privacy in *their* data, mobile devices and computers"); *id.* ¶¶ 419, 431 (alleging under Counts 13 and 14 that "Plaintiffs" have a protected privacy interest "in their private and personally identifiable data and content … on *their* devices and computers"). Again, these allegations fail to state any claim as to the Non-Users, who allege only that their data may be subject to collection from *other Users*' devices.

Plaintiffs do not allege that the Non-Users have a reasonable expectation of privacy in data about them stored *on the devices of third parties*—nor can they. "[A] person has no legitimate expectation of privacy in information he voluntarily turns over to third parties." *In re U.S. for an Ord. Authorizing the Release of Hist. Cell-Site Info.*, 809 F. Supp. 2d 113, 120 (E.D.N.Y. 2011) (quoting *Smith v. Maryland*, 442 U.S. 735, 743-44 (1979)). Especially here, where Temu's alleged ability to collect data depends on the device user granting permissions to the app, it is not clear what reasonable basis the Non-Users would have to expect that any third parties to whom they sent data would not be able to share the data if they so choose. *See Lopez,* 519 F. Supp. 3d at 684 (dismissing claim where plaintiffs failed to specifically allege the circumstances giving rise to a reasonable expectation of privacy); *In re Yahoo Mail Litig.*, 7 F. Supp. 3d 1016, 1041 (N.D. Cal. 2014) (finding claims "fatally conclusory" where complaint failed to allege any specific facts "related to what particular emails [Defendant] intercepted, or the content within particular emails" to establish a reasonable expectation of privacy).

### 4. Negligence Claim (Count 7)

Plaintiffs' negligence claim is premised on an allegation, which comes out of nowhere at page 57 of the SAC, speculating that Temu has had a data breach.[12] Specifically, Plaintiffs cite a media article stating that "[a] cybercriminal who goes by the name 'smokinthashit' *claims* to have hacked Temu's database and stolen millions of customers' personal information" and was offering the supposedly stolen data for sale on a "crime forum on the dark web that works as a marketplace for stolen data." SAC ¶ 178. Neither the SAC nor the media article asserts that anyone has verified the claim; to the contrary, Plaintiffs acknowledge (and the article reports) that Temu has categorically asserted the claim is false and there was no breach.[13] Plaintiffs nonetheless bring a negligence claim based on the supposition that a breach occurred and a conclusory assertion that Temu "failed to follow best practices and industry standards for protecting personal data they had collected." SAC ¶ 167.

The cited article is a patently deficient basis for any negligence claim, particularly a claim by the Non-Users. It does not provide a plausible basis to infer that any data breach actually occurred in the first place, given that it merely reports a "claim" made by "smokinthatshit" that he had stolen Temu customer data, which Temu denied, and given the obvious explanation for why "smokinthatshit" would make such a claim—namely, that he is a fraudster hawking bogus data. *See Roe v. St. John's Univ.*, 91 F.4th 643, 654 (2d Cir. 2024) ("[W]e cannot turn a blind eye to 'an obvious alternative explanation' for alleged facts that undermine a plaintiff's theory of liability."

---

[12] The Non-Users also vaguely claim that Defendants violated a duty not to collect their data without authorization (SAC ¶ 346), but they fail to plausibly allege that their data was collected in the first place (*see supra* at 9-13), and in any event, any alleged damages are based on the purported data breach that never occurred (SAC ¶¶ 349-354).

[13] Specifically, Temu explained that: "Temu's security team has conducted a comprehensive investigation into the alleged data breach and can confirm that the claims are categorically false; the data being circulated is not from our systems. Not a single line of data matches our transaction records." Fernanda Tronco, *Temu Threatened by Hacker Claiming Data Breach That Company Denies*, The Street, Sept. 19, 2024, https://www.thestreet.com/retail/temu-threatened-hacker-claiming-data-breach, cited at SAC ¶ 178 n.132.

(quoting *Twombly*, 550 U.S. at 567)). But in any event, even if one were to credit the claim made by "smokinthatshit," the data he allegedly claims to have stolen consists of Temu "*customers'* personal information"—not any personal information of *non-users* of the app, and certainly not any personal information of the Non-Users named here. As with Plaintiffs' other causes of action, the SAC makes no effort to explain how this one relates specifically to the Non-Users.

**5. Restitution/Unjust Enrichment Claim (Count 8)**

The alleged premise for the SAC's restitution/unjust enrichment claim is that "Plaintiffs … have conferred substantial benefits on Defendants by downloading and using the Temu app" or "having data harvested by the defendants." SAC ¶ 362. This claim plainly cannot apply to the Non-Users, who are not alleged to have downloaded or used the Temu app. Nor do the Non-Users identify anywhere in the SAC what specific data of theirs was supposedly "harvested" or how Non-Users (who allege not to be customer of Temu) otherwise conferred any benefit on Defendants.

**6. BIPA Claim (Count 9)**

Non-User Miguel Acosta, alleged to be from Illinois (*id.* ¶ 22), brings a claim under BIPA, premised on Temu purportedly collecting his "retina or iris scan, fingerprint, voiceprint, or scan of hand or face geometry" (*id.* ¶¶ 377, 382). The SAC, however, says nothing about Acosta's biometric information or whether it was stored on a Temu user's phone—why would it be?—let alone explains how the Temu app is supposed to have accessed it. Thus, Acosta does not allege any basis for a BIPA claim. *See Jacobs v. Hanwha Techwin Am., Inc.*, 2021 WL 3172967, at *3 (N.D. Ill. July 27, 2021) ("[P]laintiff repeatedly alleges that defendant 'collected' his biometric data without alleging how, when, or any other factual detail. These allegations 'merely parrot' BIPA's statutory language; they do not provide any 'specific facts to ground plaintiff's legal claims.'"); *Kloss v. Acuant, Inc.*, 462 F. Supp. 3d 873, 877 (N.D. Ill. 2020) (same).

**7. Consumer Protection Claims (Counts 4, 11, 15, 16, and 21)**

Counts 4, 11, 15, and 21 allege claims under Massachusetts, Illinois, California, and New York laws, respectively, prohibiting unfair or deceptive business practices, and Count 16 alleges a claim under California's false advertising law. Plaintiffs fail to allege any loss suffered by the Non-Users (or any other Plaintiffs) that is cognizable under any of the cited statutes. Plaintiffs identify no particular pecuniary harm, and the alleged loss in value or control over their data (*e.g.*, SAC ¶¶ 191, 244) is not sufficient, especially given the lack of any allegations that the Non-Users are in any market to sell their data. *See Mount v. PulsePoint, Inc.*, 2016 WL 5080131, at *11 (S.D.N.Y. Aug. 17, 2016) (finding loss of value of data not cognizable under New York statute), *aff'd*, 684 F. App'x 32 (2d Cir. 2017); *Kurowski v. Rush Sys. for Health*, 683 F. Supp. 3d 836, 846, at *5 (N.D. Ill. July 24, 2023) (same for pecuniary injury requirement under Illinois statute); *In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*, 903 F. Supp. 2d 942, 965–66 (S.D. Cal. 2012) (same for California unfair competition and false advertising laws); *Shaulis v. Nordstrom, Inc.*, 865 F.3d 1, 10 (1st Cir. 2017) (holding that "impairment of an abstract right without economic loss" is insufficient under the Massachusetts law).

Moreover, to the extent these counts assert claims based on deceptive conduct, they do not identify any alleged misrepresentation or other conduct the Non-Users somehow relied upon—or even would have seen—as they claim to have never used Temu's services. *See Chimienti v. Wendy's Int'l, LLC*, 2023 WL 6385346, at *3 (E.D.N.Y. Sept. 30, 2023) (New York statute requires specific representations that allegedly misled consumer); *Sava v. 21St Century Spirits, LLC*, 2024 WL 3161625, at *23 (N.D. Ill. June 25, 2024) (Illinois statute requires that the misrepresentation relate to "a matter upon which the plaintiff could be expected to rely in determining whether to engage in the conduct in question"); *Shaeffer v. Califia Farms, LLC*, 44 Cal. App. 5th 1125, 1137 (2020) (California statutes require a "showing of actual reliance");

*O'Hara v. Diageo-Guinness, USA, Inc.*, 306 F. Supp. 3d 441, 452 (D. Mass. 2018) (Massachusetts law requires representation that would "mislead consumers, acting reasonably under the circumstances, to act differently from the way they otherwise would have acted"). The only alleged misrepresentations specified in these Counts concern how requests for permissions were presented to Temu *users*, which by definition would not have been presented to the Non-Users. *See, e.g.*, SAC ¶ 444, 505 (claiming Defendants violated consumer protection laws because they "made it appear … data would not be collected and transferred unless … Plaintiffs … chose to do so"). Nor can the Non-Users allege any "unfair" conduct given that, as described above, they fail to plausibly allege that Temu ever collected data about them. *See supra* at 10.

**8. Statutory Larceny and Conversion Claims (Counts 18 and 19)**

Plaintiffs' statutory larceny and common-law conversion claims under California law require allegations that Defendants "stole" or "converted" their "property." SAC ¶¶ 480, 487. The Non Users identify no "property" Temu allegedly collected from them. *E.g.*, SAC ¶ 480 (referring vaguely to Temu "taking Plaintiffs' … private data through the Temu platform"). Unspecified "private data" does not constitute property for purposes of these claims. *See Lau v. Gen Digit. Inc.*, 2023 WL 10553772, at *6 (N.D. Cal. Sept. 13, 2023) (rejecting statutory larceny claim based on plaintiffs' alleged property interest in their personal data); *In re iPhone Application Litig.*, 844 F. Supp. 2d 1040, 1075 (N.D. Cal. 2012) ("[T]he weight of authority holds that a plaintiff's 'personal information' does not constitute property.").

Nor can the Non-Users claim they were even deprived of possession or control of the alleged "property," as required for these causes of action, because the most they allege is that their data was copied, which does not deprive anyone of possession. SAC ¶¶ 484-487; *see McGowan v. Weinstein*, 505 F. Supp. 3d 1000, 1022 (C.D. Cal. 2020) ("Where property is capable of being copied, wrongful possession of copies does not typically give rise to a conversion claim if the

rightful owner retains possession of the original or retains access to other copies."). Moreover, the data was allegedly copied from devices belonging to third parties—where the data could not have been in the Non-Users' possession or control in the first place.

#### 9. Virginia Computer Crimes Act Claim (Count 20)

The Non-Users bring a scattershot set of claims under the Virginia Computer Crimes Act ("VCCA"), some of which on their face are inapplicable, and all of which fail for similar reasons as the foregoing causes of action. First, the Non-Users' claim that Defendants "converted" their "property by false pretenses." SAC ¶¶ 493. Any conversion theory fails for the reasons stated above, *see supra* § (8); and to the extent the Non-Users rely on the "false pretenses" prong of this provision, that likewise fails because they allege they had no interaction with Defendants and therefore have no basis to claim an injury based on any alleged misrepresentations, *see supra* § (7). Second, Plaintiffs bring claims under two provisions of the statute, each relating to unlawful collection of "employment, salary, credit, or other financial or identifying information." *Id.* ¶¶ 496-500. Yet the Non-Users do not identify a single item of any data actually collected about them—let alone a specific item covered by the statute.[14] Third, Plaintiffs claim that Defendants violated a provision of the statute prohibiting unlawful copying of "computer data, computer programs or computer software." SAC ¶¶ 494-495. Here again, the Non-Users do not bother to specify any item of their data they believe is implicated by the statute—and even if they did, the statute's copying provision is preempted by federal copyright law. *See OpenRisk, LLC, v. Microstrategy Servs. Corp.*, 876 F.3d 518, 527 (4th Cir. 2017) ("The core of OpenRisk's [VCCA] claim remains

[14] *See* Va. Code Ann. § 18.2-186.3 (West) (stating that "identifying information" shall include: (i) name; (ii) date of birth; (iii) social security number; (iv) driver's license number; (v) bank account numbers; (vi) credit or debit card numbers; (vii) personal identification numbers (PIN); (viii) electronic identification codes; (ix) automated or electronic signatures; (x) biometric data; (xi) fingerprints; (xii) passwords; or (xiii) any other numbers or information that can be used to access a person's financial resources, obtain identification, act as identification, or obtain money, credit, loans, goods, or services").

the unauthorized copying and transfer of its data, and that claim is 'equivalent to' a copyright infringement action and thus preempted.").

## III. CLAIMS AGAINST PDD HOLDINGS FAIL FOR LACK OF PERSONAL JURISDICTION[15]

All claims against PPD Holdings should be dismissed, under Federal Rule of Civil Procedure 12(b)(2), for the additional reason that it has no business contacts with New York and is therefore not subject to personal jurisdiction here. *See* Zhang Decl. ¶¶ 9, 12, 14, 16 (stating that PDD Holdings has no offices or property in New York, sells no products, and otherwise does nothing to operate the Temu platform).[16] The theory on which Plaintiffs primarily rely is that PDD Holdings referred to its constituent businesses, including Temu, collectively as "we" and "our" in its annual reports. Courts have repeatedly rejected that theory as a basis for personal jurisdiction, including in multiple cases specifically involving PDD Holdings.

PDD Holdings is a Cayman Islands corporation based in Ireland. Zhang Decl. ¶ 5. The SAC does not and cannot allege any basis for specific jurisdiction over PDD Holdings in New York, as it alleges no specific facts that PDD Holdings itself does any business or took any relevant action in New York. *See, e.g.*, *SPV Osus Ltd*., 882 F.3d at 344 ("A court must look to whether there was some act by which the defendant purposefully availed itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws."). To the contrary, PDD Holdings is a holding company with no independent business operations. *See* Zhang Decl. ¶¶ 6-10. As such, PDD Holdings has stated unequivocally, among

---

[15] Because PDD Holdings is a Cayman Islands Corporation with its principal offices in Ireland, it is not subject to general jurisdiction in New York. *See SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 343 (2d Cir. 2018) ("Aside from the truly exceptional case, a corporation is at home and subject to general jurisdiction only in its place of incorporation or principal place of business.").

[16] "In deciding a motion to dismiss for lack of personal jurisdiction, the Court may consider materials outside the pleadings." *Al-Ahmed v. Twitter, Inc.*, 553 F. Supp. 3d 118, 124 (S.D.N.Y. 2021).

other things, that it (i) neither offers nor advertises any services in the U.S., (ii) has no bank accounts in the U.S., (iii) has no offices, mailing address, or other place of business in the U.S., and (iv) does not operate the Temu platform and has never collected or had access to personal data of U.S. users of Temu. *Id.* ¶¶ 6-21; *see Corning Inc. v. Shin Etsu Quartz Prod. Co*., 242 F.3d 364 (2d Cir. 2000) (affirming the district court's dismissal of claims against a foreign corporation for lack of personal jurisdiction due to insufficient contacts); *Ainette v. Mkt. Basket Inc*., 2021 WL 3371037, at *10 (S.D.N.Y. Aug. 2, 2021) (same where defendant "has no office in New York, does not pay taxes or own property here, and has neither solicited business in, nor sent employees to, this State").

Having no basis to attribute any relevant New York-based conduct to PDD Holdings, Plaintiffs resort to the routinely rejected argument that PDD Holdings can be sued in New York simply because it is Temu's parent company. The law is clear that the parent-subsidiary relationship has not in itself been treated as sufficient to establish personal jurisdiction over the foreign parent. *See Saraceno v. S.C. Johnson & Son, Inc*., 83 F.R.D. 65, 71 (S.D.N.Y. 1979) (holding that "under New York law a parent of a multinational corporate enterprise may make broad policy decisions for its subsidiaries," and although "[s]uch control is inherent in the parent-subsidiary relationship," it is not sufficient to support jurisdiction). Plaintiffs may overcome this general rule only by pleading facts sufficient to show that "the other entity is a 'mere' department of the foreign corporation" or "that the other entity acts as an agent of the foreign corporation." *Drucker Cornell v. Assicurazioni Generali S.p.A. Consol.*, 2000 WL 284222, at *3 (S.D.N.Y. Mar. 16, 2000).

The Second Circuit considers four factors to determine whether the subsidiary is the "mere department" or alter ego of its parent: "[(1)] "common ownership … ; [(2)] financial dependency

of the subsidiary on the parent corporation; [(3)] the degree to which the parent corporation interferes in the selection and assignment of the subsidiary's executive personnel and fails to observe corporate formalities; and [(4)] the degree of control over the marketing and operational policies of the subsidiary exercised by the parent." *Jazini v. Nissan Motor Co.*, 148 F.3d 181, 185 (2d Cir. 1998). Plaintiffs do not plausibly allege any of these criteria; their conclusory allegations of corporate overlap and control are not supported by any well-pleaded facts and are contradicted by the sworn declaration of a PDD Holdings representative submitted with this motion. For example, Plaintiffs assert that "PDD has six directors on [Temu's] board and three principal executive officers who are not on the board." SAC ¶ 71. That allegation, sourced solely from a website called "fool.com," is simply false. *See* Zhang Decl. ¶ 23 (stating that PDD Holdings shares no officers, directors, or employees with Temu). Even if true, that would not suffice here. *See Aspen Speciality Ins. Co. v. RCI Hosp. Hodlings, Inc.*, 2023 WL 4080550, at *4 (S.D.N.Y. June 20, 2023) ("Courts routinely reject the argument that 'common and overlapping' directors or officers between a parent and subsidiary amount to 'disregard for the separate corporate existence of the subsidiary.'"); *Campbell v. Goodyear Tire & Rubber Co*., 1984 WL 730, at *2 (S.D.N.Y. Aug. 8, 1984) (rejecting alleged basis for personal jurisdiction where there was "an explicit affidavit to the contrary").

Likewise, Plaintiffs also fail to support their conclusory allegations that PDD Holdings and Temu "fail to adhere to corporate formalities" and that PDD Holdings exercises an "unusually high degree of control" over Temu. SAC ¶¶ 50, 70. For support, Plaintiffs point to PDD Holdings' annual reports stating that they "launched" Temu (*id.* ¶ 50), that the companies use the "same logistical network and 'ecosystem'" (*id.* ¶ 53), that Temu is one of PDD Holdings' many businesses in its "portfolio of businesses" (*id.* ¶ 54), or the fact that PDD Holdings has claimed

that it is subject to U.S. privacy laws (*id.* ¶ 60). None of these statements is sufficient to show that PDD Holdings "has directed the operations" of the Temu app, that PDD Holdings' employees performed work for the Temu app, or that PDD Holdings "made key strategy decisions" for Temu. *Compare* SAC ¶¶ 35-37, *with* Zhang Decl. ¶ 19 (stating that PDD Holdings does not manage the day-to-day operations of Temu). To the contrary, courts recognize that "[t]he officers of any corporation that owns the stock of another necessarily exercise a considerable degree of control over the subsidiary corporation and the discharge of that supervision alone is not enough to subject the parent to New York jurisdiction." *Aspen*, 2023 WL 4080550, at *5 (dismissing complaint for lack of personal jurisdiction because a "parent company's control over a subsidiary is generally not enough to subject the subsidiary to suit in New York courts" and plaintiff failed to allege the parent exercised "pervasive control" over subsidiary); *NovelAire Techs., L.L.C. v. Munters AB*, 2013 WL 6182938, at *11 (S.D.N.Y. Nov. 21, 2013) (dismissing complaint because "the subsidiary's actions cannot be attributed to the parent absent the showing of control that is so utterly lacking here"). To the extent Plaintiffs intend to assert an agency theory for personal jurisdiction, it would fail for the same reasons. *See, e.g., City of Long Beach v. Total Gas & Power N. Am., Inc.*, 465 F. Supp. 3d 416, 439 (S.D.N.Y. 2020) (rejecting agency theory and alter ego theories for same reasons, after finding that plaintiffs failed to "allege plausibly that any defendant exercised control, extensive or otherwise, over any other defendant with regard to the facts giving rise to this lawsuit"), *aff'd*, 2021 WL 5754295 (2d Cir. Dec. 3, 2021).

Indeed, courts have repeatedly rejected the *exact* same strategy Plaintiffs attempt here—*i.e.*, pointing to a parent company's statement in its annual reports referring collectively to "we" or "our" to encompass its U.S.-based subsidiary. Such statements are typical of a parent-subsidiary relationship and do not demonstrate specific corporate control, oversight, or other indicia, or an

alter ego relationship. *See J.L.B. Equities, Inc. v. Ocwen Fin. Corp.*, 131 F. Supp. 2d 544, 550 (S.D.N.Y. 2001) (rejecting argument that consolidated annual reports provided a sufficient basis to exercise personal jurisdiction over the parent because they are "typical in a parent-subsidiary relationship"); *Bellomo v. Pennsylvania Life Co.*, 488 F. Supp. 744. 745 (S.D.N.Y. 1980) ("The parent and subsidiary may not, on the basis of" the fact that "its annual reports describe the business of the parent, subsidiaries and sub-subsidiaries as if they were all part of a common enterprise, and that the annual report consolidates the earnings statements of all the affiliates[,]" "be treated as the same entity for jurisdictional purposes."). Indeed, federal courts have found that there is no personal jurisdiction over PDD Holdings for this precise reason. *See Trinidad v. PDD Holdings, Inc.*, 2024 WL 3177912, at *3 (N.D. Ill. June 26, 2024) ("PDD's SEC filings, statements from PDD and Temu's websites, and various news clippings … establishes only a generic parent-subsidiary relationship."); *Ilustrata Servicos Design, LTDA v. PDD Holdings, Inc.*, 2024 WL 3177901, at *3 (N.D. Ill. June 26, 2024) ("PDD's filings incorporating 'we' statements are not inconsistent with a typical parent-subsidiary relationship in which the parent 'necessarily control[s], direct[s], and supervise[s]' to some extent.").[17]

Plaintiffs' remaining scattershot allegations are just as irrelevant. For example, Plaintiffs suggest that merely being listed on the NASDAQ (SAC ¶ 47) is sufficient to confer personal jurisdiction in New York. Not so. *See Hunter v. Deutsche Lufthansa AG*, 863 F. Supp. 2d 190, 200 (E.D.N.Y. 2012) ("Neither GTEC's NASDAQ listing, nor these other alleged 'ancillary steps in

---

[17] *See also Lord v. PDD Holdings, Inc.*, 2024 WL 3177891, at *3 (N.D. Ill. June 26, 2024) (same); *Wang v. PDD Holdings, Inc.*, 2024 WL 3177892, at *3 (N.D. Ill. June 26, 2024) (same); *Milburn v. PDD Holdings, Inc.*, 2024 WL 3177639, at *4 (N.D. Ill. June 26, 2024) (same). Plaintiffs ignore this case law and cite instead to *Roadget Bus. Pte. Ltd. v. PDD Holdings Inc.*, 2023 WL 4865005, at *1 (N.D. Ill. July 31, 2023) (cited in SAC ¶ 74), which addressed an application for emergency TRO and says nothing about personal jurisdiction. And while Plaintiffs claim the court made a "finding" about PDD Holdings, they point to the court's citation to the plaintiff's allegations "on information and belief."

support of [GTEC's] listing on a New York exchange,' however, are sufficient to confer personal jurisdiction."). Neither is the fact that PDD Holdings allegedly agrees to New York jurisdiction in its deposit agreement (SAC ¶ 75), as "[a] company's submission to jurisdiction and service of process in New York pursuant only to isolated contracts does not thereby signal its unrestricted consent to personal jurisdiction in New York for all future claims brought against it." *Hunter*, 863 F. Supp. 2d at 201. Finally, Plaintiffs allege that Temu had a "campus ambassadors" program where students could receive benefits for promoting Temu on campus. SAC ¶ 68. But on its face this was a program allegedly run *by Temu* and therefore does nothing to establish that *PDD Holdings* had contacts with New York.

For these reasons, Plaintiffs provide no plausible basis to conclude that PDD Holdings is subject to personal jurisdiction in New York, nor do they demonstrate they would they be able to do so after discovery. *See Molchatsky v. United States*, 778 F. Supp. 2d 421, 438 (S.D.N.Y. 2011) (holding that "[a] party seeking jurisdictional discovery, like a party seeking other kinds of discovery, bears the burden of showing necessity"), *aff'd*, 713 F.3d 159 (2d Cir. 2013); *Gualandi v. Adams*, 385 F.3d 236, 244-45 (2d Cir. 2004) (affirming denial of jurisdictional discovery where plaintiffs "were unable to demonstrate that additional discovery was needed in order to decide the jurisdictional issue"); *In re Ski Train Fire in Kaprun, Austria on Nov. 11, 2000*, 230 F. Supp. 2d 403, 412 (S.D.N.Y. 2002) ("Because plaintiffs have failed to make out a prima facie case for this Court's exercise of personal jurisdiction, based either on Siemens Austria's direct contacts with this forum or its status as a subsidiary of a foreign corporation with a presence here, they are not entitled to discovery.").[18]

[18] For the same reasons that the Non-Users' claims against PDD Holdings should be dismissed for lack of personal jurisdiction, the Users' claims against PDD Holdings are subject to dismissal on this ground as well, as an alternative to the grounds for rejecting their claims against PDD Holdings articulated in Defendants' Motion to Compel.

## **CONCLUSION**

For the foregoing reasons, the Non-Users' claims and all claims against PDD should be dismissed.

Dated: November 4, 2024

Respectfully submitted,

*/s/ Serrin Turner*

Serrin Turner
Matthew Valenti
Hadrian Luo
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, New York 10020
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
Email: serrin.turner@lw.com
matthew.valenti@lw.com
hadrian.luo@lw.com

*Attorneys for Defendants Whaleco Inc. d/b/a Temu and PDD Holdings Inc.*

# Appendix A

| Source for Plaintiffs' Allegations Regarding Functionality of Temu App | | |
|---|---|---|
| **Allegation** | **Citation** | **Source Referred To** |
| "According to these experts … ." | ¶ 5 | Grizzly Report (Ex. A) |
| "Indeed, experts have found … ." | ¶ 8 | Grizzly Report (Ex. A) |
| "Moreover, experts have found … ." | ¶ 9 | Grizzly Report (Ex. A) |
| "Technical analyses have concluded … ." | ¶ 100 | Grizzly Report (Ex. A) |
| "As one commentator noted … ." | ¶ 100 | Grizzly Report (Ex. A) |
| "One technical investigation … ." | ¶ 101 | Grizzly Report (Ex. A) |
| "Technical analysis of the Temu app found … ." | ¶ 105 | Grizzly Report (Ex. A) |
| "As one analyst observed … ." | ¶ 112 | Grizzly Report (Ex. A) |
| "[A]s analysts have observed … ." | ¶ 131 | Grizzly Report (Ex. A) |
| "As a technical analysis of the Temu app noted … ." | ¶ 131 | Grizzly Report (Ex. A) |
| "[I]ndependent experts have noted … ." | ¶ 133 | Grizzly Report (Ex. A) |
| "A recent technical analysis found … ." | ¶ 137 | Grizzly Report (Ex. A) |
| "[T]echnical analysis of the app has uncovered … ." | ¶ 139 | Grizzly Report (Ex. A) |
| "[A] technical analysis found … ." | ¶ 140 | Grizzly Report (Ex. A) |
| "As one expert noted … ." | ¶ 142 | Grizzly Report (Ex. A) |
| "[A]nalysts have concluded that … ." | ¶ 144 | Grizzly Report (Ex. A) |
| "[A]nalysts have concluded … ." | ¶ 145 | Grizzly Report (Ex. A) |
| "As one technical report noted … ." | ¶ 146 | Grizzly Report (Ex. A) |
| "[A] technical analysis of the Temu app [] noted … ." | ¶ 155 | Grizzly Report (Ex. A) |
| "Moreover, as analysts have noted … ." | ¶ 200 | Grizzly Report (Ex. A) |
| "As one technical analysis concluded … ." | ¶ 201 | Grizzly Report (Ex. A) |
| "According to one commentator … ." | ¶ 202 | Grizzly Report (Ex. A) |
| "For example, one analysis observed … ." | ¶ 206 | Grizzly Report (Ex. A) |
| "As one analysis observes … ." | ¶ 220 | Grizzly Report (Ex. A) |
| "Experts have found … ." | ¶ 6 | Kim Komando Blog* (Ex. B) |
| "[A]s another commentator observed … ." | ¶ 100 | Kim Komando Blog* (Ex. B) |
| "[I]ndependent experts' assessments … ." | ¶ 133 | Kim Komando Blog (Ex. B) |
| "[E]xperts have confirmed … ." | ¶ 133 | Kim Komando Blog (Ex. B) |
| "[E]xperts have concluded … ." | ¶ 133 | Kim Komando Blog (Ex. B) |
| "[I]ndependent experts have concluded … ." | ¶ 135 | Kim Komando Blog* (Ex. B) |
| *Citation to *International Business Times* article (*see* Ex. C) quoting "tech writer Albert Khoury" who in turn is quoting the Kim Komando Blog. | | |