**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

JEHAN ZIBOUKH, MARGRET PHILIE, VERA FIGLOCK, NICOLE MAY, TYANA DAUGHTERY, SOLALIZ HERNANDEZ, DEBRA KRYSTYN, I.E., A MINOR, CYNTHIA RODRIGUEZ, J.P., A MINOR, MIGUEL ACOSTA, VINSON MANGOS, NOAH KUPPER, J.P. A MINOR, CHRISTIAN VEGA, A.H. A MINOR, AND OLAYA BOURAKKADI AMRANI,
on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

WHALECO INC. D/B/A TEMU, AND PDD HOLDINGS INC. F/K/A PINDUODUO INC.,

Defendants.

Case No. 1:24-cv-3733-MKB-RML

Judge Margo K. Brodie

Magistrate Judge Robert M. Levy

CLASS ACTION

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS CLAIMS OF NON-USER PLAINTIFFS**

# TABLE OF CONTENTS

**Page**


I. THE NON-USERS WERE SIGNIFICANTLY INJURED AND HAVE STANDING ....................2

II. THE NON-USERS STATE CLAIMS FOR RELIEF ....................13

A. The Complaint Provides a Plausible Basis For Non-Users' Claims ....................14

B. The Non-Users State Valid Causes of Action ....................16

1. CFAA and CDAFA (Counts 1 & 12). .................... 16

2. ECPA, CIPA and Massachusetts Wiretap Act (Counts 2, 5 & 17). .................... 18

3. Mass. Gen. Laws Ch. 214, Unjust Enrichment, Intrusion Upon Seclusion, Cal. Const., and N.Y. Civ. Rights Law § 51 (Counts 3, 8, 10, 13, 14 & 22). .................... 19

4. Negligence (Count 7). .................... 21

5. Unjust Enrichment (Count 8). .................... 22

6. BIPA (Count 9). .................... 23

7. Consumer Protection Statutes (Counts 4, 11, 15, 16 & 21). .................... 24

8. Larceny and Conversion Claims (Counts 18 & 19). .................... 27

9. Virginia Computer Crimes Act (Count 20) .................... 28

III. THE COURT HAS PERSONAL JURISDICTION OVER PDD HOLDINGS ....................29

A. Personal Jurisdiction Exists Under NY CPLR § 302 ....................30

1. PDD Holdings committed tortious acts and transacted business in New York. .................... 31

2. PDD Holdings owned and operated the logistical network used by Temu. .................... 33

3. Jurisdiction exists over PDD Holdings based on Whaleco's activities. .................... 34

4. PDD Holdings' arguments do not defeat jurisdiction. .................... 35

B. Personal Jurisdiction Exists Under NY CPLR § 301 ....37

1. Defendant Whaleco is an "agent" of PDD Holdings. .... 37

2. Defendant Whaleco is a "department" of PDD Holdings. .... 38

3. PDD Holdings transacts business in New York. .... 39

C. Personal Jurisdiction Exists Under Rule 4(k)(2) ....40

D. At a Minimum, Plaintiffs Are Entitled to Jurisdictional Discovery ....41

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*A.I. Trade Finance, Inc. v. Petra Bank*,
989 F.2d 76 (2d Cir. 1993)....................29, 30

*Ainette v. Market Basket Inc.*,
2021 3371037 (S.D.N.Y. Aug. 2, 2021)....................30

*Al-Ahmed v. Twitter, Inc.*,
684 F. Supp. 3d 1140 (N.D. Cal. 2022)....................13

*Albanese v. Cuomo*,
1998 WL 760339 (E.D.N.Y. Sept. 18, 1998)....................12

*APWU v. Potter*,
343 F.3d 619 (2d Cir. 2003)....................41

*Baxter v. PDD Holdings, Inc.*,
24-cv-05653 (E.D.N.Y.)....................40

*Biden v. Ziegler*,
2024 WL 3498786 (C.D. Cal. June 20, 2024)....................17

*Bohnak v. Marsh & Mclennan Cos., Inc.*,
79 F.4th 276 (2d Cir. 2023).................... *passim*

*Brown v. Google LLC*,
2021 WL 6064009 (N.D. Cal. Dec. 22, 2021)....................25

*Bulova Watch Co., Inc. v. K. Hattori & Co., Ltd.*,
508 F. Supp. 1322 (E.D.N.Y. 1981)....................34, 37, 38, 39

*Burger King Corp. v. Rudzewicz*,
471 U.S. 462 (1985)....................35, 40

*Calder v. Jones*,
465 U.S. 783 (1984)....................35

*Calhoun v. Google LLC*,
526 F. Supp. 3d 605 (N.D. Cal. 2021)....................24, 27

*Cel-Tech Comm's, Inc. v. Los Angeles Cellular Tel. Co.*,
20 Cal. 4th 163 (1999)....................26

*Cooper v. Bonobos, Inc.*,
2022 WL 170622 (S.D.N.Y. Jan. 19, 2022) ....................12

*Corning Inc. v. Shin Etsu Quartz Prods. Co., Ltd.*,
242 F.3d 364 (2d Cir. 2000)....................37

*Davis v. HSBC Bank Nevada, N.A.*,
691 F.3d 1152 (9th Cir. 2012) ....................26

*DiLorenzo v. Norton*,
2009 WL 2381327 (D.D.C. July 31, 2009)....................31

*Doe v. Fullstory, Inc.*,
712 F. Supp. 3d 1244 (N.D. Cal. 2024) ....................16, 19, 20, 23

*Doe v. Tenet Healthcare Corp.*,
731 F. Supp. 3d 142 (D. Mass. 2024) ....................26

*Drucker Cornell v. Assicurazioni Generali S.p.A.*,
2000 WL 284222 (S.D.N.Y. Mar. 16, 2000) ....................37

*E.H. v. Meta Platforms, Inc.*,
2024 WL 557728 (N.D. Cal. Feb. 12, 2024) ....................16, 27

*In re Facebook, Inc. Internet Tracking Litig.*,
956 F.3d 589 (9th Cir. 2020) ....................3, 25

*Facebook, Inc. v. Power Ventures, Inc.*,
844 F.3d 1058 (9th Cir. 2016) ....................17, 18

*Finn v. Barney*,
471 F. App’x 30 (2d Cir. 2012) ....................30

*Freeplay Music, LLC v. Nian Infosolutions Private Lt*,
2018 WL 3639929 (S.D.N.Y. July 10, 2018)....................40

*Frummer v. Hilton Hotels Int’l, Inc.*,
19 N.Y.2d 533 (1967) ....................37

*General Elec. Capital Corp. v. Titan Aviation, LLC*,
2007 WL 107752 (S.D.N.Y. Jan. 16, 2007) ....................29

*Gershzon v. Meta Platforms, Inc.*,
2023 WL 5420234 (N.D. Cal. Aug. 22, 2023) ....................16

*Greenberg v. Gov. Props. Trust, Inc.*,
2007 WL 2981683 (S.D.N.Y. Oct. 10, 2007)....................40

*Hall v. EarthLink Network, Inc.*,
396 F.3d 500 (2d Cir. 2005).....19

*Huan v. Fauci*,
2024 WL 1181476 (E.D.N.Y. Feb. 12, 2024).....12

*In re iPhone App. Litig.*,
844 F. Supp. 2d 1040 (N.D. Cal. 2012).....26

*Jacobs v. Hanwha Techwin Am., Inc.*,
2021 WL 3172967 (N.D. Ill. July 27, 2021).....24

*Jazini v. Nisson Motor Co., Ltd.*,
148 F.3d 181 (2d Cir. 1998).....37

*John v. Whole Foods Market Grp., Inc.*,
858 F.3d 732 (2d Cir. 2017).....2

*Kaempe v. Myers*,
367 F.3d 958 (D.C. Cir. 2004).....31

*Kloss v. Acuant, Inc.*,
462 F. Supp. 3d 873 (N.D. Ill. 2020).....24

*Koehler v. Bank of Bermuda Ltd.*,
101 F.3d 863 (2d Cir. 1996).....38

*In re LastPass Data Sec. Incident Litig.*,
2024 WL 3580646 (D. Mass. July 30, 2024).....26

*Licea v. Am. Eagle Outfitters*,
659 F. Supp. 3d 1072 (C.D. Cal. 2023).....13

*Liverpool v. Con-Way, Inc.*,
2009 WL 1362965 (E.D.N.Y. May 15, 2009).....34

*Long Miao v. Fanhwa, Inc.*,
442 F. Supp. 3d 774 (S.D.N.Y. 2020).....14

*In re Longwei Petrol. Inv. Holding Ltd. Sec. Litig.*,
2014 WL 285103 (S.D.N.Y. 2014).....14

*Lopez v. Apple, Inc.*,
519 F. Supp. 3d 672 (N.D. Cal. 2021).....12

*Loughnane v. Rogers*,
2019 WL 4242486 (N.D. Ill. Sept. 6, 2019).....19

*Mata v. Zillow Group Inc.*,
2024 WL 5161955 (S.D. Cal. Dec. 18, 2024)....19

*Mayatextil, S.A. v. Liztex U.S.A., Inc.*,
1995 WL 131774 (S.D.N.Y. Mar. 23, 1995)....39

*McGowan v. Smith*,
52 N.Y.2d 268 (1981)....37

*McGowan v. Weinstein*,
595 F. Supp. 3d 1000 (C.D. Cal. 2020)....27

*In re Meta Pixel Tax Filing Cases*,
724 F. Supp. 3d 987 (N.D. Cal. 2024).... *passim*

*Mount v. PulsePoint, Inc.*,
2016 WL 5080131 (S.D.N.Y. Aug. 17, 2016)....13, 25

*NovelAire Tech., L.L.C. v. Munters AB*,
2013 WL 6182938 (S.D.N.Y. Nov. 21, 2013)....37

*O'Toole v. Northrop Grumman Corp.*,
499 F.3d 1218 (10th Cir. 2007)....30

*OpenRisk, LLC v. Microstrategy Servs. Corp.*,
876 F.3d 518 (4th Cir. 2017)....29

*PDK Labs, Inc. v. Friedlander*,
103 F.3d 1105 (2d Cir. 1997)....29

*In re Pharmatrak, Inc.*,
329 F.3d 9 (1st Cir. 2003)....19

*Philips Med. Sys. Puerto Rico v. GIS Partners Corp.*,
203 F. Supp. 3d 221 (D.P.R. 2016)....18

*Porat v. Lincoln Towers Cmty. Ass'n*,
464 F.3d 274 (2d Cir. 2006)....23

*Quon v. Arch Wireless Operating Co.*,
529 F.3d 892 (9th Cir. 2008)....19

*Roadget Business Pte. Ltd. v. PDD Holdings Inc.*,
2023 WL 4865005 (N.D. Ill. July 31, 2023)....34, 35, 36

*Roadget Business PTE Ltd. v. PDD Holdings, Inc.*,
No. 1:22-cv-07119 (N.D. Ill. 2022)....40

*Salazar v. NBA*,
118 F.4th 533 (2d Cir. 2024) ....................2, 3, 4, 20

*Santana v. Take-Two Interactive Software, Inc.*,
717 Fed. App'x 12 (2d Cir. 2017)....................12

*Saskatchewan Healthcare Employee's Pension Plan v. KE Holdings Inc.*,
718 F. Supp. 3d 344 (S.D.N.Y. 2024)....................14, 15

*In re Sci. Apps. Int'l Corp. (SAIC) Backup Tape Data Theft Litig.*,
45 F. Supp. 3d 14 (D.D.C. 2014)....................12, 17

*Shaulis v. Nordstrom, Inc.*,
865 F.3d 1 (1st Cir. 2017)....................25

*In re Sony Gaming Networks & Customer Data Sec. Litig.*,
963 F. Supp. 2d 942 (S.D. Cal. 2012)....................27

*SPV Osus Ltd. v. UBS AG*,
882 F.3d 333 (2d Cir. 2018)....................36

*Stein v. Needle*,
2021 WL 1178283 (D. Conn. Mar. 29, 2021) ....................17

*Stutman v. Chem. Bank*,
95 N.Y.2d 24 (2000) ....................27

*Taca Int'l v. Airlines, S.A. v. Rolls-Royce of Eng., Ltd.*,
15 N.Y.2d 97 (1965) ....................39

*In re Tamoxifen Citrate Antitrust Litig.*,
262 F. Supp. 2d 17 (E.D.N.Y. 2003) ....................37

*Theofel v. Farey–Jones*,
359 F.3d 1066 (9th Cir. 2004) ....................17, 18

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021)....................2, 3, 4, 12

*U.S. Dep't of Justice v. Reps. Comm. for Freedom of Press*,
489 U.S. 749 (1989)....................3

*U.S. v. Funds in the Amount of $30,670.00*,
403 F.3d 448 (7th Cir. 2005) ....................36

*U.S. v. Zavala*,
541 F.3d 562 (5th Cir. 2008) ....................19

*Van Buren v. U.S.*,
593 U.S. 374 (2021)....18

*Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*,
751 F.2d 117 (2d Cir. 1984)....38

**STATUTES**

28 U.S.C. § 1030....17

Cal. Pen. Code § 502....16, 17

Cal. Unfair Comp. Law....4

18 U.S.C. § 1030....4, 9, 16

18 U.S.C. §§ 2510 et seq....4, 8, 18, 33

Ill. Comp. Stat. Ann. 505/2....4, 26

Mass Gen. Laws. Ch. 93....25

Mass. Gen. Laws Ch. 214....4, 19

Mass. Wiretap Act, Mass. Gen. Laws, Ch. 272, § 99....3, 4, 16, 18

N.Y. Civ. Rights Law § 51....4, 19

N.Y. Gen. Bus. L. 349....4, 24, 25, 27, 26

Va. Code § 18.2-152.2....28

Va. Comp. Crimes Act, Va. Code § 18.2-152.1....4, 28

**OTHER AUTHORITIES**

Fed. R. Civ. P. 8(a)(2)....1

Fed. R. Civ. P. 12(b)....1, 2, 13, 23

Fed. R. Civ. P. 15(a)(2)....23

Fed. R. Evid. 201(b)(2)....30

NY CPLR 302(a)(3)....30

NY CPLR § 301....37, 39

NY CPLR § 302....30

Restatement (Second) of Torts § 652B (1977) ....................................................................3

Defendants' motion ignores most of the allegations in the complaint and mischaracterizes those it does address in an attempt to argue that the non-user Plaintiffs are "uninjured" by Defendants' theft of their private data. The complaint contains 523 paragraphs supported by 174 footnotes refuting Defendants' arguments. Multiple independent experts, government authorities, Temu's code itself, and Defendants' own admissions all make clear that Temu collected the non-user Plaintiffs' private data without authorization. The complaint more than satisfies the Federal Rules' requirement that Plaintiffs set forth a "short and plain" statement of their claims. Fed. R. Civ. P. 8(a)(2). Defendants' motion to dismiss should be denied in its entirety.

*First*, Defendants' suggestion that non-users have suffered only "hypothetical injuries" or were added only to "avoid arbitration" (Mem. at 1) is wrong. Well-settled Supreme Court and Second Circuit precedent makes clear that the non-user Plaintiffs suffered significant privacy violations that satisfy the requirements for standing under Fed. R. Civ. P. 12(b)(1).

*Second*, Defendants' assertions that the complaint is based solely on a "short-seller's report," non-user data was collected only with Temu users' "permission", and the complaint does not "connect its claims specifically to Non-Users" (Mem. at 2) are all refuted by the complaint itself. The complaint alleges Temu automatically gained unauthorized access to, and collected, non-users' data, and supports those claims with detailed discussion of, and citations to, the Temu code as well as the analyses of multiple experts and government authorities. Defendants' attempt to debate these technical details is more appropriately raised after expert discovery.[1]

*Finally*, Defendants' assertion that the Court lacks jurisdiction over PDD Holdings ignores extensive factual detail provided in the complaint, which includes discussion of PDD

[1] Defendants assert their motion should not be transformed into a motion for summary judgment because the complaint cites certain documents (Mem. at 2 n.2). However, Defendants also address materials never cited in the complaint (*e.g., id.* at 6 n.6), and the Memorandum is filled with technical arguments regarding the Temu app that are more properly the subject of expert testimony.

Holdings' own SEC filings and other documents in which it acknowledges its direct role in the operation of Temu in the United States. Defendants' assertion that PDD Holdings "conducts no business in the U.S." (Mem. at 2) begs reality, given that—among other things—it sells its securities on the NASDAQ exchange and has entered into agreements that require the resolution of disputes in New York. Defendants' motion should be denied.[2]

## I. THE NON-USERS WERE SIGNIFICANTLY INJURED AND HAVE STANDING

Under Rule 12(b)(1), courts "accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Bohnak v. Marsh & Mclennan Cos., Inc.*, 79 F.4th 276, 283 (2d Cir. 2023). "[A]t the pleading stage, 'general factual allegations of injury resulting from the defendant's conduct may suffice'"; the injury-in-fact requirement is a "low threshold." *John v. Whole Foods Market Grp., Inc.*, 858 F.3d 732, 736 (2d Cir. 2017).

The Supreme Court recently held that plaintiff suffer a concrete harm sufficient to confer standing where their alleged injury bears "a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts," including "intangible harms" such as "disclosure of private information" and "intrusion upon seclusion." *TransUnion LLC v. Ramirez,* 594 U.S. 413, 425 (2021). Accordingly, the Second Circuit has repeatedly rejected arguments similar to those Defendants make here in recent data privacy decisions. *Salazar v. NBA*, 118 F.4th 533 (2d Cir. 2024); *Bohnak v. Marsh & Mclennan Cos., Inc.*, 79 F.4th 276 (2d Cir. 2023).

Contrary to Defendants' suggestion, such claims do not encompass only collection or theft of user data, but also a defendant's unauthorized access to, or review of, an individual's

[2] While Defendants assert "Temu has identified accounts created by" three "'Non-Users' … using the email address Plaintiffs' counsel provided" (Mem. at 1 n.1), they do not provide details of their analysis or any supporting records. Moreover, just because an individual's email is used to create an account does not mean she is a Temu user—a family member may have used the email. Defendants' suggestion that "[a]ny Non-Users who created Temu accounts" cannot be "non-users" (*id.*) is also wrong. If Defendants took a consumer's data before she created a Temu account, she would still have claims as a "non-user".

private data. "[B]oth the common law and the literal understandings of privacy encompass the individual's control of information concerning his or her person." *U.S. Dep't of Justice v. Reps. Comm. for Freedom of Press*, 489 U.S. 749, 763 (1989). Accordingly, a defendant's access to, or review of, consumers' private data violates their right to privacy because it deprives them of "a meaningful opportunity to control or prevent the unauthorized exploration of their private lives." *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 598–99 (9th Cir. 2020) (plaintiffs had standing to bring Wiretap Act and CIPA claims for illicit tracking of their browsing activities); *see also Bohnak*, 79 F.4th at 286; *Salazar*, 118 F.4th at 536.[3]

In *Bohnak*, for example, the Second Circuit held that former employees had "suffered an injury in fact" and had standing to sue their former employer who "exposed" their data to an unauthorized third party—even though the data had "not (yet) been used for injurious purposes such as identity theft." 79 F.4th at 279. As the court observed, "exposure of [plaintiff's] private information" alone "falls squarely within the scope of an intangible harm the Supreme Court has recognized as 'concrete." *Id.* at 286 (quoting *TransUnion*, 594 U.S. at 425). The court further held that the risk of future identity theft was an independent basis for standing. *Id.* at 287. As the court observed, *TransUnion* held that "a risk of future harm could 'itself cause[] a *separate* concrete harm,' in which the plaintiff would have standing to pursue damages premised on that separate concrete harm." *Id.* at 285 (quoting at *TransUnion*, 594 U.S. at 436).

Similarly, in *Salazar v. NBA*, the Second Circuit held that the National Basketball Association violated the privacy of its users under the Video Privacy Protection Act when it

---

[3] For example, the tort of "intrusion upon seclusion" referenced in *TransUnion* occurs when an individual "intentionally intrudes, physically or otherwise, upon the solicitude or seclusion of another or his private affairs or concerns…." Restatement (Second) of Torts § 652B (1977). An example of such an intrusion violating a plaintiff's privacy occurs "by opening [a plaintiff's] private and personal mail." *Id.* cmt. b. "The intrusion itself makes the defendant subject to liability, even though there is no publication or other use of any kind of the … information outlined." *Id.*

allowed Meta Platforms (Facebook) to monitor which videos Facebook users watched on the NBA's website through installation of a Facebook "pixel"—a piece of code on the NBA website that Facebook used to track plaintiff's interactions with the site. 118 F.4th at 536. The court had "no trouble" holding that plaintiff's harm was "sufficiently concrete to withstand dismissal" given plaintiff's allegation that "his personally identifiable information was exposed." *Id.*

The claims here are similar. In addition to common-law claims such as invasion of privacy and intrusion upon seclusion mentioned in *TransUnion*, as in *Salazar* and *Bohnak*, Plaintiffs assert various statutory claims to remedy violations of their privacy rights. For example, Plaintiffs bring claims under state statutes and constitutional provisions that codify causes of action for invasion of privacy,[4] federal and state statutes prohibiting unauthorized access to computer systems,[5] federal and state statutes prohibiting interception of electronic communications,[6] and statutes prohibiting unfair and deceptive practices.[7] As in *Salazar* and *Bohnak*, most of these privacy claims do not require Plaintiffs to demonstrate that their data was actually collected or that Defendants used or profited from the data—all that is required is unauthorized access. Nonetheless, Plaintiffs in fact allege that Defendants collected and used their data and assert claims for conversion, larceny, and negligence. (SAC ¶¶ 342-360, 476-87.)[8]

---

[4] *E.g.*, Cal. Const. art I, § 1; Cal. Invasion of Privacy Act, Cal. Penal C. §§ 630, et seq.; Mass. Gen. Laws Ch. 214, §1B; N.Y. Civ. Rights Law § 51 (SAC ¶¶ 294-310, 417-28, 461-75, 517-23).

[5] Computer Fraud and Abuse Act, 18 U.S.C. § 1030; Cal. Comprehensive. Data Access and Fraud Act, Cal. Pen. C. § 502; Va. Comp. Crimes Act, Va. Code § 18.2-152.1 (SAC ¶¶ 269-74, 413-16, 488-500).

[6] *E.g.*, Electronic Comm'ns Privacy Act, 18 U.S.C. §§ 2510 et seq.; Mass. Wiretap Act, Mass. Gen. Laws, Ch. 272, § 99; N.Y. Gen Bus. L. § 349 (SAC ¶¶ 275-293, 322-34, 501-16).

[7] *E.g.*, Cal. Unfair Comp. Law, Bus. & Prof. C. §§ 17200 *et seq.*; Mass. Consumer Protection Act, Mass. Gen. Laws, Ch. 93A *et seq.*; Ill. Consumer Fraud and Decep. Bus. Prac. Act, 815 Ill. Comp. Stat. Ann. 505/2 *et seq.* (SAC ¶¶ 311-21, 397-412, 440-53).

[8] Defendants' claim the FAC did not allege collection of non-user data is wrong and takes an isolated use of the word "may" out of context (Mem. at 9); the FAC repeatedly says non-users' data was collected.

The complaint contains extensive factual allegations to support these claims. The non-users allege that Defendants accessed, collected, and profited from their private data without authorization. (SAC ¶¶ 7, 132, 298.) According to the complaint, "Temu … ***violates the privacy rights of individuals who never signed up for the Temu app.*** Unbeknownst to them, ***Defendants' collection of data from Temu users' devices includes data from non-users*** who engage in electronic communications with Temu users, such as through email or text messages." (*Id.* ¶ 132.) Each of the named non-user Plaintiffs alleges that she "had electronic communications with a Temu user, and had her data stored on a device used by a Temu user" and thus had her data collected by Defendants. (*Id.* ¶¶ 19, 22, 25, 28, 31.) In addition, the complaint provides specific details regarding the contents of electronic communications collected from the named non-user Plaintiffs, stating that the "sensitive data" Defendants collected from the named non-users included "social security numbers, credit card and debit card information, private photographs and videos, insurance information, images of birth certificates, passports, drivers license, and other photo identification." (*Id.* ¶ 251.)

The complaint explains in detail how Temu collected data from non-users citing assessments by multiple experts: "As independent experts' assessments of the Temu app have demonstrated, Defendants gain access to 'literally everything on your phone.' Accordingly, ***electronic communications that are sent by non-users to Temu users are encompassed by Defendants' data collection as is any non-user data that is stored on Temu users' devices.*** Thus, for example, ***independent experts have noted that the Temu app specifically collects 'your SMS text messages*** and other documents you may have on your phone.' Experts have confirmed that 'Temu gains ***full access*** to all your contacts, calendars, and photo albums, ***plus all***

***your social media accounts, chats, and texts***.' Experts have concluded that Temu: ***'Monitor[s] activity on other apps. Track[s] your notifications. Reads private messages***." (*Id.* ¶ 133.)

"Accordingly, ***non-users who never agreed to the collection of their data and never received any disclosure that their data was being collected were subjected to data collection*** by Defendants using the Temu app. Moreover, ***Defendants commercially benefitted from this information, targeting non-users with advertising for the Temu app*** through electronic communications." (*Id.* ¶ 136.) The complaint alleges Defendants "'monitize[d] this unauthorized collection of data by ***selling it to third parties***'" (*id.* ¶ 134), and that because Defendants are China-based companies, the data was available to the Chinese Communist Party (CCP) and Chinese government by operation of Chinese law (*id.* ¶¶ 155-66, 298, 303).

As illustrated in Appendix A, the complaint discusses at length Temu's source code and how it collects data from non-users without authorization. For example, the complaint alleges that "[t]he Temu app examines a user's device to ascertain whether it has 'root' access, which is the highest level of access on a device. With root access, ***the Temu app can read, modify and write not only user files, but all files on the device***, including the programming of other apps and the device's operating system." (*Id.* ¶ 118.) As the complaint explains:

> Among the functions contained in the Temu app's program code are location code (used to obtain a user's precise location), network and connectivity code (used to monitor a user's online activities), job service code (used to allow the app to bind to a JobService, which can impact the device's performance and energy usage), device storage code (used to grant access to a user's sensitive data stored on the device), system and notifications code (used to launch activities or services after the device boots up), audio and camera code (used to capture audio or video without the user's consent), cloud messaging and authentication code (used to access and transmit user data to third party services), badge permission code (used to manipulate notification badges and accessing user data), and custom permission code (used for remote configurations).[9]

---

[9] *See also*, *e.g.*, SAC ¶ 124 (explaining Temu "data collection" and monitoring other apps); *id.* ¶ 125 ("Temu collects" data "used to track, monitor and profile individuals"); *id.* ¶ 122 (Temu accesses "audio

(*Id.* ¶ 126.) The complaint provides detailed discussions of these functions—which go well beyond any functions necessary for software that purports to provide online shopping services—and how they are used to improperly access and collect non-user data without their knowledge.

The complaint describes how PDD Holdings based Temu on its Pinduoduo shopping app, which was created by the same software engineers and has been "noted for its significant privacy violations." (*Id.* ¶¶ 12, 48, 81.) The Pinduoduo app was suspended from the Google Play Store "'due to the presence of malware on the Pinduoduo app that exploited vulnerabilities in Android operating systems.'" (*Id.*) According to reports, "'Company insiders said the exploits were utilized to spy on users and competitors, allegedly to boost sales.'" (*Id.*; *see also id.* ¶¶ 92-93.)

Apple reported similar issues with Temu: "Apple said Temu previously violated the company's mandatory privacy rules. It said it had found that Temu misled people about how it uses their data." (*Id.* ¶ 94; Ex. A.[10]) As *Politico* reported, "The app's shadowy privacy and cybersecurity practices, the suspension of its Chinese sister app over malware, and Beijing's potential access to Temu's data sparked unease with cybersecurity and privacy experts." (Ex. A.)

The complaint also cites actions government authorities who have conducted their own investigations have taken to address Temu's privacy violations. For example, after investigating Temu's data collection functions, Montana banned the app from government devices. (SAC ¶¶ 11, 62, 95.) Arkansas filed an enforcement action against Defendants stating that Temu is a "'data-theft business that sells goods online as a means to an end'" and "'is purposefully designed to gain ***unrestricted access*** to a user's phone operating system.'" (*Id.* ¶¶ 11, 96; Ex. D.) As the Arkansas AG observed, ***"'[e]ven users without the Temu app are subject to Temu's***

---

and visual recordings and stored data"); *id.* ¶ 115 ("INSTALL_PACKAGES" task); *id.* ¶ 128 (Temu monitors "social media and messaging apps"); *id.* ¶ 302 (Temu "code [can] surreptitiously obtain, improperly gain knowledge of, review, and retain their private and personally identifiable data").

[10] Exhibits referenced in Sections I and II of this Opposition are all documents cited in the complaint.

***gross overreach if any of their information is on the phone of a Temu user.*** Temu monetizes this unauthorized collection of data by selling it to third parties, profiting at the direct expense of Arkansans' privacy rights.' ***This includes, among other things, text messages sent between non-users and Temu users.***" (SAC ¶ 134; Turner Decl. Ex. D, ¶ 2.)[11] Twenty-one other states are investigating Defendants' "harmful business practices," including "Temu's and PDD Holding's data collection practices," and have notified them that, "[i]f uncorrected, we will consider all available measures to protect our citizens." (*Id.* ¶ 97; Ex. D.)

U.S. authorities have also criticized Defendants' data collection practices. In April 2023, the U.S.-China Economic and Security Review Commission, a government entity established by Congress, issued a report noting the significant data hazards associated with the Temu app. (SAC ¶ 98; Ex. X.) On December 20, 2023, the congressional Committee on Energy and Commerce sent a letter to Defendants demanding further information regarding their data collection practices, noting "Security officials have cited concerns about Temu and the amount of data collected." (SAC ¶ 98.) The committee observed that these concerns were particularly significant, given that "the Chinese Communist Party (CCP) passed several laws requiring all Chinese tech companies to allow CCP officials access to user data." (*Id.*) Government authorities overseas concur. For example, law enforcement in the United Kingdom "'issued a stark warning'" about Temu: "'They have uncovered evidence of the app harvesting customer data and expressed concerns that this data may find its way into Chinese hands.'" (*Id.* ¶ 130; Ex. B.)

Indeed, outside this litigation, in its filings with the SEC, PDD Holdings acknowledged that it may be held liable for such privacy violations, including violations of statutes at issue here such as the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510-23 and Computer Fraud

[11] While Defendants assert the Arkansas complaint is a "copycat suit" based on no "investigation" (Mem. at 6 & n.8), it discusses at length how the Temu code collects data. (*See* Turner Decl. Ex. D.)

and Abuse Act, 18 U.S.C. § 1030, which it noted can be "complex and stringent." (SAC ¶ 60.) "Complying with applicable laws and regulations relating to data security and personal information protection may be costly and result in additional expenses to us, and any material failure to do so may subject us to potential liability … [and] costly litigation …." (*Id.* ¶ 61.)

In addition to the harms from these privacy violations, as in *Bohnak* the non-users allege that they are at significant and imminent risk of identity theft and other harms that independently support standing: "As a result of Defendants' misconduct, Plaintiffs' and Class Members' private and personally identifiable data that Defendants collected and maintained is now ***in the hands of unauthorized third parties***." (SAC ¶ 173.) Accordingly, "***Plaintiffs and Class Members have suffered concrete injuries and damages*** because they must now and for years into the future closely monitor their financial accounts to guard against ***imminent further fraud and identity theft*** using their private data and information." (*Id.* ¶¶ 174, 176.) The complaint notes that "[c]onsumer organizations such as the Better Business Bureau have ***received numerous complaints*** from Temu users who have ***experienced theft of their personal data***, such as financial or credit card information, after using the app." (*Id.* ¶ 177.)[12] Moreover, it alleges that named non-user Plaintiffs have received spam texts and emails advertising Temu and that "[n]on-users … have likewise experienced … fraudulent charges." (*Id.* ¶ 252.) In addition, because Defendants are China-based companies, the complaint alleges Plaintiffs' data is now accessible by the CCP and Chinese government by operation of Chinese law. (*Id.* ¶ 11.)

Finally, the complaint alleges that Defendants profited from the use and sale of non-users' data: "Defendants have engaged in such unscrupulous practices to ***maximize the***

[12] Plaintiffs further allege that Plaintiffs and the Classes were harmed by "invasion of privacy" (SAC ¶ 189), "economic harm from the loss of their data" (*id.* ¶ 190), "diminution of the value of their private" data (*id.* ¶ 191), loss of "time and money" to address "exposure of their private data to unauthorized third parties" (*id.* ¶ 194), and "diminished value" of their private data (*id.* ¶ 244).

***collection of data from Temu users and non-users and increase their profits***…. Defendants economically profit from the use of the data they have illicitly collected… [S]ources have indicated that Defendants have also profited from the data they collected by selling it to third parties." (*Id.* ¶ 150.) Arkansas observed, Temu is a "'data-theft business that sells goods online as a means to an end.'" (*Id.* ¶ 11.) While it purports to offer goods online, Temu's real business is inducing users to provide access to their data, which Defendants monetize. (*Id.* ¶¶ 13, 89.)

These allegations, which must be accepted as true, are sufficient to establish standing. Nonetheless, Defendants assert that Plaintiffs "fail to allege that Temu collected data specifically from the named Non-Users or what that data is." (Mem. at 9.) However, the complaint specifically states that "***the named plaintiffs and the Classes*** have incurred harm as a result of Defendants' invasion of their privacy rights through ***Defendants' covert taking of plaintiffs' private and personally identifiable data and content*** …." (SAC ¶ 244.) It alleges that "Defendants performed these acts for the purpose of ***secretly collecting the named plaintiffs' and the Classes' private and personally identifiable data and content***" and that they profited from that data by "***using such data*** and content to track, profile and target plaintiffs with advertisements." (*Id.* ¶ 243.) The complaint even identifies the "sensitive data" that was collected from named non-user Plaintiffs, stating: "***Named non-user plaintiffs shared sensitive data with Temu users through electronic communications that were subject to collection by the Temu app***. ***This included*** information such as ***social security numbers, credit card and debit card information, private photographs and videos, insurance information, images of birth certificates, passports, drivers license, and other photo identification***." (*Id.* ¶ 251.) While Defendants argue that "subject to" collection means only potentially collected (Mem. at 9-10), the complaint repeatedly states non-users' data was collected and, as the complete quote makes

clear, "subject to collection" in this paragraph means that this specific data was in fact collected from the named Plaintiffs. (*Id.* ¶ 132 ("***collection*** of data" from individuals "who never signed up for Temu"), ¶ 133 ("any non-user data that is stored on Temu users' devices" included in "Defendants' data ***collection***"), ¶ 136 ("data ***collection***" from non-users), ¶ 243 (Defendants "secretly ***collecting*** the ***named plaintiffs' and the Classes'*** private and personally identifiable data and content"), ¶ 244 (noting "Defendants' ***taking***" of non-users' data) (emphasis added).)

Moreover, the independent experts quoted in the complaint and the code itself show that Temu automatically collects non-users' data: "the app bypasses security on user devices to access such non-user data." (SAC ¶ 135.)[13] "'[T]he app "bypasses" phone security systems to read a user's private messages, …' which includes messages with individuals who are not Temu users." (*Id.*) It "'gains full access to all your contacts, calendars, and photo albums, plus all your social media accounts, chats, and texts. In other words, literally everything on your phone." (*Id.* ¶ 100.) As a result, "the data Defendants collected includes electronic communications sent to Temu users by individuals who never even used the Temu app." (*Id.* ¶ 7.) Each of the named non-users alleges she "had electronic communications with a Temu user, and had her data stored on a device used by a Temu user" and thus had her data collected. (*Id.* ¶¶ 19, 22, 25, 28, 31.)

Defendants' suggestion that the Grizzly report says non-user data is collected only when Temu users grant "permission" (Mem. at 10) is likewise refuted by the complaint and the report itself. The complaint alleges that Temu ***automatically*** collects data "as soon as the app is downloaded" (SAC ¶ 111) and "bypasses" all security measures to gain "full access" to data on a

[13] Defendants assert that one article from *International Business Times* is based solely on comments by Kim Komando, whom they describe as a "talk radio" host who makes "conclusory assertions." (Mem. at 5 & n.5.) But the article discusses Montana's decision to ban Temu based on a review by the State's Chief Technology Officer, and Kim Komando is not merely the host of a radio show on technology issues; she worked for tech companies such as IBM, AT&T and Unisys and now writes a syndicated computer technology column for *USA Today* and other newspapers. https://www.komando.com/about-kim/.

device (*id.* ¶ 135). The Grizzly Research report comes to the same conclusion: "'Temu is able to hack your phone from the moment you install the app, overriding the data privacy settings you think you have in place, as well as your intentions ….'" (*Id.* ¶ 13.) Indeed, Defendants concede as much in a footnote, acknowledging Temu's collection of texts does not depend "'on the permissions you've granted to the TEMU app'": "***Temu does not ever ask users to share their 'files' or exact location (or their 'text messages').***" (Mem. at 5 & n.4 (emphasis added).)

Finally, the cases Defendants cite are inapposite, and indeed most were decided before the Supreme Court's decision in *TransUnion*, which recognized the significant injury suffered by plaintiffs suffering privacy violations. For example, *Heeger v. Facebook, Inc.*, is a *pre-TransUnion* decision in which the court concluded that "there is no legally protected privacy interest in IP addresses"—the only data allegedly collected—because they are routinely publicly available as part of the normal process of using the Internet. 509 F. Supp. 3d 1182, 1189 (N.D. Cal. 2020). Similarly, *Clapper v. Amnesty International USA* is a 5-4 decision addressing government surveillance in which the Court found plaintiffs lacked standing because they did "not even allege that the Government has sought the FISC's [FISA Court's] approval for surveillance of their communications." 568 U.S. 398, 411 (2013).[14]

Accordingly, Plaintiffs' assertions regarding the alleged requirements for standing bear no relationship to the complaint's allegations or the causes of action it pleads (Mem. at 11-12):

[14] *See also In re Sci. Apps. Int'l Corp. (SAIC) Backup Tape Data Theft Litig.*, 45 F. Supp. 3d 14 (D.D.C. 2014) (no standing where plaintiffs "contend neither that their personal information has been viewed nor that their information has been exposed"); *Santana v. Take-Two Interactive Software, Inc.*, 717 Fed. App'x 12, 16 (2d Cir. 2017) (no standing for "procedural violation" of BIPA where plaintiffs consented to face scan); *Lopez v. Apple, Inc.*, 519 F. Supp. 3d 672, 681 (N.D. Cal. 2021) (no evidence communications intercepted where plaintiffs relied on an article that did not address devices they used); *Cooper v. Bonobos, Inc.*, 2022 WL 170622, *4 (S.D.N.Y. Jan. 19, 2022) (no risk of identity theft where data "encrypted" and no evidence "hackers could or would decrypt" it); *Huan v. Fauci*, 2024 WL 1181476, at *2 (E.D.N.Y. Feb. 12, 2024) (plaintiff lacked standing to sue government for "harassment" by third parties when she failed to wear facemask); *Albanese v. Cuomo*, 1998 WL 760339 (E.D.N.Y. Sept. 18, 1998) (plaintiff lacked standing to bring ADA claim against facility he never attended).

1) Plaintiffs do not need to show data "collection" to prove a privacy violation; access to or "exposure" of their data is sufficient. Nonetheless, Plaintiffs allege collection, the allegation must be accepted as true, and Temu's code and expert analyses support it;

2) The complaint alleges Temu collects data automatically, "bypassing" any features designed to prevent it; these allegations must be accepted as true and are supported by the code and multiple experts. Defendants' assertion that "collection" occurs only when "permission" is given is refuted by the complaint and their own admissions;

3) The complaint alleges each non-user communicated with a Temu user, had data stored on a user device and collected, which must be accepted as true. It further alleges Plaintiffs have a reasonable expectation of privacy (SAC ¶ 297), as shown by the law cited below;

4) The claims do not require that "Temu actually *used* this data" (Mem. at 12) and Defendants cite no law to support this assertion. Nonetheless, the complaint alleges Defendants used the data to generate profit, target ads, and sell to third parties. (SAC ¶¶ 42, 150, 154, 243.)[15] It also alleges diminution in value of the data, lost opportunity to market the data, and exposure of the data to the Chinese government. (*Id.* ¶¶ 155-67.)

Indeed, many of Defendants' cases reject similar arguments, holding that "a violation of privacy rights" alone is sufficient to establish standing.[16] As the Second Circuit recognized in *Mount v. PulsePoint, Inc.*, a defendant's "alleged unauthorized accessing and monitoring of plaintiffs' web-browsing activity implicates harms similar to those associated with the common law tort of intrusion upon seclusion so as to satisfy the requirement of concreteness." 684 Fed. App'x 32, 34 (2d Cir. 2017). Nonetheless, the facts pleaded here go well beyond such allegations, establishing not only that data was accessed, but that it was collected, used, and sold for profit.

## II. THE NON-USERS STATE CLAIMS FOR RELIEF

Defendants' arguments for dismissal under Fed. R. Civ. P. 12(b)(6) are equally flawed.

---

[15] *See, e.g.*, SAC ¶ 243 ("Defendants have used plaintiffs' and the Classes' private and personally identifiable data and content for their economic gain."); ¶ 42 ("Defendants used and disseminated" non-users' data); ¶ 150 (Defendants collect data from non-users to "increase their profits" and have profited by "selling it to third parties"); ¶ 154 ("Defendants have received substantial economic benefits from the unauthorized use of Plaintiffs' and class members' private and personally identifiable data.").

[16] *E.g.*, *Licea v. Am. Eagle Outfitters*, 659 F. Supp. 3d 1072, 1078 (C.D. Cal. 2023) ("'[V]iolations of [p]laintiffs' statutory rights under CIPA, [even] without more, constitute injury in fact because … a CIPA violation involves … a violation of privacy rights."); *Al-Ahmed v. Twitter, Inc.*, 684 F. Supp. 3d 1140, 1153 (N.D. Cal. 2022) (reviewing Twitter user data is "injury sufficient to establish Article III standing").

### A. The Complaint Provides a Plausible Basis For Non-Users' Claims

Defendants' primary argument merely repeats their inaccurate contention that the complaint allegations "all … come from the Grizzly Report." (Mem. at 13.) However, as documented in Section I, the complaint cites multiple sources in 174 footnotes, including Temu's code, expert assessments, government documents, and Defendants' own admissions. Indeed, the Grizzly report itself notes that it merely confirms expert opinions published in the public domain, which it cites. (SAC ¶ 201; Turner Decl. Ex. A.) The complaint would be more than sufficient to support each claim if the portions discussing the Grizzly report were completely ignored.

Nonetheless, even the cases Defendants cite—which are all securities fraud cases subject to a heightened pleading standard not applicable here—make clear that "'courts in this district ***frequently*** accept allegations based on short-seller reports' in the context of a motion to dismiss."[17] *Saskatchewan Healthcare Employee's Pension Plan v. KE Holdings Inc.*, 718 F. Supp. 3d 344, 383 (S.D.N.Y. 2024); *In re Longwei Petrol. Inv. Holding Ltd. Sec. Litig.*, 2014 WL 285103 (S.D.N.Y. 2014); *Long Miao v. Fanhwa, Inc.*, 442 F. Supp. 3d 774, 790 (S.D.N.Y. 2020) (claim that "reliance on a short-seller report inherently requires dismissal" is "wrong").

Likewise, Defendants' suggestion that such reports must be "corroborated" is inaccurate. As one court recently observed in discussing the *Long Miao* decision Defendants cite, "Judge Engelmayer was not announcing a rule that the content of short seller reports must be disregarded unless it is independently corroborated by counsel, as Defendants argue here. Instead, he was simply analyzing allegations based solely on statements by confidential witnesses …." *Saskatchewan*, 718 F. Supp. 3d at 383.

---

[17] It is also unclear that the report is fairly characterized as a "short-seller" report. The disclaimer states individuals associated with Grizzly may have a "short, long or neutral" position (Turner Decl. Ex. A).

In any event, the analysis in the Grizzly report is in fact "corroborated" by the opinions of multiple experts and the Temu code itself. The report states: "'Our staff analysis [was] ***verified by numerous expert confirmations***, both proprietary experts we hired, plus those ***independently published in the public domain*** [and] find[s] malware, spyware, and several levels of exceptionally threatening software behavior.'" (SAC ¶ 201 (emphasis added).)[18] Likewise, Defendants' assertion that the SAC does not "describe any investigation Plaintiffs undertook to verify any of the Grizzly Report's claims" is inaccurate; the SAC contains extensive discussion of the independent expert analyses and Temu code that support the report's conclusions.

Indeed, Defendants do not demonstrate that the report's conclusions are inaccurate, much less cite any contrary expert opinion. Instead, they merely repeat the assertion—based on a mischaracterization of a single sentence in an 86-page report—that the scope of data collection depends on "'permissions [a Temu user] may have given.'" (Mem. at 15.) However, as noted, the report itself states (SAC ¶ 13)—and other experts have confirmed—that the app "bypasses" (*id.* ¶ 111) all security measures to gain "full access" to data on the phone regardless of a user's actions (*id.* ¶ 135), and Defendants themselves admit that the app requests no such permissions to access text messages from non-users (Mem. at 5 & n.4). That is not how the app works.

In any event, "the Court cannot resolve these issues—which are fundamentally evidentiary in nature—in the context of a motion to dismiss under the guise of a 'plausibility' analysis." *Saskatchewan,* 718 F. Supp. 3d at 383. "Ultimately, the 'reliability of an analyst's report is a question of fact'" that cannot be resolved on a motion to dismiss. *Id.* at 382.[19]

---

[18] For example, the report cites a Swiss cybersecurity firm's analysis that found Temu to be "malicious" code—and quotes various cybersecurity experts throughout. (Turner Decl. Ex. A, 26-27.)

[19] Nor does the boilerplate "legal disclaimer" that Grizzly Research makes on its website change the analysis. (Mem. at 3-4, 14.) The fact that the disclaimer references "opinions" is not surprising given that the report contains opinions of multiple computer experts who examined Temu and found that the app illicitly harvests non-user data. (*Id.* at 4-5.) Moreover, the "disclaimer" refutes the notion that these

**B. The Non-Users State Valid Causes of Action**

Defendants' scattershot attacks on the counts similarly misconstrue the complaint and misstate governing law. Indeed, similar arguments have been rejected in other data privacy litigation—including in litigation involving collection of data from third parties with whom plaintiffs in those cases shared their data. *E.g.*, *E.H. v. Meta Platforms, Inc.*, 2024 WL 557728 (N.D. Cal. Feb. 12, 2024) (denying motion to dismiss invasion of privacy, UCL and conversion claims brought by non-users whose data was harvested from healthcare platform); *In re Meta Pixel Tax Filing Cases*, 724 F. Supp. 3d 987 (N.D. Cal. 2024) (denying motion to dismiss Wiretap Act, CIPA, UCL, negligence and unjust enrichment claims); *Doe v. Fullstory, Inc.*, 712 F. Supp. 3d 1244 (N.D. Cal. 2024) (denying motion to dismiss CIPA, intrusion upon seclusion and unjust enrichment claims); *Gershzon v. Meta Platforms, Inc.*, 2023 WL 5420234 (N.D. Cal. Aug. 22, 2023) (denying motion to dismiss CIPA claim after data harvested from DMV website).

**1. CFAA and CDAFA (Counts 1 & 12).**

The CFAA and CDAFA prohibit a wide range of access to computer data, imposing liability on those who "access[]" a computer system or take, copy or make use of data "without permission," Cal. Penal Code § 502, or "obtain[] information" by accessing a computer "without authorization or exceeding authorized access," 28 USC § 1030. The complaint alleges Defendants engaged in "unauthorized access and collection of data from both users and non-users." (SAC ¶ 272; *id.* ¶ 415 (data taken "from both Temu users and non-users").)

Defendants' assertion that these claims "do not apply to Non-Users" because "Non-Users cannot claim their own device was hacked" (Mem. at 16) ignores the statutes' plain language. The CFAA states that "***[a]ny person*** who suffers damage or loss by reason of a violation of this

opinions are somehow unreliable, stating: "all information contained herein is accurate and reliable, and has been obtained from public sources we believe to be accurate and reliable …." (Turner Decl. Ex. A.)

section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief." 28 USC § 1030(g) (emphasis added). Likewise, CDAFA states "the owner … of … ***data***" that is accessed without permission "may bring a civil action." Cal Pen. Code § 502(e)(1) (emphasis added). The statutes note that the "protection of the integrity of all types and forms of … computer data is vital to the protection of the privacy of individuals …." *Id.* § 502(a). Thus, "[n]either the CFAA nor the CCDAFA contain any requirement that Plaintiff must 'own,' 'possess,' or 'control' the physical device or computer that Defendants accessed." *Biden v. Ziegler*, 2024 WL 3498786, at *3 (C.D. Cal. June 20, 2024); *Theofel v. Farey–Jones*, 359 F.3d 1066, 1078 (9th Cir. 2004) ("The civil remedy extends to any person who suffers damage .... Individuals other than the computer's owner may be proximately harmed by unauthorized access, particularly if they have rights to data stored on it."); *Stein v. Needle*, 2021 WL 1178283, at *8 (D. Conn. Mar. 29, 2021) (same).

Moreover, the statutes specifically address situations in which data stored on computers owned by third parties (such as "financial institutions" and the "United States Government") is accessed. 28 U.S.C. § 1030 (a)(2)(A), (B); (c)(4)(A); Cal. Penal Code § 502. Likewise, they address situations in which access causes injuries to the public beyond mere privacy violations such as "the modification or impairment, or potential modification or impairment, of the medical examination, diagnosis, treatment, or care of 1 or more individuals" or "physical injury to any person." 28 U.S.C. § 1030(c)(4)(A)(II). Defendants' interpretation would read this language out of the statutes by prohibiting patients or bank account holders from bringing suit against parties who gained access to their data stored on third party computer systems.[20]

[20] Defendants' suggestion Temu users allegedly gave "permission" to access data (Mem. at 16 n.10) is meritless. First, Temu users did *not* give permission to collect non-users' data (nor could they)—as Defendants admit elsewhere (Mem. at 5 n.4). Second, the *non-users* never gave any such authorization—which is required. *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1068 (9th Cir. 2016) (under

### 2. ECPA, CIPA and Massachusetts Wiretap Act (Counts 2, 5 & 17).

As Defendants acknowledge, Plaintiffs likewise allege that Defendants "intercepted" their electronic communications and thus violated the ECPA, CIPA and Massachusetts Wiretap Acts. Nonetheless, Defendants argue there is no "interception" here because Temu "collect[s] personal messages *stored* on a user's device." (Mem. at 17.) Defendants' alleged support is a portion of a quote in the complaint stating Temu collects "'your SMS text messages and other documents you may have on your phone.'" (*Id.* (quoting SAC ¶ 104).) However, messages "you may have on your phone" includes messages you are receiving, and indeed the same sentence in the complaint states that Temu takes "'screenshots of the apps running on your screen.'" (*Id.*)

Moreover, Defendants ignore numerous statements elsewhere in the complaint alleging real-time collection of Plaintiffs' data, stating that Temu is "spyware" (*id.* ¶¶ 4, 8, 96, 101, 103, 138), contains code "used to monitor a user's online activities" (*id.* ¶ 126), "observe[s] the user's active usage of their device" (*id.* ¶ 123), "'[m]onitor[s] activity on other apps'" (*id.* ¶ 133), "[t]rack[s] your notifications" (*id.*), "'[r]eads private messages" (*id.*), "track[s] user actions with other apps running on the user's device" (*id.* ¶ 106), and "tracks every detail regarding Temu users' website activity" (*id.* ¶ 283). As the case law Defendants cite recognizes, such "continued receipt of e-mail messages" or other electronic communications satisfies the requirements for a

---

CFAA defendant "needed authorization both from individual Facebook users (who controlled their data and personal pages) and from Facebook (which stored this data on its physical servers" to access data); *Theofel*, 359 F.3d at 1073-74 (a defendant could not "use someone else's password to break into a mail server [which contains data belong to the plaintiff] and then claim the [third-party] server 'authorized' his access"); . Third, the complaint alleges Defendants acted without authorization or *exceeded* authorized access (*e.g.*, SAC ¶ 271), which must be accepted as true. *Van Buren v. U.S.*, 593 U.S. 374, 390 (2021) ("'exceeds authorized access' clause … provide[s] … protection for certain information within computers … by targeting so-called inside hackers—those who access a computer with permission" but then obtain information they are not authorized to take); *Philips Med. Sys. Puerto Rico v. GIS Partners Corp.*, 203 F. Supp. 3d 221, 235 (D.P.R. 2016) (defendant exceeded authorized access to third party computer by accessing plaintiff's software and data stored on computer without plaintiff authorization). Finally, unlike CFAA, CDAFA "does not [even] require *unauthorized* access. It merely requires knowing access." *Facebook*, 844 F.3d at 1069.

"wiretapping" claim. *Hall v. EarthLink Network, Inc.*, 396 F.3d 500, 504 n.1 (2d Cir. 2005)[21]; *Fullstory*, 712 F. Supp. 3d at 1260 (CIPA "interception" adequately plead where website collected non-user data using pixels); *In re Pharmatrak, Inc.*, 329 F.3d 9 (1st Cir. 2003) (web monitoring using cookies is "interception"); *Mata v. Zillow Group Inc.*, 2024 WL 5161955, at *6 (S.D. Cal. Dec. 18, 2024) (pleading interception not "overly burdensome"; alleging data taken "through the use of computer code" sufficient). In any event, "intercepting" communications and taking them from "storage" are not mutually exclusive—an app can do both.

### 3. Mass. Gen. Laws Ch. 214, Unjust Enrichment, Intrusion Upon Seclusion, Cal. Const., and N.Y. Civ. Rights Law § 51 (Counts 3, 8, 10, 13, 14 & 22).

Defendants haphazardly lump together six disparate causes of action based on multiple states' laws under the heading "invasion of privacy," including New York Civil Rights law, a Massachusetts statute, the California Constitution, common-law intrusion upon seclusion and a claim for unjust enrichment that they appear to address again in a separate section. Defendants do not lay out the elements of these different causes of action, much less demonstrate they are not adequately pleaded here. Instead, Defendants argue that non-users do not have "a reasonable expectation of privacy in data about them stored *on the devices of third parties*." (Mem. at 18.)[22]

However, courts have repeatedly held that there is a reasonable expectation of privacy in such private communications conveyed to a third party.[23] In *Bohnak*, the Second Circuit held that

---

[21] The issue was raised in *Hall* on *summary judgment*, illustrating the factual nature of the issue, and the court did not grant the motion on this issue, but rather on the ECPA's "ordinary course" exception.

[22] Defendants' suggestion that non-users did not plead a reasonable expectation of privacy in their data is incorrect. The complaint alleges that "[t]here is a reasonable expectation of privacy concerning Plaintiffs' and the Classes' data and content." (SAC ¶¶ 297, 420, 465.)

[23] *See, e.g., U.S. v. Zavala*, 541 F.3d 562, 577 (5th Cir. 2008) ("[C]ell phones contain a wealth of private information, including emails, text messages, call histories, address books, and subscriber numbers. [Plaintiff] had a reasonable expectation of privacy regarding this information."); *Quon v. Arch Wireless Operating Co.*, 529 F.3d 892, 905 (9th Cir. 2008) (finding reasonable expectation of privacy in text messages sent using employer-provided pager); *Loughnane v. Rogers*, 2019 WL 4242486, at **6-7 (N.D. Ill. Sept. 6, 2019) (privacy violated by reading "emails regarding healthcare, finances, and family").

a former employee could bring suit against her former employer for "exposure of [plaintiff's] private PII to unauthorized third parties"—even though she voluntarily provided the data to her employer. 79 F.4th at 285. Likewise, in *Salazar*, the Second Circuit held that a plaintiff could bring a claim under the "privacy protections" of VPPA against the NBA for providing his video viewing history to a third party—even though he voluntarily interacted with, and watched videos on, the NBA's website. 118 F.4th at 553. Indeed, numerous courts have allowed privacy claims to proceed against companies that use "pixel" technology (as in *Salazar*) to harvest data regarding interactions between consumers and public websites. As the court explained in rejecting a similar argument in *Fullstory*, there is "no authority suggesting that [defendants] cannot be held liable for eavesdropping because a third party, acting on Defendants' recommendation, participated in the installation of Defendants' code that sends information to Defendants." 712 F. Supp. 3d at 1257 n.14; *Meta Pixel Tax Filing*, 724 F. Supp. 3d at 999 (Meta pixels reviewed data plaintiffs shared with tax websites).

Defendants cases are not to the contrary. For example, *In re U.S. for an Order, Authorizing the Release of Historical Cell-Site Information* involved a government application for an order directing cell-phone service providers to disclose limited cell-site location records as part of a criminal investigation. 809 F. Supp. 2d 113, 114 (E.D.N.Y. 2011). Contrary to Defendants' suggestion, the court held that "cell-phone users ***maintain a reasonable expectation of privacy*** in long-term cell-site-location records and that the Government's obtaining these records constitutes a Fourth Amendment search" that "may not be obtained without a warrant and the requisite showing of probable cause." *Id.* at 119-20, 125 (emphasis added). In so ruling, the court relied on caselaw holding that "an email subscriber 'enjoys a ***reasonable expectation of privacy in the contents of emails*** that are stored with, or sent or received through, a commercial

ISP [internet service provider]'"; "'the ISP's control over the emails and ability to access them'" is not "enough to overcome an expectation of privacy.'" *Id.* at 125-26 (emphasis added).

Indeed, Defendants' position would render privacy laws a nullity. Patients would have no reasonable expectation of privacy in their confidential health information because they "voluntarily turn[ed] it over" to their physician, hospital or health insurer. Consumers would have no reasonable expectation of privacy in their confidential financial information because they "voluntarily turn[ed] it over" to their bank, credit card company, or other financial services company. So too, text messages between friends and family containing highly sensitive content would not be subject to a reasonable expectation of privacy because they are transmitted by a third-party telecommunications company and received by another third party. That is not the law.

**4. Negligence (Count 7).**

Defendants' attack on the negligence count mischaracterizes the complaint. According to Defendants, the negligence claim is "premised on an allegation, which comes out of nowhere at page 57 of the SAC, speculating that Temu has had a data breach." (Mem. at 19.) Not true. The complaint alleges Defendants were negligent in multiple ways. It alleges Defendants failed in their "duty not to collect data for which they had no authorization. This includes data from non-users …." (SAC ¶ 346.) It alleges Defendants failed in their "duty to have procedures in place to detect and prevent the loss or unauthorized dissemination of Plaintiffs' private and personally identifiable information." (*Id.* ¶ 345.) It alleges Defendants failed to "adequately monitor the security of their networks and systems" and failed "to detect [breaches] in a timely manner." (*Id.* ¶ 349.) It alleges Defendants failed to "adequately monitor the security of their networks and systems" and "detect in a timely manner that class members' data had been compromised." (*Id.*) And, it alleges Defendants failed to prevent "unauthorized access to class members' data." (*Id.*)

Nor are these allegations based on a single alleged data breach. As stated in the complaint, "[c]onsumer organizations such as the Better Business Bureau have received numerous complaints from Temu users who have experienced theft of their personal data, such as financial or credit card information, after using the app. The complaints from consumers include instances where there were unauthorized withdrawals and credit card purchases soon after the consumer signed up for Temu and purchased goods on the platform." (SAC ¶ 177; Ex. C.) Congress has raised similar concerns regarding "lax data security practices or backdoors" that could be "exploited" to "access user information.'" (SAC ¶ 99.) Named non-user Plaintiffs in particular have experienced "fraudulent charges." (*Id.* ¶ 252.) When consumers complained about such breaches, Defendants did not deny them, but rather stated: "'Please understand that in this case, we are also the victim of such fraud or unauthorized access to your account. We strongly suggest you to contact the financial institution that issued the credit card or debit card immediately.'" (*Id.* ¶ 180.) In any event, the fact that Defendants "dispute" a particular breach is no basis for dismissal—particularly where, as here, Plaintiffs allege Defendants "failed to undertake adequate measures to uncover such unauthorized disclosures." (*Id.* ¶ 179.)[24]

**5. Unjust Enrichment (Count 8).**

Defendants include a 3-sentence attack on the unjust enrichment count, asserting that non-users did not "identify anywhere in the SAC" what data of theirs was harvested and did not confer "any benefit" on Defendants because they were not "customers." (Mem. at 20.) However, as noted, the non-users allege their communications and other files were collected, and the named non-users identify specific content in those communications such as social security

[24] Likewise, the fact that the article references "customers'" data is immaterial (Mem. at 20), given that users' text message exchanges with non-users would also constitute "user" data.

numbers, drivers license and passport data. (SAC ¶¶ 132-33, 136 251.)[25] The complaint further alleges Defendants profited from the data by selling it, using it in their operations, using it for targeted advertising, and other purposes. (*Id.* ¶¶ 362-65.) *Cf. Meta Pixel Tax Filing*, 724 F. Supp. 3d at 1009 (unjust enrichment adequately pleaded); *Fullstory*, 712 F. Supp. 3d at 1253.

**6. BIPA (Count 9).**

As Defendants acknowledge, the named non-user Plaintiff from Illinois alleges that Temu collected his biometric data. (Mem. at 20, citing SAC ¶¶ 377, 380, 382.) While Defendants assert the SAC does not discuss the named Plaintiff's biometric information or "how the Temu app is supposed to have accessed it" (*id.*), as the complaint explains, biometric data covered by BIPA includes (among other things) a "scan" of "face geometry," or "voiceprint" (*id.*)—information that can easily be collected from a photo, audio file, or video provided by a non-user in an electronic communication. Moreover, materials cited in the complaint document that Temu collects this information. The complaint states that Temu contains "audio and camera code (used to capture audio or video without the user's consent)" (SAC ¶ 126) and discusses how Temu gains access to the CAMERA and RECORD_AUDIO functions that "allow the Temu app to access all the audio and visual recording and storage functions on a user's device" (*id.* ¶ 122). Accordingly, the investigatory letter sent to Defendants by 21 State Attorneys General (Ex. D) and the Arkansas enforcement action (Turner Decl. Ex. D, ¶¶ 11, 51) both cite Temu's collection of biometric data as a basis for those government actions. This is *not* a case in which the complaint contains no "factual detail." (Mem. at 20.) Moreover, the cases Defendants cite are

[25] Most of Defendants' arguments simply ignore facts alleged in the complaint or take its language out of context, quibbling with the wording of particular passages. Plaintiffs believe the claims are adequately pleaded and clear; nonetheless, such objections are easily addressed through amendment. "Without doubt, this circuit strongly favors liberal grant of an opportunity to replead after dismissal of a complaint under Rule 12(b)(6)," *Porat v. Lincoln Towers Cmty. Ass'n*, 464 F.3d 274, 276 (2d Cir. 2006), and Rule 15 instructs that "[t]he court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2).

inapposite—both involve allegations that manufacturers were liable because they sold equipment or software to ***third parties*** who, in turn, used it to collect plaintiffs' biometric data. *Jacobs v. Hanwha Techwin Am., Inc.*, 2021 WL 3172967, at *2 (N.D. Ill. July 27, 2021) ("plaintiff does not allege that defendant [manufacturer] installed the cameras, operated the cameras, or in any way accesses or controls T.J. Maxx's security system" that collected biometrics); *Kloss v. Acuant, Inc.*, 462 F. Supp. 3d 873, 876 (N.D. Ill. 2020) (plaintiff failed to show software "vendors who provide products to businesses" were involved in their collection of biometrics). Here, in contrast, Plaintiffs allege that ***Defendants*** collected Plaintiffs' biometric data.

**7. Consumer Protection Statutes (Counts 4, 11, 15, 16 & 21).**

Defendants lump together various statutes from different states under the heading of "consumer protection," ranging from California deceptive trade practices and false advertising statutes to New York's General Business Law. Again, Defendants fail to address individual elements of these claims, and the arguments they do make misconstrue the law.

Defendants first rehash their standing arguments, asserting that "Plaintiffs identify no particular pecuniary harm, and the alleged loss in value or control over their data is not sufficient." (Mem. at 21.) However, courts have held that "[p]rivacy harms involving personal data can constitute an injury to money or property sufficient to provide standing under the UCL. Indeed, there are several ways to conceptualize these kinds of injuries as injuries to money or property." *Meta Pixel*, 724 F. Supp. 3d at 1024. Such harms include (1) violation of privacy, (2) loss of property interest in the data, and (3) diminution of the market value of the data. *Id.*; *Calhoun v. Google LLC*, 526 F. Supp. 3d 605, 636 (N.D. Cal. 2021) ("plaintiffs who suffered a

loss of their personal information suffered economic injury"); *Brown v. Google LLC*, 2021 WL 6064009, at *15 (N.D. Cal. Dec. 22, 2021) (diminished future property interest sufficient).[26]

Defendants' cases are not to the contrary—most are decided before the Supreme Court's *Transunion* decision and its broad recognition of the harms caused by privacy violations and, indeed, do not even address the issue of data privacy. Nonetheless, those that do address data privacy acknowledge that some (if not all) of these forms of injury are sufficient to establish standing. Thus, a Second Circuit case Defendants cite notes that "§ 349 injury has been recognized … where confidential, individually identifiable information—such as medical records or a Social Security number—is collected without the individual's knowledge or consent," which is the case here. 684 Fed. App'x 32, 35 (2d Cir. 2017). Likewise, Defendants' cases recognize that sufficient injury occurs where (as here) Plaintiffs allege that their "ability to monetize their … information was diminished." *Mount v. PulsePoint, Inc.*, 2016 WL 5080131, at *6 (S.D.N.Y. Aug. 17, 2016). And Defendants' cases recognize that sufficient injury is alleged where, as here, the defendant "'use[d] the [personal identification] information for its own business purposes,'" used it for targeted advertising, or was "'selling the information for a profit.'" *Shaulis v. Nordstrom, Inc.*, 865 F.3d 1, 8 (1st Cir. 2017) (claim under Mass Gen. Laws. Ch. 93).

Moreover, Defendants ignore that Plaintiffs plead direct economic injuries, alleging that they have, or imminently will have to incur, out of pocket expenses to protect themselves from identity theft and to address fraudulent charges on their accounts. (SAC ¶¶ 174-76, 356.) Such expenses represent a "pecuniary harm" of the sort Defendants allege is required.

---

[26] Defendants' assertion there are no allegations that "Non-Users are in any market to sell their data" (Mem. at 21) is wrong. While not required to state a claim, the complaint alleges there is a market for the data (SAC ¶¶ 151-54), the value of the data was diminished (*id.* ¶ 191), and Defendants have profited from selling and using the data (*id.* ¶ 150). Such allegations are sufficient. *Facebook Tracking*, 956 F.3d at 599-600 (data theft is an economic injury under UCL, even where plaintiffs did not "demonstrate that they either planned to sell their data, or that their data was made less valuable through Facebook's use").

Defendants' assertion that Plaintiffs fail to adequately plead the requisite conduct under these statutes is likewise wrong. As Defendants note, such statutes encompass unfair, illegal or deceptive business practices—any one of which is sufficient to state a cause of action. *E.g.*, UCL §§ 17200, 17500; Mass. Gen. L. Ch. 93A; 815 N.Y. Gen. Bus. L. 349; Ill. Comp. Stat. Ann. 505/2. Cases Defendants cite acknowledge such statutes have "been described as 'sweeping'" in scope and the "standard for wrongful business conduct is 'intentionally broad,'" with "[e]ach 'prong'" providing "a separate and distinct theory of liability." *In re iPhone App. Litig.*, 844 F. Supp. 2d 1040, 1071 (N.D. Cal. 2012). Defendants are independently liable under multiple prongs. *First*, data privacy allegations like those here fit within "the 'intentionally broad' 'unfair' prong." *Meta Pixel*, 724 F. Supp. 3d at 1025.[27] While Defendants' repeat the assertion that non-users' data was not collected (Mem. at 22), the complaint alleges "data [was] taken from both users and non-users" alike. (SAC ¶ 313.) *Second*, Plaintiffs' claims also satisfy the "unlawful" prong, which "borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable." *Cel-Tech Comm's, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999). Indeed, "[v]irtually any state, federal or local law can serve as the predicate for an action under section 17200"—including wiretapping and unauthorized computer access statutes like those at issue here. *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1168 (9th Cir. 2012). *Finally*, Plaintiffs allege Defendants engaged in "deception" by failing to adequately disclose their data practices (SAC ¶ 314). Contrary to Defendants' suggestion, this is not a misrepresentation case where Plaintiffs must identify a specific representation and plead reliance; rather, it is an omissions case with no such pleading

[27] *See also In re LastPass Data Sec. Incident Litig.*, 2024 WL 3580646, *13 (D. Mass. July 30, 2024) (allegation of inadequate data security sufficient to state claim under Massachusetts and California statutes); *Doe v. Tenet Healthcare Corp.*, 731 F. Supp. 3d 142, 152 (D. Mass. 2024) (third party use of trackers on healthcare website to obtain patients' data violated Mass. Gen. L. Ch. 93A).

requirements. *E.H.*, 2024 WL 557728, at *4 (plaintiff need not identify representation under omissions theory, particularly where plaintiff is non-user).[28]

**8. Larceny and Conversion Claims (Counts 18 & 19).**

Contrary to Defendants' assertion (Mem. at 22), "California courts … have acknowledged that users have a property interest in their personal information." *Meta Pixel Tax Filing*, 724 F. Supp. 3d at 1024. Thus, courts have refused to dismiss larceny and conversion claims based on collection of personal data. *E.g.*, *Calhoun*, 526 F. Supp. 3d at 635 (refusing to dismiss California statutory larceny claim); *E.H.*, 2024 WL 557728, at **7-9 (conversion). This is particularly the case under more recent decisions that have adopted an expansive definition of "property". As noted above, the non-users here allege Defendants took their private data, including electronic communications, social security numbers, drivers' license, passport, and other identifying information, and that such data constitutes property under California law. (*E.g.*, SAC ¶¶ 479, 484.) They therefore adequately plead claims for conversion and larceny—even if only "copies" were taken. As the *E.H.* court held based on recent Ninth Circuit precedent, conversion applies even where plaintiffs "retain access to that information and may have granted others access" because they have a right to "exclusivity" and to "make the decision to whom to provide that information." 2024 WL 557728, at *8.[29]

[28] Defendants ignore that some of the statutes do not require reliance at all. *E.g.*, *Stutman v. Chem. Bank*, 95 N.Y.2d 24, 29 (2000) ("[R]eliance is not an element of a [NY Gen. Bus. L.] section 349 claim."). And, Defendants' cases acknowledge that in non-disclosure cases, "[a]ctual reliance is presumed, or at least inferred, when the omission is material." *In re Sony Gaming Networks & Customer Data Sec. Litig.*, 963 F. Supp. 2d 942, 969 (S.D. Cal. 2012). Nonetheless, Defendants made misrepresentations, for example: "'we prioritize the protection of privacy and are transparent about our data practices.'" (SAC ¶ 149.)

[29] The court distinguished cases like *McGowan v. Weinstein*, 595 F. Supp. 3d 1000 (C.D. Cal. 2020), noting that intervening Ninth Circuit law changed the analysis and that the "[s]urreptitious interception of personal healthcare information" (like the sensitive data taken here) is "wholly different" from "the possession of manuscripts that were intentionally shared with defendants." *E.H.*, 2024 WL 557728, at *9.

### 9. Virginia Computer Crimes Act (Count 20)

Finally, Defendants raise a grab bag of issues regarding the VCCA, which contains multiple provisions under which Defendants are liable. The first provision Defendants address provides that anyone who "[o]btains property or services by false pretenses; 2. Embezzles or commits larceny; or 3. Converts the property of another; is guilty of the crime of computer fraud." Va. Code § 18.2-152.3. Defendants simply repeat their previous arguments claiming that computer data is not "property" and thus there is no conversion. *Id.* § 18.2-152.3; Mem. at 23. However, the VCCA defines "property" broadly to specifically include "computer data, computer programs, computer software and all other personal property"—which clearly applies here. Va. Code § 18.2-152.2. Defendants ignore the second basis for liability—larceny—and claim the third prong—"false pretenses"—does not apply because plaintiffs "allege they had no interaction with Defendants" (Mem. at 23). But that is not true—the non-users do not allege they had no "interaction" with Defendants, only that they did not use Temu. Moreover, Defendants employed "false pretenses" to get Temu users to download the app so they could collect non-users' data. Each of these three prongs independently imposes liability on Defendants.

Defendants are also liable for "invasion of the privacy" because they "examine[d] without authority" "employment, salary, credit or any other financial or identifying information." Va. Code § 18.2-152.5(A). As Defendants acknowledge, statute says this includes name, social security, driver's license, credit or debit card numbers, biometric data and other information that can be used to "obtain" or "act as" identification—which were accessed here. *Id.* § 18.2-186.3.

Finally, Defendants are liable under the statute for "computer trespass," which prohibits making an "unauthorized copy" of "any printed or electronic form of computer data." *Id.* § 18.2-152.4. Defendants repeat the false assertion that "the Non-Users do not identify a single item of any data" that was copied (Mem. at 23) even though the complaint states that Plaintiffs'

electronic communications were taken, including social security numbers, drivers' license, passport and other information. Finally, while Defendants argue that claims under this section are preempted by federal copyright law citing *OpenRisk, LLC v. Microstrategy Servs. Corp.*, 876 F.3d 518 (4th Cir. 2017),[30] the plaintiff there did not even dispute that the software at issue was subject to copyright because a "'computer program … clearly comes within the 'subject matter' of copyright.'" *Id.* at 523-24. Here, in contrast, social security, drivers' license, passport, and other data is not copyrightable and so preemption would not apply.

## III. THE COURT HAS PERSONAL JURISDICTION OVER PDD HOLDINGS

Defendants' motion to dismiss for lack of personal jurisdiction should be denied for multiple reasons. At the pleading stage, a plaintiff "need only allege facts constituting a prima facie showing of personal jurisdiction." *PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105, 1108 (2d Cir. 1997); *A.I. Trade Finance, Inc. v. Petra Ban*k, 989 F.2d 76, 79 (2d Cir. 1993). The court "construe[s] the pleadings and affidavits in plaintiff's favor at this early stage," *PDK Labs*, 103 F.3d at 1108, and "must draw all inferences and resolve any doubts in favor of the plaintiffs notwithstanding contrary information proffered by the moving parties," *General Elec. Capital Corp. v. Titan Aviation, LLC*, 2007 WL 107752, at *3 (S.D.N.Y. Jan. 16, 2007).

Here, personal jurisdiction exists over PDD Holdings under the New York long-arm statute because it purposefully directed its activities at New York and actively participated in the unauthorized collection of Plaintiffs' data. (SAC ¶¶ 41-75.) Among other things, PDD Holdings (1) owns and operates the Temu platform (as well as the related Pinduoduo platform) that collected data from Plaintiffs in New York without authorization, (2) was directly involved in developing the Temu software that collected data from Plaintiffs in New York, (3) owns the

[30] Plaintiffs also dispute that *OpenRisk* was correctly decided given that the VCCA contains additional elements that are not included in the Copyright Act, which defeat Defendants' preemption arguments.

logistical network that ships goods ordered on Temu to consumers in New York, and (4) directly transacts business in New York in other ways, such as offering its stock on the Nasdaq exchange and entering into agreements requiring that disputes be resolved in New York. PDD Holdings' assertion that it "has no business contacts with New York" and "does nothing to operate the Temu platform" (Mem. at 24) is refuted by the record. Nonetheless, PDD Holdings is also subject to personal jurisdiction based on the conduct of its wholly-owned subsidiary, Whaleco, which is both an "agent" and "department" of PDD Holdings.

### A. Personal Jurisdiction Exists Under NY CPLR § 302

Personal jurisdiction over PDD Holdings is governed by New York law. *AI Trade*, 989 F.2d at 80. Under NY CPLR 302(a)(3), "a court may exercise personal jurisdiction over any non-domiciliary … [who] in person or through an agent: (1) transacts any business within the state or contracts anywhere to supply goods or services in the state; or (2) commits a tortious act within the state … ; or (3) commits a tortious act without the state causing injury to person or property within the state." NY CPLR § 302(a). As Defendants cases note, "Section 302(a) is a 'single act statute,' and 'proof of one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never enters New York ….'" *Ainette v. Market Basket Inc.*, 2021 3371037, at *6 (S.D.N.Y. Aug. 2, 2021). Here, the complaint contains extensive allegations documenting that PDD Holdings (1) transacted business in New York, (2) committed tortious acts in New York, and (3) committed tortious acts outside New York that harmed consumers in New York.[31]

[31] While most of the exhibits are incorporated into, and quoted in, the SAC (*see* Mem. at 2 n.2), the materials such as Defendants' SEC filings, press releases, and posted business policies are publicly available materials mostly created by Defendants containing their admissions and thus are also subject to judicial notice since they are "not subject to reasonable dispute because [they] . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2); *Finn v. Barney*, 471 F. App'x 30, 32 (2d Cir. 2012) (affirming judicial notice of website section); *O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218, 1224–25 (10th Cir. 2007) ("It is not uncommon for courts to take judicial notice of factual information found on the world wide web"; material created by defendant should "not be subject to dispute … because [defendant] created it");

**1. PDD Holdings committed tortious acts and transacted business in New York.**

In 2022, PDD Holdings launched the online shopping platform, Temu, in the United States. (SAC ¶ 1.) Temu is ultimately owned by PDD Holdings, which also runs the Chinese e-commerce giant Pinduoduo, an online shopping platform that is the precursor of Temu, and is offered to consumers through app stores in the U.S. (*Id.* ¶¶ 2, 48-49, 79.) PDD Holdings developed Temu, including features responsible for collecting data without authorization; indeed, the same software engineers who developed Pinduoduo also worked on Temu. (*Id.* ¶¶ 12, 48; Ex. E.) U.S. consumers may download Pinduoduo and use it to ship goods to China (SAC ¶ 32),[32] and, like Temu, Pinduoduo collects user data without authorization (*id.* ¶¶ 90-93; Ex. F).

These same privacy-violating features were incorporated into Temu. (SAC ¶ 94.) "The factories are the same. The producers are the same. They're just repackaging the same app, turning it into English and calling it Temu."[33] PDD Holdings describes Temu as "our proprietary technology" (*id.* ¶ 66; Ex. G, at 65) and developed Temu to be a global version of the Pinduoduo app (SAC ¶ 48; Ex. H). As a result, Apple recently concluded that Temu did not comply with Apple's privacy standards and that Temu misled users regarding how their data was being used. (SAC ¶ 48; Ex. A.) Likewise, Arkansas brought an action against PDD Holdings describing Temu as a "'data-theft business that sells goods online as a means to an end.'" (*Id.* ¶ 96; Ex. I.)

As catalogued in Appendix B, PDD Holdings admits in SEC filings that it owns, operates and created Temu. "In September 2022, ***we launched Temu***, a global online platform that brings

---

*DiLorenzo v. Norton*, 2009 WL 2381327, at *2 (D.D.C. July 31, 2009) (SEC filings "properly the subject of judicial notice"); *Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004) (taking judicial notice of public records that are "referred to in the complaint and are integral to [plaintiff's] claim"); *see also* Mem. at 6 n. 6 (asking court to take judicial notice of publicly-available documents on Internet).

[32] The declaration Defendants submitted states: "Pinduoduo does not ship goods to the U.S. or serve the U.S. market." (Zhang Decl. ¶ 17.) However, U.S. users can download Pinduoduo from U.S. app stores and use it to ship goods to individuals *in China*, resulting in numerous transactions with U.S. users.

[33] NPR (Mar. 22, 2024), https://www.npr.org/2024/03/22/1197958526/temu-website-app-shopping.

together consumers, merchants, manufacturers and brands around the world." (SAC ¶ 50 (emphasis added); Ex. H, at 21.) Moreover, PDD Holdings admits that Temu—like Pinduoduo—uses ***PDD Holdings' services***: "Consumers primarily access ***our services*** through the Pinduoduo and Temu mobile apps."[34] (SAC ¶ 50; Ex. H, at 19 (emphasis added).)

PDD Holdings described itself as "a multinational commerce group that ***owns and operates*** a portfolio of businesses," including Temu. (SAC ¶ 51 (emphasis added); Ex. J.) It stated that it "operates" Temu: "***Temu is operated by the Nasdaq-listed PDD Group*** (Nasdaq: PDD, or 'PDD Group') through www.temu.com and its mobile apps (Android/iOS) for consumers globally." (*Id.*; Ex. J.) Its press releases stated: "***PDD Group*** (Nasdaq: PDD) is a multinational that ***owns and operates a portfolio of businesses, including US-based marketplace Temu and Pinduoduo in China***." (SAC ¶ 54; Ex. K.) In its Annual Report, PDD Holdings admitted its "brands" include "Pinduoduo and Temu", Temu consumers are "our buyers", and Temu is "our Temu platform". (*Id.* ¶ 56; Ex. G, at 16-17, 44.)

PDD Holdings admits it "processes a large amount of data," is "required to comply with laws relating to privacy and cybersecurity," and faces "a number of challenges relating to data" such as "protecting the data in and hosted on our system" and "complying with applicable laws and regulations relating to the collection, use, storage, transfer, disclosure and security of personal data." (SAC ¶ 57; Ex. G, at 26, 84, 128.) It admits it has "platforms and systems for the storage and transmission of confidential information, such as buyers' personal information, payment-related information and transaction information." (SAC ¶ 58; Ex. G, at 26.) It admits it

[34] Defendants quote language stating PDD Holdings "does not conduct operations directly." (Mem. at 3 n.3.) But that text is in a section of the report on operations *in China*, which occur through contracts to comply with Chinese law restricting foreign investment in Chinese companies. The text directly following states: "we conduct our operations *in China* through (i) our PRC subsidiaries, (ii) the VIE, and (iii) the subsidiaries of the VIE." (Ex. H.) The report then admits PDD has "Multi-jurisdictional Operations" and "a business presence in multiple jurisdictions, including the PRC ***and the United States***."

is "subject to complex and evolving laws and regulations regarding privacy and data protection in the countries and regions where we have operations," including the ECPA and CFAA—U.S. data privacy statutes—that "regulate the way we collect, use, store, transfer, disclose and secure data and protect the privacy of our users." (SAC ¶ 60; Ex. G, at 27-29.) And it admits that "[t]hese laws and regulations can be complex and stringent" and "may result in claims" against it. (*Id.*) "***[A]ny material failure to [comply with these laws] may subject us to potential liability, regulatory investigations, [and] costly litigation.***" (SAC ¶ 61 (emphasis added); Ex. G, at 29.) This includes in New York, where PDD Holdings transacted business with Temu users and non-users, collected data from them, and used this data in its operations. (SAC ¶¶ 42-46.)

PDD Holdings also marketed Temu in the United States, including New York. For example, "***Temu's parent company PDD Holdings spent around $2 billion on ads*** with Meta last year alone, according to The Wall Street Journal." (*Id.* ¶ 67 (emphasis added); Ex. M.) The 2023 Temu marketing budget was reportedly more than $7 billion. (SAC ¶ 82.) PDD Holdings promoted Temu through Super Bowl ads it ran across the U.S., including in New York. (*Id.* ¶¶ 3, 85.) PDD Holdings also hired "campus ambassadors" who received a 3% commission on purchases made by other students at U.S. colleges that they referred to Temu. (*Id.* ¶ 68; Ex. K.)[35]

PDD Holdings raised capital in New York to fund these operations, listing stock on the Nasdaq exchange (SAC ¶ 32) and executing associated contracts that prescribed "'federal or state courts'" in New York City as the forum for litigation of disputes (*id.* ¶ 75; Ex. G, at 58).

**2. PDD Holdings owned and operated the logistical network used by Temu.**

The Court may independently exercise jurisdiction over PDD Holdings because it owns and operates a logistics network that fulfills orders placed on Temu (including transactions in

[35] PDD Holdings may have at least one "advisor" in New York who from July 2020 to the present "[a]dvise[d] the Pinduoduo and Temu platforms on US marketing and brand protection issues." (Ex. N.)

New York). Defendants admit that "Temu leverages on ***PDD Group's vast and deep network of merchants, logistic partners, and its established ecosystem built over the years.***" (SAC ¶ 52 (emphasis added); *see also id.* ¶ 53 ("***Temu leverages the sourcing and fulfillment capabilities of PDD Holdings*** … . .") (emphasis added); Ex. O.) "***PDD Holdings*** (Nasdaq: PDD) … has built ***extensive sourcing, logistics, and fulfillment capabilities that it shares with its various businesses***." (SAC ¶ 55 (emphasis added); Ex. O.) Using this network, PDD Holdings delivered millions of shipments to Temu users in the U.S. (and New York) each year. (SAC ¶ 87; Ex. P.)

Illustrating its direct role in Temu's operations, hundreds of merchants descended on a PDD Holdings facility in China to protest Temu's policies, which they claimed were destroying their profits on goods they sold on the Temu platform. As the reports noted, "Temu is run by PDD Holdings, which also operates the local online retail platform Pinduoduo." (Ex. Y.)

**3. Jurisdiction exists over PDD Holdings based on Whaleco's activities.**

Whaleco's actions provide a further basis for exercising jurisdiction over PDD under § 302 given that "[t]he long-arm statute also establishes that jurisdiction lies when a corporation transacts business 'through an agent.'" *Liverpool v. Con-Way, Inc.*, 2009 WL 1362965, at *5 (E.D.N.Y. May 15, 2009) (quoting NYCPLR § 302(a)(1)). To invoke this provision, it is not necessary to "establish a formal agency relationship" between a parent and subsidiary. *Bulova Watch Co., Inc. v. K. Hattori & Co., Ltd.*, 508 F. Supp. 1322, 1345 (E.D.N.Y. 1981).

Here, PDD Holdings admits it provides "online platforms" "through its consolidated subsidiaries" (Ex. G, at F-12), and conducts its "businesses through a number of operating entities" (*id.* at 4). It admits Temu is one of "its constituent businesses". (Mem. at 24.) Indeed, at the same time it opposes jurisdiction, it seeks to invoke the arbitration clause contained in Temu's Terms on the ground that Whaleco is its "agent".

Accordingly, the Court may exercise jurisdiction over PDD Holdings due to the actions

of its subsidiary Whaleco. Moreover, exercise of jurisdiction would be consistent with due process because PDD Holdings actively collected data from New York consumers and, as evidenced by its admissions, specifically anticipated it could be subject to suit in New York. Exercising jurisdiction thus "does not offend traditional notions of fair play and substantial justice." *Calder v. Jones*, 465 U.S. 783, 788 (1984); *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (due process satisfied where "'defendant purposefully avails itself" of State).

**4. PDD Holdings' arguments do not defeat jurisdiction.**

PDD Holdings' arguments against jurisdiction do not overcome this record.

*First*, PDD seeks to explain away its multiple admissions on the ground that it merely "referred to its constituent businesses, including Temu, collectively as 'we' and 'our'." (Mem. at 24.) However, Defendants did not merely reference "we" or "our", but specifically stated: "'***PDD Holdings (Nasdaq: PDD)*** … ***owns and operates*** a portfolio of businesses, including Temu'" (SAC ¶ 55; Ex. J); "***PDD Group (Nasdaq: PDD)*** … ***owns and operates*** a portfolio of businesses, including US-based marketplace Temu and Pinduoduo" (SAC ¶ 54; Ex. K); "***PDD Holdings*** … has built ***extensive sourcing, logistics, and fulfillment capabilities that it shares with its various businesses***" (SAC ¶ 55; Ex. J) (emphasis added). In any event, statements referencing collective action only underscore that Whaleco was acting as PDD Holdings' agent, and ***confirm*** that PDD Holdings ***participated*** in these actions that are the basis for jurisdiction.

*Second*, PDD submits a declaration filled with one-sentence assertions from its "Director of Investor Relations." (Zhang Decl. ¶ 1.) That declaration mostly ignores the factual record establishing jurisdiction. However, as is illustrated in Appendix C, to the extent the declaration addresses the facts at all, it makes unsupported assertions that are contradicted by the record. For example, the Zhang declaration states PDD Holdings "has no business contacts with the U.S.," even though it sells its stock on the Nasdaq exchange and entered into associated deposit

agreements in New York. (*Id.* at p. 2.) It asserts that "PDD Holdings does not operate Temu or Pinduoduo," even though Defendants have repeatedly admitted that PDD Holdings owns and operates Temu and Pinduoduo. (*Id.*) Finally, it asserts PDD and Whaleco "do[] not share" any "annual reports" or "financial and accounting records" (*id.* ¶ 22), even though PDD's SEC filings present consolidated financial statements and, indeed, its memorandum acknowledges Temu is one of its "constituent businesses" (Mem. at 24). A party cannot use such "self-serving" and "unsupported" declarations to contradict prior admissions and "manufacture genuine issues of material fact." *U.S. v. Funds in the Amount of $30,670.00*, 403 F.3d 448, 466 (7th Cir. 2005). Moreover, it is unclear that a "Director of Investor Relations" employed only since August 2023 who is "familiar with the ***corporate structure*** of PDD Holdings" (Zhang Decl. ¶¶ 1, 4) would even have a foundation to address such matters at all—particularly where, as here, the declarant previously attested that "PDDH … ***has no employees***" (*Ark.* Zhang. Decl. ¶ 4, Ex. Q).

*Finally*, PDD Holdings points to unpublished opinions from the Northern District of Illinois involving third party sellers of counterfeit goods on Temu. (Mem. at 28.) However, those decisions were decided under the Illinois long arm statute—not New York law. Moreover, the decisions did not involve PDD Holdings' role in the development of Temu and collection of user data, but rather the sale of counterfeit goods. In any event, those decisions—which are nearly identical unpublished opinions, all issued by the same judge on the same day—considered only limited factual materials and contain only cursory analysis. Indeed, another Northern District of Illinois judge exercised jurisdiction granted a TRO against PDD Holdings, finding it "operates and controls the services offered on the Temu mobile application and website." *Roadget Business Pte. Ltd. v. PDD Holdings Inc.*, 2023 WL 4865005, at *1 (N.D. Ill. July 31, 2023).[36]

[36] Many of the cases PDD Holdings cites are inapposite because there were no contacts with New York. *E.g., SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 343 (2d Cir. 2018) ("UBS SA, UBS FSL and UBS TPM

### B. Personal Jurisdiction Exists Under NY CPLR § 301

PDD Holdings is also subject to general jurisdiction under CPLR § 301, which provides jurisdiction over out-of-state corporations that are "doing business" in New York. *See McGowan v. Smith*, 52 N.Y.2d 268, 272 (1981). This test is satisfied here based on the activities of PDD Holdings' subsidiary Whaleco because it is both an "agent" and "department" of PDD Holdings. *Bulova Watch Co., Inc. v. K. Hattori & Co., Ltd.*, 508 F. Supp. 1322, 1333 (E.D.N.Y. 1981).

#### 1. Defendant Whaleco is an "agent" of PDD Holdings.

Under the agency prong, common ownership "gives rise to a valid inference as to the broad scope of the agency." *Frummer v. Hilton Hotels Int'l, Inc.*, 19 N.Y.2d 533, 538 (1967). This is true even if the parent is "simply a holding company". *In re Tamoxifen Citrate Antitrust Litig.*, 262 F. Supp. 2d 17, 23 (E.D.N.Y. 2003) (citing *Waldron v. British Petroleum Co.*, 149 F. Supp. 830 (S.D.N.Y. 1957)). Here, it is undisputed that Whaleco is a "wholly-owned subsidiary of PDD Holdings" (Zhang Decl. ¶ 13), and, as in other cases where courts have found jurisdiction, "it is obvious that if the subsidiaries were not in New York and [defendant] sought to enter the American market it would have to do so directly"—i.e., if Whaleco did not exist, PDD Holdings would simply offer Temu directly in the U.S. *Bulova*, 508 F. Supp. at 1342.

The cases Defendants cite further confirm this conclusion. In *Bellomo v. Pennsylvania Life Co.*, for example, the court concluded that Pennsylvania Life's subsidiary was its agent for purposes of jurisdiction because Pennsylvania Life sold "a variety of insurance policies through

---

lack any presence in New York at all"); *Corning Inc. v. Shin Etsu Quartz Prods. Co., Ltd.*, 242 F.3d 364 (2d Cir. 2000) (unpublished) (no "allegations that [defendant] knew, or had good reason to know, its conduct would have effects in the United States"); *Drucker Cornell v. Assicurazioni Generali S.p.A.*, 2000 WL 284222 (S.D.N.Y. Mar. 16, 2000) (no allegation company "supplied goods or services in New York"); *Jazini v. Nisson Motor Co., Ltd.*, 148 F.3d 181, 184 (2d Cir. 1998) (complaint contained "conclusory" "restatement, with slight changes, of the legal standard"); *NovelAire Tech., L.L.C. v. Munters AB*, 2013 WL 6182938, at *4 (S.D.N.Y. Nov. 21, 2013) (website did not "provide means for visitors to submit orders for delivery in New York or otherwise transact business through the website").

several subsidiaries." 488 F. Supp. 744, 746-47 (1980). As the court observed, where "the subsidiaries are created by the parent" holding company "to carry on business on its behalf, there is no basis for distinguishing between the business of the parent and the business of the subsidiaries." *Id.* at 746. The same is true here where, even before Whaleco was formed, PDD Holdings offered e-commerce services like Pinduoduo and created Temu itself rather than engaging in "corporate acquisitions." *Id.* Moreover, as in *Bellomo*, PDD represented in its SEC filings: "we conduct our operations through … our subsidiaries." (Ex. G, at 4.)

**2. Defendant Whaleco is a "department" of PDD Holdings.**

Jurisdiction also exists because Whaleco is a "department" of PDD Holdings. *Bulova*, 508 F. Supp. at 1334. While courts consider various factors in deciding whether a subsidiary is a "department", the "essential factor" is whether there is "common ownership." *Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*, 751 F.2d 117, 120 (2d Cir. 1984).

Here, there is no dispute that there is common ownership (Zhang Decl. ¶ 13), and indeed PDD Holdings describes Temu a "constituent business" (Mem. at 24) and "business unit" (Ex. R). Such characterizations of a subsidiary as part of the parent's business show that the parent treats the subsidiary as a department. *Koehler v. Bank of Bermuda Ltd.*, 101 F.3d 863, 864 (2d Cir. 1996) (subsidiary a department where it was "part of a unified global banking network").

Moreover, the complaint contains numerous allegations regarding PDD Holdings' direct role with the Temu platform. These include its creation of Temu using software engineers who created Pinduoduo, its role in key decisionmaking, and its logistics and marketing activities. (SAC ¶¶ 12, 36-37, 48, 81-82.) PDD Holdings' "participation in the actions underlying the complaint … strengthens the finding of jurisdiction." *See Andrulonis*, 526 F. Supp. at 189.

The high degree of financial dependence among Defendants further supports jurisdiction. As PDD Holdings admits, "[a]s a business unit within PDD Holdings, Temu doesn't disclose its

financials separately." (Ex. R.) Rather, "PDD Holdings reports the operations and financial results of its subsidiary companies on a consolidated basis." (Mem. at 3.) Whaleco is highly financially dependent on PDD Holdings given that Temu is a relatively new business (started in 2022) that reportedly loses money on each order (Turner Decl. Ex. A, at 4). *Mayatextil, S.A. v. Liztex U.S.A., Inc.*, 1995 WL 131774, at *5 (S.D.N.Y. Mar. 23, 1995) (companies' "finances are intertwined"); *Taca Int'l v. Airlines, S.A. v. Rolls-Royce of Eng., Ltd.*, 15 N.Y.2d 97, 101 (1965).

Defendants also fail to adhere to corporate formalities. Analysts report that "Gu Pingping (PDD's Chief Operating Officer) is in charge of Temu now" and serves as a "shadow CEO". (Ex. S; Ex. U ("Gu PingPing is a … top decisionmaker" for Temu).) Similarly, reports indicate PDD Holdings lacks standard positions like a Chief Financial Officer. (SAC ¶¶ 70-71; Exs. S, T.) Indeed, a recent report found that Temu's U.S. headquarters "employs fewer than 20 people," primarily lawyers and tax professionals—further demonstrating Whaleco's dependence on PDD Holdings. (Ex. U.) Whaleco's "relatively recent incorporation and dependence on" PDD Holdings, "also supports a finding of jurisdiction." *Andrulonis*, 526 F. Supp. at 189.

Finally, the "center of operations" for Temu is in China, where products are supplied and orders are fulfilled through PDD Holdings' logistical network, evidencing a "monocentrism" that further supports a finding that Whaleco is a mere department of PDD Holdings. *Id*.

**3. PDD Holdings transacts business in New York.**

Jurisdiction under CPLR § 301 exists independently based on PDD Holdings' own activities. *See Bulova*, 508 F. Supp. at 1327. As noted, PDD Holdings ships hundreds of thousands or millions of products purchased on Temu into the State using its logistical network, funded Temu's operations by listing stock on Nasdaq and entering into agreements in New York

(SAC ¶¶ 10, 47),[37] and has submitted to personal jurisdiction in federal and state courts in New York (*id.* ¶ 75; Ex. G, at 58). Indeed, PDD Holdings is being sued in New York for securities fraud based on its data practices. *Baxter v. PDD Holdings, Inc.*, 24-cv-05653 (E.D.N.Y.).

**C. Personal Jurisdiction Exists Under Rule 4(k)(2)**

In the alternative, Fed. R. Civ. P. 4(k)(2) permits a federal court to exercise personal jurisdiction where the claim arises under federal law, process was properly served, the defendant is not subject to jurisdiction in any state court of general jurisdiction, and jurisdiction "is consistent with the United States Constitution and laws." Fed. R. Civ. P. 4(k)(2). Here, many of the claims arise under federal law, process was properly served, PDD Holdings has not identified another forum in the U.S. where it could be sued, and, personal jurisdiction does not offend due process because PDD has "purposefully avail[ed] itself of the privilege of conducting activities" within the U.S. *Burger King*, 471 U.S. at 475. Jurisdiction under Rule 4(k)(2) is reasonable under the circumstances. *Freeplay Music, LLC v. Nian Infosolutions Private Lt*, 2018 WL 3639929, at **16-17 (S.D.N.Y. July 10, 2018). PDD Holdings would not be burdened by litigating in this district, given that it is listed on the Nasdaq in New York, has entered into contracts requiring litigation in New York, is seeking to invoke Terms requiring litigation in New York, and is defending multiple cases in this district. Moreover, at least one federal court has exercised personal jurisdiction over PDD Holdings, and in another lawsuit, it actively litigated with competitor Shein for over a year without raising any objection to personal jurisdiction. *Roadget*

[37] "[A] listing can be considered as evidence in conjunction with other indicia of doing business." *Greenberg v. Gov. Props. Trust, Inc.*, 2007 WL 2981683, at *6 (S.D.N.Y. Oct. 10, 2007). The contracts here state that the depositary for PDD Holdings Inc, formerly Pinduoduo Inc., shares is Deutsche Bank Trust Company Americas, 60 Wall Street, New York, NY 10005 (Ex. Z; Ex. AA at 1), are governed by New York law, require litigation in New York, and designate a New York agent for service, Law Debenture Corporate Services Inc., 801 2d Ave., Suite 403, New York, NY 10017 (Ex. AA, at 35-36).

*Business PTE Ltd. v. PDD Holdings Inc.*, No. 1:22-cv-07119 (N.D. Ill. 2022). Finally, New York has a significant interest in this case given the unlawful data harvesting from state residents.

**D. At a Minimum, Plaintiffs Are Entitled to Jurisdictional Discovery**

In sum, this record is sufficient to establish jurisdiction over PDD Holdings. Nonetheless, plaintiffs should be provided with "'ample opportunity to secure and present evidence relevant to the existence of jurisdiction'" through discovery. *APWU v. Potter*, 343 F.3d 619, 627 (2d Cir. 2003). Here, as stated in the attached Evans Declaration, jurisdictional discovery would elicit additional facts supporting jurisdiction and would be particularly appropriate given that PDD Holdings is uniquely in possession of such facts and is "secretive by culture." (SAC ¶ 72; Ex. R.)

**CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss should be denied.

Dated: January 3, 2025

Respectfully submitted by,

**HAGENS BERMAN SOBOL SHAPIRO LLP**

*<u>/s/ Jeannie Evans</u>*

Jeannie Evans (Bar No. 6296339)
Hagens Berman Sobol Shapiro LLP
455 N. Cityfront Plaza Dr., Suite 2410
Chicago, IL 60611
Telephone: (708) 628-4962
Facsimile: (708) 628-4952
jeannie@hbsslaw.com

Steve W. Berman (Bar No. 3126833)
Hagens Berman Sobol Shapiro LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com

Nathaniel A. Tarnor, #4742797
68 3rd Street, Suite 249
Brooklyn, NY 11231
Telephone: (212) 752-5455
Facsimile: (917) 210-3980
nathant@hbsslaw.com

**ALPHEUS LLC**

Douglas G. Smith
77 West Wacker Drive, Suite 4500
Chicago, IL 60601
Telephone: (312) 451-6708
dsmith@alpheusllc.com

*Attorneys for Plaintiffs*