**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

JEHAN ZIBOUKH, MARGRET PHILIE, VERA FIGLOCK, NICOLE MAY, TYANA DAUGHTERY, SOLALIZ HERNANDEZ, DEBRA KRYSTYN, I.E., A MINOR, CYNTHIA RODRIGUEZ, J.P., A MINOR, MIGUEL ACOSTA, VINSON MANGOS, NOAH KUPPER, J.P. A MINOR, CHRISTIAN VEGA, A.H. A MINOR, AND OLAYA BOURAKKADI AMRANI, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

WHALECO INC. D/B/A TEMU, AND PDD HOLDINGS INC. F/K/A PINDUODUO INC.,

Defendants.

Case No. 1:24-cv-3733-MKB-RML

Judge Margo K. Brodie

Magistrate Judge Robert M. Levy

CLASS ACTION

**PLAINTIFFS' OPPOSITION TO DEFENDANTS'**
**MOTION TO COMPEL ARBITRATION**

# TABLE OF CONTENTS

**Page**


LEGAL STANDARD ..... 2

ARGUMENT ..... 3

I. THE DELEGATION CLAUSE, AND ARBITRATION CLAUSE AS A WHOLE, ARE UNCONSCIONABLE. ..... 3

A. The Delegation Clause, and Arbitration Clause as a Whole, Are Procedurally Unconscionable. ..... 4

B. The Delegation Clause, and Arbitration Clause as a Whole, Are Substantively Unconscionable. ..... 6

II. ARBITRATION IS BARRED BECAUSE THE TERMS DEPRIVE PLAINTIFFS OF FEDERAL REMEDIES. ..... 10

III. THERE WAS NO AGREEMENT TO ARBITRATE THIS DISPUTE DUE TO THE LACK OF MUTUAL ASSENT, INADEQUATE NOTICE, AND THE TERMS' PLAIN LANGUAGE. ..... 12

A. The Lack of Mutual Assent Precludes Formation of any Agreement. ..... 12

B. Defendants Failed To Provide Clear and Conspicuous Notice Of The Terms. ..... 13

C. The Terms' Plain Language and Collateral Estoppel Bar Arbitration. ..... 16

IV. THE DELEGATION AND ARBITRATION CLAUSES DO NOT APPLY TO THIS DISPUTE. ..... 17

V. CLAIMS BROUGHT BY THE MINOR CLASS CANNOT BE ARBITRATED. ..... 19

A. The Minors Did Not Agree to Arbitrate. ..... 19

B. The Minors Disaffirmed Any Alleged Agreement. ..... 22

C. Minors Who Never Created An Account Never Entered into Any Agreement. ..... 26

VI. CLAIMS AGAINST DEFENDANT PDD HOLDINGS, INC. CANNOT BE ARBITRATED. ..... 28

VII. DISCOVERY WOULD PROVIDE FURTHER GROUNDS FOR DENIAL OF DEFENDANTS' MOTION. .......... 31

CONCLUSION .......... 31

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Achey v. Cellco P'ship*,
293 A.3d 551 (2023) ....................3

*Al-Nahhas v. Rosebud Lending LZO*,
2023 WL 5509320 (N.D. Ill. Aug. 25, 2023) ....................30

*Applebaum v. Lyft, Inc.*,
263 F. Supp. 3d 454 (S.D.N.Y. 2017)....................13

*Arbogast v. Sky Zone, LLC*,
2024 WL 3378936 (D.W.V. July 11, 2024) ....................23

*Arnaud v. Doctor's Assocs. Inc.*,
2019 WL 4279268 (E.D.N.Y. Sept. 10, 2019) ....................14

*Astra Oil Co., Inc. v. Rover Navigation, Ltd.*,
344 F.3d 276 (2d Cir. 2003)....................30

*AT&T Mobility LLC v. Concepcion*,
563 U.S. 333 (2011)....................10

*Baker v. Match Grove, Inc.*,
2023 WL 3737808 (N.D. Ill. May 31, 2023)....................9, 11

*Berman v. Freeman Fin. Network, LLC*,
30 F.4th 849 (9th Cir. 2022) ....................14

*Bradley v. Meijer Stores, L.P.*,
2023 WL 3042984 (N.D. Ill. Apr. 23, 2023) ....................31

*Cap Gemini Ernst & Young, U.S., LLC v. Nackel*,
346 F.3d 360 (2d Cir. 2003)....................4

*CCC Intelligent Solutions Inc. v. Tractable Inc.*,
36 F.4th 721 (7th Cir. 2022) ....................28

*Cedeno v. Sasson*,
100 F.4th 386 (2d Cir. 2024) ....................1, 11

*China Shipping Container Lines Co. Ltd. v. Big Port Serv. DMCC*,
803 Fed. App'x 481 (2d Cir. 2020)....................16

*Choctaw Generation Ltd. P'ship v. Am. Home Assurance Co.*,
271 F.3d 403 (2d Cir. 2001)....................30

*City of Almaty, Kazakhstan v. Sater*,
2021 WL 4940304 (S.D.N.Y. Oct. 22, 2021)....................28, 29

*Clemins v. GE Money Bank*,
2011 WL 6148676 (E.D. Wis. Dec. 8, 2011)....................31

*Coatney v. Ancestry.com*,
93 F.4th 1014 (7th Cir. 2024)....................27

*Coinbase, Inc. v. Suski*,
602 U.S. 143 (2024)....................2, 28

*Comer v. Micor, Inc.*,
436 F.3d 1098 (9th Cir. 2006)....................23

*Cullinane v. Uber Techs., Inc.*,
893 F.3d 53 (1st Cir. 2018)....................14

*DDK Hotels, LLC v. Williams-Sonoma, Inc.*,
9 F.4th 308 (2d Cir. 2021)....................19

*De Jesus v. Gregorys Coffee Mgmt., LLC*,
2021 WL 5391026 (E.D.N.Y. Nov. 29, 2021)....................1, 3, 4, 9

*Denney v. Jenkins & Gilchrist*,
412 F. Supp. 2d 293 (S.D.N.Y. 2005)....................31

*Difrancesco v. Win-Sum Ski Corp. Eyeglasses*,
2017 WL 1046741 (W.D.N.Y. Mar. 20, 2017)....................26

*Dish Network Corp. v. ACE Am. Ins. Co.*,
431 F. Supp. 3d 415 (S.D.N.Y. 2019)....................17

*Doctor's Assocs., Inc. v. Alemayehu*,
934 F.3d 245 (2d Cir. 2019)....................12

*Doe v. Roblox Corp.*,
602 F. Supp. 3d 1243 (N.D. Cal. 2022)....................20

*Doe v. Trump Corp.*,
6 F.4th 400 (2d Cir. 2021)....................28, 29, 30

*Doffing v. Meta Platforms*,
2022 WL 3357698 (D. Or. July 20, 2022)....................21, 22, 26, 27

*Eakins v. Whaleco Inc.*,
721 F. Supp. 3d 1252 (W.D. Okla. Mar. 5, 2024) ....................14, 16

*Edmundson v. Klarna, Inc.*,
85 F.4th 695 (2d Cir. 2023) ....................12, 15

*F.T. Maritime Servs. Ltd. v. Lambda Shipholding Ltd.*,
533 F. Supp. 3d 149 (S.D.N.Y. 2021)....................16

*Feld v. Postmates, Inc.*,
442 F. Supp. 3d 825 (S.D.N.Y. 2020)....................14

*Gostev v. Skillz Platform, Inc.*,
88 Cal. App. 5th 1035 (2023) ....................4, 7

*Green Tree Fin. Corp. v. Randolph*,
531 U.S. 79 (2000)....................11

*Hamby v. Power Toyota Irvine*,
798 F. Supp. 2d 1163 (S.D. Cal. 2011)....................31

*Hantash v. V Model Mgmt. N.Y., Inc.*,
2007 WL 2324326 (S.D.N.Y. Aug. 7, 2007)....................22

*Heckman v. Live Nation Entertainment, Inc.*,
120 F.4th 670 (9th Cir. 2024) .................... *passim*

*Hines v. Overstock.com, Inc.*,
668 F. Supp. 2d 362 (E.D.N.Y. 2009) ....................14

*I.B. v. Facebook, Inc.*,
905 F. Supp. 2d 989 (N.D. Cal. 2012) ....................24, 25, 26

*Ingle v. Circuit City Stores, Inc.*,
328 F.3d 1165 (9th Cir. 2003) ....................7

*J.R. Supermarket, Inc. v. Visa Inc.*,
2024 WL 3823096 (E.D.N.Y. Aug. 14, 2024)....................19

*Jackson v. Amazon, Inc.*,
65 F.4th 1093 (9th Cir. 2023) ....................18

*Johnson v. Whaleco Inc.*,
2023 U.S. Dist. LEXIS 184104 (M.D. Fla. Oct. 13, 2023) ....................14, 16

*K.F.C. v. Snap Inc.*,
29 F.4th 835 (7th Cir. 2022) ....................23

*Kohler v. Whaleco, Inc.*,
2024 WL 4887538 (S.D. Cal. Nov. 25, 2024) ....................9

*MacClelland v. Cellco P'ship*,
609 F. Supp. 3d 1024 (N.D. Cal. 2022) .................... *passim*

*Meeg v. Heights Casino*,
2020 WL 1493658 (E.D.N.Y. Mar. 27, 2020) ....................12

*Meyer v. Uber Techs., Inc.*,
868 F.3d 66 (2d Cir. 2017) ....................12, 15

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
473 U.S. 614 (1985) ....................9, 10, 11

*Morgan v. Sundance, Inc.*,
596 U.S. 411 (2022) ....................2

*Nguyen v. Barnes & Noble Inc.*,
763 F.3d 1171 (9th Cir. 2014) ....................14

*Nicosia v. Amazon.com, Inc.*,
384 F. Supp. 3d 254 (E.D.N.Y. 2019) ....................26

*Nicosia v. Amazon.com, Inc.*,
834 F.3d 220 (2d Cir. 2016) ....................2, 13, 17, 26

*Oldham v. Nova Mud, Inc.*,
2022 WL 17618106 (D.N.M. Dec. 13, 2022) ....................30

*Palma v. Hat World, Inc.*,
2024 WL 660242 (C.D. Cal. Jan. 10, 2024) ....................26

*Pandolfi v. AviaGames, Inc.*,
2024 WL 4051754 (N.D. Cal. Sept. 4, 2024) ....................3, 5

*Parklane Hosiery Co., Inc. v. Shore*,
439 U.S. 322 (1979) ....................17

*Rent-A-Center, W., Inc. v. Jackson*,
561 U.S. 63 (2010) ....................3, 9

*Republic of Iraq v. ABB AG*,
769 F. Supp. 2d 605 (S.D.N.Y. 2011), *aff'd*, 472 F. App'x 11 (2d Cir. 2012) ....................28

*Rigano v. Uber Technologies*,
218 N.Y.S.3d 799 (N.Y. Sup. Ct. 2024) ....................13

*In re: Ring LLC Privacy Litig.*,
2021 WL 455722 (C.D. Cal. Sept. 3, 2021) ....................23

*Ross v. Am. Express Co.*,
547 F.3d 137 (2d Cir. 2008)....................29, 30, 31

*Sellers v. JustAnswer LLC*,
73 Cal. App. 5th 444 (2021) ....................14

*Silva v. Whaleco, Inc.*,
2024 WL 4487421 (N.D. Cal. Oct. 10, 2024)....................14

*Smith v. Whaleco Inc.*,
2024 WL 3513800 (W.D. Tex. July 23, 2024) ....................14, 16

*Smith/Enron Cogeneration Ltd. v. Smith Cogeneration Int'l, Inc.*,
198 F.3d 88 (2d Cir.1999)....................30

*Sokol Holdings, Inc. v. BMB Munai, Inc.*,
542 F.3d 354 (2d Cir. 2008)....................29, 30

*I.C. ex rel. Solovsky v. Delta Galil USA*,
135 F. Supp. 3d 196 (S.D.N.Y. 2015)....................4, 20, 22

*Spahr v. Secco*,
330 F.3d 1266 (10th Cir. 2003) ....................22, 23

*Specht v. Netscape Comm'cns Corp.*,
306 F.3d 17 (2d Cir. 2002)....................13

*Starke v. SquareTrade, Inc.*,
913 F.3d 279 (2d Cir. 2019)....................12, 13

*State Farm Mut. Auto. Ins. Co. v. Tri-Borough NY Med. Practice P.C.*,
120 F.4th 59 (2d Cir. 2024) ....................1, 12

*In re StockX Customer Data Sec. Breach Litig.*,
19 F.4th 873 (6th Cir. 2021) ....................23

*T.K. v. Adobe Sys. Inc.*,
2018 WL 1812200 (S.D. Cal. Oct. 2, 2024) ....................24, 25

*Townsend v. Quadrant Corp.*,
173 Wash. 2d 451 (2012)....................24

*Wexler v. AT & T Corp.*,
211 F. Supp. 3d 500 (E.D.N.Y. 2016) ....................18, 19

*Wilson v. Redbox Automated Retail, Inc.*,
448 F. Supp. 3d 873 (N.D. Ill. 2020) ........................................................................14

*Zachman v. Hudson Valley Fed. Credit Union*,
49 F.4th 95 (2d Cir. 2022) ........................................................................2, 31

**STATUTES**

18 U.S.C. § 1030(g) ........................................................................11

18 U.S.C. § 2520 ........................................................................11

**OTHER AUTHORITIES**

Fed. R. Civ. P. 23(b)(3) ........................................................................8, 9

Fed. R. Civ. P. 11(b) ........................................................................9

Defendants' motion to compel arbitration should be denied for multiple reasons.[1]

*First*, the "delegation clause" (7/8/23 Terms § 20.7, Ex. A) is unconscionable, requiring arbitration in a novel "batch arbitration" procedure that deprives consumers of the ability to obtain relief. Multiple courts have ruled such delegation provisions unconscionable, including most recently in *Heckman v. Live Nation Entertainment, Inc.*, 120 F.4th 670 (9th Cir. 2024). The Terms of Use ("Terms") implicitly acknowledge the potential invalidity of the clause, stating the entire arbitration agreement is void if "batch arbitration" procedures that the clause adopts are ruled invalid. (7/8/23 Terms § 20.11, Ex. A.)[2]

*Second*, the Terms are void because they deprive Plaintiffs of remedies available under federal and state privacy statutes they invoke, such as claims for attorney fees, punitive damages, and public injunctive relief. The Second Circuit recently rejected arbitration on similar grounds. *Cedeno v. Sasson*, 100 F.4th 386 (2d Cir. 2024); *State Farm Mut. Auto. Ins. Co. v. Tri-Borough NY Med. Practice P.C.*, 120 F.4th 59 (2d Cir. 2024). Again, Defendants ignore this issue.

*Third*, Plaintiffs address the issues raised in *Hu v. Whaleco Inc.* to bring to the Court's attention additional facts and case law emerging since the Court's ruling and to preserve these issues for appeal. 2024 WL 4481439 (E.D.N.Y. Oct. 1, 2024).

*Fourth*, the delegation clause (and arbitration clause as a whole) does not apply to this dispute, which concerns theft of Plaintiffs' data—not services Defendants provided Plaintiffs under the Terms. Indeed, the claims here are brought not only by Temu users, but also by individuals who never used Temu and never agreed to the Terms.

[1] Defendants allege three of the non-users created Temu accounts (Mem. at 1 n.1), but as noted in opposition to the motion to dismiss, Defendants' analysis does not establish that they created accounts, and they have not produced the records on which it is based. Regardless, they would have claims as non-users during periods they did not have an account.

[2] Defendants rely on a version of the Terms created after the lawsuit was filed. However, "'[a]rbitration agreements signed after litigation is commenced are deemed unconscionable and thus unenforceable.'" *De Jesus v. Gregorys Coffee Mgmt., LLC*, 2021 WL 5391026, at *5 (E.D.N.Y. Nov. 29, 2021).

*Fifth*, the minor class's claims are not arbitrable. Contrary to Defendants' assertion (Mem. at 2), the minors did not enter into any valid agreement. As courts have recognized, even where the presentation of online terms may be sufficient to provide adults adequate notice and establish mutual assent, notice and mutual assent may nonetheless be insufficient to create a binding agreement with minor users. That is the case here where the named Plaintiffs were as young as 9 years old when they used Temu. Nonetheless, the minors also exercise their "absolute right" to disaffirm any alleged agreement under New York law, including any agreement to delegate disputes to an arbitrator.

*Finally*, the claims against PDD Holdings Inc. are not arbitrable because, as Defendants acknowledge, PDD Holdings "is not a named party to the Terms" (Mem. at 2), and thus Plaintiffs never agreed to arbitrate any claims against it. Moreover, PDD Holdings cannot invoke the Terms under an "estoppel theory" because the prerequisites for estoppel are not met, and indeed the Terms *expressly prohibit* any third-party beneficiaries. (Terms § 19.12, Ex. A.)

## LEGAL STANDARD

"Arbitration is a matter of contract and consent, and ... disputes are subject to arbitration if, and only if, the parties actually agreed to arbitrate those disputes." *Coinbase, Inc. v. Suski*, 602 U.S. 143, 145 (2024). While Defendants maintain the Federal Arbitration Act seeks to "promote arbitration" (Mem. at 8), "federal policy is about treating arbitration contracts like all others, not about fostering arbitration." *Morgan v. Sundance, Inc.*, 596 U.S. 411, 418 (2022).

"The party seeking to compel arbitration bears an initial burden of demonstrating that an agreement to arbitrate was made." *Zachman v. Hudson Valley Fed. Credit Union*, 49 F.4th 95, 101-02 (2d Cir. 2022). In deciding a motion to compel arbitration, courts apply a standard similar to that applied to a motion for summary judgment and "draw all reasonable inferences in favor of the non-moving party." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016).

## ARGUMENT

### I. The Delegation Clause, and Arbitration Clause as a Whole, Are Unconscionable.

Defendants' motion fails because the delegation clause (and the arbitration clause as a whole) are substantively and procedurally unconscionable. The Terms implicitly acknowledge that the novel batch arbitration procedures required by the delegation clause may be void, providing that if batch arbitration is ruled invalid, the entire arbitration clause is void.[3] (7/8/23 Terms § 20.11, Ex. A.) And, indeed, multiple courts have held "the delegation clause of [an] arbitration agreement, and the arbitration agreement as a whole, are unconscionable" where they employ novel batch arbitration procedures like those here. *Heckman*, 120 F.4th at 676; *Pandolfi v. AviaGames, Inc.*, 2024 WL 4051754 (N.D. Cal. Sept. 4, 2024); *MacClelland v. Cellco P'ship*, 609 F. Supp. 3d 1024 (N.D. Cal. 2022); *Achey v. Cellco P'ship*, 293 A.3d 551, 558 (2023) (batch arbitration has "a systematic effect to impose arbitration on a customer as an inferior forum").

In determining whether a delegation clause is unconscionable, the "analysis is not limited to the bare text of the clause." *Heckman*, 120 F.4th at 680. "'A party is . . . permitted under *Rent-A-Center* to challenge the enforceability of a delegation clause by explaining how "unrelated" provisions make the delegation unconscionable.'" *Id.* at 680-81 (citing *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 68 (2010)). "'[A] court must be able to interpret the provision in the context of the agreement as a whole ….'" *Id.* at 681.

"The doctrine of unconscionability 'seeks to prevent sophisticated parties with grossly unequal bargaining power from taking advantage of less sophisticated parties.'" *De Jesus*, 2021

---

[3] The Terms originally provided: "Except as provided in Section 20.9 [batch arbitration], if any part or parts of this Arbitration Agreement are found under the law to be invalid or unenforceable, then such specific part or parts shall be of no force and effect and shall be severed and the remainder of the Arbitration Agreement shall continue in full force and effect." 7/8/23 Terms § 20.11, Ex. A. After the lawsuits, Defendants added the following: "For the avoidance of doubt, this means that, if Section 19.9 is found under the law to be invalid or unenforceable to any extent, then you agree that the entire Arbitration Agreement shall be of no force and effect." Trinh Decl. Ex. B, § 19.11.

WL 5391026, at *7. "The question of unconscionability of an arbitration agreement must be resolved first, 'as a matter of state law, before compelling arbitration pursuant to the FAA.'" *Id.* at *4; *Cap Gemini Ernst & Young, U.S., LLC v. Nackel*, 346 F.3d 360, 365 (2d Cir. 2003).

In assessing unconscionability, courts consider, among other things, "whether there was deception, high pressured tactics, and the use of fine print." *I.C. ex rel. Solovsky v. Delta Galil USA*, 135 F. Supp. 3d 196, 211-12 (S.D.N.Y. 2015). The delegation clause here employs novel and one-sided procedures that increase the burdens on consumers, frustrating their ability to bring claims. Indeed, the one-sided nature of the clause is evidenced by the fact that Defendants are unwilling to arbitrate at all if the batch arbitration procedures are ruled unenforceable to any extent. (7/8/23 Terms § 20.11, Ex. A.) Moreover, the delegation clause (and Terms as a whole) are predicated upon deception and concealed in pages of inconsistent fine print.

### A. The Delegation Clause, and Arbitration Clause as a Whole, Are Procedurally Unconscionable.

In *Heckman v. Live Nation Entertainment, Inc.*, for example, the court held a delegation clause unconscionable to an "extreme degree" where it directed arbitration pursuant to novel batch arbitration procedures that required "quite confusingly, that all claims will be resolved by 'individual arbitration,' and not 'in any purported class or representative proceeding.'" 686 F. Supp. 3d 939, 956 (N.D. Cal. 2023); *Heckman*, 120 F.4th at 681-83. The same is true here, where the Terms impose batch arbitration, while stating that "mass", "collective" and "class" arbitration are prohibited, and arbitration can occur "only on an individual basis." (7/8/23 Terms §§ 20.4, 20.9, Ex. A.) *See Gostev v. Skillz Platform, Inc.*, 88 Cal. App. 5th 1035, 1055-56 (2023) ("arbitration clause that is 'confusing' and 'contradictory' may constitute unfair surprise").

*Heckman* found the delegation clause further flawed because the prolix terms drafted by defendant required users to "parse through … separately posted Rules and comprehend their

implications (no small task …).” 686 F. Supp. 3d at 956. The same is true here, where consumers must not only follow a hyperlink to the Terms containing the arbitration clause, but follow yet another link to the AAA’s website, ascertain which rules govern, and find another link to the 38 pages of consumer arbitration rules.[4] Once they perform this task, consumers find that the arbitration clause is inconsistent with these rules and riddled with internal inconsistencies.

As in *Heckman*, Defendants also gave themselves the unilateral right to amend the Terms, which assume users consent to changes by merely continuing to use the site. (7/8/23 Terms § 1.7, Ex. A.) This aspect of the Terms is “particularly disadvantageous to consumers” because it is “nearly impossible to avoid retroactive application of any changes [defendant] imposes.” *Heckman*, 120 F.4th at 678. “‘[O]ppression is even more onerous’ when a ‘clause pegs both the scope and procedure of the arbitration to rules which might change.’” *Id.* at 682.

Moreover, as in *Heckman*, Defendants used this unilateral power to make “significant change[s] in the parties’ agreement,” which were further obscured by the “difficult-to-parse Rules.” 686 F. Supp. 3d at 952. Among other things, as in *Heckman*, Defendants unilaterally changed the company providing arbitration services from JAMS (9/1/22 Terms § 20.5, Ex. B), which historically “did not provide for a grouping of individual consumer claims,” 686 F. Supp. 3d at 951, to AAA, a company that requires “mass arbitration”, which is prohibited by the arbitration clause here. While Defendants have suggested that *Heckman* found the arbitration clause procedurally unconscionable because changes were made to the clause “in the middle of litigation” (*Hu* Doc. 50, at 15), in reality it was simply because a unilateral change was made to the Terms. *See Pandolfi*, 2024 WL 3558853, at *8 (agreeing with “*Heckman* that there is a ‘situation of unfair surprise’” where users get “‘no notice of [a] significant change to” Terms’”).

[4] 7/8/23 Terms § 20.5, Ex. A (directing users to AAA rules at https://adr.org/consumer).

### B. The Delegation Clause, and Arbitration Clause as a Whole, Are Substantively Unconscionable.

The delegation clause here is also substantively unconscionable because it incorporates multiple provisions that "'are overly harsh or one-sided.'" *Heckman*, 686 F. Supp. 3d at 957. Defendants would require millions of individual consumers to jump through a series of costly, time-consuming, and one-sided procedures designed to frustrate consumers' ability to recover.

**Informal Dispute Resolution.** Defendants require that Plaintiffs engage in an "informal dispute resolution" process that "is a condition precedent and requirement that must be fulfilled before commencing arbitration." (7/8/23 Terms § 20.2, Ex. A.) Consumers must personally participate in the conference, but there is no such requirement that any Defendant's officer or employee participate. (*Id.*) "The provision [thus] lacks mutuality, which is a 'paramount' consideration in assessing substantive unconscionability." *MacClelland*, 609 F. Supp. 3d at 1042.

The arbitration clause also contains measures ensuring that this dispute resolution process functions as a bottleneck to resolution of claims. For example, the clause provides that conferences "shall be individualized such that a separate conference must be held each time either party initiates a Dispute, even if the same law firm or group of law firms represents multiple users in similar cases…" (7/8/23 Terms § 20.2, Ex. A.) Such provisions "operate to effectively thwart arbitration and vindication of rights altogether," *id.* at 1046, and "conflict with one of the basic principles of our legal system—justice delayed is justice denied," *id.* at 1042.

**Arbitration Demand.** Plaintiffs also seek to impose onerous requirements for the arbitration demand. These include requiring a statement of the legal claims being asserted and the factual bases for them, a description of the remedy sought and an accurate, good-faith calculation of the amount in controversy, a statement certifying completion of the Informal Dispute Resolution process, and evidence that the claimant paid any necessary filing fees.

(7/8/23 Terms § 20.5, Ex. A.) While Defendants claim these provisions apply equally to both sides, the reality is only consumers will be bringing arbitration claims. As one court observed in a similar circumstance, "[b]ecause the possibility that [defendant] would initiate an action against one of its employees is so remote, the lucre of the arbitration agreement flows one way: the employee relinquishes rights while the employer generally reaps the benefits of arbitrating its employment disputes." *Ingle v. Circuit City Stores, Inc.*, 328 F.3d 1165, 1174 (9th Cir. 2003).

**"Batch" Arbitration.** Most significantly, the delegation clause requires a procedure that requires claims to be arbitrated "in batches of 100" "as a single consolidated arbitration with one set of filing and administrative fees due per side per batch, one procedural calendar, one hearing (if any) in a place to be determined by the arbitrator, and one final award." (7/8/23 Terms § 20.9, Ex. A.)[5] These procedures disadvantage consumers in multiple ways.

*First*, batch arbitration requires consumers to arbitrate in an inconvenient forum. While normally "arbitration will be conducted in the county where you [the claimant] reside," if there are 100 or more claims and "batch" arbitration is triggered, the arbitration occurs in another location determined by procedures that are not clear. (*Id.* § 20.5.) Requiring consumers to arbitrate in an inconvenient forum renders a clause unconscionable. *See, e.g., Gostev*, 88 Cal. App. 5th at 1061 ("requiring all users of a mobile app to arbitrate their claims in San Francisco" is "substantively unconscionable"). Moreover, to the extent there are issues arising from arbitration that must be decided by the Court (such as disputes over conditions precedent to arbitration or payment of arbitration fees, etc., *see* 7/8/23 Terms § 20.7), those issues must be litigated "exclusive[ly]" in New York (a second, inconvenient forum) and consumers, but not Defendants, "waive all defense of lack of personal jurisdiction and forum non conveniens."

[5] Later versions have batches of 25 and state: "Arbitration awards in one batch of arbitration demands shall have no precedential effect on subsequently administered batches." Trinh Decl. Ex. B, § 19.9.

(7/8/23 Terms § 19.5, Ex. A) The non-mutuality of these terms is illustrated here, where at the same time Defendants seek to impose these inconvenient fora on Plaintiffs, PDD Holdings challenges personal jurisdiction, alleging it would be "unfair" to require it to litigate in New York (where its stock is listed and it has agreed to litigate disputes under other agreements).

*Second*, giving arbitrators "'sole discretion' in determining … whether to group together similar cases in a mass arbitration" is procedurally improper; "[s]uch unfettered discretion invites the potential for unfairness." *Heckman*, 686 F. Supp. 3d at 961; *Heckman*, 120 F.4th at 678. Moreover, such procedures are non-mutual because only *consumer* claims will be batched together; Defendants would never bring one claim, much less 100, against a single consumer.

*Third*, the clause requires that arbitrators "be selected by the parties from the AAA roster of consumer dispute arbitrators." (7/8/23 Terms § 20.6, Ex. A.) Here, where there are potentially millions of claims, this limitation presents another barrier to resolution.[6] Nor, contrary to Defendants' contention (*Hu* Doc. 50, at 18), will "concurrent" arbitration of batches solve the problem given the limited number of potential arbitrators.

*Finally*, the court in *Heckman* concluded that such arbitration procedures raise significant due process concerns "given the lack of other critical procedural safeguards present in MDLs and class actions." 686 F. Supp. 3d at 962. Claimants do not have the opportunity to participate in "batch" arbitrations other than their own arbitrarily-assigned batch. Moreover, "[t]here is no process for appointing leadership or impartial[ly] making determinations as to adequacy of counsel." *Id.* "And critically, there is no opportunity for claimants to opt out, as is required for class actions maintained under Fed. R. Civ. P. 23(b)(3)." *Id.* Accordingly, the court found that

[6] Defendants appear to recognize this problem because later versions of the Terms state: "If the AAA is not available to arbitrate, the parties will select an alternative arbitral forum," which raises new problems and renders the clause vague and uncertain. Trinh Decl. Ex. B, § 20.5.

the "protocol creates a process that poses a serious risk of being fundamentally unfair to claimants, and therefore evinces elements of substantive unconscionability." *Id.*[7]

**Sanctions.** The arbitration clause also rewrites Rule 11 in a one-sided way, stating: "[t]he parties shall bear their own attorneys' fees and costs in arbitration unless the arbitrator finds that either the substance of the Dispute or the relief sought in the Request was frivolous or was brought for an improper purpose (as measured by the standards set forth in Federal Rule of Civil Procedure 11(b))." (7/8/23 Terms § 20.8, Ex. A.) The clause does not impose costs or fees for frivolous ***defenses***. Likewise, the clause purports to afford fees and costs in a one-sided manner—to "the party that obtains an order compelling arbitration," but not to the party that obtains an order denying arbitration. (*Id.*)

**Public Injunctive Relief.** Finally, the arbitration clause improperly prohibits public injunctive relief. *MacClelland*, 609 F. Supp. 3d at 1037.[8] The Terms implicitly acknowledge this flaw, noting that a court may rule that the "limitations of this Section are invalid or unenforceable as to a particular claim or request for relief (such as a request for public injunctive relief)." (7/8/23 Terms § 20.4, Ex. A.) The complaint here seeks such injunctive relief—ordering adequate disclosures relating to data privacy, barring access to Temu data in China, and other data privacy measures benefitting the public. (SAC ¶¶ 307, 360, 412, 427-38.)[9]

---

[7] In *Hu*, Defendants suggested consumers can opt out of the procedures by bringing claims in small claims court (*Hu* Doc. 50, at 18), but "opting out" does not cure unconscionability, and bringing claims in small claims court would deprive Plaintiffs of relief (such as injunctive relief), violating federal and state statutory rights. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637 n.19 (1985) (arbitration agreement void where it acts "as a prospective waiver of a party's right to pursue statutory remedies"); *Baker v. Match Grove, Inc.*, 2023 WL 3737808, at *3 (N.D. Ill. May 31, 2023) ("[a]n arbitration agreement cannot require a party to forgo substantive statutory rights").

[8] One court has ruled that Temu's prohibition of public injunctive relief is unconscionable and denied arbitration of that issue. *Kohler v. Whaleco, Inc.*, 2024 WL 4887538, at *11 (S.D. Cal. Nov. 25, 2024). While the court ruled that the remainder of the dispute (which involved product pricing on Temu, not data privacy), must be arbitrated, the decision is wrongly decided and at odds with the Ninth Circuit's recent decision in *Heckman.* In any event, the court did not consider all of the issues Plaintiffs raise here.

[9] Whether a delegation clause is unconscionable must be decided by the Court. *Rent-A-Center*, 561 U.S. at 78; *De Jesus*, 2021 WL 5991026, at *4 ("unconscionability of an arbitration agreement must be

In sum, the arbitration procedures adopted by the delegation clause contain "multiple substantively unconscionable provisions such that it indicates a systematic effort to impose arbitration not simply as an alternative to litigation, but as an inferior forum." *See MacClelland*, 609 F. Supp. 3d at 1044. The Court may therefore proceed to consider the unconscionability of the arbitration clause, which is riddled with unconscionable provisions for the same reasons. Moreover, these provisions cannot be severed because they permeate the agreement. *Heckman*, 120 F.4th at 688-89.

**C. The FAA Does Not Authorize "Batch" Arbitration.**

Finally, Defendants cannot compel arbitration under the FAA because the FAA does not apply to a novel "batch" arbitration. *Heckman*, 120 F.4th at 691 (Vandyke, J., concurring); *id.* at 690-91 (majority). The Supreme Court has emphasized that "aggregated" arbitration is not "arbitration as envisioned by the FAA." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 351 (2011). Rather, "[i]t was enforcement of a *particular type* of arbitration—bilateral arbitration with its specific advantages and attributes—that Congress set out to protect when it passed the FAA roughly one hundred years ago." *Heckman*, 120 F.4th at 691 (Vandyke, concurring) (citing *Viking River Cruises v. Moriana*, 596 U.S. 639, 651 (2022)). "Simply labeling something as 'arbitration' does not automatically bring it within the ambit of the FAA's protection." *Id.*

**II. Arbitration is Barred Because The Terms Deprive Plaintiffs of Federal Remedies.**

The Terms here further fail because courts compel arbitration of statutory claims only if a "litigant effectively may vindicate its statutory cause of action in the arbitrable forum," and the

resolved first, 'as a matter of state law, before compelling arbitration'"). Moreover, the clause here does not even purport to delegate unconscionability to an arbitrator. As with contract formation, "unconscionability" is a "condition precedent" to arbitration and, as with mutual assent, is "related to" § 20.4—and thus must be decided by the Court. (7/8/23 Terms § 20.7, Ex. A.) Finally, Defendants' assertion in *Hu* that Plaintiffs "lack standing" to raise unconscionability because there are allegedly less than 25 class representatives in *Hu* and *Ziboukh* (*Hu* Doc. 50, at 13) is meritless. Defendants ignore that these are class claims and counsel have been contacted by thousands of class members. (Evans Decl. ¶ 2.)

statute "will continue to serve both its remedial and deterrent function." *Mitsubishi*, 473 U.S. at 637. The clause here acts "as a prospective waiver of a party's right to pursue statutory remedies" and is thus void "as against public policy." *Id.* at 637 n.19; *Cedeno*, 100 F.4th at 408.

The complaint asserts claims under federal (and state) statutes such as the CFAA and ECPA, which allow recovery of attorney fees, punitive damages, and public injunctive relief. 18 U.S.C. § 2520 ("equitable or declaratory relief," "punitive damages," and "reasonable attorney's fee and other … costs"); 18 U.S.C. § 1030(g) ("injunctive relief or other equitable relief").

However, the Terms state that "parties shall bear their own attorneys' fees and costs" (7/8/23 Terms § 19.8, Ex. A), prohibit "exemplary or punitive damages" (*id.* § 15.1), and bar public injunctive relief, authorizing "injunctive relief only in favor of the individual party seeking relief and only to the extent necessary to provide relief warranted by the party's individual claim" (*id.* § 19.4). "'[A]n arbitration agreement may not limit statutorily imposed remedies such as punitive damages and attorney fees.'" *MacClelland*, 609 F. Supp. 3d at 1037.[10]

Similarly, the clause impairs statutory rights by imposing costs that make arbitration prohibitively expensive, especially in a case like this where each consumer's claims for damages are relatively small in comparison with the costs associated with arbitration using burdensome batch arbitration procedures. As the Supreme Court has observed, "the existence of large arbitration costs could preclude a litigant . . . from effectively vindicating her federal statutory rights in the arbitral forum." *Green Tree Fin. Corp. v. Randolph*, 531 U.S. 79, 90 (2000). Forcing thousands of arbitrations of claims of comparatively low dollar value that all pertain to a single unlawful scheme utilizing the same mechanism (the Temu app) and which seek common

[10] The arbitration clause similarly impairs state statutory rights. *E.g.*, *Baker*, 2023 WL 3737808, at *3 (terms sending Illinois BIPA claims to small claims court where injunctive relief was unavailable violated public policy; *MacClelland*, 609 F. Supp. 3d at 1037 (barring public injunctive relief unconscionable).

injunctive relief to be resolved in a fragmented manner employing repetitive, costly and burdensome procedures would frustrate Plaintiffs' ability to "effectively" vindicate their rights. *State Farm*, 120 F.4th at 91-92 (enjoining "thousands of arbitrations" plaintiff alleged were part of a common scheme to "monetize a RICO violation" under "effective vindication" doctrine).

## III. There Was No Agreement To Arbitrate This Dispute Due To The Lack of Mutual Assent, Inadequate Notice, And The Terms' Plain Language.

Arbitration is also barred because (1) there was no mutual assent, (2) there was inadequate notice, and (3) the Terms render the arbitration clause void where, as here, there are rulings holding it unenforceable. While the Court addressed these issues in *Hu*,[11] since the Court ruled, additional evidence and case law have emerged supporting Plaintiffs' position.

### A. The Lack of Mutual Assent Precludes Formation of any Agreement.

"Under New York law, a court may only compel arbitration when 'the evidence establishes … [a] clear, explicit and unequivocal agreement to arbitrate.'" *Meeg v. Heights Casino*, 2020 WL 1493658, at *3 (E.D.N.Y. Mar. 27, 2020); *see also Starke v. SquareTrade, Inc.*, 913 F.3d 279, 293 (2d Cir. 2019) ("a contract requires a 'meeting of the minds'").[12] Here, there is no "clear, explicit and unequivocal" agreement because, among other things, the Terms require a novel "batch" arbitration procedure while simultaneously purporting to require that claims proceed on an "individual" basis and prohibit "mass arbitration". (7/8/23 Terms §§ 1.6, 20.4, 20.9, Ex. A.)[13] Indeed, in *Hu*, Defendants essentially conceded that the Terms were

[11] For the Court's convenience, the Ziboukh Plaintiffs' Amicus submissions are attached as Ex. C.

[12] Defendants' cases concur, noting that "manifestation of assent" must be "unambiguous as a matter of law." *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 76 (2d Cir. 2017). "To form a contract, there must be 'a manifestation of mutual assent'" *Edmundson v. Klarna, Inc.*, 85 F.4th 695, 703 (2d Cir. 2023). "[P]arties may not delegate to the arbitrator the fundamental question of whether they formed the agreement to arbitrate in the first place." *Doctor's Assocs., Inc. v. Alemayehu*, 934 F.3d 245, 251 (2d Cir. 2019).

[13] The clause states "you and Temu will only be permitted to pursue disputes or claims and seek relief against the other party on an individual basis" (7/8/23 Terms § 1.6, Ex. A), claims may be brought "only on an individual basis," and claims "cannot be arbitrated or consolidated with those of any other customer or user" (*id.* § 20.4), yet simultaneously states "[t]his Batch Arbitration provision shall in no way be interpreted as authorizing a class, collective and/or mass arbitration or action of any kind" (*id.* § 20.9) and

not "clear" and "unequivocal", but rather "ambiguous". (*Hu* Doc. 50, at 9-10.) Defendants do not submit any evidence that any Temu users who sought to arbitrate claims have managed to do so to completion, much less that they have been able to obtain relief, under these complex, inconsistent, and one-sided procedures.

Moreover, courts continue to issue decisions demonstrating there can be no agreement to arbitrate under circumstances like those here. For example, a recent New York decision held there was no "meeting of the minds, mutual assent, or intent to be bound sufficient to give rise to a binding and enforceable arbitration agreement" where "'[r]easonable users may not understand that, by simply signing up for future ride services over the Internet, they have entered into a contractual relationship.'" *Rigano v. Uber Technologies*, 218 N.Y.S.3d 799 (N.Y. Sup. Ct. 2024) (quoting *Zambrano v. Acevedo*, 2021 NY Slip Op. 32133 (N.Y. Sup. Ct. Cty. Nov. 05, 2021)). The same is true here, where users would not be aware that by signing up for Temu, an app that allows them to make future purchases, they entered into a contractual relationship in which "the right to trial by jury was being waived," *id.*—much less one that waived a jury trial for unlawful and unauthorized theft of their data.

### B. Defendants Failed To Provide Clear and Conspicuous Notice Of The Terms.

Defendants also failed to provide the "clear and conspicuous" notice of the Terms required to enter into a binding online agreement. *Starke*, 913 F.3d at 293. Courts within this circuit have repeatedly held that no arbitration agreement exists where hyperlinked Terms are not

---

prohibits mass arbitration (*id.* § 20.5). Likewise, the AAA rules the Arbitration Clause adopts do not mention "batch arbitration" at all, but rather provide rules for "consumer arbitration" and "mass arbitration" of consumer claims. https://adr.org/consumer, Ex. D; Consumer Arb. Rules, Ex. E; Mass Arb. Rules, Ex. F at 4. As Defendants acknowledged in *Hu*, these are "AAA's mass arbitration rules," which "incorporated mass arbitration procedures." (*Hu* Doc. 50, at 14 n.9.) Similarly, while the Arbitration Clause states there will be "one set of filing and administrative fees" for each batch (7/8/23 Terms § 20.9, Ex. A), the AAA rules provide a discounted rate for "mass arbitrations." Exs. D, G & H. Finally, while the Arbitration Clause suggests the parties will agree to send each "batch" arbitration to a forum that is "reasonably convenient" for all 100 claimants (7/8/23 Terms § 20.5, Ex. A), the AAA rules state the location will be selected by the arbitrator (Ex. E, p. 15).

sufficiently conspicuous,[14] three federal courts applying these precedents have found that Temu's Terms fail this test, and indeed, found that Defendants sought to "***conceal*** those hyperlinks from conspicuous view." *Johnson v. Whaleco Inc.*, 2023 U.S. Dist. LEXIS 184104, at *8 (M.D. Fla. Oct. 13, 2023); *Smith v. Whaleco Inc.*, 2024 WL 3513800 (W.D. Tex. July 23, 2024); *Eakins v. Whaleco Inc.*, 721 F. Supp. 3d 1252 (W.D. Okla. Mar. 5, 2024).

Among other things, the courts found: (1) the hyperlink to the Terms is not adjacent to the button manifesting assent, (2) the hyperlink is in the smallest font on the page, (3) the hyperlink is not distinguishable from the surrounding text (through bright blue coloring or underline, for example), (4) there are multiple buttons and statements in larger font appearing between the button manifesting assent and the hyperlink, (5) the button manifesting assent does not say "I agree," "Sign up," "Create Account," or "Register," but rather merely states "continue", and (6) the page contains unrelated statements promoting Temu as providing "free shipping" and "free returns". *See Hu*, 2024 WL 4481439, at *11; Ex. J.[15]

[14] *See, e.g.*, *Nicosia*, 834 F.3d at 236-37 (hyperlink not "conspicuous in light of the whole webpage"); *Starke*, 913 F.3d at 294 (hyperlink "spatially decoupled" from assent button); *Specht v. Netscape Comm'cns Corp.*, 306 F.3d 17, 31-32 (2d Cir. 2002) (hyperlink at bottom of webpage); *Applebaum v. Lyft, Inc.*, 263 F. Supp. 3d 454, 466-67 (S.D.N.Y. 2017) (hyperlink in "smallest font on the screen"); *Arnaud v. Doctor's Assocs. Inc.*, 2019 WL 4279268, at *6 (E.D.N.Y. Sept. 10, 2019) ("merely placing the links on the same page as the action button is insufficient"); *Berkson*, 97 F. Supp. 3d at 404; *Hines v. Overstock.com, Inc.*, 668 F. Supp. 2d 362, 367 (E.D.N.Y. 2009). Examples of prompts in these cases are provided in Exhibit I. Other jurisdictions are in accord. *E.g.*, *Berman v. Freeman Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022) ("A web designer must do more than simply underscore the hyperlinked text"); *Cullinane v. Uber Techs., Inc.*, 893 F.3d 53, 64 (1st Cir. 2018) ("the presence of other terms on the same screen with a similar or larger size, typeface, and with more noticeable attributes diminished the hyperlink's capability to grab the user's attention"); *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1177 (9th Cir. 2014); *Wilson v. Redbox Automated Retail, Inc.*, 448 F. Supp. 3d 873, 883 (N.D. Ill. 2020) ("button for the Terms of Use and accompanying disclosure [was] not adjacent to the 'Pay Now' button"); *Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 479 (2021) (hyperlink "at the very bottom of the screen, in smaller text than anything else on the page, and in a grey hue that contrasts less with the dark background than any other text on the page"). Nonetheless, a magistrate issued a decision finding Temu's Terms sufficiently conspicuous. *Silva v. Whaleco, Inc.*, 2024 WL 4487421 (N.D. Cal. Oct. 10, 2024).

[15] While Defendants assert the prompt is a "sign-in wrap agreement[]" (Mem. at 9) rather than "browsewrap", they previously described it as "browsewrap" (Def. Mot. at 7-8, *Fontanez v. Whaleco*, Ex. K), and the prompt nowhere states that users are "signing in" or "registering" an account much less pushing a "sign in" or "sign up" button as in Defendants' examples (*id.*). Accordingly, *Johnson* concluded that the agreement was "browsewrap," 2023 U.S. Dist. LEXIS 184104, at *7. In any event, courts have held that "sign-in" wraps can be particularly problematic and misleading, *Berkson*, 97 F. Supp. 3d at 399,

A recent decision citing these rulings and the Second Circuit cases on which they rely further underscores that this dispute is not arbitrable. In *Bretto v. AMC Entertainment Holdings, Inc.*, the court held that "plaintiffs didn't agree to arbitrate their claim" because "AMC's terms and conditions were 'spatially decoupled' from the 'Purchase' button." 2024 WL 4134844, at *5,*7 (D. Kan. Sept. 10, 2024) (citing *Starke*, 913 F.3d at 294; *Nicosia*, 834 F.3d at 236-37; *Eakins*, 2024 WL 1190766, at *3). The court found that the "larger, brighter, and more important object—the 'Purchase' button—diverts the user's attention away from the notice of terms and conditions," which it concluded was similar to the Temu prompt, where the "'terms of use agreement appears in relatively small font . . . spatially decoupled from the attention-grabbing orange "Continue" button.'" *Id.* at *7, quoting *Eakins*, 2024 WL 1190766, at *3. The court concluded that AMC's prompt thus failed to give "sufficiently conspicuous notice of its terms"—even though (unlike Temu) AMC's hyperlink was "in blue font, 'the color typically used to signify the presence of a hyperlink.'" *Id.* at *8.

As the Second Circuit observed in *Meyer*, arbitration should be denied if "reasonable minds could disagree" about the conspicuousness of the notice. 868 F.3d at 76. That is the case here where multiple courts have found Temu's notice insufficiently conspicuous, courts have approvingly cited their analysis and Second Circuit law on which it relies, and Defendants modified the current prompt to attempt to correct issues the courts raised (Ex. J).[16]

---

and as Defendants' cases recognize, "[t]he categorization of types of web-based contracts … is not dispositive," *Feld v. Postmates, Inc.*, 442 F. Supp. 3d 825, 829 (S.D.N.Y. 2020).

[16] The cases upon which Defendants primarily rely—*Meyer* and *Klarna*—involved much different situations where the terms were "coupled with the user's transaction" at the "instance of purchase" when "a reasonably prudent user would understand that the terms presented on the interface govern the user's future relationship with [merchant]." *Klarna*, 85 F.4th at 706. The registration prompts at issue thus stood in contrast "to the vague references to 'terms and conditions' used in other cases, which we deemed to undermine the conspicuousness of notice." *Id.* at 707.

### C. The Terms' Plain Language and Collateral Estoppel Bar Arbitration.

Arbitration is further barred because (1) the arbitration clause itself precludes arbitration if the batch arbitration provision is deemed invalid or unenforceable, as three courts have held; and (2) these prior decisions collaterally estop Defendants from invoking the clause.

**The Arbitration Clause.** Defendants do not dispute that Temu's Terms provide that, in the event Temu's "batch arbitration" provision is ruled invalid or unenforceable, the entire arbitration clause shall be void. (7/8/23 Terms § 20.11, Ex. A.) As Defendants underscored in a subsequent revision of the Terms, if the "batch arbitration" provision "is found under the law to be ***invalid or unenforceable to any extent,*** then you agree that the entire Arbitration Agreement shall be of no force and effect." (Trinh Decl. Ex. B, § 19.11 (emphasis added).) Here, three courts have held the batch arbitration provision (and the rest of the Terms) invalid.

While Defendants asserted in *Hu* that the decisions "did not address *any* issue of validity or enforceability whatsoever; instead, the issue was whether an agreement to arbitrate had been *formed*" (*Hu* Doc. 50, at 8 n.4), the decisions make clear that "the parties did not enter into a ***valid and binding*** arbitration agreement." *Smith*, 2024 WL 3513800, at *5; *Eakins*, 721 F. Supp. 3d at 1260 ("the parties did not enter into a ***valid*** arbitration agreement.").

**Collateral Estoppel.** Arbitration is independently barred by the doctrine of collateral estoppel. Defendants do not dispute that three courts examined identical prompts and found them inadequate. Nor do Defendants dispute that "'traditional contract formation law does not vary meaningfully from state to state.'" (*Hu* Doc. 50, at 6 n.2, quoting *Klarna*, 85 F.4th at 702-03). Thus, the law and the facts are essentially the same and the *Johnson* decision has been reduced to final judgment, rendering collateral estoppel applicable. *See China Shipping Container Lines Co. Ltd. v. Big Port Serv. DMCC*, 803 Fed. App'x 481, 488 (2d Cir. 2020) (collateral estoppel "preclude[d] [party] from relitigating the existence of an arbitration

agreement" where prior ruling held no agreement to arbitrate existed); *F.T. Maritime Servs. Ltd. v. Lambda Shipholding Ltd.*, 533 F. Supp. 3d 149, 156 (S.D.N.Y. 2021) (collateral estoppel barred arbitration; prior ruling precluded re-litigating "whether an arbitration agreement exists").

Nonetheless, Defendants asserted in *Hu* that it would be unfair to apply collateral estoppel due to alleged inconsistency between a Florida state court decision and the three federal decisions denying arbitration. (*Hu* Doc. 50, at 8.) However, the "unfairness" analysis depends on multiple factors. *Dish Network Corp. v. ACE Am. Ins. Co.*, 431 F. Supp. 3d 415, 427 (S.D.N.Y. 2019). Defendants here had full "incentive to raise [the issue] in the earlier action" and in fact did so, seeking to arbitrate each of the cases. *Id.* Likewise, there were no "procedural opportunities unavailable in the [prior] action[s] that could readily cause a different result" here. *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 331 (1979).[17] Finally, the weight of authority here is against arbitration. Thus, Defendants "received a 'full and fair' opportunity to litigate their claims" before multiple courts and applying collateral estoppel is not "unfair". *Id.* at 332.

**IV. The Delegation and Arbitration Clauses Do Not Apply To This Dispute.**

Setting aside its invalidity, the delegation clause does not even apply to this dispute, which involves the theft of Plaintiffs' data—including theft of data from individuals who never agreed to the Terms or used Temu at all. Accordingly, the claims are not arbitrable.

*First*, there is no "clear and unmistakable" evidence that this dispute was delegated to the arbitrator. *See Nicosia*, 834 F.3d at 229. The delegation clause states that "Dispute[s]" shall be submitted to an arbitrator (7/8/23 Terms § 20.7, Ex. A) and defines "Dispute" as "any dispute, claim, or disagreement arising out of or relating in any way to your access to or use of the

[17] The case on which Defendants rely is further distinguishable because, in declining to apply collateral estoppel, the court noted the outcome would not change because the court "ultimately agree[d]" with the prior decisions. *Dish Network Corp. v. Ace Am. Ins. Co.*, 431 F. Supp. 3d 415, 426 (S.D.N.Y. 2019).

Services, any communications you receive, any products sold or distributed through the Services, or the Terms." (*Id.* § 20.1.) However, the dispute here relates to Defendants' theft of Plaintiffs' data—not "access to or use of the Services," communications received, products sold, or the Terms. None of the causes of action, for example, allege breach of the Terms or seek to rely on the Terms at all. Rather, the claims are all data privacy claims brought by Temu users and non-users alike. As other courts have observed, such privacy-based claims do not "touch on" matters falling within the scope of such arbitration clauses, but rather involve intentional wrongdoing outside the scope of any such agreement. *E.g.*, *Jackson v. Amazon, Inc.*, 65 F.4th 1093, 1103 (9th Cir. 2023) ("wiretapping and invasion of privacy … does not touch on any matters related to the contract that would fall within the arbitration clause"). Moreover, interpreting the agreement in this way would render it "too broad", voiding the "mutual intent" necessary for "contract formation"; "no reasonable person would think that checking a box accepting the 'terms and conditions' necessary to obtain … service" would require them to arbitrate whether Defendants unlawfully stole their data, engaged in illegal "wiretapping" or "hacked" their devices. *See Wexler v. AT & T Corp.*, 211 F. Supp. 3d 500, 504-05 (E.D.N.Y. 2016).

*Second*, the delegation clause expressly excludes disputes like this one. The clause states that "all Disputes arising out of or relating to Section 20.4, including any claim that all or part of Section 20.4 is unenforceable, illegal, void or voidable, or that Section 20.4 has been breached, shall be decided by a court of competent jurisdiction and not by an arbitrator." (7/8/23 Terms § 20.7, Ex. A.) Section 20.4, in turn, contains multiple provisions relating to batch arbitration, prohibiting public injunctive relief and stating that claims may be brought only on "an individual basis and not on a class, representative, or collective basis," may not be "arbitrated on a class, collective, representative, or mass action basis," and "cannot be arbitrated or consolidated with

those of any other customer or user." (*Id.* § 20.4.) Accordingly, this dispute plainly "relates to" Section 20.4, including whether that section is "unenforceable, illegal void or voidable" and is thus excluded from arbitration. In addition, the delegation clause excludes "all Disputes about whether either party has satisfied any condition precedent to arbitration." *Id.* The motion raises whether "conditions precedent" to arbitration are satisfied, such as whether an agreement was formed or the agreement is unconscionable, and thus this exception applies as well.

This Court recently held that claims were not arbitrable under similar circumstances in *J.R. Supermarket, Inc. v. Visa Inc.*, 2024 WL 3823096 (E.D.N.Y. Aug. 14, 2024). There, the Court ruled that there was not "clear and unmistakable evidence" that the delegation clause applied and that the claims fell within the scope of arbitration. While the delegation clause applied to "[a]ny dispute, claim or controversy of any kind or nature" between the parties "arising out of or relating to" either the parties' agreement or their "relationship," the Court found that the dispute fell within an exception in the delegation clause and was not arbitrable. *Id.* at **9-10 (citing *DDK Hotels, LLC v. Williams-Sonoma, Inc.*, 9 F.4th 308, 318-19 (2d Cir. 2021)). Here, the delegation is not as broad, but rather only applies to certain enumerated categories of "Disputes" that do not include the dispute here. Nonetheless, as in *DDK Hotels*, the dispute also falls within multiple express exceptions contained in the delegation clause itself.

## V. Claims Brought By The Minor Class Cannot Be Arbitrated.

The minor Plaintiffs' claims are not arbitrable for additional, independent reasons.[18]

### A. The Minors Did Not Agree to Arbitrate.

As a threshold matter, the minors did not enter into a valid agreement to arbitrate.[19]

[18] Defendants' assertion that minors were added "in a transparent attempt to avoid arbitration" (Mem. at 5) is wrong. Minors were members of the original class. For example, original Plaintiff Jehan Ziboukh used Temu as a minor, and the intent was to include her as a representative of the new minor class (Mem. at 8 n.4). Nonetheless, Defendants' assertion is an implicit concession the minors' claims are arbitrable.

[19] Defendants' claim that minor Plaintiffs "do not … dispute they formed a valid arbitration agreement"

**Inadequate Notice.** Courts have held that a minor "would not be on inquiry notice that she was assenting to" online terms like Temu's. *Doe v. Roblox Corp*., 602 F. Supp. 3d 1243, 1256 (N.D. Cal. 2022). As the court observed in *Roblox*, "[e]ven if the notice would be sufficiently conspicuous and understandable for an adult," it may not be "for a child." *Id.* As the court explained, "[t]he law has long recognized that children have less capacity than adults to assent to contractual terms." *Id.* Thus, "[a] child—even a reasonably prudent one—would not be on inquiry notice that she was assenting to an agreement" presented as a "sign up" button accompanied by a hyperlink to online terms of use, particularly where, as here, the Terms are "complex, dense, and legalistic." *Id.* Likewise, under such circumstances, the child's "manifestations of assent" are "insufficient to show a valid contract was formed." *Id.*

This is particularly true where, as here, a site lacks "age-related protections that some other websites use." *Id.* As the complaint notes, Temu contains no age verification (or inadequate verification) resulting in extensive minor use.[20] (SAC ¶ 446.) Indeed, Defendants specifically target minor users through cartoon ads and other measures. (*Id.* ¶¶ 226-27.) Because there was inadequate notice, no contract was formed.

**No offer, acceptance or mutual assent.** No agreement exists with the minors for an additional reason: Defendants never offered any agreement to minors, and thus there was no offer or acceptance. To establish an agreement, there must be "an offer, acceptance of the offer, consideration, mutual assent, and an intent to be bound." *Solovsky*, 135 F. Supp. 3d at 208. However, Defendants assert that "the Terms expressly prohibit minors from creating accounts"

---

(Mem. at 10) is inaccurate. The minors disputed they entered into a valid arbitration agreement in their pre-motion letter (Doc. 49, at 2 (citing *Roblox*)) and at the status hearing (8/2/24 Hrg. Tr. at 7-8).

[20] Defendants point to language in the Terms prohibiting minor accounts, but they point to no actual enforcement mechanism to prevent minor usage such as age verification, and much of that language was added only after the lawsuit.

(Mem. at 3), citing language stating that, "[t]o use the Services, you represent that you are at least eighteen (18) years old and of legal age to form a binding contract" (7/8/23 Terms § 2.1, Ex. A).[21] Accordingly, Defendants cannot claim there was any agreement with minor users.

A similar situation occurred in *A.D. v. Credit One Bank, N.A.*, where a mother allowed her daughter to use her credit card and even used her minor daughter's cell phone to access the account. 885 F.3d 1054, 1062-63 (7th Cir. 2018). The court held the minor could not have agreed to arbitrate because the terms required authorized users to be at least fifteen years old. *Id.* at 1062. The same is true here where the agreement requires users to be eighteen years or older.

**Unconscionability.** The delegation clause (and the arbitration clause as a whole) is also unconscionable as applied to minor Plaintiffs. As courts have observed, even in cases where online Terms like Temu's are sufficient to bind adult users, they may be "procedurally unconscionable, substantively unconscionable, and unenforceable against a minor." *Doffing v. Meta Platforms*, 2022 WL 3357698, at *6 (D. Or. July 20, 2022). Thus, for example, the court in *Doffing* found that seeking to bind a minor to an arbitration provision "incorporated by reference through a 'Sign up and Accept' screenclick is a quintessential example of a minor being 'overreached,'" and denied arbitration on that ground. *Id.* The same is true here where the delegation clause is buried in complicated and inconsistent fine print in Terms expressly stating that they do not apply to minors under 18. A minor could not be expected to understand or agree to such Terms in any knowing and voluntary manner—particularly minors as young as 9 years old, like the named Plaintiffs here. (*See, e.g.*, J.O. Decl. ¶ 2, A.H. Decl. ¶ 2, Ex. L; SAC ¶¶ 21, 27, 30.)

---

[21] Defendants also cite provisions that were subsequently added to the Terms contemplating that children over 13 could use the services if they did so through a parental account, but those provisions did not exist in earlier versions of the Terms issued before the lawsuit was filed. (*See, e.g.,* Ex. B.)

### B. The Minors Disaffirmed Any Alleged Agreement.

Even if a contract had been created, as Defendants acknowledge (Mem. at 11), minors have "an absolute right to disaffirm" such agreements. *See Solovsky*, 135 F. Supp. at 208; *Hantash v. V Model Mgmt. N.Y., Inc.*, 2007 WL 2324326, at *1 (S.D.N.Y. Aug. 7, 2007) ("infant has an absolute right to disaffirm" contracts); *Doffing*, 2022 WL 3357698, at *5 ("contracts executed by a minor may be disaffirmed by the minor"). Here, the minors disaffirm any alleged agreement—including the delegation clause and the arbitration clause as a whole—and thus Defendants' motion should be denied. (Pls.' Decls., Ex. L; SAC ¶¶ 18, 21, 27, 30.)

Contrary to Defendants' suggestion (Mem. at 11-12), whether the minors disaffirmed the Terms is not a question for the arbitrator. *First*, the delegation clause does not mention disputes with minors at all, much less disputes regarding whether their "'contracts are subject to rescission'" or they have a "'right to disaffirm a contract'". (*Id.* at 11.) Nor would one expect the delegation clause to do so given that the Terms expressly state that users had to be "of legal age to form a binding contract" and that individuals under 18 could not enter into the Terms. (7/8/23 Terms § 2.1, Ex. A.) There would be no need to address disputes regarding a minor's recission of the contract because minors would not be subject to the Terms at all. Defendants' attempt to shoehorn this issue into the delegation clause by characterizing it as a matter of "enforceability" fails. The issue is not one of "enforceability"; as Defendants' own cases make clear, it is whether the contract can be "rescinded" or "disaffirmed". Moreover, according to Defendants, minors would never even be parties to the Terms because "the Terms expressly prohibit minors from creating accounts." (Mem. at 3.)

*Second*, Defendants' assumption that this issue can be delegated to the arbitrator in the first place is wrong. Courts have held that issues regarding the mental capacity of a plaintiff to enter into an agreement, such as the capacity of a minor to form a contract, cannot be delegated

to an arbitrator because they relate to contract formation. *E.g.*, *Spahr v. Secco*, 330 F.3d 1266, 1273 (10th Cir. 2003) (court must decide Alzheimer patient's "mental incapacity defense" to arbitration). Defendants do not cite any Second Circuit law to the contrary, but rather certain out-of-jurisdiction decisions that reflect a split of authority on this issue. *E.g.*, *K.F.C. v. Snap Inc.*, 29 F.4th 835 (7th Cir. 2022); *In re StockX Customer Data Sec. Breach Litig.*, 19 F.4th 873 (6th Cir. 2021). As the dissent in *StockX* observed, the Sixth Circuit itself had previously adopted the opposite position, considering "a mental-capacity challenge as a challenge based on a contract's formation." *Id.* at 887 (Moore, J., dissenting).[22] Accordingly, the dissenting judge indicated she "would hold that a minor who has disaffirmed a contract is not subject to the contract's delegation provision." *Id.* at 888.

**Estoppel Does Not Apply.** Defendants' contention that the minors are estopped from disaffirming the Terms because they allegedly received a benefit from "being able to use the Temu service to shop for and purchase goods" (Mem. at 13) is incorrect for multiple reasons.

*First*, estoppel does not apply because Plaintiffs do not base their claims on the Terms; rather, they bring statutory and tort claims for invasion of privacy. As courts have held in rejecting estoppel theories as a basis for compelling arbitration in other data privacy litigation, "a party must knowingly seek the benefits of a contract before equitable estoppel will apply," and plaintiffs do not "'knowingly exploit the contract when they bring claims that "do not arise out of the contract," but rather "sound in tort."' *In re: Ring LLC Privacy Litig.*, 2021 WL 455722, at *3 (C.D. Cal. Sept. 3, 2021) (quoting *B.F. v. Amazon Inc.*, 858 Fed. Appx 218 (9th Cir. Apr. 23, 2021) (children not required to arbitrate wiretapping claims)); *Comer v. Micor, Inc.*, 436 F.3d

[22] The Supreme Court in *Buckeye Check Cashing, Inc. v. Cardegna* cited *Spahr* and recognized that courts had held that "it is for courts to decide ... whether the signor lacked the mental capacity to assent," but declined to address the issue. 546 U.S. 440, 444 n.1 (2006).

1098, 1102 (9th Cir. 2006) (estoppel inapplicable where no contract claims); *Arbogast v. Sky Zone, LLC*, 2024 WL 3378936, at *12 (D.W.V. July 11, 2024) ("equitable estoppel does not apply" because "contract does not give rise to this action"); *Townsend v. Quadrant Corp.*, 173 Wash. 2d 451, 465 (2012) (children not required to arbitrate under estoppel theory because their claims "do not arise out of the contract" but rather "sound in tort").[23]

The court's decision in *Wojcik v. Midland Credit Management, Inc.*, is instructive. There, the court held that "Defendant cannot invoke equitable estoppel to enforce the Arbitration Provision against Plaintiff because Plaintiff's suit against Defendant is not based 'on the contract.'" 2019 WL 3423567, at *6 (E.D.N.Y. July 30, 2019). Rather, plaintiff brought claims under a federal statute governing debt collection practices. *Id.* The court acknowledged that "absent [the credit card] Agreement," there would be no debt to collect. *Id.* Nonetheless, it held that, "'[f]or a plaintiff's claims to rely on the contract containing the arbitration provision, the contract must form the legal basis of those claims; it is not enough that the contract is factually significant to the plaintiff's claims or has a 'but-for' relationship with them.'" *Id.*

*Second*, courts have held that such equitable theories do not apply where, as here (*see* Ex. L), plaintiffs disaffirm the entire agreement. *See, e.g., T.K. v. Adobe Sys. Inc.*, 2018 WL 1812200, at *5 (S.D. Cal. Oct. 2, 2024) ("[T]he fact that [plaintiff] used ACCP for fourteen months and retained these benefits does not mean that she is bound by the terms of the disaffirmed contract. 'Disaffirmance by a minor rescinds the entire contract, rendering it a nullity.'"); *I.B. v. Facebook, Inc.*, 905 F. Supp. 2d 989, 1001 (N.D. Cal. 2012) ("'minors, if they would disaffirm a contract, must disaffirm the entire contract, not just the irksome provisions'").

[23] In contrast, cases Defendants cite like *J.P. v. Educational Testing Servs.*, involve situations where "all of Plaintiffs' theory of recovery depend on their contracts with Defendants, and therefore Plaintiffs cannot disaffirm the contracts while seeking their benefits." 2021 WL 3519916, at *4 (C.D. Cal. Apr. 15, 2021).

Defendants' cases are not to the contrary. For example, in *E.K.D. v. Facebook, Inc.*, the court indicated a minor plaintiff could not disaffirm a forum selection clause while seeking to continue to enforce the remaining contract terms. 885 F. Supp. 2d 894, 900 (S.D. Ill. 2012).[24] As subsequent cases have explained, "*E.K.D.* [was] limited to enforceability of a forum selection clause and did not rule on the minor's right to disaffirm the entire agreement." *I.B.*, 905 F. Supp. 2d at 1002; *T.K.*, 2018 WL 1812200, at *5 ("a minor cannot disaffirm only parts of a contract").

*Third*, even under Defendants' legally-flawed theory, as a matter of fact, Plaintiffs here did not "benefit" from the Terms. Rather, they were significantly harmed by Defendants' unlawful data collection and other deceptive practices. While Defendants assert that minors "benefited" by being able to "shop and pay for goods" on Temu, where they did so, they *paid* for the goods.

Courts have rejected such attenuated "benefit" theories. In *Credit One Bank*, for example, the court held that a child could not be required to arbitrate under her mother's credit card agreement even though her mother allowed her to make purchases using the card. 885 F.3d at 1057. The court concluded that "the ability to use the credit card to make purchases" was not a sufficient "benefit" to support an estoppel theory. *Id.* at 1064. The same is true here where the alleged benefit from being able to "make purchases" is too attenuated.

*Fourth*, New York courts have held that even where such equitable theories apply, they do not bar a minor from disaffirming, but rather only provide a potential basis for offsetting damages by the value of any "benefits" the minor obtained. As the court explained in *CBS, Inc. v. Tucker*, "[t]he court is unable to conclude that New York law precludes an infant from disaffirming a contract, made during infancy, simply because the contract has been of benefit to

[24] *T.K. Through Leshore v. Bytedance Tech Co.*, did not address the merits of this issue, but rather was an unpublished opinion approving a settlement agreement. 2022 WL 888943 (N.D. Ill. Mar. 25, 20222).

the infant." 412 F. Supp. 1222, 1227 n.6 (S.D.N.Y. 1976). Rather, at most, "had a benefit been received, its value would have been deducted from the consideration recovered by the infant." *Id.* Similarly, in *Doffing*, the court held that "a minor will not be bound by a contract that she entered during infancy," regardless of any alleged benefits received. 2022 WL 335769, at *6.

*Finally*, policy considerations preclude equitable estoppel. "The importance of protecting minors from 'the machinations of other people' and from 'their lack of judgment or experience' is especially pronounced in the context of a mandatory arbitration agreement. A minor is far less likely than an adult to understand the meaning and the implications of an arbitration agreement . . . . Public policy therefore favors Plaintiff's right to disaffirm the Arbitration Agreement." *Palma v. Hat World, Inc.*, 2024 WL 660242, at *5 (C.D. Cal. Jan. 10, 2024).

**C. Minors Who Never Created An Account Never Entered into Any Agreement.**

Minors who used Temu but never created an account did not agree to arbitration for an additional reason: like non-users, they never executed Temu's Terms.[25] Defendants' contention that "equitable doctrines" may bind such minors to the Terms fails for multiple reasons.

*First*, New York courts have made clear that minors cannot be bound by contracts signed by third parties. Thus, for example, New York courts have held that "'[a] minor is not bound by a release executed by his parent.'" *Difrancesco v. Win-Sum Ski Corp. Eyeglasses*, 2017 WL 1046741, at *7 (W.D.N.Y. Mar. 20, 2017) (quoting *Alexander v. Kendall Cent. Sch. Dist.*, 634 N.Y.S.2d 318, 319 (4th Dep't 1995)). The cases Defendants cite do not hold to the contrary. For example, the primary case Defendants cite involved a husband who used his wife's account—not a minor. *Nicosia v. Amazon.com, Inc.*, 384 F. Supp. 3d 254, 274 (E.D.N.Y. 2019).[26]

[25] Defendants do not identify which, if any, named Plaintiff would fall in this category.

[26] *Nicosia v. Amazon.com, Inc.* was an unpublished summary order that by its terms has no precedential effect. *See* 815 F. App'x 612 (2d Cir. 2020).

*Second*, courts have rejected efforts to bind non-signatories to arbitration agreements in data privacy litigation like this where Plaintiffs bring statutory or tort-based causes of action. In *B.F. v. Amazon.com, Inc.*, for example, the court ruled that children who did not agree to Amazon's terms could not be compelled to arbitrate even though their parents had agreed to them. As the court observed "[g]enerally, non-signatories are not bound by a contract's arbitration clause because 'a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" 858 Fed. App'x at 220. As the court explained, "Plaintiffs are not asserting any right or looking to enforce any duty created by the contracts between their parents and Amazon. Instead, Plaintiffs bring only state statutory claims that do not depend on their parents' contracts. In other words, irrespective of those agreements, Amazon would owe to Plaintiffs the legal duty that Plaintiffs claim has been violated." *Id.* at 221. The same is true here.

*Finally*, the contract here expressly states: "There are no third-party beneficiaries intended under these Terms." (7/8/23 Terms § 19.2, Ex. A.) *See Coatney v. Ancestry.com*, 93 F.4th 1014, 1027 (7th Cir. 2024) (non-signatory children not required to arbitrate because "Terms do not suggest they benefit anyone other than the signatory and [defendant]"). The language Defendants cite from the current Terms stating that users "will accept full responsibility for any unauthorized use of the Services by minors" (Trinh Decl. Ex. B, § 2.3) does *not* say that "the account-holder's acceptance of the Terms should be attributed to the minor" (Mem. at 15)—just the opposite: the *account holder* has "full responsibility" for use by minors, which is "*unauthorized*". Moreover, such language was not even included in the Terms in effect before this lawsuit was filed. *See supra* n.2. But even if such language were in the Terms, it would not compel arbitration, and the minors could disaffirm any alleged agreement. *Doffing*, 2022 WL 3357698, at *1 (minors could disaffirm agreement even though it expressly

allowed minors to "use the Services with the prior consent of your parent or legal guardian"); *supra* § V.B.[27]

## VI. Claims Against Defendant PDD Holdings Inc. Cannot Be Arbitrated.

The arbitration clause likewise does not apply to claims against PDD Holdings because, as Defendants acknowledge, PDD Holdings "is not a named party to the Terms." (Mem. at 17.) "Arbitration is a matter of contract and consent, and . . . disputes are subject to arbitration if, and only if, the parties actually agreed to arbitrate those disputes." *Coinbase*, 602 U.S. at 145. Accordingly, "[i]f a signatory to an agreement is to be required to arbitrate with a nonsignatory party, the agreement must so provide in express language." *City of Almaty, Kazakhstan v. Sater*, 2021 WL 4940304, at *4 (S.D.N.Y. Oct. 22, 2021); *Republic of Iraq v. ABB AG*, 769 F. Supp. 2d 605, 612-13 (S.D.N.Y. 2011) (same), *aff'd*, 472 F. App'x 11 (2d Cir. 2012).

Here, PDD Holdings is not a signatory to the Terms of Use. Accordingly, the arbitration clause does not mention PDD Holdings at all, much less state in "express language" that consumers are "required to arbitrate with a nonsignatory party." *Sater*, 2021 WL 4940304, at *4. Indeed, the Terms affirmatively disclaim any third-party beneficiaries, stating: "There are no third-party beneficiaries intended under these Terms." (7/8/23 Terms § 19.12, Ex. A.) "Where, as here, the arbitration clause is limited to the signatory parties and the agreement states that it is intended exclusively to govern the rights of the signatory parties, the language of the contract evinces the parties' intent to arbitrate arbitrability with the signatories and no one else." *Doe v. Trump Corp.*, 6 F.4th 400, 411 n.7 (2d Cir. 2021); *see also CCC Intelligent Solutions Inc. v. Tractable Inc.*, 36 F.4th 721, 723-24 (7th Cir. 2022) (nonsignatory business that used an alias

---

[27] Defendants complain that Plaintiffs "withheld" minors' account identifiers, email addresses and phone numbers without any "legal basis" "thereby preventing Temu from identifying their account records." (Mem. at 7 &n.3.) But it is Defendants who urged the Court to enter an order prohibiting discovery; they cannot now complain about that order.

when executing arbitration agreement could not compel arbitration because it was "not a party").

Defendants nonetheless argue that PDD Holdings may invoke the arbitration clause "under an estoppel theory." (Mem. at 17.) This theory fails for several reasons.

*First*, a "necessary circumstance" for estoppel to apply is "a relationship among the parties which either supported the conclusion that [the party opposing arbitration] had consented to extend its agreement to arbitrate to [the non-signatory], or, otherwise put, made it inequitable for [the party opposing arbitration] to refuse to arbitrate on the ground that it had made no agreement with [the non-signatory]." *Sokol Holdings, Inc. v. BMB Munai, Inc.*, 542 F.3d 354, 361-62 (2d Cir. 2008); *Ross v. Am. Express Co.*, 547 F.3d 137, 146 (2d Cir. 2008). Here, the Terms do not mention PDD Holdings at all, much less make it a party to the arbitration clause. To the contrary, the Terms affirmatively disclaim any third-party beneficiaries. Accordingly, consumers reading the Terms would not be aware of PDD Holdings, much less understand that they were giving PDD Holdings any right to compel arbitration. (Pls.' Decls., Ex. L., ¶ 5.) The Second Circuit has held that estoppel does not apply under such circumstances where "the plaintiffs were unaware of any corporate relationship between [the] signatory [defendant] and the non-signatory defendants" and there was "no evidence to suggest that the plaintiffs treated the defendants as if they were effectively parties to the … agreement." *Trump Corp.*, 6 F.4th at 414.[28]

*Second*, the Second Circuit has also held that where "the non-signatory is alleged to be a third-party wrongdoer as it is here, … the arbitration contract 'in no way' extends to the non-

[28] While Defendants focus on the relationship between Whaleco and PDD Holdings, the relationship between the Defendants "is beside the point because the inquiry turns on the closeness between [the non-signatory] and the consent of the signatories he wishes to estop, Plaintiffs." *Sater*, 2021 WL 4940304, at *6 (citing *Sokol*, 542 F.3d at 361). Rather, it is the relationship between Plaintiffs and the non-signatory (PDD Holdings) that matters. Here, "Plaintiffs did not have a sufficiently close relationship with [the non-signatory, PDD Holdings] as to infer their consent to arbitrate with [it]." *Id.* Moreover, as in *Sater*, the nonsignatory took steps to "hid[e] [its] affiliation from Plaintiffs." *Id.*

signatory." *Id.* at 413-14 (citing *Sokol*, 542 F.3d at 362). As the court explained in *Trump Corp.*, "[t]here is no unfairness in denying estoppel to a third-party wrongdoer aligned with a signatory in effectuating allegedly wrongful business practices." *Id* at 414. That is the case here where Plaintiffs allege that PDD Holdings engaged in wrongful business practices, including "obscur[ing] and conceal[ing]" its relationship to the signatory defendant Whaleco (as in *Trump Corp.*) and stealing Plaintiffs' data. As stated in the complaint, commentators have described PDD Holdings as a "'fraudulent company'" that uses "'cleverly hidden spyware'" to steal user data (SAC ¶ 101), and Defendants specifically sought to "obscure and conceal" PDD Holdings' role with respect to Temu (*id.* ¶¶ 72-73.)

*Third*, for estoppel to apply, it is "essential" that the claims in the lawsuit must be based on "the contract providing for arbitration." *Sokol*, 542 F.3d at 362; *Ross*, 547 F.3d at 146. The New York cases Defendants cite involve situations in which plaintiffs expressly based their claims on the agreement.[29] Here, in contrast, Plaintiffs bring statutory and common-law privacy claims—not contract-based causes of action. Thus, estoppel is inapplicable because Plaintiffs' claims are not based on "'the agreement that the estopped party had signed.'" (*See* Mem. at 17.)

*Finally*, to the extent Defendants make factual assertions in support of their theory, they are inconsistent with the position they take in their motion to dismiss PDD Holdings for lack of personal jurisdiction. As Defendants acknowledge in a footnote, they "dispute Plaintiffs'

---

[29] *E.g.*, *Astra Oil Co., Inc. v. Rover Navigation, Ltd.*, 344 F.3d 276, 280-81 (2d Cir. 2003) (breach of contract); *Choctaw Generation Ltd. P'ship v. Am. Home Assurance Co.*, 271 F.3d 403, 407 (2d Cir. 2001) (dispute over interpretation of liquidated damages provision); *Smith/Enron Cogeneration Ltd. v. Smith Cogeneration Int'l, Inc.*, 198 F.3d 88, 98 (2d Cir.1999) (signatory claimed non-signatories fraudulently induced contract); *see also Al-Nahhas v. Rosebud Lending LZO*, 2023 WL 5509320, at *11 (N.D. Ill. Aug. 25, 2023) (denying arbitration because plaintiff was not "simultaneously assert[ing] that a defendant owes it a contractual duty but that the arbitration provision found in the contract does not apply"); *Oldham v. Nova Mud, Inc.*, 2022 WL 17618106, at *5 (D.N.M. Dec. 13, 2022) (denying arbitration: "[t]he logic of [*Choctaw*] does not apply here as Plaintiff is seeking to enforce statutory rights as opposed to those arising from the breach of a contract").

characterization of the relationship between Temu and PDD Holdings and deny PDD Holdings' involvement in any conduct alleged in the SAC." (Mem. at 18 n.9.) Indeed, they characterize PDD Holdings as a passive holding company that "does not operate any substantive business." (Zhang Decl. ¶ 6.) The Court need not reach these facts because, as noted, the prerequisites for application of estoppel are not present. Nonetheless, the inconsistency in PDD Holdings' position in the two motions is a further basis for denying equitable relief here.[30]

## VII. Discovery Would Provide Further Grounds for Denial of Defendants' Motion.

Finally, while the arbitration clause (and Terms) are invalid on their face, as discussed in the attached declaration, discovery would produce further confirmation that this dispute should not be arbitrated.[31] (*See* Evans Decl. ¶¶ 3-6.) Moreover, Defendants have submitted a fourteen-page declaration making a series of factual assertions based on undisclosed company "records" in Defendants' possession. (*See* Trinh Decl.) Discovery is necessary so that Plaintiffs have an opportunity to review these records and test Defendants' factual assertions. *See Zachman v. Hudson Valley Fed. Credit Union*, 49 F.4th 95, 103 (2d Cir. 2022) (remanding for discovery).

## CONCLUSION

For the foregoing reasons, Defendants' motion to compel arbitration should be denied.

---

[30] The estoppel inquiry is "fact-specific." *Ross*, 547 F.2d at 144. In *In re Titanium Dioxide Antitrust Litig.*, the court held the facts may not be "sufficient to work an estoppel" even though the complaint alleged the non-signatory was a "co-conspirator." 962 F. Supp. 2d 840, 851 (D. Md. 2013). In *Denny v. BDO Seidman, LLP*, the Second Circuit "remand[ed] the cause to the District Court to enable it to consider the merits of the estoppel claim," 412 F.3d 58, 70 (2d Cir. 2005), and on remand, the district court ruled that estoppel did *not* apply, *Denney v. Jenkins & Gilchrist*, 412 F. Supp. 2d 293, 300 (S.D.N.Y. 2005). Finally, *Coons v. Yum Brands, Inc.*, is inapposite and wrongly decided. The court ruled a non-signatory defendant must arbitrate based on a lone decision holding that a non-signatory *plaintiff* who "alleged an agency relationship [with another plaintiff] as *the basis for its standing* in the suit" must arbitrate. 672 F. Supp. 3d 626, 636 (S.D. Ill. 2006). Plaintiffs here do not allege they have any agency relationship.

[31] *Bradley v. Meijer Stores, L.P.*, 2023 WL 3042984, at *1 (N.D. Ill. Apr. 23, 2023) ("[T]he FAA entitles [a] party to discovery"); *Hamby v. Power Toyota Irvine*, 798 F. Supp. 2d 1163, 1164 (S.D. Cal. 2011) ("A party opposing a motion to compel arbitration is entitled to discovery relevant to the issue of unconscionability."); *Clemins v. GE Money Bank*, 2011 WL 6148676, at **1-2 (E.D. Wis. Dec. 8, 2011) (information "provided to customers", number of opt outs, and costs of arbitration are discoverable).

Dated: January 3, 2025

Respectfully submitted by,

**HAGENS BERMAN SOBOL SHAPIRO LLP**

*/s/ Jeannie Evans*

Jeannie Evans (Bar No. 6296339)
HAGENS BERMAN SOBOL SHAPIRO LLP
455 N. Cityfront Plaza Dr., Suite 2410
Chicago, IL 60611
Telephone: (708) 628-4962
Facsimile: (708) 628-4952
jeannie@hbsslaw.com

Steve W. Berman (Bar No. 3126833)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com

Nathaniel A. Tarnor, #4742797
HAGENS BERMAN SOBOL SHAPIRO LLP
68 3rd Street, Suite 249
Brooklyn, NY 11231
Telephone: (212) 752-5455
Facsimile: (917) 210-3980
nathant@hbsslaw.com

**ALPHEUS LLC**

Douglas G. Smith
77 West Wacker Drive, Suite 4500
Chicago, IL 60601
Telephone: (312) 451-6708
dsmith@alpheusllc.com

*Attorneys for Plaintiffs*