**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

JEHAN ZIBOUKH, MARGRET PHILIE, VERA FIGLOCK, NICOLE MAY, TYANA DAUGHTERY, SOLALIZ HERNANDEZ, DEBRA KRYSTYN, I.E., A MINOR, CYNTHIA RODRIGUEZ, J.P., A MINOR, MIGUEL ACOSTA, VINSON MANGOS, NOAH KUPPER, J.P., A MINOR CHRISTIAN VEGA, A.H., A MINOR, AND OLAYA BOURAKKADI AMRANI, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

WHALECO INC. d/b/a TEMU, and PDD HOLDINGS INC.,

Defendants.

Case No. 1:24-cv-03733-MKB-RML

District Judge Margo K. Brodie

Magistrate Judge Robert M. Levy

**DEFENDANTS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THEIR MOTION TO DISMISS CLAIMS OF THE "NON-USER" PLAINTIFFS**

Date: February 18, 2025

Serrin Turner
Matthew Valenti
Hadrian Luo
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, New York 10020
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
Email: serrin.turner@lw.com
matthew.valenti@lw.com
hadrian.luo@lw.com

## TABLE OF CONTENTS


PRELIMARY STATEMENT ..... 1

ARGUMENT ..... 2

I. THE NON-USERS LACK ARTICLE III STANDING ..... 2

A. The Non-Users Identify No Injury Particular to Any Named Plaintiff ..... 2

B. The Non-Users Rely on Mere Speculation Their Data Was Collected ..... 3

C. The Non-Users Allege No Harm from Any Purported Access to Their Data ..... 5

II. THE NON-USERS FAIL TO STATE A CLAIM ..... 6

A. The Non-Users Plead No Plausible Factual Basis for Their Claims ..... 6

B. The Non-Users' Claims Also Fail for Claim-Specific Reasons ..... 8

1. Computer Hacking Claims (Counts 1 and 12) ..... 8

2. Wiretapping Claims (Counts 2, 5, and 17) ..... 9

3. Invasion of Privacy Claims (Counts 3, 8, 10, 13, 14, and 22) ..... 10

4. Negligence Claim (Count 7) ..... 11

5. Unjust Enrichment (Count 8) ..... 11

6. BIPA (Count 9) ..... 12

7. Consumer Protection Statutes (Counts 4, 11, 15, 16, and 21) ..... 13

8. Larceny and Conversion Claims (Counts 18 and 19) ..... 14

9. Virginia Computer Crimes Act (Count 20) ..... 14

III. THE COURT LACKS PERSONAL JURISDICTION OVER PDD HOLDINGS ..... 15

A. Plaintiffs Fail to Identify Any Contacts PDD Holdings Has with New York ..... 15

B. Plaintiffs' Various Legal Theories for Personal Jurisdiction Are Meritless ..... 16

C. Jurisdictional Discovery Is Not Warranted ..... 20

CONCLUSION ..... 20

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*A.W.L.I. Grp., Inc. v. Amber Freight Shipping Lines*,
828 F. Supp. 2d 557 (E.D.N.Y. 2011) ....19

*Aerotel, Ltd. v. Sprint Corp.*,
100 F. Supp. 2d 189 (S.D.N.Y. 2000) ....15

*Ainette v. Market Basket, Inc.*,
2021 WL 3371037 (S.D.N.Y. 2021) ....16, 18

*Andrews v. Sirius XM Radio Inc.*,
932 F. 3d 1253 (9th Cir. 2019) ....9

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ....6

*Badger v. CUNY Graduate Ctr.*,
2023 WL 2811107 (S.D.N.Y. 2023) ....8

*Bohnak v. Marsh & McLennan Cos., Inc.*,
79 F.4th 276 (2d Cir. 2023) ....5, 10

*Calcano v. Swarovski N. Am. Ltd.*,
36 F.4th 68 (2d Cir. 2022) ....6

*Calhoun v. Google LLC*,
526 F. Supp. 3d 605 (N.D. Cal. 2021) ....14

*Carpenter v. McDonald's Corp.*,
580 F. Supp. 3d 512 (N.D. Ill. 2022) ....12

*Chen v. Dunkin' Brands, Inc.*,
954 F.3d 492 (2d Cir. 2020) ....16

*Christie v. Hyatt Corp.*,
2024 WL 2387513 (E.D.N.Y. 2024) ....17

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ....3, 5

*Collins v. MCA Receivables, LLC*,
2024 WL 246111 (S.D.N.Y. 2024) ....9

*DiPizio v. Empire State Dev. Corp.*,
745 F. App'x 385 (2d Cir. 2018) ....................................................................................7

*DNC v. Russian Fed'n*,
392 F. Supp. 3d 410 (S.D.N.Y. 2019)..............................................................................9

*Doe by & through Doe v. Apple Inc.*,
2022 WL 17538446 (S.D. Ill. 2022) ...............................................................................12

*Donner v. DER SPIEGEL Gmbh & Co. KG*,
2024 WL 4035215 (S.D.N.Y. 2024)................................................................................18

*E.H. v. Meta Platforms, Inc.*,
2024 WL 557728 (N.D. Cal. 2024), MTD Opp. 26-27 ...................................................13

*Elkind v. Revlon Consumer Prods. Corp.*,
2015 WL 2344134 (E.D.N.Y. 2015)..................................................................................2

*Gardiner v. Walmart, Inc.*,
2021 WL 2520103 (N.D. Cal. 2021) ...............................................................................14

*George Moundreas & Co. SA v. Jinhai Intelligent Mfg. Co. Ltd.*,
2021 WL 168930 (S.D.N.Y. 2021)..................................................................................17

*Greenland Asset Mgmt. Corp. v. MicroCloud Hologram, Inc.*,
197 N.Y.S.3d 924 (N.Y. Sup. Ct. 2023) .........................................................................16

*Griffith v. TikTok, Inc.*,
2024 WL 5279224 (C.D. Cal. 2024)................................................................................14

*Hammond v. The Bank of N.Y. Mellon Corp.*,
2010 WL 2643307 (S.D.N.Y. 2010)..................................................................................6

*Hassan v. U.S.*,
441 F. App'x 10 (2d Cir. 2011) ........................................................................................5

*hiQ Labs, Inc. v. LinkedIn Corp.*,
273 F. Supp. 3d 1099 (N.D. Cal. 2017) ............................................................................8

*Hunter v. Deutsche Lufthansa AG*,
863 F. Supp. 2d 190 (E.D.N.Y. 2012) .............................................................................16

*In re Meta Pixel Tax Filing Cases*,
724 F. Supp. 3d 987 (N.D. Cal. 2024) ......................................................................12, 13

*Jerge v. Potter*,
2000 WL 1160459 (W.D.N.Y. 2000) ..............................................................................20

*Khorloo v. John C. Heath Att'y at Law, PLLC*,
2020 WL 1530735 (N.D. Ill. 2020) ....................14

*La Russo v. St. George's Univ. Sch. of Med.*,
936 F. Supp. 2d 288 (S.D.N.Y. 2013), *aff'd*, 747 F.3d 90 (2d Cir. 2014) ....................6, 12

*Liau v. Weee! Inc.*,
2024 WL 729259 (S.D.N.Y. 2024)....................5

*Linde v. Arab Bank, PLC*,
262 F.R.D. 136 (E.D.N.Y. 2009)....................20

*LivePerson, Inc. v. 24/7 Customer, Inc.*,
83 F. Supp. 3d 501 (S.D.N.Y. 2015)....................9

*Maddox v. Bank of N.Y. Mellon Tr. Co., N.A.*,
19 F.4th 58 (2d Cir. 2021) ....................3, 6

*Mednik v. Specialized Loan Servicing, LLC*,
2021 WL 707285 (E.D.N.Y. 2021)....................18

*Opperman v. Path, Inc.*,
87 F. Supp. 3d 1018 (N.D. Cal. 2014) ....................8

*Pervasive Software, Inc. v. Lexware GmbH & Co. KG*,
688 F.3d 214 (5th Cir. 2012) ....................15

*Pruchnicki v. Envision Healthcare Corp.*,
845 F. App'x 613 (9th Cir. 2021)....................13

*Pryce v. Progressive Corp.*,
2022 WL 1085489 (E.D.N.Y. 2022)....................3

*Roe v. Amgen Inc.*,
2024 WL 2873482 (C.D. Cal. 2024)....................14

*Salazar v. Nat'l Basketball Ass'n*,
118 F.4th 533 (2d Cir. 2024) ....................5

*Saskatchewan Healthcare Employee's Pension Plan v. KE Holdings Inc.*,
718 F. Supp. 3d 344 (S.D.N.Y. 2024)....................7

*Schatzki v. Weiser Cap. Mgmt., LLC*,
2012 WL 2568973 (S.D.N.Y. 2012)....................9

*Singh v. Google LLC*,
2022 WL 94985 (N.D. Cal. 2022) ....................13

*Snyder v. Fantasy Interactive, Inc.*,
2012 WL 569185 (S.D.N.Y. 2012)....9

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016)....2

*Stutman v. Chem. Bank*,
95 N.Y.2d 24 (N.Y. 2000)....13

*Stutts v. De Dietrich Grp.*,
465 F. Supp. 2d 156 (E.D.N.Y. 2006)....17, 19

*Swarts v. The Home Depot, Inc.*,
2023 WL 5615453 (N.D. Cal. 2023)....13

*Thackurdeen v. Duke Univ.*,
660 F. App'x 43 (2d Cir. 2016)....19

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021)....4

*Twin Beauty LLC v. NR Interactive LLC*,
2024 WL 5108153 (E.D.N.Y. 2024)....19

*U.S. v. Zhou*,
2025 WL 218831 (E.D.N.Y. 2025)....10

*Van Buren v. United States*,
593 U.S. 374 (2021)....9

*Wynne v. Commonwealth*,
18 Va. App. 459 (1994)....15

*Yamashita v. Scholastic, Inc.*,
2017 WL 74738 (S.D.N.Y. 2017)....8

**STATUTES**

15 U.S.C. § 6801....11

18 U.S.C. § 1030(g)....9

Cal. Penal Code § 502....9

New York General Business Law § 349....13

Virginia Computer Crimes Act....14

## RULES

CPLR 302(a) ........................................................................ 17, 18

CPLR 302(a)(1) ........................................................................ 18

CPLR 302(a)(2) ........................................................................ 19

CPLR 302(a)(3) ........................................................................ 19

Rule 4(k)(2) ........................................................................ 19, 20

Rule 8 ........................................................................ 1, 6, 7, 8

Rule 12(b)(6) ........................................................................ 6, 7

## REGULATIONS

45 CFR § 164.502 ........................................................................ 11

## PRELIMARY STATEMENT

Plaintiffs' Opposition does not fix any of the deficiencies that doom the Non-Users' claims.

*First*, the Non-Users lack Article III standing. There is not a single allegation in the SAC—even a conclusory one—identifying any specific data allegedly collected about any specific named Non-User. That is because the Non-Users have no basis to assert Temu collected their data, let alone that they were harmed as a result. Plaintiffs' Opposition has no real answer to these arguments, but instead merely repeats the speculative, conclusory, and non-particularized allegations in the SAC and insists they are enough to establish standing. They are not—and the Non-Users' claims should be dismissed for this reason alone.

*Second*, the Non-Users do not allege a sufficient factual basis for their claims. Their theory that the Temu app hacks users' phones to collect Non-User data is not plausibly pled. It is sourced entirely from a short-seller report that merely speculates that the Temu app *could* operate as spyware on user devices, without ever alleging facts sufficient to show that it *does* so. That is not enough to satisfy Rule 8—a deficiency that cuts across all of the Non-Users' claims. Their claims also fail for various other, claim-specific reasons, none of which Plaintiffs persuasively rebut.

*Third*, all claims against PDD Holdings are separately subject to dismissal for lack of personal jurisdiction, because PDD Holdings has no significant contacts with New York, as averred in the Declaration of Kairui Zhang. Unable to refute these facts, Plaintiffs instead try to impute to PDD Holdings the business contacts that its subsidiaries have with New York. These arguments mischaracterize PDD Holdings' public statements—which nowhere assert that PDD Holdings itself does business in New York—and misapply the law—which makes clear that separate corporate entities cannot be conflated for purposes of assessing personal jurisdiction.

For all these reasons, the Non-Users' claims against both Defendants should be dismissed.

## ARGUMENT

### I. THE NON-USERS LACK ARTICLE III STANDING

The Non-Users do not sufficiently allege that Defendants ever accessed, collected, or did anything else with their data, let alone that they suffered any injury as a result. The Non-Users instead merely speculate that Defendants collected unspecified "non-user" data from unspecified devices in unspecified ways—and that *their* (unspecified) data may have been collected as a result. These claims are a textbook example of the sort of speculative injuries that do not give rise to Article III standing. Nothing in the Opposition cures this fundamental flaw.

#### A. The Non-Users Identify No Injury Particular to Any Named Plaintiff

*First*, Plaintiffs fail to identify any injury that is particularized to the Non-Users. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) ("For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'"). The law is clear that "named plaintiffs who [purport to] represent a class 'must allege and show that *they personally have been injured*, not that injury has been suffered by other, unidentified members of the class to which they belong.'" *Id.* at 338 n.6.[1] Yet the Opposition, like the SAC, makes only generalized allegations about data collection from "non-users," without identifying any particular data allegedly collected from any particular named Non-User. *See, e.g.*, MTD Opp. 5 ("The complaint explains in detail how Temu collected data from non-users[.]"). In fact, other than identifying the parties to the case, neither the SAC nor the Opposition even mentions the *name* of any Non-User, let alone explains how any of them suffered a concrete injury. This failure alone requires dismissal. *See Elkind v. Revlon Consumer Prods. Corp.*, 2015 WL 2344134, at *4 (E.D.N.Y. 2015) ("[I]f none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the

---

[1] Unless otherwise indicated, all internal citations and quotations are omitted, and all emphasis is added.

defendants, none may seek relief on behalf of himself or any other member of the class.”).

Plaintiffs’ only response is that they have standing because the SAC alleges that “the named plaintiffs … have incurred harm” and that “[n]amed non-user plaintiffs shared sensitive data with Temu users … that were subject to collection by the Temu app.” MTD Opp. 9 (citing SAC ¶ 251). These generic allegations still leave unanswered whether any data was *actually* collected *from any specific Non-User*, and if so, what it was. Plaintiffs cannot establish standing through claims of harm to unidentified “non-users,” particularly based on their data only being “subject to” collection. *See Pryce v. Progressive Corp.*, 2022 WL 1085489, at *9 (E.D.N.Y. 2022) (“As is well established in this Circuit, … the speculative injuries of unnamed class members are insufficient to confer Article III standing upon a class representative.”).

**B. The Non-Users Rely on Mere Speculation Their Data Was Collected**

More fundamentally, Plaintiffs do not allege facts sufficient to show that the Temu app actually collects non-users’ data—whether the Non-Users named here or *any* non-users. MTD 9-13. Plaintiffs instead attempt to lower the bar, claiming that they need not plead that Defendants collected or misused their data because mere “unauthorized *access*” suffices. MTD Opp. 2-4. This confuses the elements of their claims with Article III standing requirements—and misses the point.[2] Whether they claim Temu “collected” or “accessed” their data, the SAC fails because it rests on the same baseless chain of speculation—viz., that the Temu app not only has the *ability* to “hack” a user’s phone, but *also* that it actually *did* so, *and* that it did so on a phone containing sensitive data of a named Non-User, and *further* that Defendants actually collected (or “accessed”) that particular data. MTD 11-12; *Clapper v. Amnesty Int’l USA*, 568 U.S. 398, 412 (2013).

[2] Plaintiffs assert that for “most of [their] privacy claims … all that is required is unauthorized access,” and then cite every statute they claim Defendants violated. MTD Opp. 4. But the elements of their statutory claims do not, by themselves, establish standing. *See Maddox v. Bank of N.Y. Mellon Tr. Co., N.A.*, 19 F.4th 58, 64 (2d Cir. 2021) (“[I]n suits for damages plaintiffs cannot establish Article III standing by relying entirely on a statutory violation[.]”).

The Non-Users contend that the SAC contains "extensive factual allegations" of concrete injuries, MTD Opp. 5, but they merely repeat, at length, the Grizzly Report's allegations about what the Temu app purportedly *can* do, without alleging facts sufficient to show the app *actually did* collect data of any Non-User. *Id.* 5-8, 10-15. They thus end up with an utterly conclusory summary of their basis for standing: "The complaint alleges each non-user communicated with a Temu user, [and] had data stored on a user device and collected, which must be accepted as true." *Id.* 13. Similarly, their Appendix A is merely a nine-page chart of conclusory allegations from the SAC—*e.g.*, that "Temu violates the privacy rights of individuals who never signed up for the Temu app" and "non-users … were subjected to data collection," *id.*, App. A at 5, 6. It is not enough to state such conclusions; Plaintiffs must support them with well-pled facts.

Plaintiffs cite no case extending Article III standing based on such conclusory allegations. They cite *TransUnion* for the proposition that "intangible harms" like "intrusion upon seclusion" can support Article III standing. *Id.* at 2 (citing *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021)). But the problem is that the Non-Users do not sufficiently allege any "intrusion" into their data in the first place. Indeed, *TransUnion* only underscores the lack of facts needed to support standing here. In *TransUnion*, the Supreme Court held that one class of plaintiffs had standing, because false information about them was *undisputedly disclosed* to third parties, which plausibly inflicted reputational harm. 594 U.S. at 432. By contrast, the Supreme Court held that a second class lacked standing because they alleged only the "mere *risk*" that their data *could* be improperly disclosed. *Id.* at 436. That is, at most, all the Non-Users allege here—the "mere risk" that their data has been collected by Temu, not any actual collection of it. *Id.*

Plaintiffs' reliance on *Bohnak* and *Salazar* further underscores this deficiency. MTD Opp. 3-4. In each case, the named plaintiff pointed to well-pled facts—not conjecture—that *their* data

was *actually* collected by an allegedly unauthorized party. In *Bohnak*, the defendant suffered a data breach and specifically informed the plaintiff that an "unauthorized actor … gained access to her PII [personally identifiable information]." *Bohnak v. Marsh & McLennan Cos., Inc.*, 79 F.4th 276, 281, 289 (2d Cir. 2023) (cleaned up). Similarly, in *Salazar*, there was no dispute that the user plaintiff's video viewing history was collected by Facebook, allegedly without his consent. *Salazar v. Nat'l Basketball Ass'n*, 118 F.4th 533, 538 n.3 (2d Cir. 2024) (explaining that plaintiff alleged he watched videos on defendant's website while logged into Facebook, causing his viewing history to be sent to Facebook). No similar facts are pled here. Rather, the Non-Users' claims rest on the mere possibility that data was collected about them. Such claims are "necessarily conjectural" and insufficient for standing. *See* MTD 11-12; *Clapper*, 568 U.S. at 412; *Hassan v. U.S.*, 441 F. App'x 10, 11 (2d Cir. 2011) (rejecting standing based on claims of what "might" happen).

### C. The Non-Users Allege No Harm from Any Purported Access to Their Data

Even if the Non-Users sufficiently alleged that Defendants collected or accessed their sensitive data, they would still lack standing because they do not allege any resulting harm. Plaintiffs claim only that "named non-user Plaintiffs have received spam texts and emails advertising Temu and that '[n]on-users … have likewise experienced … fraudulent charges.'" MTD Opp. 9 (citing ¶ 252). These boilerplate allegations—which, again, are not associated with any specific named Non-User—do not cut it.

As Defendants explained, MTD 12-13, spam is insufficient to allege an Article III injury. *See Liau v. Weee! Inc.*, 2024 WL 729259, at *6 (S.D.N.Y. 2024) ("[C]ourts have generally rejected the theory that unsolicited calls or emails constitute an injury in fact."). The remaining alleged harms are limited to one conclusory paragraph in the SAC, claiming that unidentified "non-users" experienced fraudulent charges, and that "[n]amed plaintiffs"—without specifying if any Non-User was among them—"[spent] time and money" to address them. MTD Opp. 9 (citing SAC

¶ 252). In addition to lacking any meaningful detail, these allegations are facially absurd. The implicit notion—that Temu operates a scheme to hack into users' phones, collects data of non-users on those phones, which for some reason includes non-users' *credit card information*, and then uses that information to *make fraudulent purchases*—makes zero sense. More is required to plausibly allege harm. *See Ashcroft v. Iqbal*, 556 U.S. 662, 663–64 (2009) (in applying the Rule 8 plausibility standard, a court is free to "draw on its experience and common sense"); *Calcano v. Swarovski N. Am. Ltd.*, 36 F.4th 68, 76 (2d Cir. 2022) ("Plaintiffs' threadbare assertions are conclusory and do not raise a reasonable inference of injury.").[3]

## II. THE NON-USERS FAIL TO STATE A CLAIM

The Non-Users fail to state a claim under Rules 8 and 12(b)(6) for the same reasons they lack standing. They do not plausibly allege that Defendants actually collected specific sensitive data about them, and therefore they cannot establish any claim notionally premised on such misconduct. *La Russo v. St. George's Univ. Sch. of Med.*, 936 F. Supp. 2d 288, 305 (S.D.N.Y. 2013) ("[A] complaint based on speculation alone does not state a claim."), *aff'd*, 747 F.3d 90 (2d Cir. 2014). While the Non-Users' claims should be dismissed for that reason alone, they also fail for various claim-specific reasons, none of which the Opposition rebuts.

### A. The Non-Users Plead No Plausible Factual Basis for Their Claims

Plaintiffs have no plausible basis to allege that Defendants collect data from any non-users—whether the named Non-Users or non-users generally. As a result, none of the Non-Users' claims are sufficiently pled under *Twombly* and Rule 8.

[3] The Non-Users' allegations that they face a risk of future identity theft, MTD Opp. 9, are equally absurd, and *TransUnion* in any event holds that a mere risk of future harm is not sufficient for standing. *See supra* at p. 4; *Maddox*, 19 F.4th at 64 ("*TransUnion* established that in suits for damages plaintiffs cannot establish Article III standing by relying entirely on a statutory violation or risk of future harm[.]"); *Hammond v. The Bank of N.Y. Mellon Corp.*, 2010 WL 2643307, at *9 (S.D.N.Y. 2010) (no standing where "Plaintiff's alleged injuries are solely the result of a perceived and speculative risk of future injury that may never occur" and he "failed to show an actual resulting injury").

Plaintiffs' theory that Temu hacks its users' phones to collect data about non-users is based solely on an uncorroborated short-seller report (the Grizzly Report). MTD 5-6. Courts view such allegations with skepticism, and for good reason. *Id.* 13-14. Plaintiffs assert that courts credit short-seller reports on occasion, MTD Opp. 14-15, but there is no basis to do so here. Even Plaintiffs' cases make clear that "caution regarding short seller reports … is warranted" and "there is still greater need for care" where—like here—the short-seller report relies on "unidentified sources" rather than "interviews by plaintiffs' counsel." *Saskatchewan Healthcare Employee's Pension Plan v. KE Holdings Inc.*, 718 F. Supp. 3d 344, 381 (S.D.N.Y. 2024).

Regardless, even taking the Grizzly Report at face value, it only speculates about what the Temu app has the *ability* to do—not what it does—and even in that limited respect, only if the device user has granted certain permissions to Temu. MTD 4-5. Plaintiffs have no response to this, but instead simply continue pointing to the Grizzly Report's allegations about what the app supposedly *could* do. MTD Opp. 12 (citing Grizzly Report allegation that "Temu *is able* to hack your phone"). Plaintiffs do cite one vague assertion that Temu collects data "as soon as the app is loaded" (*id*. 11 (citing SAC ¶ 111)), but the only information specified is the device's unique MAC address, which is merely a device identifier of *the user* of the app. SAC ¶ 107; *see also* MTD 4. Accordingly, the Report says nothing about any *actual* collection of sensitive data about non-users.

The Non-Users nonetheless proceed to speculate that Defendants actually collected sensitive non-user data and that they did so for the named Non-Users, but they offer up only conclusory assertions on this point, *e.g.*: "The complaint alleges each non-user communicated with a Temu user, had data stored on a user device and collected, which must be accepted as true." MTD Opp. 13. Plaintiffs' failure to allege any plausible basis for this fundamental premise of their claims renders the SAC insufficient under Rules 8 and 12(b)(6). *See DiPizio v. Empire State Dev.*

*Corp.*, 745 F. App'x 385, 390 (2d Cir. 2018) (dismissing complaint for failure to allege "specific facts that plausibly support a claim" after "stripping away the complaint's conclusory statements, none of which [were] entitled to an assumption of truth"). Without stating what data was collected about whom or how, the SAC fails to provide adequate notice of the basis for the Non-Users' claims such that Defendants have the ability to investigate the facts. MTD 13-15; *see Badger v. CUNY Graduate Ctr.*, 2023 WL 2811107, at *2 (S.D.N.Y. 2023) ("[T]he Court must determine whether those [alleged] facts make it plausible – not merely possible – that the pleader is entitled to relief."); *see also Yamashita v. Scholastic, Inc.*, 2017 WL 74738, at *2 (S.D.N.Y. 2017) (dismissing complaint where lack of specificity showed it "is nothing more than a fishing expedition" and "Rule 8 does not permit such aimless trawling").

### B. The Non-Users' Claims Also Fail for Claim-Specific Reasons

#### 1. Computer Hacking Claims (Counts 1 and 12)

The Non-Users argue that their hacking claims survive because "[n]either the CFAA nor the CCDAFA contain any requirement that Plaintiff must 'own,' 'possess,' or 'control' the physical device or computer that Defendants accessed." MTD Opp. 16-17. The Court should reject this interpretation of the statutes. Hacking statutes like the CFAA and CCDAFA are rooted in the concept of "computer 'trespass,'" and courts generally interpret them "by examining general principles which govern trespass law"—which are designed to protect the *property* interests of the owner of the property trespassed upon. *See hiQ Labs, Inc. v. LinkedIn Corp.*, 273 F. Supp. 3d 1099, 1109, 1111 (N.D. Cal. 2017) ("The CFAA was intended [] to deal with 'hacking' or 'trespass' onto private [] computers."); *Opperman v. Path, Inc.*, 87 F. Supp. 3d 1018, 1053 (N.D. Cal. 2014) ("The [C]CDAFA authorizes *the owner of the computer* [to] bring a civil action … .").

This principle is reflected in the type of loss or damages that are cognizable under the two statutes. Under the CFAA, loss or damages must "relate to the victim's computer systems."

*LivePerson, Inc. v. 24/7 Customer, Inc.*, 83 F. Supp. 3d 501, 513–14 (S.D.N.Y. 2015).[4] Similarly, under the CCDAFA, compensatory damages include only remediation costs relating to the victim's system. *See* Cal. Penal Code § 502 (defining "compensatory damages" as "any expenditure reasonably and necessarily incurred *by the owner or lessee* to verify that a computer system, computer network, computer program, or data was or was not altered, damaged, or deleted"). The Non-Users do not specify any loss or damage relating to their computer systems—nor can they, because they are not alleging *their* computers were hacked. Their harm allegations arising from the collection or misuse of their data are not a viable substitute. *See Van Buren v. United States*, 593 U.S. 374, 392 (2021) (finding CFAA's "loss" and "damage" definitions "ill fitted … to remediating 'misuse' of sensitive information"); *Andrews v. Sirius XM Radio Inc.*, 932 F. 3d 1253, 1262-63 (9th Cir. 2019) (finding "loss" definition did not cover alleged loss of value of data).[5]

**2. Wiretapping Claims (Counts 2, 5, and 17)**

Plaintiffs acknowledge that wiretapping entails the *interception* of communications while *in transit*. MTD Opp. 18. That element is "construed narrowly" to mean "contemporaneous with the transmission of that communication." *DNC v. Russian Fed'n*, 392 F. Supp. 3d 410, 446 (S.D.N.Y. 2019); *Snyder v. Fantasy Interactive, Inc.*, 2012 WL 569185, at *2 (S.D.N.Y. 2012) (explaining that interception includes "only acquisitions of communication contemporaneous with transmission, *not storage*"). The Non-Users do not satisfy that element because their theory is that

---

[4] *See also Collins v. MCA Receivables, LLC*, 2024 WL 246111, at *8 (S.D.N.Y. 2024) (dismissing CFAA claim because plaintiffs "do not allege … that they suffered any losses relating to their computer systems"); *Schatzki v. Weiser Cap. Mgmt., LLC*, 2012 WL 2568973, at *3 (S.D.N.Y. 2012) ("'Loss' is interpreted narrowly … and it 'includes only costs actually related to computers.'").

[5] Moreover, in addition to requiring "loss" or "damage," the CFAA's civil remedy section requires at least one of several aggravating factors, none of which Plaintiffs adequately allege here. *See* 18 U.S.C. § 1030(g) (cross-referencing factors set forth in § 1030(c)(4)(A)(i)). In particular, Plaintiffs do not allege "loss" aggregating at least $5,000 in value. And to the extent that Plaintiffs rely on an alleged "threat to public health and safety," SAC ¶ 273, § 1030(c)(4)(A)(i)(IV))—a provision manifestly designed to address attacks causing disruption to computers that support health and safety systems—they have not pled any facts that remotely support that conclusion.

Temu "hacks" users' devices and collects the Non-Users' data *in storage*. MTD 17; SAC ¶¶ 132, 133, 282 (alleging collection of the Non-Users' data that is "stored information on a Temu user's device" or "on users' computers" or phones).

Plaintiffs' response that they are "alleging real-time collection of Plaintiffs' data," MTD Opp. 18, rings hollow. Some of the allegations Plaintiffs identify do not even apply to the Non-Users. For example, they point to allegations that the Temu app "tracks … Temu *users'* website activity" (*id.*, citing SAC ¶ 283), and cite cases about cookies and pixels (*id.* at 18-19), which also relate to how a website tracks that activity of its *users*. The remaining allegations—*e.g.*, that Temu is "spyware"—do not specifically allege contemporaneous interception of communications. Nowhere do Plaintiffs allege specific facts sufficient to show that any of the Non-Users' communications were intercepted in real time. Their wiretapping claims thus fail.

### 3. Invasion of Privacy Claims (Counts 3, 8, 10, 13, 14, and 22)

The Non-Users' invasion of privacy claims fail because they depend on the flawed premise that they have a reasonable expectation of privacy in data they sent to some unidentified third party. MTD 18; *see U.S. v. Zhou*, 2025 WL 218831, at *4 (E.D.N.Y. 2025) ("[T]here is 'no legitimate expectation of privacy in information [an individual] voluntarily turns over to third parties.'"). Plaintiffs again rely on *Bohnak* and *Salazar*, which are inapposite for the reasons stated above, and neither case addressed whether the plaintiff lacked a reasonable expectation of privacy. *Supra* I.B. In *Bohnak*, for example, "[a]s a condition of [her] employment, Defendants required that she entrust her PII" to them, which may well create an expectation of privacy, 79 F.4th at 281, while here the Non-Users do not identify who received their data and for what purpose.

The Non-Users' response that dismissing their privacy claims on this ground would "render privacy laws a nullity" (MTD Opp. 21) is a non sequitur, because nowhere do they allege that data collected about the Non-Users was protected by any special privacy laws—*e.g.*, laws that protect

information about health, insurance, or finances in certain circumstances.[6] They do not allege sufficient facts showing that such circumstances apply here because they do not allege any specific facts about the data supposedly collected about them in the first place.

**4. Negligence Claim (Count 7)**

The negligence claim, as presented in the SAC, is premised on a supposed data breach claimed to have been committed by someone calling himself "smokinthashit," which Temu denies and which Plaintiffs offer no evidence of it actually occurring. SAC ¶ 178; *see* MTD 19-20. It appears Plaintiffs have withdrawn reliance on this fictional data breach, as the Opposition nowhere speaks of it. Instead, Plaintiffs now assert their negligence claims rest on *other* unspecified data breaches. MTD Opp. 21-22 ("Nor are these allegations based on a single alleged data breach.").

Plaintiffs identify no other breach, however. They instead point to anonymous complaints filed with the Better Business Bureau by persons stating they experienced fraudulent charges after using Temu. MTD Opp. 22 (citing SAC ¶ 177). These complaints could be rooted in many things other than a data breach, including users unknowingly falling prey to scam websites masquerading as Temu—a problem Temu itself has sued to stop.[7] Regardless, the cited reports clearly do not concern any data breach of Temu somehow affecting *non-users* of the services—and certainly not the named Non-Users. Because Plaintiffs identify no such breach, their negligence claim fails.

**5. Unjust Enrichment (Count 8)**

Plaintiffs do not respond to Defendants' argument that the Non-Users fail to identify what specific data of theirs was supposedly "harvested," or how the Non-Users could have conferred

---

[6] *See, e.g.*, 45 CFR § 164.502 (requiring health providers to protect health data); 15 U.S.C. § 6801 *et seq.* (requiring financial institutions to protect consumer financial data); 15 U.S.C. § 6801 *et seq.* (protecting personal information held by credit reporting agencies).

[7] *See* Technode.com, *Temu Takes Legal Action Against Scam Sites to Safeguard Consumers*, https://technode.com/2023/11/10/temu-takes-legal-action-against-scam-sites-to-safeguard-consumers, Nov. 10, 2023.

any benefit on Defendants when they do not even claim to use the Temu service. MTD 20. Instead, Plaintiffs again simply list general categories of purportedly sensitive data that Temu supposedly collected (*e.g.*, "social security numbers" and "passport data"), without identifying any particular data belonging to any particular Non-User—or explaining why a Non-User would be sending such data to someone else's cell phone. MTD Opp. 22-23; *La Russo*, 936 F. Supp. 2d at 305 ("[A] complaint based on speculation alone does not state a claim."). The cases on which Plaintiffs rely are readily distinguishable. For example, in *In re Meta Pixel Tax Filing Cases*, 724 F. Supp. 3d 987, 1008–09 (N.D. Cal. 2024), the plaintiffs were Meta users and identified specific data that Meta allegedly collected about each of them—neither of which is the case here.

**6. BIPA (Count 9)**

Plaintiffs bring a BIPA claim on behalf of Illinois Non-Users, which here could apply only to Plaintiff Miguel Acosta. Plaintiffs do not even mention Acosta's name, let alone articulate any specific instance of Defendants collecting his biometric data. Instead, Plaintiffs allege that the Temu app can access the microphone and camera on a device. MTD Opp. 23-24. Plaintiffs seem to be alleging that Temu could have taken control of the microphone or camera on a user's device to record audio or snap a photo of Acosta. Besides being utterly speculative, this allegation is insufficient as matter of law because biometric information under BIPA does not include mere photos/videos or audio recordings—absent any well-pled allegation (which Plaintiffs do not make here) that Defendants use that information to extract a "faceprint" or "voiceprint" capable of identifying the person. *See Doe by & through Doe v. Apple Inc.*, 2022 WL 17538446, at *4 (S.D. Ill. 2022) (holding that "photographs are not biometric identifiers"); *Carpenter v. McDonald's Corp.*, 580 F. Supp. 3d 512, 515 (N.D. Ill. 2022) ("[A] voiceprint, which is a record of mechanical measurement [covered by BIPA], is not the same as a simple recording of a voice.").

### 7. Consumer Protection Statutes (Counts 4, 11, 15, 16, and 21)

As Defendants explained, Plaintiffs' deception claims fail because they do not allege that the Non-Users were exposed to any deceptive information from Temu. MTD 21-22. Plaintiffs now assert that their claims are premised on omission, MTD Opp. 26, but the same problem holds: they fail to explain how the Non-Users could have relied on or been injured by alleged omissions when they were not exposed to any information from Temu rendered misleading by an omission. *See Singh v. Google LLC*, 2022 WL 94985, at *11 (N.D. Cal. 2022) ("Without exposure to the alleged misstatements, [a plaintiff] could not rely on those misstatements (or be misled by [defendant's] *omission of additional information*) and thus could not [be injured] under [the] statutes.").[8]

The Non-Users' claims based on alleged unfair conduct fare no better,[9] as they fail to identify any pecuniary harm cognizable under the state statutes. MTD 21. Plaintiffs rely on an outlier case for the proposition that "privacy harms involving personal data can constitute an injury to money or property sufficient to provide standing under the [California] UCL." *In re Meta Pixel Tax Filing Cases*, 724 F. Supp. 3d at 1024; MTD Opp. 24-25. That is the minority view, as multiple courts in "this Circuit have found [] that the 'mere misappropriation of personal information' does not establish compensable damages" sufficient to proceed with a UCL claim. *Pruchnicki v. Envision Healthcare Corp.*, 845 F. App'x 613, 615 (9th Cir. 2021); *see also Swarts v. The Home Depot, Inc.*, 2023 WL 5615453, at *748 (N.D. Cal. 2023) ("Numerous courts have held that disclosure of personal information alone does not constitute economic or property loss sufficient

[8] Plaintiffs rely on *E.H. v. Meta Platforms, Inc.*, 2024 WL 557728, at *4 (N.D. Cal. 2024), MTD Opp. 26-27, but this case was wrongly decided in light of the California Court of Appeal decision in *Pfizer*, which holds that plaintiffs who were never exposed to the allegedly deceptive information could not state a deception claim under UCL. 182 Cal. App. 4th at 631-33; *see also Singh*, 2022 WL 94985, at *11.

[9] New York General Business Law §349 governs "deceptive acts or practices" only and does not apply to unfair business conduct unrelated to deception. *See Stutman v. Chem. Bank*, 95 N.Y.2d 24, 29 (N.Y. 2000) ("A plaintiff under Section 349 must prove … the challenged act or practice was … misleading[.]").

to establish UCL standing … .”); *Gardiner v. Walmart, Inc.*, 2021 WL 2520103, at *8 (N.D. Cal. 2021) (“Courts have widely held that ‘personal information’ does not constitute [such lost] money or property under the UCL.”).[10]

**8. Larceny and Conversion Claims (Counts 18 and 19)**

Plaintiffs do not state larceny or conversion claims for several reasons. First, they cannot claim any property interest in their supposedly collected data. MTD 22. Plaintiffs cite (at MTD Opp. 27) *Calhoun v. Google LLC*, 526 F. Supp. 3d 605 (N.D. Cal. 2021), but *Calhoun* is inapposite, as courts have recognized in rejecting the same argument Plaintiffs advance here. *See, e.g., Roe v. Amgen Inc.*, 2024 WL 2873482, at *8 (C.D. Cal. 2024) (distinguishing *Calhoun* because it was decided on standing grounds, and agreeing “with the weight of the authority” that plaintiffs cannot plead “lost money or property” based on disclosure of data). Second, even if there were any such property interest, “Plaintiffs have not shown that Defendants collected any sensitive information from them.” *Griffith v. TikTok, Inc.*, 2024 WL 5279224, at *12 (C.D. Cal. 2024). Third, Plaintiffs bring a statutory larceny claim under California Penal Code § 484 (SAC ¶ 478), which requires “not only that [Defendants] made specific false representations to them, but also that [P]laintiffs transferred their property to [Defendants] in reliance on the representation.” *Amgen*, 2024 WL 2873482, at *7. Again, the Non-Users do not claim to have had any interactions with Defendants, and they therefore cannot allege they relied on any statements by Defendants. *Supra* II.B.7.

**9. Virginia Computer Crimes Act (Count 20)**

The Non-Users argue that they meet the VCCA’s third element because Defendants used “false pretenses” to collect their data. MTD Opp. 28. But Defendants could not have interacted

---

[10] The same holds in Illinois. *See Khorloo v. John C. Heath Att’y at Law, PLLC*, 2020 WL 1530735, at *2 (N.D. Ill. 2020) (“It seems unlikely that the [Illinois] statute allows plaintiffs to recover damages for privacy violations because the [statute] is concerned with fraudulent or unfair advertising, not with individual privacy rights.”).

under false pretenses with the Non-Users—because by definition the Non-Users had no interactions with Temu—nor can they rely on interactions that Temu *users* allegedly had. *See Wynne v. Commonwealth*, 18 Va. App. 459, 460 (1994) (explaining that "false pretenses [must have] *induced the owner* to part with his property"). Plaintiffs try to salvage the remainder of this claim with vague references to categories of data Defendants allegedly collected, but again they do not specify any particular data collected about any particular Non-User. MTD Opp. 28.

## III. THE COURT LACKS PERSONAL JURISDICTION OVER PDD HOLDINGS[11]

### A. Plaintiffs Fail to Identify Any Contacts PDD Holdings Has with New York

The Opposition identifies no valid basis for exercising personal jurisdiction over PDD Holdings, a foreign holding company with no business in or other contacts with New York. Instead, Plaintiffs do little more than continue pointing to generic statements in PDD Holdings' investor filings about the operations of its portfolio businesses. MTD Opp. 35. These statements reflect nothing more than a standard parent-subsidiary relationship and are insufficient to ground personal jurisdiction, as Defendants explained. MTD 28; *see also Aerotel, Ltd. v. Sprint Corp.*, 100 F. Supp. 2d 189, 193 (S.D.N.Y. 2000) (declining to extend jurisdiction over foreign Sprint entity based on its statement that "Sprint built and operates the United States' only nationwide all-digital, fiber optic network," reasoning that "[t]hese statements … cannot create a single entity structure given the sophistication and complexity of today's corporate world").

The other bases that Plaintiffs cite for exercising jurisdiction over PDD Holding are insufficient as a matter of law and/or directly refuted by the Zhang Declaration. For example, Plaintiffs assert that PDD Holdings has a registered agent in New York. MTD Opp. 39-40. Not

[11] If the Court dismisses the Non-Users' claims for lack of standing or failure to state a claim, it need not decide whether the Court also lacks personal jurisdiction over PDD Holdings. Because standing is a threshold question, it must be decided before any other issue, including personal jurisdiction. *See Pervasive Software, Inc. v. Lexware GmbH & Co. KG*, 688 F.3d 214, 231-32 (5th Cir. 2012).

only is that factually incorrect, *see* Zhang Decl. ¶¶ 7-8 ("[PDD Holdings] is not registered to do business in New York or in the United States … [and] has never appointed any agent for service of process in New York"), it does not give rise to jurisdiction anyway, *see Chen v. Dunkin' Brands, Inc*., 954 F.3d 492, 499 (2d Cir. 2020) ("[A] foreign corporation does not consent to general personal jurisdiction in New York by merely registering to do business in the state and designating an in-state agent for service of process[.]").[12]

At bottom, Plaintiffs have no genuine basis to dispute the Zhang Declaration, which confirms that PDD Holdings is separate from Temu and does not itself have sufficient contacts with the State of New York. The Zhang Declaration therefore should be fully credited and, based on its averments, the Court should decline to exercise personal jurisdiction over PDD Holdings. *See Ainette v. Market Basket, Inc.*, 2021 WL 3371037, at *7 (S.D.N.Y. 2021) (rejecting personal jurisdiction given that defendant "presented statements made under penalty of perjury, by corporate representatives with knowledge, that [it] is organized under the laws of Germany and is headquartered there … and that the company has no office, employees, or assets in New York").

### B. Plaintiffs' Various Legal Theories for Personal Jurisdiction Are Meritless

Plaintiffs try several other routes to claim jurisdiction over PDD Holdings, but they all fail because PDD Holdings does no business in, and has no other relevant contacts with, New York.

**No General Jurisdiction.** Plaintiffs argue that PDD Holdings is subject to general jurisdiction under the New York long-arm statute, MTD Opp. 37-40, but PDD Holdings is a

---

[12] Plaintiffs also point to a contract between Pinduoduo Inc. and Deutsche Bank, which "empowers Law Debenture Corporate Services Inc." as Pinduoduo's process agent. *See* Evans Decl., Ex. AA. But designating a process agent for a specific contract does not establish that PDD Holdings does business in New York or has an agent of service for all disputes. *See Hunter v. Deutsche Lufthansa AG*, 863 F. Supp. 2d 190, 201 (E.D.N.Y. 2012) ("A company's submission to jurisdiction and service of process in New York pursuant only to isolated contracts does not thereby signal its unrestricted consent to personal jurisdiction in New York for all future claims brought against it."). Plaintiffs also note that PDD Holdings is listed on the Nasdaq exchange, but as Defendants already explained, MTD 28-29, "[a] corporation listing its shares on a stock exchange does not constitute doing business in the State and does not confer jurisdiction." *Greenland Asset Mgmt. Corp. v. MicroCloud Hologram, Inc*., 197 N.Y.S.3d 924 (N.Y. Sup. Ct. 2023).

Cayman Islands entity with a principal place of business in Ireland. SAC ¶ 32. "[O]ther than in 'exceptional cases,' a corporation is 'at home' only in its state of incorporation and in the state of its principal place of business." *George Moundreas & Co. SA v. Jinhai Intelligent Mfg. Co. Ltd.*, 2021 WL 168930, at *4 (S.D.N.Y. 2021). Plaintiffs offer no reason why this is an "exceptional case." Even foreign entities that have *significant* business in New York are not subject to general jurisdiction here. *See Christie v. Hyatt Corp.*, 2024 WL 2387513, at *3 (E.D.N.Y. 2024).

Plaintiffs appear to rely on a "mere department" or "agent" theory of general jurisdiction, arguing Temu is "part of [PDD Holdings'] business" due to "common ownership." MTD Opp. 38-39. The theory fails because it boils down (again) to pointing to PDD Holdings' corporate relationship with Temu, and the law is clear that "[t]he presence of the subsidiary alone does not establish the parent's presence in the state." *Stutts v. De Dietrich Grp.*, 465 F. Supp. 2d 156, 162-63 (E.D.N.Y. 2006) (rejecting plaintiffs' reliance on statement on foreign parent's website that subsidiary was a "USA partner," because it did not show "that the [parent] had an office, a bank account [or any other sufficient contacts with] New York"). Even if Temu were a "mere department," that would not somehow imply that PDD Holdings is subject to general jurisdiction in New York, because *Temu* is not subject to general jurisdiction here, as it is a Delaware corporation with its principal place of business in Massachusetts. SAC ¶ 33. "Plaintiffs cannot impute jurisdiction to Defendants when they fail to show general jurisdiction over *any relevant entity* in New York." *Christie*, 2024 WL 2387513, at *3 (emphasis in original).

**No Specific Jurisdiction.** Plaintiffs also argue PDD Holdings is subject to specific jurisdiction in New York under various provisions of CPLR 302(a). MTD Opp. 30-35. Their arguments fail because PDD Holdings does not do business or otherwise have any sufficient contacts with New York.

*First*, as to CPLR 302(a)(1), Plaintiffs must show that "(1) the defendant … 'transacted business within the state,' either itself or through an agent, and (2) the cause of action 'must arise from that business activity.'" *Mednik v. Specialized Loan Servicing, LLC*, 2021 WL 707285, at *4 (E.D.N.Y. 2021). Plaintiffs do not identify a single action directed by PDD Holdings toward New York that satisfies this test. *See* Zhang Decl. ¶ 12 ("PDD Holdings has never directed any sale of products or advertising toward New York or the U.S., solicited any business in New York, sold any products or services or shipped any products to New York or the U.S.").

At most, Plaintiffs try to allege business activities directed *at the global or United States market*, without specifying any efforts directed specifically to New York. MTD Opp. 31-32 (relying on PDD Holdings' statement that "we launched Temu, *a global online platform* that brings together consumers, merchants, manufacturers and brands around the world"); *id.* at 33 ("PDD Holdings promoted Temu through Super Bowl ads it ran *across the U.S.*, including in New York."). That does not suffice because CPLR 302(a) requires that contacts be directed at New York specifically. *See Donner v. DER SPIEGEL Gmbh & Co. KG*, 2024 WL 4035215, at *6 (S.D.N.Y. 2024) (rejecting specific jurisdiction where there was no evidence that defendant's conduct was "purposefully directed to New Yorkers rather than a nationwide audience"); *Ainette*, 2021 WL 3371037, at *10 (rejecting allegations based on defendant targeting "the entire United States market"). At bottom, as in *Ainette*, "Plaintiffs have not made any evidentiary showing that [PDD Holdings] engaged in any conduct purposefully directed at New York," while PDD Holdings "has come forward with evidence, in the form of declarations by persons with knowledge, that it has no office in New York, does not pay taxes or own property here, and has neither solicited business in, nor sent employees to, this State." 2021 WL 3371037, at *10. "In the face of these unrefuted statements," Plaintiffs cannot establish jurisdiction here. *Id.*

*Second*, Plaintiffs do not satisfy CPLR 302(a)(2), which requires that the foreign defendant committed a "tortious act within the state." Because Plaintiffs identify no act that PDD Holdings undertook within New York, they cannot establish jurisdiction under CPLR 302(a)(2). *See supra* at pp. 15-18; *see also Thackurdeen v. Duke Univ.*, 660 F. App'x 43, 46 (2d Cir. 2016) ("[A] defendant's physical presence in New York is a prerequisite to jurisdiction under § 302(a)(2) … [b]ecause physical presence is lacking here, so is jurisdiction under § 302(a)(2).").

*Third*, under CPLR 302(a)(3), Plaintiffs "must establish harm within New York State caused by [PDD Holdings' alleged] tortious conduct" and also must show that PDD Holdings either (i) "regularly does or solicits business" there, or (ii) "expects or reasonably should expect the act to have consequences in the state." *A.W.L.I. Grp., Inc. v. Amber Freight Shipping Lines*, 828 F. Supp. 2d 557, 571 (E.D.N.Y. 2011). Plaintiffs do not satisfy these elements, as they do not identify any specific conduct by PDD Holdings directed at New York specifically (*see supra* at pp. 15-18) and certainly do not identify any specific injury caused by such conduct.[13]

**No Jurisdiction Under Rule 4(k)(2).** Finally, Plaintiffs assert that PDD Holdings is subject to jurisdiction under Rule 4(k)(2). MTD Opp. 40. In the case of foreign parents whose contacts with the United States allegedly hinge on an affiliated corporation (here, Temu), "courts require sufficient allegations of interdependence to find a prima facie case of jurisdiction under Rule 4(k)(2)." *Stutts*, 465 F. Supp. 2d at 166. Plaintiffs ignore this rule and rely entirely on the convenience to PDD Holdings of litigating in this forum, but that is irrelevant because they fail to show sufficient contacts with the U.S. as a whole or interdependence. PDD Holdings has no

---

[13] As for whether an alleged injury occurred in New York, courts look to the "location of the original event which caused the injury, not the location where the resultant damages are felt by the plaintiff." *Twin Beauty LLC v. NR Interactive LLC*, 2024 WL 5108153, at *6 (E.D.N.Y. 2024). Plaintiffs identify no relevant acts by PDD Holdings in New York that could be the "original event" of any injury, because PDD Holdings has no contacts with New York. *See supra* at pp. 15-18; *Twin Beauty*, 2024 WL 5108153, at *7 (rejecting jurisdiction under CPLR 302(a)(3) where "[n]one of those events occurred in New York").

significant relationship with the U.S., and SEC filings and discrete contracts are insufficient to show otherwise. *Supra* pp. 15-18; *see Jerge v. Potter*, 2000 WL 1160459, at *5 (W.D.N.Y. 2000) (Rule 4(k)(2) does not apply where "[the foreign parent] invests in and owns several corporations within the United States but does not directly operate any of such entities"). Plaintiffs likewise fail to allege interdependence between the companies. MTD 25-27; Zhang Decl. ¶¶ 11-24.

### C. Jurisdictional Discovery Is Not Warranted

Plaintiffs seek jurisdictional discovery to develop their theory that PDD Holdings has sufficient contacts with New York. MTD Opp. 41. No such discovery is warranted. Plaintiffs' jurisdictional arguments depend solely on (i) mischaracterized snippets of PDD Holdings' public filings and (ii) attempts to impute a subsidiary's actions to its parent. MTD 24-30; *supra* § III.A.-B. These theories are factually incorrect, as they are refuted by the Zhang Declaration, and they also have been rejected by courts as insufficient as a matter of law. *Supra* § III.A.-B. Plaintiffs state no basis for delving into a foreign entity's corporate records to support such legally and factually flawed theories. *See Linde v. Arab Bank, PLC*, 262 F.R.D. 136, 146 (E.D.N.Y. 2009) ("While it may be difficult for Arab Bank to establish jurisdiction over IDB without the benefit of discovery, this is but the consequence of seeking discovery from a nonparty 'foreign corporation that has carefully structured its business so as to separate itself from the operation of its wholly-owned subsidiaries in the United States.'").

## CONCLUSION

The Non-Users' claims and all claims against PDD Holdings should be dismissed.

Dated: February 18, 2025

Respectfully submitted,

*/s/ Serrin Turner*
Serrin Turner
Matthew Valenti
Hadrian Luo
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, New York 10020
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
Email: serrin.turner@lw.com
matthew.valenti@lw.com
hadrian.luo@lw.com

*Attorneys for Defendants Whaleco Inc. d/b/a Temu and PDD Holdings Inc.*